IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

PHHHOTO Inc.

        *Plaintiff,*

    v.

Meta Platforms, Inc. f/k/a Facebook, Inc.
and DOES Nos. 1-7,

        *Defendants.*

Case No. 1:21-cv-6159

## **COMPLAINT**

1.      In 2012, a group of entrepreneurs and engineers—Champ Bennett ("Bennett"),

Omar Elsayed, and Russell Armand (collectively, the "founders")—set out to build an app that

would create opportunities to capture moments in a format as expressive as video but as easy as a

point-and-shoot camera. The result was Phhhoto, launched in 2014, which went beyond

photography and aimed to create a social network that would give people opportunities to share

their lives in ways they had never seen before. No format such as Phhhoto had ever existed. The

Phhhoto app captured five frames in a single point-and-shoot burst and linked them together into

a looping video, animating a still picture and making the subject come alive. The burst created a

short video called a "phhhoto." Users could post their phhhotos on Phhhoto's internal social

network or share phhhotos on Instagram.

2.      As described by TechCrunch (a leading online publication for startup and

technology news), "with quick app-switching to Instagram and integration with other social

media, the [Phhhoto] app seems like one of the many natural successors to our ingrained Instagram behavior."

3.     Phhhoto's technology formed the kernel for a *new* social network. Phhhoto could be described as an "instant animated camera." It was billed as "quicker than video, better than stills," and it offered users the ability to add filters to their phhhotos. The resulting short video allowed users to take and exhibit photography in a completely new way. Phhhoto was free to download, simple and easy to use, and available for both iOS and, by late 2015, Android devices. And Phhhoto provided a platform for social networking by enabling users to share their phhhotos to their social media accounts.

4.      One early adopter of Phhhoto was Mark Zuckerberg ("Zuckerberg"), the CEO of defendant Meta Platforms, Inc, then known as Facebook, Inc. ("Facebook"). On or about August 8, 2014, Zuckerberg downloaded and installed the app onto his phone, entered the phone number of his device into the Phhhoto app, created a personal account, and posted a profile picture of himself (reproduced below) to his new Phhhoto account.



5.     Zuckerberg was not the only Facebook executive to take notice of Phhhoto, create an account (as reflected in the profiles below), and do reconnaissance. On or about December 20, 2014, Kevin Systrom, formerly the co-founder and CEO of Instagram, and at that time the head of Facebook's Instagram business unit, followed Zuckerberg's lead, downloading the Phhhoto app from the Apple App Store and creating an account. Thereafter, Facebook employees Bryan Hurren ("Hurren"), John Barnett, and Christine Choi, among others, followed suit, all creating Phhhoto accounts, with several posting their pictures, and exploring Phhhoto's features.



6.     The new Phhhoto application soared in popularity. Phhhoto had fewer than 500,000 Monthly Average Users ("MAUs") in early 2015, but that number grew to approximately 3.7 million MAUs at its peak.

7.     Users increasingly posted photographic content made with the Phhhoto app onto Instagram and Facebook so that their followers could see that content in their "feeds." Early on, the well-known songwriter and record producer staged-named Diplo contacted the fledgling company, unsolicited, to make an investment. Indeed, famous celebrities including Beyonce, Katy Perry, Miley Cyrus, Joe Jonas, Crissy Teigen, Bella Hadid, and Shawn Mendes began to

use Phhhoto without being solicited or compensated. They created their own content using the app and posted that content to their Instagram accounts. The press took notice of Phhoto's early success and adoption.

8.      So compelling was Phhhoto's technology and content, and so popular was its application, that Hurren, then Facebook's Strategic Partnerships Manager, reached out to Phhhoto, asserting that Phhhoto was "really awesome."  Hurren first offered to incorporate Phhhoto's technology into the Facebook Messenger service. When Phhhoto declined, Hurren offered to incorporate Phhhoto's content into Facebook's users' Newsfeeds. Phhhoto invested heavily in this project, but ultimately Hurren did not move forward, citing internal "legal conversations" that "hung" the project up.

9.      Instead, Facebook and Instagram embarked on a scheme to crush Phhhoto and drive it out of business. Among other anticompetitive acts directed against Phhhoto, Instagram withdrew interoperability previously provided to Phhhoto, changed Instagram's longstanding third party content attribution rules to Phhhoto's detriment, and introduced—with the anticompetitive intent and effect of harming Phhhoto rather than otherwise benefiting Facebook or Instagram—a market clone that copied feature-by-feature the Phhhoto product. The injurious intent and effect of these actions was not known to, and indeed concealed from, Phhhoto at the time.

10.      The anticompetitive campaign culminated in a change in the way that Instagram displayed content in its own users' feeds which had the intent and effect of suppressing Phhhoto content. Instagram affirmatively concealed the nature of its change and even published misleading statements about the change. Despite Phhhoto's diligent efforts to identify and understand the effect of Facebook's actions on Phhhoto, Phhhoto did not become aware of the

true nature of the change in Instagram's user feeds until late October 2017, and only then by sheer serendipity. Indeed, Phhhoto did not become aware of Facebook's overall campaign against competitors, nor of Mark Zuckerberg's personal involvement in and direction of that campaign, until the release of internal Facebook documents by the UK parliament in December of 2018.

11.     The actions of Facebook and Instagram destroyed Phhhoto as a viable business and ruined the company's prospects for investment. Lacking investment or any other means to remain viable, the company shut down its operations in June 2017. Phhhoto failed as a direct result of Facebook's anticompetitive conduct. But for Facebook's conduct, Phhhoto was positioned to grow into a social networking giant, similar in size, scope, and shareholder value to other social networking and media companies with which Facebook did not interfere.

## CONTENTS

I.   PARTIES .................................................................................................................. 8

   A.   Plaintiff .......................................................................................................... 8

   B.   Defendants ...................................................................................................... 8

II.  JURISDICTION & VENUE ..................................................................................... 9

III. ANTICOMPETITIVE CONDUCT ........................................................................ 10

   A.   How Facebook achieved market domination through its initially "open" platform. ........ 10

   B.   Phhhoto launches an innovative platform for photo-taking, photo-sharing, and social
         networking. .................................................................................................................. 13

   C.   Facebook targets, and ultimately crushes, Phhhoto. .......................................... 16
         1.   Phhhoto's and Facebook's failed effort to integrate the newsfeed. ............... 16
         2.   Facebook cuts off Phhhoto's access to Instagram's API. ............................. 18
         3.   Facebook blocks #Phhhoto from being pre-populated in Instagram posts. ......... 19
         4.   Instagram clones Phhhoto and releases the copy as Boomerang. .................... 21
         5.   Instagram updates the newsfeed algorithm -- and suppresses Phhhoto's posts. ...... 22
         6.   Phhhoto discovers Facebook's fraud. ........................................................ 24

   D.   As a result of Facebook's fraudulent and anticompetitive conduct, Phhhoto could not
         survive. .......................................................................................................................... 27
         1.   Facebook's anticompetitive conduct rendered Phhhoto unfundable. ................ 27

   E.   Phhhoto learns that Facebook's conduct was part of an anti-competitive scheme to crush
         competitors. .................................................................................................................. 30

IV.  RELEVANT MARKET ........................................................................................... 31

   A.   The market for personal social networking services .............................................. 31

   B.   Geographic market ............................................................................................ 33

V.   MARKET POWER .................................................................................................. 34

   A.   Facebook's market share demonstrates its monopoly power. ................................ 34

   B.   Direct evidence demonstrates Facebook's monopoly power. .................................. 35

   C.   Facebook's network has developed strong and durable network effects. .................. 36
         1.   Facebook's network effects constitute significant barriers to entry. .................. 36
         2.   Market entrants lack the data necessary to attract advertisers. ........................ 38
         3.   Facebook also benefits from cross-side network effects. ................................. 38

VI.  INJURY AND COMPETITIVE HARM .................................................................. 40

   A.   Injury to Phhhoto ............................................................................................. 40

   B.   Harm to Competition ......................................................................................... 41
         1.   Harm to Consumers ................................................................................... 41
         2.   Harm to Advertisers ................................................................................... 42

VII. ACCRUAL OF CLAIMS ......................................................................................... 43

A.    Fraudulent Concealment ................................................................................. 43

B.    Continuing Violations and Ascertainment of Damages.................................. 44

VIII.    CAUSES OF ACTION ........................................................................................ 45

A.    Count One: Unlawful Monopolization (Monopoly Maintenance) in the Personal Social Networking Services Market – Section 2 of the Sherman Act, 15 U.S.C. § 2 ....................... 45

B.    Count Two: Fraud ........................................................................................... 46

C.    Count Three: Violation of New York General Business Law §349 ................ 47

D.    Count Four: Unfair Competition ................................................................... 48

IX.    PRAYER FOR RELIEF....................................................................................... 49

X.    DEMAND FOR JURY TRIAL ............................................................................ 50

I.      **PARTIES**

      A.      **Plaintiff**

12.     Plaintiff PHHHOTO Inc. ("Phhhoto") is a Delaware corporation with its principal place of business in Brooklyn, New York. Phhhoto was launched in 2014 by Omar Elsayed, Champ Bennett, and Russell Armand as a social networking application built around pathbreaking camera phone technology that permitted users to photograph a series of integrated photos in a single point-and-shoot burst, and then share those "phhhotos" on the Phhhoto platform or other social networking applications. At the height of Phhhoto's popularity, the application engaged 3.7 million monthly and 1.3 million daily active users.

      B.      **Defendants**

13.     Founded by Mark Zuckerberg in 2004, Defendant Meta Platforms, Inc. ("Meta") is a publicly traded company, incorporated in Delaware, with its principal place of business at One Hacker Way in Menlo Park, California. On October 28, 2021, Facebook, Inc. ("Facebook") changed its name to become Meta Platforms, Inc. For ease of reference, Defendant Meta is referred to throughout this Complaint by its corporate name at the time of the conduct and prior to its rebranding, "Facebook."

14.     Facebook is a social media platform that provides online services to an estimated 3 billion users worldwide. Facebook operates as a platform wherein third-party applications and hardware interoperate with its main social media applications—Facebook and Instagram. Facebook owns and operates several business divisions, including:

      a.    <u>Facebook</u>. Facebook's core application for personal social networking services, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other" and contains a "News Feed" that displays an

algorithmically ranked series of content, including a wide range of media and
updates regarding the activities of the user's social connections and individually
targeted advertisements.

b. Messenger. Facebook's Messenger is a multimedia messaging application, allowing
users to send messages that include photos, videos, and file attachments from
person to person across platforms and devices.

c. Instagram. Instagram is an application for personal social networking services that
allows users to share photos, videos, and messages on mobile devices. Facebook
acquired Instagram in April 2012. Facebook and Instagram are highly integrated.

15.     In exchange for providing services, Facebook collects user data, which it uses to
create and provide targeted advertising services. Facebook's principal revenue is from the
targeted advertising that it sells to advertisers. In 2019, Facebook collected $70.7 billion in
revenue, almost entirely from allowing companies to serve ads to its users.

16.     Facebook has over 50,000 employees and maintains offices worldwide.

17.     Doe Defendants 1–7 are other individuals or entities who acted in concert and
conspiracy with, or engaged in or abetted the unlawful conduct by Facebook that is set forth in
this Complaint. Plaintiff intends to amend or seek leave to amend this Complaint upon learning
the identities of these Doe Defendants.

## II.    JURISDICTION & VENUE

18.     This action arises under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2),
New York General Business Law § 349, and New York common law.

19.     Facebook is engaged in activities that substantially affect interstate commerce. It
provides personal social networking services throughout the United States and sells advertising

in connection with these services throughout the United States. The conduct involved in this action took place in interstate commerce.

20.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over the state statutory claims as well as common law fraud and unfair competition claims presented in this action under 28 U.S.C. § 1367.

21.     Venue is appropriate in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c). Facebook transacts business within this judicial district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district.

22.     This Court has personal jurisdiction over Facebook because the unfair business practices, fraud, and unlawful maintenance of monopoly power alleged in this Complaint caused injury to persons throughout the United States, including to Phhhoto in this district. Facebook also transacts substantial business in this district.

## III.    ANTICOMPETITIVE CONDUCT

### A.    How Facebook achieved market domination through its initially "open" platform.

23.     Facebook's history is a prelude to its anticompetitive scheme. Facebook began in 2004 as a social networking desktop application. The first Apple smart phone was not released until 2007, so for the first several years of its existence, Facebook had no efficient way to present and promote itself to potential users, and potential users had no efficient way to access and use the Facebook application other than through the desktop browser, a market dominated by Microsoft. Microsoft could have cut off user access to Facebook at any time and killed the nascent company "in the cradle."  In recognition of his need to curry and maintain favor with Microsoft, Zuckerberg in 2007 sold Microsoft $240 million of Facebook's stock.

24.     In 2007, Zuckerberg also decided to transform Facebook from a simple application into a "platform" by releasing services, tools, and products for third-party developers to create their own applications and services that interoperated with Facebook. According to Zuckerberg, the platform approach was designed to increase Facebook's usage, so that people would "share everything they want, and do it on Facebook," while recognizing that "[s]ometimes the best way to enable people to share something is to have a developer build a special purpose app or network for that type of content and to make that app social by having Facebook plug into it."

25.     In 2010, Instagram launched as a photo- and video-sharing application on the Apple iPhone, and in 2011, Instagram was transformed into a platform for interoperation with third-party applications. In 2012, Facebook bought Instagram for $1 billion, meaning that Facebook thereafter owned and controlled the two largest social networking platforms, Instagram and Facebook itself.

26.     Facebook implemented a series of innovations that fomented interconnectivity between and among itself, users, third parties, and advertisers. Facebook's launch of the "Facebook Platform" in 2007 allowed open "APIs" (or "application programming interfaces"): digital tools that allow different applications to share data and functionality with one another. The Facebook Platform allowed third parties and app developers to create apps that interoperated with Facebook. By enticing app developers toward interoperability, Facebook advanced its platform growth to its benefit. By May 2013, over 10 million apps and websites were integrated with Facebook through APIs.

27.     Facebook was explicit in its initial desire to integrate with other app developers, stating that it "welcome[d] developers with competing applications" to build on Facebook's

platform. Facebook designed its platform specifically so that third-party applications could interoperate with Facebook, or, as Facebook described it, "third-party developers are on a level playing field with applications built by Facebook."

28.     As part of its own initial interoperability goals, in 2011 Instagram adopted iPhone Hooks, which gave users the ability to share photos taken on their iPhones and through other third-party applications directly to Instagram. Users could hook into Instagram seamlessly through third-party apps, so that photos could be instantly passed from the third-party app directly to Instagram's "publish" screen for posting, and they could include a hashtag identifying the developer of the content.

29.     With the app developer thus identified in the hashtag, users could find the developer's app in the app store and download it for their own use. By adopting these features, Instagram helped prevent the platform's loss of developers to competitors who had adopted them. As a senior Instagram executive told the press in 2011, Instagram "wanted to make it easier for other iPhone-apps (and iPhone web-apps) to hook into Instagram to open a particular item or post a photo through our app."

30.     The decision to run Facebook and Instagram as platforms that interoperated with third party apps was intentional, as interoperability would spawn creative development by third parties and increase engagement with both apps. And third-party developers relied on Facebook's promises of interoperability when developing new apps, knowing Facebook and Instagram would be primary platforms for sharing content.

31.     Facebook's open-platform strategy enabled it to acquire and maintain substantial market power (which it would later use to exclude competitors by "closing" the platform). Facebook bragged to its advertising clients about Facebook's dominance, noting that Facebook

12

itself was "now 95% of all social media in the U.S." A 2016 survey would confirm that Facebook was the most widely used social network in the U.S., with 78% of respondents using the platform at least once per month.

**B.      Phhhoto launches an innovative platform for photo-taking, photo-sharing, and social networking.**

32.      Phhhoto entered the market in 2014 as an innovative and creative platform, with more edge and room for creativity than Instagram. It appealed directly to Generation Z, at the same time that Instagram was becoming stale and younger users were losing interest in that platform. Phhhoto was more than just a camera; Phhhoto was described as a "powerful tool that makes your pics look more enhanced by providing lots of new filters and widgets."

33.      And Phhhoto's differentiation extended beyond its innovative camera to reflect the app's human-centered design ideology. Phhhoto strove to, and did in fact, build communities that could fluidly transition between virtual reality and the real world. For example, Phhhoto featured an entirely human-powered discovery section, called WOW, which aimed to enfranchise its user community by inviting influential users to co-curate the WOW feed with Phhhoto staff. Together with Phhhoto staff, talented Phhhotographers would identify and highlight the best and most innovative phhhotos on Phhhoto's WOW feed—creating community and spurring artistic expression.

34.      Phhhoto differentiated itself from Instagram and Facebook to become exactly what Zuckerberg feared in competitors, a new "mechanic"—that is, a new way to connect and interact with users in a manner sufficiently innovative from what already existed. By 2014 users were primed for social networking and photo-sharing, and Phhhoto offered a different take in a world that was increasingly dominated by photography.

35.      Almost as soon as it launched on July 7, 2014, Phhhoto's popularity exploded. It

garnered nearly 20,000 new user registrations per day by October of that year. For context, Looksery, a real-time face-filtering/modifying app founded in 2013 and launched in June 2014, had gained 3 million users as of September 2015 (an average of fewer than 7,000 new users per day) before it was acquired by Snapchat for $150 million.

36.    Additionally, Phhhoto's DAU/MAU—the ratio of daily active users to monthly active users—was high at 40%. DAU/MAU is an indicator of a strong app because a high percentage of monthly active users returning on a daily basis suggests high "stickiness" of users who are regularly engaged with the app. This is particularly important to potential advertisers. DAU/MAU exceeding 30% is generally considered excellent, and by comparison to other applications at the time, Phhhoto's 40% DAU/MAU was a strong indicator of success.

37.    Phhhoto grew large and fast—by 2016 reaching 10 million registered users and 1.3 million daily active users, who created 400 million images using the app's feature Phhhoto camera. Indeed, Phhhoto's new-user growth rate exceeded that of Snapchat and even Instagram. Phhhoto's cohort retention—a metric that considers retention for users who join in the same month—was increasing too. In January 2016, more recent Phhhoto users had greater user engagement after three months (43%) than their earlier cohorts (20-30%). Phhhoto was thus attracting increasingly engaged users of the platform.

38.    Phhhoto was distinguished by innovation, and users responded with continuing engagement. Phhhoto continued to introduce new features, including "filters," which provided users with editing tools (in December 2014); a "people section" that allowed users to connect with their friends and discover new ones through the app (in January 2015); "daily filters," by which Phhhoto's editing tools began changing on a daily basis (starting in September 2015), to allow users to curate a personalized aesthetic by collecting the filters (for example, filters would

have a theme pertaining to upcoming holidays and other special events); and "Party" (in December 2015), which allowed users to share messages and phhhotos in small groups.

39.     As shown in the slide below, taken from a Phhhoto presentation to potential investors, with new features came more frequent engagement by users with the app. The value that users obtained from Phhhoto grew, and Phhhoto's DAU/MAU ratio also grew, to its 40% level indicative of very high engagement.



40.     As Facebook had intended to turn Instagram into a platform with interoperability with the third-party apps, Phhhoto relied on Instagram and to a lesser extent, Facebook, to attract new users. Phhhoto acquired the great bulk of its new users through word of mouth. Individuals would see phhhotos posted by their friends on Instagram, which would introduce them to the unique and compelling format and entice the users to download and start using Phhhoto. Without the initial visibility provided through the Instagram or Facebook platforms, Phhhoto would not

have an obvious way to attract new users. Likewise, if users stopped seeing phhhotos posted in their Instagram or Facebook newsfeeds, they would also be less likely to continue using phhhotos themselves.

### C.    Facebook targets, and ultimately crushes, Phhhoto.

41.    Beginning sometime in 2015—although it was not known to, and indeed was concealed from, Phhhoto at the time—Facebook began to target Phhhoto with fraudulent, anti-competitive, and unfair business practices.

### 1.    Phhhoto's and Facebook's failed effort to integrate the newsfeed.

42.    At its inception, Phhhoto had a mutually beneficial relationship with Instagram. Phhhoto's unique concept, significant user engagement, and overall consumer appeal meshed perfectly with Instagram's brand and platform for sharing photos and videos. As more users engaged with Phhhoto and posted phhhotos to Instagram, more users engaged with Instagram—and vice versa. The continued user engagement in both platforms reinforced strong network effects for both companies.

43.    Facebook, however, had not yet implemented native support for the graphics interchange format (commonly called "GIFs"). Yet Internet users had a growing appetite for communicating using video and GIFs and, by then, were virally circulating GIF content on other major web platforms like Twitter, Tumblr, and Reddit, which had implemented support for the looping image format in prior years.

44.    It was in this environment that Facebook's Hurren reached out to Bennett at Phhhoto in early February 2015 to discuss a potential integration. Hurren had authorization to contact Phhhoto from Ime Achibong, Director of Product Partnerships, and a known "right-hand man" to Zuckerberg. In an email on February 1, 2015, Hurren said: "potentially interesting platform integration opportunity for you. In particular, I'd like to discuss Phhhoto – It's really

awesome."

45.     That "platform integration opportunity" was for Phhhoto to develop a standalone application that would enable Phhhoto's moving images camera to work within the Facebook Messenger app. The project Facebook proposed would require Phhhoto to dedicate several months of effort and to alter its entire tech-development strategy. For all that the effort required, Phhhoto would come up empty-handed: Facebook intended the tool ultimately to exist only on *its* platform, entirely outside of Phhhhoto. Phhhoto declined the engagement on February 5, 2015.

46.     After Phhhoto declined Hurren's first offer, Hurren reached out again. He explained that Facebook was proposing to integrate Phhhoto into the Facebook newsfeed. This was a significant opportunity for Phhhoto. Phhhotos had previously only appeared in their native format in the Instagram newsfeed. Integration with Facebook's newsfeed would mean that users could post phhhotos to the Facebook newsfeed directly through the Phhhoto app.

47.     Phhhoto's Bennett was excited about the idea, and Phhhoto offered to take the lead on the technical integration. Expanding to Facebook's newsfeed potentially was beneficial for both companies: Phhhoto users would be able to expand the reach of their posts by readily accessing Facebook's newsfeed through the Phhhoto app. And Facebook would benefit by expanding its user engagement, particularly among younger audiences.

48.     However, Facebook strung Phhhoto along for months without making meaningful progress on the supposed integration that Facebook itself had proposed. Following Phhhoto's completion of the technical integration, Hurren told Bennett that "we're hung up on some legal conversations."  Later, after Hurren had indicated that Facebook was ready to implement the integration, Phhhoto prepared by increasing the number of servers to prepare for the anticipated

load. The integration did not occur, and Facebook never responded to Bennett's subsequent inquiries into whether Phhhoto could help move it along.

49.     Around the same time, Facebook was working with other third parties on similar newsfeed integration. Unlike Facebook's interactions with Phhhoto, other partners in this rollout, such as GIPHY, were provided with support and information they needed to make the integration a success. After the integration, GIPHY's content was displayed correctly in the newsfeed. In 2020 Facebook acquired GIPHY for a reported $400 million.

50.     Ultimately, Phhhoto was never able to have its posts integrate into the Facebook newsfeed. Instead, Facebook undermined its own proposed collaboration and abandoned support for the partnership.

### 2.     Facebook cuts off Phhhoto's access to Instagram's API.

51.     On March 31, 2015, while Hurren and Bennett were discussing Facebook's proposed newsfeed integration, Instagram suddenly withdrew Phhhoto's access to the Instagram Find Friends API, which had allowed Phhhoto to access the Instagram friends list. Phhhoto had used the API since its launch the prior year. Phhhoto users could still save their phhhotos and publish them on Instagram's platform, but they no longer had the ability to recreate their social graph from Instagram—the world's top photo app. The withdrawal of the Find Friends API access would negatively impact how potential investors perceived Phhhoto.

52.     Cutting off Phhhoto's API access was done neither because the Phhhoto relationship was unprofitable to Facebook nor because Phhhoto had violated any Facebook or Instagram policies. Indeed, Facebook was reaching out to Phhhoto concerning business opportunities and expressed no concern about any violations of policy. Rather, access was withdrawn because Facebook viewed Phhhoto as a potential competitive threat.

53.     When Phhhoto lost access to the Instagram API, Bennett reached out to Hurren to see if there was someone at Instagram with whom he could speak to obtain more information about the "API permissions."  In their telephone conversation, Hurren explained that Instagram was apparently upset that Phhhoto was growing in users through its relationship with Instagram. However, that explanation left Phhhoto confused—given not only that Instagram had effectively solicited such an association through its adoption of iPhone Hooks, but also that Facebook continued (so it seemed) to work to incorporate Phhhoto into the Facebook newsfeed, and thus Facebook did not appear to have any such concern.

54.     Cutting off API access not only caused Phhhoto to lose access to the Instagram friend list, but also caused buggy features suggesting that the Phhhoto app was unstable. The result of cutting off API access was to reduce overall user engagement in both platforms. By permitting Instagram to cut off Phhhoto's access to Instagram's APIs, Facebook damaged a preexisting beneficial and profitable relationship, without any legitimate business justification for doing so.

### 3.     Facebook blocks #Phhhoto from being pre-populated in Instagram posts.

55.     At or about the time that Instagram adopted iPhone Hooks in 2011, providing interoperability with third-party apps such that users of those apps could hook seamlessly into Instagram to publish posts, Instagram also enabled pre-population of content with those posts. Posts from other apps could include attribution in the caption for the originating app (as well as the user's identity on the originating app). Twitter and even Facebook itself recognized the value of pre-populating with hashtags, by allowing it on their platforms through different back-end mechanisms. Instagram, likewise, did this to further encourage such third-party apps' interoperability with Instagram, and Instagram benefited because the features increased user

engagement with Instagram.

56.    From the feature's inception, Phhhoto used iPhone Hooks to pre-populate all phhhotos with a hashtag—#phhhoto—so that users viewing Phhhoto posts on Instagram would be aware of the phhhoto's origination. The hashtag also meant that if anyone searched for "#phhhoto" on Instagram, they would see all phhhotos posted publicly to Instagram. Users would take note of Phhhoto's popularity and infer that Phhhoto was an app worth trying. Users had the choice to remove the hashtag, and like any other Instagram post, to populate the post however they pleased. But as with other third-party app developers, pre-populating with #phhhoto was an important contributor to Phhhoto's growth because users would see the posts and learn about Phhhoto through Instagram.

57.    Despite this mutually beneficial relationship, on or about August 9, 2015, Instagram withdrew the ability to pre-populate #phhhhoto (or any other third-party pre-populated hashtag), but otherwise kept the features of iPhone Hooks. Instagram reported publicly that it implemented the change because it had "gotten feedback that the pre-filled captions coming though this sharing channel often feel spammy."

58.    Instagram's conduct, however, indicates that the professed "spammy" rationale was pretextual. Unlike "spam" messages, a pre-populated hashtag is not an unsolicited barrage of commercial pitches, but rather an identification in the caption along the margin that does not interfere with the content, but rather assists the Instagram user to find, download, and use the originating app.

59.    With pre-population of hashtags prohibited, an alternative encouraged by Instagram was for developers to use a watermark (which could include a hashtag identifier) for their content. Unlike a hashtag, however, embedding a watermark—something that users could

not remove—would disfigure or cover up content that would not otherwise be impacted by a hashtag. A watermark is an unsolicited commercial message, and it is more intrusive—and certainly more "spammy" than a hashtag located in the margin would be.

60.     By curtailing the use of pre-populated hashtags in favor of watermarks for third-party apps, Instagram harmed users as well. Not only would the watermark disfigure content, but a watermark cannot be searched in the way a hashtag can. Unlike a hashtag, a watermark does not allow users to simply click to see other content bearing the same hashtag.

61.     Although Instagram was thus handicapping content from Phhhoto as a third-party app, content originating on Instagram remained pristine of watermarks, and users may have assumed that unidentified pictorial content came from Instagram.

### 4.     Instagram clones Phhhoto and releases the copy as Boomerang.

62.     When Phhhoto's founders first launched Phhhoto, it was an iPhone-only app, but throughout September and October of 2015, Phhhoto prepared to launch for Android devices. The official launch date of Phhhoto for Android was set for October 22, 2015, and Phhhoto prepared the tech press for the news. To support its public relations plan, Phhhoto sent out embargoed press releases in advance of the launch; that way, the tech media would be ready to report on its announcement at the time the press embargo lifted.

63.     However, on the morning of October 22, 2015, only hours before Phhhoto's press embargo was to lift, Instagram also issued an announcement: it was launching the "Boomerang Video App," with John Barnett—an active Phhhoto user—as the project manager for the launch. Simply put, Boomerang was a slavish clone of Phhhoto. Fstoppers, a popular photo blog, asked why Instagram continued to create "exact copies of already existing apps."

64.     On information and belief, Instagram released Boomerang not because it

anticipated doing so would attract additional users to Instagram, but rather because Instagram perceived and intended Boomerang as a means to injure Phhhoto and exclude it as a competitive threat.

65.     Instead of the active press that Phhhoto anticipated with the launch of Phhhoto for Android, it received little press, and what press it did receive featured Boomerang.

66.     After Boomerang's launch, while Phhhoto's growth rate slowed somewhat, it still continued to grow, *i.e. to* gain new users and secure daily user engagement.

### 5.   Instagram updates the newsfeed algorithm -- and suppresses Phhhoto's posts.

67.     Since its inception, Instagram had displayed posts in reverse chronological order, so that the newest posts would appear first in a user's feed. In March 2016, however, Instagram changed this order of posts that users would see in their feeds, announcing that it would henceforth display posts in user's feeds according to an undisclosed algorithm, which was purported to show users the posts most important to them first. In reality, the change surreptitiously suppressed Phhhoto's visibility, a fact that was concealed by pretextual explanation and would not be known to Phhhoto until Bennett, by sheer chance, saw one of his posts disappear from his screen in late 2017.

68.     When announcing the algorithmic change in 2016, which was widely reported in the press, Instagram stated:

> The order of photos and videos in your feed will be based on the likelihood you'll be interested in the content, your relationship with the person posting and the timeliness of the post. As we begin, we're focusing on optimizing the order — all the posts will still be there, just in a different order.

69.     It was certainly possible to design an algorithm that could display posts in a more desirable (to users) order than a chronological feed, and some other applications had moved to

algorithmic feeds for just this reason. Accordingly, the change to an algorithmic feed by Instagram did not suggest anticompetitive conduct by Instagram, and it did not raise any reasonable inference of nefarious activity. Nor was any even suggested in the press at the time. Indeed, Instagram's CEO Systrom played down the change, saying that "[i]t's not like people will wake up tomorrow and have a different Instagram."

70.     Such a change, if actually implemented as Instagram had described, would have been welcomed, as it should have benefited Phhhoto—a highly popular app with incredibly engaged users, as its metrics demonstrated. The change should have meant that Phhhoto posts would be "bumped up" in the newsfeed, enhancing Phhhoto's visibility and user engagement. But that's not what happened.

71.     Moving to an algorithmic newsfeed gave Instagram the ability to choose which posts users would see most prominently and which posts would be buried at the end of feeds by coding an algorithm to determine the order in which posts would appear. This change, which Instagram began to implement sometime between March 15 and April 1, 2016, gave Facebook the unchallenged ability to decide the extent to which users' content would be displayed prominently on Instagram.

72.     In April 2016, Phhhoto's new user registrations declined precipitously. User engagement also declined, but not so clearly at first. Users posted less content, commented less frequently, and shared or favorited content shared by others less frequently, too. From April 1, 2016 to May 1, 2016, Phhhoto's ranking among photo and video apps in the Apple App Store dropped from 11th place to 41st place. Phhhoto had never before experienced such a significant decline in its ranking, and Phhhoto's founders and engineers thought that something had gone wrong with the functioning of their app.

23

73.     For months after the metrics dropped in April 2016, Phhhoto's team worked tirelessly to figure out why Phhhoto was suddenly unpopular. They assumed at first that the problem was with their own code, so they spent months looking for issues, including running analytics to determine if Phhhoto had bugs that were causing the app to crash on users.

74.     Had Phhhoto known or been able to discover that the Instagram algorithm was suppressing Phhhoto posts, it could have taken action to prevent the collapse of the company. Instead of wasting time and effort looking for issues with the code, Phhhoto could have turned to the media, the courts, investors, or its community with an explanation and a plea for assistance.

75.     Facebook's suppression of users' posts of phhhotos thus stymied Phhhoto's prior organic growth. Phhhoto was deprived of visibility to potential new users on the Instagram platform, and its existing users were less likely to maintain engagement at prior levels when their content was not effectively disseminated.

### 6.     Phhhoto discovers Facebook's fraud.

76.     As Phhhoto's founders and engineers searched in vain for explanations for its precipitous downturn in new user growth and user engagement, the app became unattractive for financing, and its continued viability was doomed. In June 2017, Phhhoto shut down operations as a social networking application and its founders returned to work at their prior company, Hypno. And on October 25, 2017, Bennett sought to connect Phhhoto's remaining Instagram followers to Hypno, a company that provided camera platforms and interactive experiences for live events, retail, and attractions, but had little social media presence.

77.     To make this connection, Bennett sent Hypno promotional materials from the existing Hypno Instagram account to the small group of Hypno followers on Instagram, and then he sent the same promotional video from the old Phhhoto account to Phhhoto's followers.

However, Bennett never anticipated what would happen next: the post from the old Phhhoto account *vanished* from Bennett's own Instagram feed, which he should have received after sending it to himself, among others. On Bennett's personal account on Instagram, the post appeared in his own feed for an instant but then evaporated, as reflected in his astonished text message to colleagues: "I saw it for a split second – then it disappeared."

78.     Ultimately, Bennett's post had 100 views by the followers of the Hypno account, but only 36 views by the old Phhhoto followers, even though there were approximately *500 times* as many of them as there were followers on the new Hypno account—*i.e.*, barely one-third the views, instead of about 500 times as many, as logic and arithmetic would have predicted. The number of "like" acknowledgments was similarly skewed: identical content posted by the same user tagging the Hypno account was liked 50% more times than when tagging the old Phhhoto account. Within hours, it was evident that something was wrong: other Phhhoto followers, just like Bennett, were *not seeing* posts from Phhhoto's old Instagram account.

79.     Bennett then recognized the reason for Phhhoto's sudden user decline and engagement issues beginning in 2016. It was not the app or the code, but rather a concealed and purposeful *suppression* of Phhhoto's content. On information and belief, based upon Bennett's October 25, 2017 experience, Phhhoto's prior experience after the 2016 algorithm change, and later Instagram statements and media reports concerning the Instagram algorithm, Instagram in fact weighted and penalized a user's post (and user accounts it deemed offending) by lowering placement in other users' feeds if the post contained content from or created by Phhhoto.

80.     Facebook and Instagram *continued* to conceal that Instagram's 2016 algorithm was penalizing users by negatively weighting and suppressing their accounts and their posts that contained Phhhoto content. And Facebook did not treat its own properties and third-party apps

equally in weighting video content. Notably, after the 2016 implementation of the algorithm, as the suppression caused Phhhoto's growth and rankings in the Apple App Store to plummet, the rankings of Instagram's Phhhoto clone, Boomerang, *went up*.

81.     At a 2018 press conference explaining some basics of the algorithm, Instagram asserted that three main factors that influenced how users' posts would be displayed in the newsfeed: (1) interest—an algorithmic determination of what content users would be interested in based on past behavior; (2) recency—how recently a post was shared, prioritizing newer posts; and (3) relationship—providing a higher ranking to those posts with people who interact frequently. At the same time, Instagram *disclaimed* that it either hid posts in its newsfeed, engaged in shadowbanning (secretly banning or lowering the rank of a user's post), or favored a format (photo or video), except to the extent an individual was more likely to engage with a particular format.

82.     However, on September 21, 2021, the New York Times reported that Facebook did, in fact, manipulate and reorder posts and content in users' newsfeeds to benefit Facebook. The Times unearthed a secret Facebook scheme known as "Project Amplify."  The scheme was intended to favor content created by Facebook over third-party content by manipulating the order of content in users' feeds. The reporting confirms that Facebook developed precisely the type of content manipulation that Facebook had previously directed at Phhhoto. On information and belief, the Times' report is the first time that Facebook's manipulative and deceptive conduct with respect to users' newsfeeds and accounts has been publicly divulged. Prior to this time, Facebook had otherwise concealed such conduct through deceptive and dishonest statements.

**D.     As a result of Facebook's fraudulent and anticompetitive conduct, Phhhoto could not survive.**

**1.     Facebook's anticompetitive conduct rendered Phhhoto unfundable.**

83.     Ultimately, Facebook's anticompetitive conduct not only cast a shadow on Phhhoto, it also undermined Phhhoto's efforts to raise investment capital and prevented Phhhoto from obtaining the necessary funds to continue operating.

84.     Until the suppression algorithm, Phhhoto was still able to captivate new users and engage its community on a near-daily basis. It was the penalizing of posts containing Phhhoto's content that caused both new user registrations and active daily users to drop off substantially. However, Facebook's prior actions—including cutting off API access, the withdrawal of iPhone Hooks, and Instagram's release of Boomerang—nonetheless affected the press and potential investors.

85.     Phhhoto made multiple attempts to obtain funding to support the development and growth of the app. Its first two efforts were quite successful. In December 2014, Phhhoto closed a deal for its first round of funding, a convertible note, in anticipation of its seed round. Nearly a year later, in November 2015, Phhhoto announced the closing of its seed round.

86.     After securing early funding in December 2014 and November 2015, Phhhoto's rapid growth necessitated that it secure additional investments. Over a dozen top-tier venture capital funds responded to Phhhoto's inquiries and requested meetings with and presentations from the company to evaluate participation in Phhhoto's Series A round of funding. Many of the funds conducted significant analyses of Phhhoto's data.

87.     The data at this time represented exactly what investors were interested in seeing in the technology sector. Phhhoto had 900,000 Daily Active Users and 2.5 million Monthly Active Users as it embarked on the potential investor presentations. It was also the 200th most

popular app among all categories—and the 20th most popular app among all photo/video applications.

88.    Phhhoto's audience, too, was highly desirable to advertisers, further enhancing its investment profile: 75% of Phhhoto users were in the United States, 60% were female, 76% were between the ages of 13 and 24, and 17% were between the ages of 24 and 35, as highlighted in the investor pitch slide below showing Phhhoto's impressive organic growth.



Due to the nature of Phhhoto's business model, which would ultimately rely heavily on advertising revenue, such growth and demographic makeup of Phhhoto's audience were important for its ability to gain revenue from brands and businesses aimed at attracting younger audiences. These are key metrics used by venture capitalists when evaluating whether to invest in a company.

89.    Phhhoto suspected that Facebook's anticompetitive conduct in the market generally, and targeting of Phhhoto specifically, might cause investors to value Phhhoto at a lower level than would have been expected absent such conduct. Nevertheless, in light of comparable investments and valuations by venture capitalists, Phhhoto expected significant

investments from venture capitalists. Based on existing and projected growth, Phhhoto's valuation should have increased substantially in subsequent investment rounds—absent additional anticompetitive conduct by Facebook.

90.     Despite Phhhoto's impressive metrics and history of rapid growth and user engagement, and despite overwhelming initial interest, venture capitalists hesitated to invest at any valuation level. Several cited Instagram's conduct directly. Others wondered whether Phhhoto could sustain its growth in the future in light of Facebook's conduct. Nevertheless, many were intrigued with the investment opportunity that Phhhoto provided, and they asked Phhhoto to remain in contact and update its performance, as these potential investors continued to evaluate the situation.

91.     Once the algorithmic change in the order of posts in Instagram users' newsfeeds took effect around April 2016, the rate of Phhhoto's new user registrations plummeted, as did Phhhoto's user engagement metrics. The updated Phhhoto metrics showed that Phhhoto was rapidly failing as a company, despite its large number of registered users. Phhhoto's updated metrics would not support a case for Series A funding by top venture capitalists. Therefore, Phhhoto ceased its efforts to raise a Series A round of investment. To keep the company afloat, Phhhoto's founders instead tried to secure investors for another convertible note, in the form of an extension of Phhhoto's successful seed round. But as the effects of the Instagram algorithm continued, and as Phhhoto's metrics continued to decline, even this became impossible. Phhhoto's efforts to close the seed extension collapsed during the summer of 2016.

92.     Had Facebook not interfered with Phhhoto's growth as a social network, Phhhoto could easily be worth hundreds of millions of dollars today. For comparison, in 2021, Poparazzi, a far less popular photo-sharing app with 10,000 registered users and 100,000 photo uploads,

raised $20 million in a Series A round, and garnered a $135 million valuation. VSCO, a photo sharing app launched in 2011, reported 20 million monthly active users in April 2015 and currently sees between 5 and 10 million daily active users. It raised $90 million in two seed rounds, and it has a current valuation of $550 million.

93.    Without any hope of investment cash flow, Phhhoto's remaining option was to prematurely roll out ads. However, due to its lack of funding, Phhhoto also lacked the necessary resources to put together a proper advertising sales team, to do proper advertising integration, to obtain high-quality ad clients and to otherwise launch a successful advertising strategy at that stage.

94.    On June 20, 2017, as a direct effect of Facebook's fraudulent and anticompetitive conduct, Phhhoto became unable to sustain its application infrastructure and was forced to shut down the Phhhoto app. At the time of the shutdown, Phhhoto's founders knew neither the extent of their injuries, nor whether they had even in fact sustained antitrust injury. By this time, Phhhoto's 10 million registered users had created 400 million phhhotos. The Phhhoto team pivoted back into its parent company, Hold Still Inc., d/b/a Hypno, an experiential marketing business offering photo booths, a content platform, and other interactive camera experiences for retail and live events.

### E.    Phhhoto learns that Facebook's conduct was part of an anti-competitive scheme to crush competitors.

95.    A little over a year after the October 25, 2017 discovery of Instagram's algorithm having actually been suppressing Phhhoto's posts, governmental disclosures shed light on that action as part of a Facebook scheme of anticompetitive conduct. On December 5, 2018, the Digital, Culture, Media and Sport Committee of the U.K. Parliament, publicly released documents produced confidentially in *Six4Three, LLC, v. Facebook,* No. 4:16-06716 (N.D. Cal.

2016). This revelation provided the first link between Facebook's earlier actions toward Phhhoto (here, cutting off API access) as part of an exclusionary scheme with the algorithmic suppression discovered in late 2017. Phhhoto may not have been Facebook's only target, but it was undoubtedly an important one.

## IV.     RELEVANT MARKET

### A.     The market for personal social networking services.

96.     Facebook competes in, and has monopoly power in, the market for personal social networking services ("personal social networking" or "personal social networking services"). Personal social networking services are online services or platforms that allow users to develop and maintain social relationships with other people by sharing experiences in a digital social space. Personal social networking services are distinct from, and not interchangeable with, other online services in three significant respects.

97.     First, personal social networking services are built on a social graph that facilitates connections between users' friends, family, and other personal connections. A social graph is a digital representation of a person's relationships with other people. It allows users to connect with real world people—both those known in their personal lives, and those they do not know, such as friends-of-friends, or others who have similar interests, hobbies, or personal characteristics (such as background or religion). The social graph provides the foundation for users, enabling them to communicate, see updates from their connections, learn about connections' personal interests and activities, and find new connections. It also allows users to find new content and services that they might be interested in.

98.     Second, personal social networking services provide unique features that allow users to share information with their connections in the digital social space. One key feature of

personal social networking services is the ability to "broadcast" from one user to its connections and others. For example, a user can share a news story; post a photo from a vacation; share new, unique content created by novel applications; or announce the arrival of a new baby. This user-generated content is posted in a content feed where users see the broadcast posts from their connections in a running format. Connections can then engage with the user-generated content posted in a content feed, for example, by "favoriting," commenting, or sharing the content with their own social network. Users can also join together in virtual groups, such as those based personal interests ("Billy Strings Music Fans"), hobbies ("DC Family Biking"), or shared history ("PS 232 Class of 2004"). Users can create events and use the social graph to find attendees.

99.    Third, personal social networking services allow users to find and connect with others—individuals they know in person, or others that share interests or characteristics. The social graph facilitates these growing social connections by tracking user information and connecting users who may have an interest in connecting to one another.

100.    Personal social networking services differ significantly from, and are not interchangeable with, other types of online platforms, such as those used for business or interest-based connections, for video or audio consumption, or online messaging services. For example, Facebook and Instagram are distinct from LinkedIn, which is a specialized network designed with the specific purpose of creating and maintaining online professional connections. Users of Facebook and Instagram are not likely to substitute a personal social networking service for a specialized or narrow platform such as LinkedIn. Instead, users are likely to have accounts for both: one for personal social networking services, and one for professional endeavors.

101.    Personal social networking services are also distinct from, and not interchangeable with, platforms like YouTube, Spotify, or Netflix, each of which allows users to

32

consume media content, and in some cases, broadcast content, but lacks the personal connection integration that personal social networking services possess. Instead, users of such platforms predominantly consume content, but do not employ them as a means to communicate or connect with friends and family. Rather, users will consume the content generated on these platforms, and then share them with connections on Facebook and Instagram.

102.   For example, a YouTube user may use the Facebook plugin on a YouTube video to "like" the video and share it to their Facebook network directly through the YouTube site. A user may post to Twitter or Reddit and consume content posted by others who are typically individuals that the user does not know in real life. They may follow a politician on Twitter, join a conversation about ski vacations on Reddit, or gain ideas about home décor on Pinterest--all without interacting with a single friend or family member. On the opposite end of the spectrum, messaging services, such as WhatsApp or iMessage, allow users to connect with their existing networks, but do not rely on a social graph or shared space for users to find others with similar interests, connections or hobbies. Messaging services also lack the "broadcast" and content feed functions of personal social networking services, where users can publish their own updates to all connections, as well as view a running list of similar updates from all connections.

### B.   Geographic market

103.   The relevant geographic market is the United States. While Facebook has users worldwide, users themselves are still geographically limited. Network effects are stronger between people who are closer together, such as those living in the United States. Most users in the market for personal social networking services concentrate their connections predominantly to those in the same country. Facebook itself tracks performance of its products and those of its rivals by country, rather than on a global or regional basis. Accordingly, the relevant geographic

market is the United States.

## V.     MARKET POWER

104.    Monopoly power is the power to control prices or exclude competition. Market power can be inferred from a firm's large percentage share of the relevant market, or it can be proven directly through evidence of control over prices or exclusion of competition. Facebook has, at all relevant times, possessed monopoly power in the personal social networking services market through its Facebook and Instagram platforms.

105.    Facebook's monopoly power is shown in this case indirectly, by its overwhelmingly dominant share of the relevant market, as well as directly, including by evidence of its exclusion of competition. The personal social networking services market also has strong direct network effects, significant barriers to entry, and obstacles to switching ("high switching costs") that enable Facebook to enhance and maintain its monopoly power.

### A.     Facebook's market share demonstrates its monopoly power.

106.    Since at least 2011, Facebook has possessed a monopolistic share of the relevant market. Specifically, it has more than 200 million monthly users in the United States and approximately 3 *billion* users worldwide. Over 80% of internet users in the United States use Facebook regularly, and the share of the population using the platform is projected to keep growing. Even if one includes visits to all social media, not only personal social networking services, 71.8% of visits in the United States were to Facebook. On average, users spend in total more than 4 billion minutes per day using Facebook.

107.    Since 2012, Facebook has also controlled Instagram, which in 2020 had more than 138 million monthly users. On average, over 54% of U.S. internet users use Instagram each month. On average, users spend in total 1.5 billion minutes per day using Instagram.

108.    Since 2012, Facebook's share of time spent using apps providing personal social

networking services has consistently exceeded 80%, and it has averaged 92%. Likewise, Facebook's share of daily active users for personal social networking services has exceeded 70% since 2016, and its share of monthly active users has exceeded 65% since at least 2011.

109.    In terms of user hours, in 2016 users spent an average of 50 minutes daily on Facebook, Instagram, and Messenger—nearly twice the amount of time spent on Snapchat (25-30 minutes), more than three times as much as spent on YouTube (17 minutes), and 50 times the average spent on LinkedIn and Twitter (one minute each).

110.    Facebook also is dominant among mobile users of personal networking services. As of September 2019, the three most popular mobile apps for social networking were all within the Facebook family, with Facebook having nearly 170 million monthly users, and Instagram having 121 million monthly users. Facebook is the most-downloaded personal networking app on the Apple App Store in the United States.

111.    The next largest provider of personal social networking services in the United States is Snapchat, which in 2020 attracted 75 million users per month. However, users spent an average of 600 million minutes per day using the Snapchat service, a fraction of the time spent on Facebook and Instagram. No other platforms rival Facebook in the market for personal social networking services. Alternatives have failed to reach the same size or scale, or they have exited the market.

**B.    Direct evidence demonstrates Facebook's monopoly power.**

112.    Facebook's monopoly power is also demonstrated by its ability to prevent new entrants from entering the market, and by having prevented small companies from growing large enough to become competitors.  Facebook has been able to selectively deny potential competitors access to its platform, and accordingly extinguish them as potential competitors.

Facebook has also been able to enforce restrictive policies that deny potential competitors access to Facebook's massive user base.

113.    Further indicating its monopoly power, user engagement is not significantly affected when Facebook's conduct has caused significant user dissatisfaction. User dissatisfaction has been rampant in the face of regulatory attention and well-publicized scandals, yet Facebook has withstood these challenges without losing many users. Facebook's misuse and mishandling of user data and decreasing product quality also reflect Facebook's monopoly power.

**C.     Facebook's network has developed strong and durable network effects.**

**1.     Facebook's network effects constitute significant barriers to entry.**

114.    The market for personal social networking services faces high barriers to entry, which enhance the durability of Facebook's market power.

115.    The most important feature of a personal social networking service is the ability to engage a high number of users. When more users are engaged with a platform, users' posts and content can reach a broader audience, and users view more content from their larger network of connections, causing them to want to engage with the platform more frequently. This results in a "network effect," by which the value or utility of the service increases as more users use it. With personal social networking, high user engagement also attracts new users, as they do not want to miss connecting digitally with their network.

116.    New entrants in the market for personal social networking services must convince users that enough of their friends and family members will also engage with the social networking platform to make use of the platform worthwhile. Attaining this necessary critical mass of users is a substantial barrier to entry that can insulate a dominant platform from competitive threats, unless and until a competitor with innovative technology disrupts the

market.

117.    Relatedly, users of new competitors in the market for personal social networking services experience "high switching costs" in terms of the difficulty of migrating away from the dominant platforms, Facebook and Instagram. Users cannot take their posts and social networking history with them if they move to another platform. These impediments to switching are called "stickiness," a term Facebook's own executives developed and describe as: "The idea is that after you have invested hours and hours in your friend graph or interest graph or follower graph, you are less likely to leave for a new or different service that offers similar functionality."

118.    From the standpoint of a potential market entrant, enticing users to join a new platform is the first critical hurdle because users are reluctant to incur such high switching costs—which increase over time as users invest more in their social network. And to be successful, potential competitors must attract a critical mass of third parties to connect with the platform and enhance user experiences, as well as advertisers to monetize their endeavor. Thus, Zuckerberg recognized that the greatest threat to Facebook was not from an identical social networking platform—as demonstrated by the failure of Google+—but instead from a differentiated product that would be able to gain necessary scale quickly by offering users an innovative or distinctive way of connecting with friends and family.

119.    High barriers to entry also exist in the personal networking services market because Facebook has made it difficult for users to "multi-home" outside the Facebook family— that is, to use multiple different personal networking platforms to meet users' various personal networking needs. While users can create a post on Instagram and simultaneously share that post to both their Instagram and Facebook feeds, users cannot, by the same click of a "share" button, also share that image directly to Snapchat or Twitter.

120.    Likewise, while Facebook users can chat with friends in both their Instagram and Facebook networks from a single integrated platform, they cannot use Facebook's messaging platform to reach contacts or services outside the Facebook family, like iMessage, Telegram, or GroupMe. And Facebook has already begun an effort to integrate Facebook's WhatsApp messaging service as well, unifying the platforms of three of the most popular mobile social networking and messenger apps.

121.    Taken together, Facebook's suite of products make it unlikely that users will exit the Facebook ecosystem. Even if members of Facebook's network delete their Facebook profile, users may still remain active on Messenger, WhatsApp, or Instagram, allowing Facebook to continue to harvest data and target ads to those users. A new entrant with less scale than Facebook would lose all value of a user who ceased engagement with its platform.

### 2.    Market entrants lack the data necessary to attract advertisers.

122.    Strong network effects exist between Facebook and advertisers. As Facebook's network has grown, advertisers have become able to reach larger audiences with increasing precision due to the massive quantity of data that Facebook has accumulated on users, their friends, and their interests. Facebook can accumulate more data which translates to more highly targeted advertising, which increases the value of the ad-targeting services Facebook sells to firms and the profit Facebook earns from its advertising business. When Phhhoto had no choice but to try to launch an advertising strategy without the necessary resources, its attempt failed, including because it could not acquire top-tier advertisers that Facebook had. Facebook's power permits it to monetize its ads at a higher rate than a new entrant or advertising vehicle with less scale could.

### 3.    Facebook also benefits from cross-side network effects.

123.    A key element of Facebook's success has been its ability to engage third-party

app developers in creating programs that work directly in, or harmoniously with, Facebook and Instagram. Relatedly, websites, apps, and other forms of online media eagerly connect with Facebook/Instagram through plugins such as the ubiquitous "like" button that a user can click on almost any website. The ability of these third parties to integrate with Facebook creates strong network effects that would be difficult for a new market entrant to mirror.

124.    This third-party engagement likewise garners significant cross-side network effects—the value of a network that benefits from an increase in users on the other side of that network—that cannot be readily replicated by a new entrant. For example, through plugins and its open graph, third parties drive traffic to Facebook through their own apps or websites. This too creates a cycle which allows Facebook and Instagram users to view third-party content through Facebook, which drives traffic back to the third-party programs. Facebook derives value from these cross-side network effects; it increases the amount of valuable user data—such as what information a user likes, with whom they are connected, and where they are located— which can then be sold to advertisers.

125.    Because of its unparalleled network and access to data, Facebook has unprecedented access to information about its users that are key to both (a) engaging users by presenting them with desirable content, and (b) allowing advertisers to specifically target their ads to prospective customers. A new market entrant would not be able to offer advertisers the type of data Facebook can provide, which is essential to monetizing personal social networking services.

## VI.    INJURY AND COMPETITIVE HARM

### A.    Injury to Phhhoto

126.    Facebook targeted Phhhoto, as described above, with a scheme of anticompetitive, fraudulent, and unfair business practices which, because of Facebook's unlawfully maintained monopoly, directly and proximately caused Phhhoto injuries to its business and property.

127.    In withdrawing Facebook's access to critical infrastructure, Facebook severely diminished Phhhoto's distribution channel, preventing Phhhoto from gaining the scale it needed to grow, attract and engage users, and attract investment. Absent Facebook's anticompetitive conduct, Phhhoto would have had the ability to become a substantial platform for personal social networking services in the United States.

128.    Through the launch of the Boomerang clone, Facebook sought to and did deter investors from investing in Phhhoto. Facebook's suppression algorithm devastated Phhhoto's growth and user engagement metrics by preventing users from seeing Phhhoto content on Instagram, ultimately rendering Phhhoto uninvestable.

129.    Facebook made knowing and fraudulent misrepresentations upon which Phhhoto relied, including those regarding: (a) Facebook's intention to integrate Phhhoto into the Facebook newsfeed; (b) Facebook's explanation that it withdrew the third-party ability to pre-populate hashtags through the iPhone Hooks because the hashtags were "spammy"; and (c) the operation of the algorithmic newsfeed that suppressed Phhhoto posts. Together, this conduct prevented Phhhoto from taking the steps necessary to preserve its user engagement and viability as an app.

130.    Facebook's anticompetitive, fraudulent, and unfair course of conduct deprived Phhhoto of access to hundreds of millions of dollars of capital to the detriment of its economic

viability. Investors would not fund Phhhoto any further because they were concerned that Facebook's actions, including Instagram's launch of the Boomerang clone and withdrawal of API access, prevented Phhhoto from attracting users as a viable app, and Phhhoto's investability was further diminished by the impact of Facebook's suppression algorithm on Phhhoto's user growth and engagement.

131.    Facebook's fraudulent and anticompetitive course of conduct also drastically reduced Phhhoto's ability to obtain advertising revenue. For each user that Facebook denied to Phhhoto through its unlawful conduct, Phhhoto experienced a quantifiable loss of advertising revenue.

132.    Facebook's fraudulent and anticompetitive course of conduct reduced Phhhoto's value both during its existence and in its ability to sell its assets when it was shut down.

### B.    Harm to Competition

133.    By its unlawful and anticompetitive conduct, Facebook has harmed competition and potential competition in the market for personal social networking services in the United States, and it has caused harm to consumers. As a result of Facebook's conduct, potential competitors were less likely to innovate or invest in creating competing services that would benefit and engage users. Further, innovative or differentiated nascent competitors, including Phhhoto, were prevented from gaining scale, which in turn enabled Facebook to maintain its monopoly power.

#### 1.    Harm to Consumers

134.    Users benefit from competition among personal networking platforms. This competition can arise on the basis of: (a) innovation, if a rival creates a new way for users to produce, share, or consume content with other users in their network; (b) price, if users can pay less by providing less personal data for access to a new platform or the new platform pays users

to join and engage; and (c) quality, if a new entrant better protects users from harmful content or data breaches, requires users to view fewer advertisements, or provides otherwise improved content and services.

135.    As Facebook gained and maintained monopoly power it degraded the quality of services it provided to users. This included rolling back privacy protections, increasing the number of advertisements users viewed, and prohibiting third parties from continuing to share their services through Facebook. Because potential competitors were less likely to innovate or invest in creating competing services that would benefit and engage users, consumers were deprived of choice in the market for personal social networking services. Users have been deprived of the ability to select products for personal social networking services that offer different features or user engagement activities, different levels of advertising, or data and privacy protection features different from Facebook.

136.    Facebook users are harmed when the data cost of using Facebook platforms, like Instagram and Facebook, is higher than such users would choose if meaningful competition on that basis existed. Facebook users give away more personal data and privacy than they would in a competitive marketplace, which lowers the quality of the Facebook services. Even if Facebook over-collects or misuses user data, consumers who wish to continue using a personal networking service are captives in Facebook's platform monopoly. Facebook users are likewise harmed when Facebook wields its monopoly power to acquire or destroy nascent competition, which might otherwise have transformed the way that digital communities grow and interact.

## 2.    Harm to Advertisers

137.    Advertisers are likewise harmed because Facebook's dominant market position allows it to charge supracompetitive prices for its ad-targeting services, which Facebook

calibrates with unparalleled success because of the enormous amount of data it harvests from its users. Advertisers are also harmed by lower-quality outcomes than they would have in a competitive marketplace. And because Facebook's conduct has suppressed output in the market for personal social networking services, advertisers have had fewer opportunities to engage with users.

## VII.   ACCRUAL OF CLAIMS

138.   Phhhoto could not and did not begin to discover Facebook's fraudulent and anticompetitive conduct until October 25, 2017. Further, Phhhoto did not have reason to believe or begin to learn that Facebook's conduct: (a) promising to integrate Phhhoto into the Facebook newsfeed; (b) removing the ability to pre-populate hashtags through iPhone hooks because #phhhoto looked "spammy"; (c) revoking Phhhoto's access to the Find Friends API; and (d) copying Phhhoto with Boomerang was part of a scheme of coordinated exclusionary conduct that had caused injury to Phhhoto until December 5, 2018 at the earliest, when the U.K Parliament first published a trove of theretofore confidential documents that revealed that Facebook had been targeting competitors like Phhhoto for acquisition or destruction.

139.   By agreement of the named parties to this action, any applicable statutes of limitations have been tolled for a total of 14 days.

### A.   Fraudulent Concealment

140.   Facebook purposely and fraudulently concealed its anticompetitive and unlawful conduct through misrepresentations and material omissions made to Phhhoto concerning: Facebook's intention to integrate Phhhoto into the Facebook newsfeed; the reason for withdrawal of the ability to pre-populate hashtags through iPhone Hooks; and the operation of and reason for implementation of the algorithmic newsfeed. Facebook concealed from Phhhoto the role of the

algorithm in suppressing users' posts and, thus, the reason for Phhhoto's declining growth and user engagement. And Instagram affirmatively stated that the algorithmic newsfeed would promote posts based on a user's likelihood of being interested in the content, while denying that it hid posts, engaged in shadowbanning, or favored photo or video formats. These statements were false, or at a minimum omitted material facts that would be necessary to make these statements truthful, and Phhhoto relied to its detriment on these representations and omissions.

141.    Facebook's conduct was also self-concealing because it was performed outside the sight and knowledge of Phhhoto. As a result, Phhhoto did not, and could not, have discovered Facebook's fraudulent and anticompetitive scheme sooner than it did, despite the exercise of reasonable diligence.

142.    Phhhoto exercised reasonable diligence in attempting to determine the reasons for Facebook's decision to withdraw critical infrastructure access and algorithmically suppress Phhhoto posts. Phhhoto inquired of Facebook about the reasons for the withdrawal of critical infrastructure access, and it received false and misleading responses, such as the pre-population of #Phhhoto being "spammy."

**B.    Continuing Violations and Ascertainment of Damages**

143.    Facebook has committed continuing violations of the antitrust laws, and a continuing tort of fraud, resulting in substantial monetary injury to Phhhoto. Facebook engaged in a pattern of anticompetitive and fraudulent conduct, including: first promoting interoperability on its platforms and then revoking that access in order to maintain its monopoly; fraudulently promising to integrate Phhhoto into the Facebook newsfeed but copying Phhhoto instead; and eliminating Phhhoto as a competitor by ensuring that user engagement plummeted such that the app became unattractive for necessary investment and could no longer continue as a viable

business.

144.     Each of Facebook's injurious overt acts accumulated new injuries for Phhhoto. However, even had the acts been discoverable and not concealed at the time, the consequences and damages were then speculative and not yet ascertainable.

## VIII.   CAUSES OF ACTION

### A.     Count One: Unlawful Monopolization (Monopoly Maintenance) in the Personal Social Networking Services Market – Section 2 of the Sherman Act, 15 U.S.C. § 2

145.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

146.     As detailed above, at all relevant times, Facebook has possessed monopoly power in the relevant market for Personal Social Networking Services in the United States.

147.     By promoting interoperability between Facebook and Phhhoto, Facebook was able to engage users and collect data related to Phhhoto's users, improve the quality of its services, and increase advertising revenue. After benefiting from the presence of Phhhoto's users' unique and compelling content on its platforms and gaining quantitative insight into Phhhoto's market desirability, Facebook abused its monopoly power by withdrawing access to the critical infrastructure. This course of dealing created a profitable arrangement for Facebook, and there was no legitimate rationale for severing the course of dealing, which rather was intended to and did suppress competition.

148.     Facebook willfully maintained and enhanced its monopoly power through an anticompetitive and exclusionary course of conduct as alleged herein, including but not limited to cutting off Phhhoto's access to critical APIs, revoking Phhhoto's ability to use the iPhone hooks to prepopulate with #Phhhoto, fraudulently promising to integrate Phhhoto into the

Facebook newsfeed but creating a clone of Phhhoto's product instead, and suppressing

Phhhoto's users' posts to the Instagram newsfeed.

149.    As a direct and proximate result of this unlawful conduct, Phhhoto was injured in

its business and property by losing investment opportunities, having its advertising revenue

diminished, and suffering the total loss of the value of the company.

150.    As a result of Facebook's conduct, Phhhoto has suffered the type of injury that the

antitrust laws were intended to prevent.

151.    Facebook's conduct has harmed and continues to harm competition in the market

for personal social networking services, including by stifling innovation and investment,

degrading quality, suppressing output, and depriving consumers of choice in the Personal Social

Networking Services market in the United States.

152.    There are no procompetitive justifications for Facebook's anticompetitive and

exclusionary conduct.

153.    The anticompetitive effects of Facebook's conduct outweigh any procompetitive

benefits, to the extent that any such benefits even exist. In any event, any benefits of Facebook's

conduct could have been achieved by less anticompetitive means.

154.    By its acts and practices, Facebook has engaged in a course of conduct that

constitutes monopolization, here the unlawful maintenance and exercise of monopoly power, in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**B.      Count Two: Fraud**

155.    Plaintiff incorporates by reference the allegations set forth above as if fully set

forth herein.

156.    Facebook made misrepresentations of fact and material omissions to Phhhoto,

including but not limited to Facebook's intention to integrate Phhhoto into the Facebook newsfeed; the reason for withdrawal of the ability to pre-populate hashtags through iPhone Hooks; the reasons for Facebook's revocation of Phhhoto's access to the Find Friends API, and the operation of and reason for implementation of the algorithmic newsfeed.

157.    In making these misrepresentations of fact and material omissions to Phhhoto, Facebook knew that they were false.

158.    Facebook intended for Phhhoto to rely on the aforesaid misrepresentations of fact and material omissions that pertained to features of Phhhoto that were crucial to the company and the program's user engagement.

159.    Phhhoto relied on Facebook's aforesaid misrepresentations of fact and material omissions in the manner previously alleged herein.

160.    As a direct and proximate result of Facebook's misrepresentations of fact and material omissions, Phhhoto incurred damages by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

**C.    Count Three: Violation of New York General Business Law §349**

161.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

162.    Facebook furnishes services in the market for personal social networking services in the State of New York.

163.    Facebook engages in consumer-oriented conduct by providing personal social networking services in the form of Facebook and Instagram.

164.    Facebook engaged in a course of conduct that included deceptive acts and practices in the conduct of its business with Phhhoto in the State of New York.

165.    Facebook made misrepresentations of fact and material omissions to Phhhoto, including but not limited to Facebook's intention to integrate Phhhoto into the Facebook newsfeed; the reason for withdrawal of the ability to pre-populate hashtags through iPhone Hooks; and the reason for implementation of the algorithmic newsfeed. These misrepresentations of fact and material omissions were materially misleading.

166.    Facebook's misrepresentations of fact and material omissions were not only directed at Phhhoto, but they were aimed preventing consumers from having a choice of services in the market for personal social networking. Moreover, Facebook's conduct had the effect of degrading the quality of personal social networking services, stifling innovation, and suppressing output, as well as depriving consumers of choice.

167.    As a direct and proximate result of Facebook's misrepresentations of fact and material omissions, Phhhoto incurred damages by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

**D.      Count Four: Unfair Competition**

168.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

169.    Facebook engaged in an anticompetitive and exclusionary course of conduct as alleged herein, including but not limited to cutting off Phhhoto's access to critical APIs, revoking Phhhoto's ability to use the iPhone hooks to prepopulate with #Phhhoto, fraudulently promising to integrate Phhhoto into the Facebook newsfeed but creating a clone of Phhhoto's product instead, and suppressing Phhhoto's users' posts to the Instagram newsfeed.

170.    Moreover, Facebook misapplied its commercial advantage by misrepresenting that it would integrate Phhhoto into the Facebook newsfeed, supposedly offering Phhhoto the

opportunity to take commercial advantage of the world's largest personal social network. It used information gained through Phhhoto's efforts at integration into the Facebook newsfeed to take commercial advantage of Phhhoto and to create its own clone, Boomerang.

171.   By promoting interoperability between Facebook and Phhhoto, Facebook was able to engage users, collect data related to Phhhoto's users, improve the quality of its services, and increase its advertising revenue. After benefiting from the presence of Phhhoto's unique and compelling content on its platforms and gaining quantitative insight into Phhhoto's market desirability, Facebook took commercial advantage of Phhhoto by withdrawing access to the critical infrastructure.

172.   In taking commercial advantage of Phhhoto, Facebook exercised bad faith.

173.   As a direct and proximate result of this unlawful conduct, Plaintiff has been injured in its business and property, by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

174.   By its acts and practices, Facebook has engaged in a course of conduct that constitutes the common law tort of unfair competition.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.   Judgment for Plaintiff against Facebook with the respect to the claims set forth herein;

b.   Monetary damages, including treble and/or punitive damages, in an amount to be proven at trial;

c.   Expenses of litigation and costs of this action, including reasonable attorneys' fees; and

d.   Such other and further relief as the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY.


Dated:  November 4, 2021

Scott Martin
Irving Scher
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
smartin@hausfeld.com
ischer@hausfeld.com

Michael D. Hausfeld (application for
admission *pro hac vice* forthcoming)
Sarah R. LaFreniere
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
Tel.: (202) 540-7200
mhausfeld@hausfeld.com
slafreniere@hausfeld.com

Gary L. Reback (application for admission *pro
hac vice* forthcoming)
CARR & FERRELL LLP
120 Constitution Drive
Menlo Park, CA 94025
Tel.: (650) 812-3400
greback@carrferrell.com

**Counsel for Plaintiff PHHHOTO Inc.**