IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

PHHHOTO Inc.

*Plaintiff,*

v.

Meta Platforms, Inc. f/k/a Facebook, Inc.
and DOES Nos. 1-7,

*Defendants.*

Case No. 1:21-cv-06159-KAM-RLM

**<u>AMENDED COMPLAINT</u>**

1.      In 2012, a group of entrepreneurs and engineers—Champ Bennett ("Bennett"),

Omar Elsayed, and Russell Armand (collectively, the "founders")—set out to build an app that

would create opportunities to capture moments in a format as expressive as video but as easy as a

point-and-shoot camera. The result was Phhhoto, launched in 2014, which went beyond

photography and aimed to create a social network that would give people opportunities to share

their lives in ways they had never seen before. No format such as Phhhoto had ever existed. The

Phhhoto app captured five frames in a single point-and-shoot burst and linked them together into

a looping video, animating a still picture and making the subject come alive. The burst created a

short video called a "phhhoto." Users could post their phhhotos on Phhhoto's internal social

network or share phhhotos on Instagram.

2.      As described by TechCrunch (a leading online publication for startup and

technology news), "with quick app-switching to Instagram and integration with other social

media, the [Phhhoto] app seems like one of the many natural successors to our ingrained Instagram behavior."

3.      Phhhoto's technology formed the kernel for a *new* social network. Phhhoto could be described as an "instant animated camera." It was billed as "quicker than video, better than stills," and it offered users the ability to add filters to their phhhotos. The resulting short video allowed users to take and exhibit photography in a completely new way. Phhhoto was free to download, simple and easy to use, and available for both iOS and, by late 2015, Android devices. And Phhhoto provided a platform for social networking by enabling users to share their phhhotos to their social media accounts.

4.      One early adopter of Phhhoto was Mark Zuckerberg ("Zuckerberg"), the CEO of defendant Meta Platforms, Inc, then known as Facebook, Inc. ("Meta"). On or about August 8, 2014, Zuckerberg downloaded and installed the app onto his phone, entered the phone number of his device into the Phhhoto app, created a personal account, and posted a profile picture of himself (reproduced below) to his new Phhhoto account.



5.     Zuckerberg was not the only Meta executive to take notice of Phhhoto, create an account (as reflected in the profiles below), and do reconnaissance. On or about December 20, 2014, Kevin Systrom, formerly the co-founder and CEO of Instagram, and at that time the head of Meta's Instagram business, followed Zuckerberg's lead, downloading the Phhhoto app from the Apple App Store and creating an account. Thereafter, Meta employees Bryan Hurren ("Hurren"), John Barnett, and Christine Choi, among others, followed suit, all creating Phhhoto accounts, with several posting their pictures, and exploring Phhhoto's features.



6.     The new Phhhoto application soared in popularity. Phhhoto had fewer than 500,000 Monthly Average Users ("MAUs") in early 2015, but that number grew to approximately 3.7 million MAUs at its peak.

7.     Users increasingly posted photographic content made with the Phhhoto app onto Meta's Instagram and Facebook platforms so that their followers could see that content in their "feeds." Early on, the well-known songwriter and record producer staged-named Diplo contacted the fledgling company, unsolicited, to make an investment. Indeed, famous celebrities including Beyonce, Katy Perry, Miley Cyrus, Joe Jonas, Crissy Teigen, Bella Hadid, and Shawn Mendes

began to use Phhhoto without being solicited or compensated. They created their own content using the app and posted that content to their accounts associated with Meta's Instagram product. The press took notice of Phhhoto's early success and adoption.

8.     So compelling was Phhhoto's technology and content, and so popular was its application, that Hurren, then Strategic Partnerships Manager for Meta's Facebook business, reached out to Phhhoto, asserting that Phhhoto was "really awesome." Hurren first offered to incorporate Phhhoto's technology into the Messenger service on Meta's Facebook platform. When Phhhoto declined, Hurren offered to incorporate Phhhoto's content into the Newsfeed for Meta's Facebook platform users. Phhhoto invested heavily in this project, but ultimately Hurren did not move forward, citing internal "legal conversations" that "hung" the project up.

9.     Instead, Meta had embarked on a scheme to crush Phhhoto and drive it out of business. Among other anticompetitive acts directed against Phhhoto, Meta first withdrew aspects of interoperability with its Instagram platform that it had previously provided to Phhhoto. Then, as described above, Hurren surreptitiously terminated the project that he had initiated for integrating Phhhoto's content into the Newsfeed of Meta's Facebook platform. The scheme continued with Meta changing longstanding third party content attribution rules of its Instagram business to Phhhoto's detriment and introducing—with the anticompetitive intent and effect of harming Phhhoto rather than otherwise benefiting Meta—a market clone that copied feature-by-feature the Phhhoto product. The injurious intent and effect of these actions was not known to, and indeed affirmatively concealed from, Phhhoto at the time.

10.     The anticompetitive campaign culminated in Meta's change to the way that the Instagram platform displayed content in its own users' feeds, which had the intent and effect of suppressing Phhhoto content. In October 2017, by pure chance, Phhhoto was able to discover

that Meta was not, contrary to its express representations, displaying content on its Instagram platform of most interest to a user. And only thereafter did further information emerge to reveal that Meta—through a closely guarded secret algorithm impenetrable to the outside world—had in fact been purposely suppressing Instagram users' posts that contained Phhhoto content. Meta affirmatively concealed the nature of Instagram's algorithm and published misleading statements about the change in the manner users would view posts on its Instagram platform.

11.    Although Phhhoto undertook diligent efforts to understand its declining metrics prior to October 2017, there was no reason to investigate (and based on Meta's purposeful misrepresentations, specific reason to reject) whether Meta's algorithm was designed to penalize posts with Phhhoto content. Indeed, Phhhoto did not become aware of Meta's overall campaign against competitors, nor of Mark Zuckerberg's personal involvement in and direction of that campaign, until the release of internal Meta documents by the UK Parliament in December of 2018.

12.    Meta employed this anticompetitive campaign against competitors, including Phhhoto, in order to maintain its monopoly in the market for personal social networking services. Meta secured that monopoly position by acquiring Instagram in 2012, thus controlling the two most significant platforms—Facebook and Instagram—in that relevant market. And Meta unlawfully used that power and engaged in exclusionary conduct to eliminate Phhhoto and others as competitive threats to Meta's monopoly.

13.    Meta's actions destroyed Phhhoto as a viable business and ruined the company's prospects for investment. Lacking investment or any other means to remain viable, the company shut down its operations in June 2017, while Meta continued to affirmatively conceal its anticompetitive conduct. Phhhoto failed as a direct result of that conduct. But for Meta's

conduct, Phhhoto was positioned to grow into a social networking giant, similar in size, scope, and shareholder value to other social networking and media companies with which Meta did not interfere.

14.     Meta thus violated Section 2 of the Sherman Antitrust Act by unlawfully maintaining a monopoly. 15 U.S.C. § 2. Meta engaged in a course of exclusionary conduct aimed to eliminate a horizontal competitor from the market. Meta also engaged in an unlawful refusal to deal with Phhhoto, by first inviting Phhhoto to interoperate on its platforms and then withdrawing that interoperability and suppressing Phhhoto users' posts—by which Meta curtailed a profitable relationship for anticompetitive reasons.

15.     Meta also engaged in common-law fraud and unfair competition under New York law.

## CONTENTS

I.   PARTIES ........................................................................................................... 9

   A.   Plaintiff ...................................................................................................... 9

   B.   Defendants .................................................................................................. 9

II.   JURISDICTION & VENUE ............................................................................ 10

III.   ANTICOMPETITIVE CONDUCT ................................................................ 11

   A.   How Meta achieved market domination through its initially "open" platform. ............... 11

   B.   Phhhoto launches an innovative platform for photo-taking, photo-sharing, and social networking. ......................................................................................................... 15

   C.   Meta targets, and ultimately crushes, Phhhoto. ........................................... 19
      1.   Meta surreptitiously terminates efforts to integrate Phhhoto with the Facebook newsfeed. ........................................................................................................ 19
      2.   Meta cuts off Phhhoto's access to Instagram's API. ................................ 23
      3.   Meta blocks #Phhhoto from being pre-populated in Instagram posts. ......... 24
      4.   Meta clones Phhhoto and releases the copy as Boomerang. ...................... 26
      5.   Meta updates Instagram's newsfeed algorithm – and suppresses Phhhoto's posts. ..... 28
      6.   Meta attempts to poach Phhhoto employees ............................................. 32
      7.   Phhhoto discovers Meta's fraud ............................................................... 33

   D.   As a result of Meta's fraudulent and anticompetitive conduct, Phhhoto could not survive. ......................................................................................................... 38
      1.   Meta's anticompetitive conduct rendered Phhhoto unfundable. ................... 38

   E.   Phhhoto learns that Meta's conduct was part of an anti-competitive scheme to crush competitors. ......................................................................................................... 42

IV.   RELEVANT MARKET .................................................................................. 44

   A.   Product Market ......................................................................................... 44

   B.   Geographic market .................................................................................... 48

V.   MARKET POWER .......................................................................................... 48

   A.   Meta's market share demonstrates its monopoly power. ............................. 49

   B.   Direct evidence demonstrates Meta's monopoly power. .............................. 51

   C.   Meta's network has developed strong and durable network effects. .............. 53
      1.   Meta's network effects constitute significant barriers to entry. .................. 53
      2.   Market entrants lack the data necessary to attract advertisers. .................. 55
      3.   Meta also benefits from cross-side network effects. .................................. 55

VI.   INJURY AND COMPETITIVE HARM ......................................................... 56

   A.   Injury to Phhhoto ...................................................................................... 56

   B.   Harm to Competition ................................................................................ 57
      1.   Harm to Consumers ................................................................................ 58

2.  Harm to Advertisers ........................................................................................ 59

**VII. ACCRUAL OF CLAIMS** .............................................................................................. **59**

A.  Summary of Claim Accrual ................................................................................. 59

B.  Fraudulent Concealment ...................................................................................... 60

C.  Continuing Violations and Ascertainment of Damages ....................................... 63

**VIII.      CAUSES OF ACTION** ........................................................................................... **64**

A.  Count One: Unlawful Monopolization (Monopoly Maintenance) in the Personal Social Networking Services Market – Section 2 of the Sherman Act, 15 U.S.C. § 2 ........................ 64

B.  Count Two: Fraud ............................................................................................... 65

C.  Count Three: Unfair Competition ....................................................................... 66

**IX.   PRAYER FOR RELIEF** ............................................................................................ **67**

**X.    DEMAND FOR JURY TRIAL** ................................................................................. **68**

## I.     PARTIES

### A.     Plaintiff

16.     Plaintiff PHHHOTO Inc. ("Phhhoto") is a Delaware corporation with its principal

place of business in Brooklyn, New York. Phhhoto was launched in 2014 by Omar Elsayed,

Champ Bennett, and Russell Armand as a social networking application built around

pathbreaking camera phone technology that permitted users to photograph a series of integrated

photos in a single point-and-shoot burst, and then share those "phhhotos" on the Phhhoto

platform or other social networking applications. At the height of Phhhoto's popularity, the

application engaged 3.7 million monthly and 1.3 million daily active users.

### B.     Defendants

17.     Founded by Mark Zuckerberg in 2004, Defendant Meta Platforms, Inc. ("Meta")

is a publicly traded company, incorporated in Delaware, with its principal place of business at

One Hacker Way in Menlo Park, California. Prior to changing its name on October 28, 2021,

Meta was known as Facebook, Inc. For ease of reference, Defendant Meta is referred to

throughout this Complaint as "Meta," and the social networking platform businesses it operates

are referred to by their platform names—Facebook and Instagram.

18.     Meta is a social media company that provides online services to an estimated 3

billion users worldwide. Meta operates two platforms wherein third-party applications and

hardware interoperate with its main social media applications—Facebook and Instagram. Meta

owns and operates several business divisions, including:

a.   Facebook. Facebook is Meta's core application for personal social networking

service according to Meta's filings with shareholders, designed to enable "people to

connect, share, discover, and communicate with each other" and contains a "News

Feed" that displays an algorithmically ranked series of content, including a wide

range of media and updates regarding the activities of the user's social connections
and individually targeted advertisements.

    b. <u>Instagram</u>. Instagram is an application for personal social networking services that
allows users to share photos, videos, and messages on mobile devices. Meta
acquired Instagram in April 2012.

    c. <u>Messenger</u>. Messenger is a multimedia messaging application, allowing users to
send messages that include photos, videos, and file attachments from person to
person across platforms and devices.

19.    In exchange for providing services, Meta collects user data, which it uses to create
and provide targeted advertising services. Meta's principal revenue is from the targeted
advertising that it sells to advertisers. In 2019, Meta collected $70.7 billion in revenue, almost
entirely from allowing companies to serve ads to its users.

20.    Meta has over 50,000 employees and maintains offices worldwide.

21.    Doe Defendants 1–7 are other individuals or entities who acted in concert and
conspiracy with, or who engaged in or abetted the unlawful conduct by Meta that is set forth in
this Complaint. Plaintiff intends to amend or seek leave to amend this Complaint upon learning
the identities of these Doe Defendants.

## II.    JURISDICTION & VENUE

22.    This action arises under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)
and New York common law.

23.    Meta is engaged in activities that substantially affect interstate commerce. It
provides personal social networking services throughout the United States and sells advertising
in connection with these services throughout the United States. The conduct involved in this

action took place in interstate commerce.

24.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over the state claims presented in this action under 28 U.S.C. § 1367.

25.     Venue is appropriate in this judicial district under 15 U.S.C. § 22 and 28 U.S.C.§ 1391(b) and (c). Meta transacts business within this judicial district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district.

26.     This Court has personal jurisdiction over Meta because the unfair competition, fraud, and unlawful maintenance of monopoly power alleged in this Complaint caused injury to persons throughout the United States, including to Phhhoto in this district. Meta also transacts substantial business in this district.

## III.     ANTICOMPETITIVE CONDUCT

### A.     How Meta achieved market domination through its initially "open" platform.

27.     Meta's history is a prelude to its anticompetitive scheme. Meta began in 2004 with Facebook as its social networking desktop application. The first Apple smartphone was not released until 2007, so for the first several years of its existence, Facebook had no efficient way to present and promote itself to potential users, and potential users had no efficient way to access and use the Facebook application other than through the desktop browser, a market dominated by Microsoft. Microsoft could have cut off user access to Facebook at any time and killed the nascent company "in the cradle." In recognition of his need to curry and maintain favor with Microsoft, Zuckerberg in 2007 sold Microsoft $240 million of Meta (then Facebook) stock.

28.     In 2007, Zuckerberg also decided to transform Facebook from a simple application into a "platform" by releasing services, tools, and products for third-party developers

to create their own applications and services that interoperated with Facebook. According to Zuckerberg, the platform approach was designed to increase Facebook's usage, so that people would "share everything they want, and do it on Facebook," while recognizing that "[s]ometimes the best way to enable people to share something is to have a developer build a special purpose app or network for that type of content and to make that app social by having Facebook plug into it."

29.     In 2010, Instagram launched as a photo-sharing (and later video-sharing) application on the Apple iPhone, and in 2011, Instagram's management turned the Instagram application into a platform by adopting a feature known as iPhone Hooks so that other applications could interoperate and share content with it.

30.     On or about April 9, 2012, Meta bought Instagram for $1 billion, meaning that Meta would ultimately own and control the two largest platforms for personal social networking services, Instagram and Facebook.

31.     While Instagram was always centered around photography, and later videos, over time, Meta's Facebook business transitioned from largely text-based to photo- and then video-related content. In May 2012, Meta launched "Facebook Camera" which allowed users to take photos on their phone that could be shared to Facebook immediately—a functionality Instagram always possessed. Then, in April 2016, Meta moved Facebook to a "video-first" strategy, encouraging users to create and share more photos and videos. Shortly thereafter, in July 2016 Zuckerberg noted on an earnings call that he and his team "see a world where video is first, with video at the heart of all of our apps and services." The following year, Facebook Camera added support for GIFs, text, and live video, and Meta launched "Facebook Stories" for users to create short photo or video collections.

32.      Meta implemented a series of innovations that fomented interconnectivity between and among itself, users, third parties, and advertisers. Meta's launch of the "Facebook Platform" in 2007 allowed open "APIs" (or "application programming interfaces"): digital tools that allow different applications to share data and functionality with one another. The Facebook Platform allowed third parties and app developers to create apps that interoperated with Facebook. By enticing app developers toward interoperability, Meta advanced its platform growth to its benefit. By May 2013, over 10 million apps and websites were integrated with Meta's Facebook platform through APIs.

33.      Meta was explicit in its initial desire to integrate with other app developers, stating that it "welcome[d] developers with competing applications" to build on its Facebook platform.[1] Meta designed the platform specifically so that third-party applications could interoperate with Facebook, or, as Meta described it, "third-party developers are on a level playing field with applications built by Facebook."[2]

34.      Even prior to its acquisition by Meta, in 2011, Instagram had adopted iPhone Hooks, which gave users the ability to share photos taken on their iPhones and through other third-party applications directly to Instagram. Developers could "hook" their applications into Instagram seamlessly, so that users could share photos instantly from the third-party app directly to Instagram's "publish" screen for posting. When linked to Instagram, the user would be directed to the "filter" page, and the image would be pre-loaded and resized to fit Instagram's

---

[1] Six4Three, LLC, *Written Statement for the Record, Online Platforms and Market Power, Part II: Innovation and Entrepreneurship*, Hearing Before the House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law (July 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD003.pdf.

[2] Six4Three, LLC, *supra* note 1.

specifications. Developers could pre-populate the photo caption to include a hashtag identifying the developer of the content. Meta continued these policies and practices for its Instagram platform after it acquired Instagram.

35.     With the app developer thus identified in the hashtag, users could find the developer's app in the app store and download it for their own use. By adopting these features, Instagram helped prevent the platform's loss of developers to competitors who had adopted them. As a senior Instagram executive told the press in 2011, Instagram "wanted to make it easier for other iPhone-apps (and iPhone web-apps) to hook into Instagram to open a particular item or post a photo through our app."[3] Market observers noted that Instagram's adoption of iPhone Hooks positioned Instagram as a hub for other apps and as a key platform in the market for personal social networking services.[4]

36.     Meta's decision to run Facebook and Instagram as platforms that interoperated with third party apps was intentional, as interoperability would spawn creative development by third parties and increase engagement with both apps. And third-party developers including Phhhoto relied on Meta's promises of interoperability when developing new apps, knowing its Facebook and Instagram platforms would be primary ones for sharing content.

37.     As third-party apps integrated with Meta's Facebook and Instagram platforms, the platforms became critical infrastructure for applications like Phhhoto. When Meta withdrew Phhhoto's access to this critical infrastructure, Meta intended to prevent Phhhoto from gaining the scale it needed to grow, attract and engage users, and attract investments.

---

[3] MG Siegler, *Instagram Unveils "iPhone Hooks" so Other Apps Can Play Nicely with Them*" TC (June 1, 2011, 4:05PM) https://techcrunch.com/2011/06/01/instagram-iphone-hooks/.

[4] Om Malik, *Why Instagram Can Become the Mobile Social Hub,* GIGAOM (May 30, 2011), https://gigaom.com/2011/05/30/instagram-100-cameras-and-1/.

38.     Meta's strategy of promising interoperability to encourage third-party app development for its platforms enabled it to acquire and maintain substantial monopoly power. Meta bragged to its advertising clients about its dominance, noting that Facebook itself was "now 95% of all social media in the U.S." A 2016 survey would confirm that Facebook was the most widely used social network in the U.S., with 78% of respondents using the platform at least once per month.

### B.     Phhhoto launches an innovative platform for photo-taking, photo-sharing, and social networking.

39.     Phhhoto entered the market in 2014 as an innovative and creative platform, with more edge and room for creativity than Instagram. Phhhoto's founders themselves risked nearly all of the proceeds that they had made from a prior successful venture—together, nearly $2 million of their own money—into the Phhhoto app as a means for creating and sharing new video content. Phhhoto appealed directly to Generation Z, at the same time that Meta's Instagram platform was becoming stale and younger users were losing interest in it. Phhhoto was more than just a camera; Phhhoto was described as a "powerful tool that makes your pics look more enhanced by providing lots of new filters and widgets."

40.     And Phhhoto's differentiation extended beyond its innovative camera to reflect the app's human-centered design ideology. Phhhoto strove to, and did in fact, build communities that could fluidly transition between virtual reality and the real world. For example, Phhhoto featured an entirely human-powered discovery section, called WOW, which aimed to enfranchise its user community by inviting influential users to co-curate the WOW feed with Phhhoto staff. Together with Phhhoto staff, talented Phhhotographers would identify and highlight the best and most innovative phhhotos on Phhhoto's WOW feed—creating community and spurring artistic expression.

41.     Phhhoto differentiated itself from Meta's Instagram and Facebook platforms to become exactly what Zuckerberg feared in competitors, a new "mechanic"—that is, a new way to connect and interact with users in a manner sufficiently innovative from what already existed. By 2014 users were primed for social networking and photo-sharing, and Phhhoto offered a different take in a world that was increasingly dominated by photography.

42.     Almost as soon as it launched on July 7, 2014, Phhhoto's popularity exploded. It garnered nearly 20,000 new user registrations per day by October of that year. For context, Looksery, a real-time face-filtering/modifying app founded in 2013 and launched in June 2014, had gained 3 million users as of September 2015 (an average of fewer than 7,000 new users per day) before it was acquired by Snapchat for $150 million.

43.     Additionally, Phhhoto's DAU/MAU—the ratio of daily active users to monthly active users—was high at 40%. DAU/MAU is an indicator of a strong app because a high percentage of monthly active users returning on a daily basis suggests high "stickiness" of users who are regularly engaged with the app. This is particularly important to potential advertisers. DAU/MAU exceeding 30% is generally considered excellent, and by comparison to other applications at the time, Phhhoto's 40% DAU/MAU was a strong indicator of success.

44.     Phhhoto grew large and fast—by 2016 reaching 10 million registered users and 1.3 million daily active users, who created 400 million images using the app's feature Phhhoto camera. Indeed, Phhhoto's new-user growth rate exceeded that of Snapchat and even Instagram. Phhhoto's cohort retention—a metric that considers retention for users who join in the same month—was increasing too. In January 2016, more recent Phhhoto users had greater user engagement after three months (43%) than their earlier cohorts (20-30%). Phhhoto was thus attracting increasingly engaged users of the platform.

16

45.     Phhhoto was distinguished by innovation, and users responded with continuing engagement. Phhhoto continued to introduce new features, including "filters," which provided users with editing tools (in December 2014); a "people section" that allowed users to connect with their friends and discover new ones through the app (in January 2015); "daily filters," by which Phhhoto's editing tools began changing on a daily basis (starting in September 2015), to allow users to curate a personalized aesthetic by collecting the filters (for example, filters would have a theme pertaining to upcoming holidays and other special events); and "Party" (in December 2015), which allowed users to share messages and phhhotos in small groups.

46.     As shown in the slide below, taken from a Phhhoto presentation to potential investors, with new features came more frequent engagement by users with the app. The value that users obtained from Phhhoto grew, and Phhhoto's DAU/MAU ratio also grew, to its 40% level indicative of very high engagement.



47.     As Meta had intended to turn Instagram into a platform with interoperability with the third-party apps, Phhhoto relied on Instagram, as well as Facebook, to attract new users. Phhhoto was aware of and relied upon Meta's statements regarding Instagram's interoperability in deciding how to structure its application and attract users.

48.     Phhhoto acquired the great bulk of its new users through word of mouth. Individuals would see phhhotos posted by their friends on Instagram, which would introduce them to the unique and compelling format and entice the users to download and start using Phhhoto. Additionally, phhhotos posted on Instagram by celebrity users like Beyonce and Diplo produced downloads of the Phhhoto app by others. Phhhotos posted to Instagram experienced a multiplier in terms of reach—with more people seeing the phhhotos and downloading that app than through other platforms.

49.     Without the initial visibility provided through Meta's Instagram and Facebook platforms, Phhhoto would not have an obvious way to attract new users. Likewise, if users stopped seeing phhhotos posted in their Instagram or Facebook newsfeeds, they would also be less likely to continue using Phhhoto themselves. Phhhoto created the ability for users to share their content in GIF or MP4 formats too, so that phhhotos could be shared through other channels—such as email, text messaging, and on Facebook (which lacked GIF support at the time). But other channels did not generate sufficient user exposure and engagement to allow Phhhoto to grow independently, without relying on a Meta platform for initial exposure.

50.     The interoperability benefited Meta by making its Instagram and Facebook platforms hubs of personal social networking activity. By providing a platform for Phhhoto and users from other applications to share their unique and compelling content, Instagram and Facebook increased user engagement on their platforms.

### C.      Meta targets, and ultimately crushes, Phhhoto.

51.      Beginning sometime in 2015—although it was not known to, and indeed was concealed from, Phhhoto at the time—Meta began to target Phhhoto with fraudulent, anticompetitive, and unfair business practices.

### 1.      Meta surreptitiously terminates efforts to integrate Phhhoto with the Facebook newsfeed.

52.      At its inception, Phhhoto had a mutually beneficial relationship with Meta. Phhhoto's unique concept, significant user engagement, and overall consumer appeal meshed perfectly with Meta's Instagram brand and platform for sharing photos and videos. As more users engaged with Phhhoto and posted phhhotos to Instagram, more users engaged with Instagram—and vice versa. The continued user engagement in both platforms reinforced strong network effects for both companies. Users and user engagement are key determinants of profit, and Meta's interoperation with Phhhoto was profitable.

53.      Facebook, however, had not yet implemented native support for the graphics interchange format (commonly called "GIFs"). Yet Internet users had a growing appetite for communicating using video and GIFs and, by then, were virally circulating GIF content on other major web platforms like Twitter, Tumblr, and Reddit, which had implemented support for the looping image format in prior years.

54.      It was in this environment that Meta's Strategic Partnerships Manager for the Facebook business, Brian Hurren, reached out to Bennett at Phhhoto in early February 2015 to discuss a potential integration. Hurren had authorization to contact Phhhoto from Ime Achibong, Meta's Director of Product Partnerships, and a known "right-hand man" to Zuckerberg. In an email on February 1, 2015, Hurren said: "potentially interesting platform integration opportunity for you. In particular, I'd like to discuss Phhhoto – It's really awesome." Hurren and others at

Meta saw that a partnership between Phhhoto and Meta would be mutually beneficial and profitable for Meta.

55.     That "platform integration opportunity" was for Phhhoto to develop a standalone application that would enable Phhhoto's moving images camera to work within the Facebook Messenger app. The project Meta proposed would require Phhhoto to dedicate several months of effort and to alter its entire tech-development strategy. For all that the effort required, Phhhoto would come up empty-handed: Meta intended the tool ultimately to exist only on *its* platform, entirely outside of Phhhoto. Phhhoto declined the engagement on February 5, 2015.

56.     Although Hurren's initial outreach appeared genuine to Phhhoto at the time, Meta was engaging in a coordinated, anticompetitive scheme to deceive Phhhoto and exclude it as a nascent competitor. As noted, notwithstanding Hurren's outreach, Meta withdrew aspects of Phhhoto's interoperability with its Instagram platform.

57.     Less than three weeks after Phhhoto declined Hurren's first offer, Hurren reached out again. In an email to Bennett on February 26, 2015, Hurren said: "I actually have another opportunity for you. It's much less of a lift, and I think you'll be interested." Hurren immediately sent a non-disclosure agreement, which Phhhoto signed. He explained that Meta was proposing to integrate Phhhoto into the Facebook newsfeed. This was a significant opportunity for Phhhoto. At the time, Instagram was the only significant platform where phhhotos could be displayed in their native format—an animated, looping video that played automatically. On Facebook phhhotos displayed as still photos. Integration with Facebook's newsfeed would mean that users could post phhhotos to the Facebook newsfeed directly through the Phhhoto app. "[G]if support in newsfeed," as Hurren referred to it, was a big step for Facebook, but the capability had existed within Instagram throughout Phhhoto's existence. And the positive network effects of GIF

support in the Instagram newsfeed had expanded Phhhoto's and Meta's reach and engagement.

58.     Phhhoto's Bennett was excited about the idea, and Phhhoto offered to take the lead on the technical integration. Expanding to Facebook's newsfeed potentially was beneficial for Meta as well as Phhhoto, as GIF support in Instagram's newsfeed had already demonstrated. Phhhoto users would be able to expand the reach of their posts by readily accessing Facebook's newsfeed through the Phhhoto app. And Meta would benefit by expanding its user engagement, particularly among younger audiences. Phhhoto users, like Instagram users, trended younger than Facebook users. Providing an outlet for Phhhoto users to post directly to the Facebook newsfeed would expand Facebook's reach to this critical market segment. The innovation would improve the existing offerings on Facebook and would provide more value to the users as well. Hurren's voluntary outreach to Phhhoto demonstrates that Meta saw the newsfeed GIF project as beneficial and profitable.

59.     Meta proceeded to string Phhhoto along for months without making meaningful progress on the supposed integration that Meta itself had proposed. As emails from Hurren to Bennett and others show, the initial integration was supposed to roll out to a small subset of users on March 20, 2015, with the remainder gaining access on April 6, 2015. Six days before the launch, Hurren requested further technical specifications—which Phhhoto implemented.

60.     On April 8, 2015, two days after the proposed launch, Hurren wrote to Bennett again: "apologies . . . we're delayed at least 2 weeks – we're hung up on some legal conversations and will update as soon as we have a firm schedule." And still, Phhhoto persisted to work with Facebook on the integration. Complying with Hurren's May 1, 2015 request to "confirm that the metadata changes are in place" and meet other specification requests and requirements. Hurren confirmed "We're currently at ~5% of all users and looking to scale to

100% by end of the week."

61.     In anticipation, Phhhoto increased the number of servers to prepare for the anticipated load, but it did not see phhhotos displaying properly in the newsfeed. Bennett reached out on June 1, 2015, stating "It seems like we've implemented according to spec – perhaps you can verify?" Bennett checked in again on June 4 and June 8. On June 1, Hurren indicated he would "check on my end" and on June 8 indicated that he was "[t]rying to get an ETA on the fix." But ultimately the integration did not occur, and Meta never responded to Bennett's subsequent inquiries into whether Phhhoto could help move it along.

62.     During the collaboration, Phhhoto worked diligently to meet all of Facebook's specifications. As a result of the integration project, Meta learned significant information about Phhhoto's usage and growth—including the names of key software developers, whom Meta would later try to hire itself.

63.     Armed with this and other information concerning Phhhoto's operations, rather than integrate Phhhoto's posts into the Facebook newsfeed, Meta undermined its own proposed collaboration. On information and belief, at some point between Hurren's initial contact in February 2015, and the non-response to Bennett's June 8, 2015 email, Meta decided to abandon the project as part of its anticompetitive scheme against Phhhoto. However, Meta thereafter purposely misled Phhhoto about its purportedly ongoing intention to collaborate and integrate GIFs into the newsfeed. Because phhhotos on Facebook, without native GIF support, continued to display only as still photos, they lacked the key aesthetic appeal that had made Phhhoto so popular with Instagram users. In quashing the Facebook newsfeed integration effort, Meta thus withheld from Phhhoto access to critical infrastructure that Meta controlled.

64.     Around the same time, Meta was working with other third parties on similar

integration into its Facebook newsfeed. Unlike Meta's interactions with Phhhoto, other partners in this rollout, such as GIPHY, were provided with support and information they needed to make the integration a success. After the integration, GIPHY's content was displayed correctly in the newsfeed. In 2020, Meta acquired GIPHY for a reported $400 million.

### 2.   Meta cuts off Phhhoto's access to Instagram's API.

65.   On March 31, 2015, while Hurren and Bennett were discussing Facebook's proposed newsfeed integration, Meta suddenly withdrew Phhhoto's access to the Instagram Find Friends API, which had allowed Phhhoto to access the Instagram friends list. Phhhoto had used the API since its launch the prior year. Phhhoto users could still save their phhhotos and publish them on Instagram, but they no longer had the ability to recreate their social graph from Instagram—the world's top photo app. The withdrawal of the Find Friends API access would negatively impact how potential investors perceived Phhhoto.

66.   Cutting off Phhhoto's API access was done neither because the Phhhoto relationship was unprofitable to Meta nor because Phhhoto had violated any policies with respect to its Facebook or Instagram platforms. Indeed, Meta was reaching out to Phhhoto concerning business opportunities and expressed no concern about any violations of policy. Rather, access was withdrawn because Meta viewed Phhhoto as a potential competitive threat.

67.   When Phhhoto lost access to the Instagram API, Bennett reached out to Hurren to see if there was someone at Instagram with whom he could speak to obtain more information about the "API permissions." On April 1, 2015, Bennett emailed Hurren, stating "Looks like a change to our permissions was made recently and I'm hoping I can find out more about why that happened." Hurren responded on April 2, 2015: "[s]peaking to someone in 10 mins :)" and then "[g]ive me a call." In their telephone conversation, Hurren explained that Meta was apparently

upset that Phhhoto was growing in users through its relationship with Instagram. However, that explanation left Phhhoto confused—given not only that Instagram had effectively solicited such an association through its adoption of iPhone Hooks, but also that Meta continued (so it seemed) to work to incorporate Phhhoto into the Facebook newsfeed, and thus Meta did not appear to have any such concern.

68.     Cutting off API access not only caused Phhhoto to lose access to the Instagram friend list, but also caused buggy features suggesting that the Phhhoto app was unstable. By cutting off Phhhoto's access to Instagram's APIs, Meta damaged a preexisting beneficial and profitable relationship, without any legitimate business justification for doing so.

### 3.     Meta blocks #Phhhoto from being pre-populated in Instagram posts.

69.     At or about the time that Instagram adopted iPhone Hooks in 2011, providing interoperability with third-party apps such that users of those apps could hook seamlessly into Instagram to publish posts, Instagram also enabled pre-population of content with those posts. Posts from other apps could include attribution in the caption for the originating app (as well as the user's identity on the originating app). Twitter and even Meta's Facebook platform itself recognized the value of pre-populating with hashtags, by allowing it on their platforms through different back-end mechanisms. Instagram, likewise, did this to further encourage such third-party apps' interoperability with Instagram, and Meta benefited because the features increased user engagement with Instagram.

70.     From the feature's inception, Phhhoto used iPhone Hooks to pre-populate all phhhotos with a hashtag—#phhhoto—so that users viewing Phhhoto posts on Instagram would be aware of the phhhoto's origination. Indeed, in its development stages, Phhhoto was aware of iPhone Hooks and constructed the app with the expectation that it would have the ability to pre-

populate #phhhoto and gain visibility for its product. The hashtag also meant that if anyone searched for "#phhhoto" on Instagram, they would see all phhhotos posted publicly to Instagram that included #phhhoto. Users would take note of Phhhoto's popularity and infer that Phhhoto was an app worth trying. Users had the choice to remove the hashtag, and like any other Instagram post, to populate the post however they pleased. But as with other third-party app developers, pre-populating with #phhhoto was an important contributor to Phhhoto's growth because users would see the posts and learn about Phhhoto through Instagram.

71.     Despite this mutually beneficial relationship, on or about August 9, 2015, Meta withdrew the ability to pre-populate #phhhoto (or any other third-party pre-populated hashtag) from its Instagram platform, but otherwise kept the features of iPhone Hooks. Meta reported publicly that it implemented the change because it had "gotten feedback that the pre-filled captions coming though this sharing channel often feel spammy."

72.     Meta's conduct, however, indicates that the professed "spammy" rationale was pretextual. Unlike "spam" messages, a pre-populated hashtag is not an unsolicited barrage of commercial pitches, but rather an identification in the caption along the margin that does not interfere with the content, but rather assists the Instagram user to find, download, and use the originating app.

73.     With pre-population of hashtags prohibited, an alternative encouraged by Meta was for developers to use a watermark (which could include a hashtag identifier) for their content. Unlike a hashtag, however, embedding a watermark—something that users could not remove—would disfigure or cover up content that would not otherwise be impacted by a hashtag. A watermark is an unsolicited commercial message, and it is more intrusive—and certainly more "spammy" than a hashtag located in the caption would be.

74.     By curtailing the use of pre-populated hashtags in favor of watermarks for third-party apps, Meta harmed users as well. Not only would the watermark disfigure content, but a watermark cannot be searched in the way a hashtag can. Unlike a hashtag, a watermark does not allow users to simply click to see other content bearing the same hashtag.

75.     Although Meta was thus handicapping content from Phhhoto as a third-party app on its Instagram platform, content originating on Instagram remained pristine of watermarks, and users may have assumed that unidentified pictorial content came from Instagram.

### 4.     Meta clones Phhhoto and releases the copy as Boomerang.

76.     When Phhhoto's founders first launched Phhhoto, it was an iPhone-only app, but throughout September and October of 2015, Phhhoto prepared to launch for Android devices. The official launch date of Phhhoto for Android was set for October 22, 2015, and Phhhoto prepared the tech press for the news. To support its public relations plan, Phhhoto sent out embargoed press releases in advance of the launch; that way, the tech media would be ready to report on its announcement at the time the press embargo lifted.

77.     However, on the morning of October 22, 2015, only hours before Phhhoto's press embargo was to lift, Meta also issued an announcement: it was launching the "Boomerang Video App," with John Barnett—an active Phhhoto user—as the project manager for the launch. Simply put, Boomerang was a slavish clone of Phhhoto. Fstoppers, a popular photo blog, asked why Instagram continued to create "exact copies of already existing apps."

78.     Instead of the active press that Phhhoto anticipated with the launch of Phhhoto for Android, it received little press, and what press it did receive featured Boomerang due to the timing of Meta's announcement.

79.     On information and belief, Meta released Boomerang not because Meta

anticipated doing so would attract additional users to Instagram, but rather because Meta perceived and intended Boomerang as a means to injure Phhhoto and exclude it as a competitive threat.

80.     Meta's conduct demonstrates that not even Meta with its monopoly power could introduce a new video product without leveraging its existing monopoly platform. Nor could Boomerang compete on the merits with Phhhoto for adoption by users.

81.     Specifically, posts on Instagram originating from Meta's own Boomerang app were originally accompanied by a "Made with Boomerang" caption, which included a link so that someone viewing a Boomerang GIF could download the Boomerang app. TechCrunch noted this function when Meta first announced the release of Boomerang in October 2015, stating that Meta "include[d] a 'Made with Boomerang' link on posts . . .  so when people see a cool loop, they'll be able to instantly download and make their own."[5]

82.     The Boomerang caption and link could not be removed or edited by the user creating the post. The caption and link were in stark contrast to Meta's ban two months earlier, in August 2015, on pre-populated hashtags such as #phhhoto on its Instagram platform on the grounds that such hashtags were "spammy." And the Boomerang caption and download link also contained significantly greater functionality than the hashtag that Meta had denied to Phhhoto (which, if clicked, would merely show a user a gallery of other #phhhoto-tagged images), affording Boomerang a competitive advantage.

83.     On information and belief, Meta's preferencing of Boomerang on its Instagram

---

[5]  Josh Constine, *Instagram's New Standalone App Boomerang Captures 1-Second Video Loops*, TechCrunch (Oct. 22, 2015, 10:02 AM), https://techcrunch.com/2015/10/22/instagram-boomerang/.

platform with the caption and download link did not produce substantial adoption by users, so shortly after its launch, Meta bundled the Boomerang download button with the main Instagram camera itself in order that users would see the Boomerang download at the moment they were ready to create content to share on Instagram.

84.     Meta subsequently bundled Boomerang directly into the 'Stories' feature of its Instagram platform. Finally, on or about March 1, 2022, after the initial Complaint in this case was filed, Meta completed the bundling of Boomerang into its Instagram platform entirely, removing the standalone Boomerang app from the Apple App Store and the Google Play Store altogether.[6]

### 5.     Meta updates Instagram's newsfeed algorithm – and suppresses Phhhoto's posts.

85.     Since its inception, Instagram had displayed posts in reverse chronological order, so that the newest posts would appear first in a user's feed. In March 2016, however, Instagram changed this order of posts that users would see in their feeds, announcing that it would henceforth display posts in users' feeds according to an undisclosed algorithm, which was purported to show users the posts most important to them first. In reality, the change surreptitiously suppressed the visibility of Phhhoto's content, a fact that was concealed by pretextual explanation and would not be known to Phhhoto until Bennett, by sheer chance, saw one of his posts disappear from his screen in late 2017.

86.     When announcing the algorithmic change in 2016, which was widely reported in the press, Meta issued its own specific press release on the subject (also published on its website), which expressly assured app developers and users that:

---

[6] Sarah Perez, *Instagram's Boomerang and Hyperlapse Apps Disappear from App Stores*, TechCrunch (Mar. 7, 2022, 11:47 AM), https://techcrunch.com/2022/03/07/instagrams-boomerang-and-hyperlapse-apps-disappear-from-app-stores/.

The order of photos and videos in your feed will be based on the likelihood
you'll be interested in the content, your relationship with the person posting
and the timeliness of the post. As we begin, we're focusing on optimizing
the order — all the posts will still be there, just in a different order.[7]

87.     The change to an algorithmic newsfeed was widely reported without question—
not only by technology media like TechCrunch, but also in the mainstream press. The New York
Times reported, "Instagram will place the photos and videos it thinks you will most want to see
from the people you follow toward the top of your feed, regardless of the time those posts were
originally shared."[8] Websites and blogs provided advice on who would win and lose under the
new algorithm. It was widely believed that unique original content shared by close
connections—the exact type of content Phhhoto users shared on Instagram—would be
prioritized. And Phhhoto reasonably relied on Meta's statements in their business conduct.

88.     It was certainly possible to design an algorithm that could display posts in a more
desirable (to users) order than a chronological feed, and some other applications had moved to
algorithmic feeds for just this reason. Accordingly, Meta's change to an algorithmic feed on its
Instagram platform did not suggest anticompetitive conduct, and it did not raise any reasonable
inference of nefarious activity. Nor was any even suggested in the press at the time. Indeed,
Meta's Systrom, the head of Instagram at the time, played down the change, saying that "[i]t's
not like people will wake up tomorrow and have a different Instagram."[9]

89.     Such a change, if actually implemented as Meta had described, would have been
welcomed, as it should have benefited Phhhoto—a highly popular app with incredibly engaged

---

[7] Press Release, *See the Moments You Care About First*, Instagram (Mar. 15, 2016),
https://about.instagram.com/blog/announcements/see-posts-you-care-about-first-in-your-feed.
[8] Mike Isaac, *Instagram May Change Your Feed Personalizing, it with an Algorithm*, The
New York Times (Mar. 15, 2016), https://www.nytimes.com/2016/03/16/technology/instagram-feed.html.
[9] *Id*.

users, as its metrics demonstrated. If Meta's statement was true, which Phhhoto was justified in relying upon, then phhhotos would be precisely the type of content promoted by the algorithm. Phhhoto users' posts would be "bumped up" in the newsfeed due to the change, enhancing Phhhoto's visibility and user engagement. But that's not what happened.

90.     Moving to an algorithmic newsfeed gave Meta the ability to choose which posts users would see most prominently and which posts would be buried at the end of feeds by coding an algorithm to determine the order in which posts would appear. This change, which Meta began to implement on Instagram sometime between March 15 and April 1, 2016, gave Meta the unchallenged ability to decide the extent to which users' content would be displayed prominently on Instagram.

91.     In April 2016, Phhhoto's new user registrations declined precipitously. User engagement also declined, but not so clearly at first. Users posted less content, commented less frequently, and shared or favorited content shared by others less frequently, too. From April 1, 2016 to May 1, 2016, Phhhoto's ranking among photo and video apps in the Apple App Store dropped from 11th place to 41st place. Phhhoto had never before experienced such a significant decline in its ranking, and Phhhoto's founders and engineers thought that something had gone wrong with the functioning of their app.

92.     For months after the metrics dropped in April 2016, Phhhoto's team worked tirelessly to figure out why Phhhoto was suddenly unpopular. They assumed at first that the problem was with their own code, so they spent months looking for issues, including running analytics to determine if Phhhoto had bugs that were causing the app to crash on users. Phhhoto's founders relied on Meta's statement about the operation of the algorithm—that "[t]he order of photos and videos in your feed will be based on the likelihood you'll be interested in the

content, your relationship with the person posting and the timeliness of the post"—but they were intentionally misled, and without knowing or having any reason to believe Meta was the reason for the sudden drop in users and engagement, Phhhoto spent months trying to a fix a problem that they could neither uncover nor fix.

93.     Armand and Bennett hypothesized various reasons the app may have suddenly dropped in popularity, such as competition from Boomerang and cyclical usage, but ruled them out.

94.     Other than Meta's reassuring statement announcing the algorithmic newsfeed, there was no information available to anyone outside of Meta that could explain how the algorithm operated. In 2016, Meta disclosed very little about the operation of Instagram's algorithm. As TechCrunch reported two years later, in a June 6, 2018 article, "Instagram has never explained exactly how the algorithm chooses what to show you until today."[10] Even the most sophisticated engineers would not be able to crack the way in which Meta used machine learning to personalize the feed of each user, much less whether Meta used this same ability against its competitors. Without insight into Meta's internal documents or code, the Instagram algorithm was in a proverbial black box. And even companies professing their ability to help promote content on Instagram acknowledged that "we might not know exactly how the Instagram algorithm works."[11]

95.     Had Phhhoto known or been able to discover that the Instagram algorithm was

---

[10] Josh Constine, *How Instagram's Algorithm Works*, TechCrunch (June 1, 2018, 2:03 PM), https://techcrunch.com/2018/06/01/how-instagram-feed-works/.
[11] Alfred Lua, *Understanding the Instagram Algorithm: 7 Key Factors and Why the Algorithm is Great for Marketers,* Business 2 Community (Apr. 25, 2017), https://www.business2community.com/brandviews/buffer/understanding-instagram-algorithm-7-key-factors-algorithm-great-marketers-01829937.

suppressing Phhhoto posts, it could have taken action to prevent the collapse of the company. Instead of wasting time and effort looking for issues with the code, Phhhoto could have turned to the media, the courts, investors, or its community with an explanation and a plea for assistance.

96.     Meta's suppression of users' posts of phhhotos thus stymied Phhhoto's prior organic growth. Phhhoto was deprived of visibility to potential new users on Instagram, and its existing users were less likely to maintain engagement at prior levels when their content was not effectively disseminated.

97.     By suppressing users' posts of phhhotos, Meta damaged a preexisting beneficial and profitable relationship, without any legitimate business justification for doing so.

### 6.     Meta attempts to poach Phhhoto employees

98.     As Phhhoto's metrics continued to decline, and Phhhoto scrambled to revive its user engagement, Meta began the next phase of its coordinated effort against Phhhoto, shifting its focus to Phhhoto's employees. On information and belief, Meta targeted Phhhoto's top engineers both to undermine Phhhoto's business and to acquire proprietary information critical to Phhhoto's success.

99.     On September 19, 2016, Rushabh Doshi, an Engineering Director at Meta, reached out to Jacob Sologub, a Senior Software Engineer at Phhhoto, asking if Sologub would be interested in joining the Meta team for a position Doshi described as "extremely relevant" to Sologub's current work at Phhhoto. Doshi wrote that Meta was "looking for great engineers," like Sologub, to join the team, and explained that the team was currently "working on building a great in-app camera, packed with features . . . ."

100.     As underscored in Doshi's email, Meta wanted Phhhoto employees not for their general talent or skills, but specifically to help Meta do the exact work Phhhoto was doing—to

improve its clone app and features and to better mimic Phhhoto.

101.    On September 27, 2016, a week after reaching out to Sologub, Meta reached out to Jason LaFerrera, a System Architect at Phhhoto. John Abate, a Technical Recruiter at Meta's Facebook, asked LaFerrera if he would be interested in joining Meta's Front End Team. Like Doshi, Abate emphasized how relevant LaFerrera's work at Phhhoto would be. He noted LaFerrera's "experience building both web and mobile applications" at Phhhoto and sent LaFerrera a link to Meta's engineering page.

102.    Sologub and LaFerrera were two of the best engineers at Phhhoto and were part of a very small team. Despite Meta's efforts, neither Sologub nor LaFerrera went on to work for Meta.

103.    Meta's attempt to steal Phhhoto's key engineering personnel to work on Meta's in-app camera and features—work specifically intended to copy and compete against Phhhoto— began mere months after, it is now clear, Meta had started using its algorithm to suppress Phhhoto's posts. Attempting to hire Phhhoto's engineers at a time Meta knew Phhhoto needed them most is yet another aspect of Meta's anticompetitive scheme.

### 7.    Phhhoto discovers Meta's fraud.

104.    As Phhhoto's founders and engineers searched in vain for explanations for its precipitous downturn in new user growth and user engagement, the app became unattractive for financing, and its continued viability was doomed. In June 2017, Phhhoto shut down operations as a social networking application and its founders returned to work at their prior company, Hypno. And on October 25, 2017, Bennett sought to connect Phhhoto's remaining Instagram followers to Hypno, a company that provided camera platforms and interactive experiences for live events, retail, and attractions, but had little social media presence.

105.    To make this connection, Bennett sent Hypno promotional materials from the existing Hypno Instagram account to the small group of Hypno followers on Instagram, and then he sent the same promotional video from the old Phhhoto account to Phhhoto's followers. However, Bennett never anticipated what would happen next: the post from the old Phhhoto account appeared to *vanish* from Bennett's own Instagram feed, which he should have received after sending it to himself, among others. On Bennett's personal account on Instagram, the post appeared in his own feed for an instant but then evaporated from where it had been; as he declared in an astonished message, "I saw it for a split second – then it disappeared." In a real-time chat with Armand, Bennett said: "I posted the vid on @hypno . . . it immediately disappeared from my feed."

106.    Bennett's chat with Armand also notes, "100 views on @hypnocam [the new Hypno account] . . . 36 views on @hypno.cam [the old Phhhoto account.]" That is, ultimately Bennett's post had 100 views by the followers of the Hypno account, but only 36 views by the old Phhhoto followers, even though there were approximately *500 times* as many of them as there were followers on the new Hypno account—*i.e.*, barely one-third the views, instead of about 500 times as many, as logic and arithmetic would have predicted. As Bennett wrote to Armand at the time, "500x more followers." The number of "like" acknowledgments was similarly skewed: identical content posted by the same user tagging the Hypno account was liked 50% more times than when tagging the old Phhhoto account. Within hours, it was evident that something was wrong: other Phhhoto followers, just like Bennett, were *not seeing* posts from Phhhoto's old Instagram account.

107.    Only then, in October 2017, did Bennett and the Phhhoto team have reason to begin investigating the sudden user decline and engagement issues Phhhoto had experienced

34

beginning in 2016. The dropping engagement was not a function of the app or the code, but rather as a result of Meta's concealed and purposeful *suppression* of Phhhoto's content. On information and belief, based upon Bennett's October 25, 2017 experience, Phhhoto's prior experience after the 2016 algorithm change, and later Meta statements and media reports concerning the Instagram algorithm, Meta in fact weighted and penalized a user's post (and user accounts it deemed offending) by lowering placement in other users' feeds if the post contained content from or created by Phhhoto.

108.    Indeed, Meta *continued* to conceal that Instagram's 2016 algorithm was penalizing users by negatively weighting and suppressing their accounts and their posts that contained Phhhoto content. And Meta did not treat its own properties and third-party apps equally in weighting video content. Notably, after the 2016 implementation of the algorithm, as the suppression caused Phhhoto's growth and rankings in the Apple App Store to plummet, the rankings of Meta's Phhhoto clone, Boomerang, *went up*.

109.    After Bennett's chance discovery provided reason to investigate whether Meta was purposely suppressing Phhhoto content, Bennett and Armand quickly discussed a plan of action:

Armand:     let's spend the last 50k of whatever we have in phhhoto acct on this

Bennett:     i should ask @joshconstine if he's heard anything about this

Armand:     indeed . . . tell him to keep it hush tho and when we sue he can break it

Bennett:     gonna ping him now . . . dude yah this account is TRASH . . . im pretty
            sure this is illegal . . . anti-trust

110.    Bennett then immediately inquired of Josh Constine, a journalist for TechCrunch, in an email dated October 25, 2017:

[C]urious if you ever heard anything about Instagram using their algorithmic feed

to suppress competitive apps in photo/video space? we noticed a strange trend as phhhoto downloads were skyrocketing our IG followers stopped growing and our view counts suddenly tanked . . . just curious if you've heard anything.

Not having received a response, on April 14, 2018, Bennett followed up again, asking "curious if you ever dug into the algo feed?"

111.    Such actions could and would have been undertaken earlier, but for the fact that neither Bennett nor anyone else at Phhhoto had a reasonable suspicion that Meta's conduct through the algorithm was behind Phhhoto's drop in metrics—and, indeed, Meta's statements deliberately and fraudulently concealed the algorithmic suppression, even if the operation of the algorithm itself was not opaque to the outside world, which it was.

112.    After years of secrecy, only at a 2018 press conference did Meta explain some basics of Instagram's algorithm for the first time, asserting that three main factors that influenced how users' posts would be displayed in the newsfeed: (1) interest—an algorithmic determination of what content users would be interested in based on past behavior; (2) recency—how recently a post was shared, prioritizing newer posts; and (3) relationship—providing a higher ranking to those posts with people who interact frequently. The statements received press coverage from leading industry publications, including by Josh Constine at TechCrunch—the same individual Bennett had reached out to regarding possible algorithmic suppression.[12] But even at the time of the press conference, Meta still *disclaimed* that it either hid posts in its newsfeed, engaged in shadowbanning (secretly banning or lowering the rank of a user's post), or favored a format (photo or video), except to the extent an individual was more likely to engage with a particular format.

113.    After hearing about the revelations, on December 5, 2018, Bennett emailed a

---

[12] Constine, *supra* note 10.

contact at Meta to inquire about the metrics he had observed in October 2017. The Meta

employee recognized that it was "strange for a video with 32k followers to only have ~250

views, and then stated that the "[a]ccount might have somehow gotten flagged and is being

downranked." In the context of social media, "flagging" is a term for identifying posts with a

policy violation, such as offensive or fraudulent content. Bennett's October 2017 post, of course,

did not fit into any such category for flagging for any reason other than Meta's anticompetitive

targeting.

114.    On September 21, 2021, the New York Times reported that Meta did, in fact,

manipulate and reorder posts and content in users' newsfeeds to benefit Meta. The Times

unearthed a secret Meta scheme known as "Project Amplify." The scheme was intended to favor

content created by Meta over third-party content by manipulating the order of content in users'

feeds. The reporting confirms that Meta developed precisely the type of content manipulation

that Meta had previously directed at Phhhoto. On information and belief, the Times' report is the

first time that Meta's manipulative and deceptive conduct with respect to users' newsfeeds and

accounts has been publicly divulged. Prior to this time, Meta had otherwise concealed such

conduct through deceptive and dishonest statements.

115.    Following the New York Times's September 2021 revelations, speculation about

Instagram's mysterious algorithm has continued. In a 2022 article, Kate Kye of Protocol reported

on the complexity of the algorithm, noting that "a variety of AI and non-AI based tools [are] at

play, sometimes in collaboration with actual human moderators or decision-makers. It means

some standard approaches to explaining AI don't necessarily work to explain Meta's ever-

elusive algorithms."[13]

---

[13] Kate Kaye, *Meta Tries to Explain its AI with an Instagram Algorithm Decoder*, Protocol

116.    Only last month, in February 2022, Meta deployed "system cards" which would provide users some insight into the operation of Meta's algorithms and ostensibly provide "a unique in-depth view into the very complex world of AI system to human interface in a repeatable and scalable way for Meta."[14] Meta called system cards a "first step"[15] and itself recognized that it had concealed the truth behind its operation of the algorithm—from both users and developers—up to this point.

### D.    As a result of Meta's fraudulent and anticompetitive conduct, Phhhoto could not survive.

#### 1.    Meta's anticompetitive conduct rendered Phhhoto unfundable.

117.    Ultimately, Meta's anticompetitive conduct not only cast a shadow on Phhhoto, it also undermined Phhhoto's efforts to raise investment capital and prevented Phhhoto from obtaining the necessary funds to continue operating.

118.    Until the suppression algorithm, Phhhoto was still able to captivate new users and engage its community on a near-daily basis. Meta's penalizing of posts containing Phhhoto's content is what caused both new user registrations and active daily users to drop off substantially. However, Meta's prior actions—including cutting off API access, the withdrawal of iPhone Hooks, and Meta's conduct with respect to the release of Boomerang—nonetheless affected the press and potential investors.

119.    Phhhoto made multiple attempts to obtain funding to support the development and growth of the app. Its first two efforts were quite successful. In December 2014, Phhhoto closed a deal for its first round of funding, a convertible note, in anticipation of its seed round. Nearly a

---

(Feb. 23, 2022), https://www.protocol.com/bulletins/meta-ai-instagram-algorithm-decoder.

[14] Research, *System Cards, a New Resource for Understanding How AI Systems Work*, Meta AI, (Feb. 23, 2021), https://ai.facebook.com/blog/system-cards-a-new-resource-for-understanding-how-ai-systems-work/.

[15] *Id.*

year later, in November 2015, Phhhoto announced the closing of its seed round.

120.    After securing early funding in December 2014 and November 2015, Phhhoto's rapid growth necessitated that it secure additional investments. Over a dozen top-tier venture capital funds responded to Phhhoto's inquiries and requested meetings with and presentations from the company to evaluate participation in Phhhoto's Series A round of funding. Many of the funds conducted significant analyses of Phhhoto's data.

121.    The data at this time represented exactly what investors were interested in seeing in the technology sector. Phhhoto had 900,000 Daily Active Users and 2.5 million Monthly Active Users as it embarked on the potential investor presentations. It was also the 200th most popular app among all categories—and the 20th most popular app among all photo/video applications.

122.    Phhhoto's audience, too, was highly desirable to advertisers, further enhancing its investment profile: 75% of Phhhoto users were in the United States, 60% were female, 76% were between the ages of 13 and 24, and 17% were between the ages of 24 and 35, as highlighted in the investor pitch slide below showing Phhhoto's impressive organic growth.



Due to the nature of Phhhoto's business model, which would ultimately rely heavily on advertising revenue, such growth and demographic makeup of Phhhoto's audience were important for its ability to gain revenue from brands and businesses aimed at attracting younger audiences. These are key metrics used by venture capitalists when evaluating whether to invest in a company.

123.   Phhhoto suspected that Meta's anticompetitive conduct in the market generally, and targeting of Phhhoto specifically, might cause investors to value Phhhoto at a lower level than would have been expected absent such conduct. Nevertheless, in light of comparable investments and valuations by venture capitalists, Phhhoto expected significant investments from venture capitalists. Based on existing and projected growth, Phhhoto's valuation should have increased substantially in subsequent investment rounds—absent additional anticompetitive conduct by Meta.

124.   Despite Phhhoto's impressive metrics and history of rapid growth and user engagement, and despite overwhelming initial interest, some venture capitalists hesitated to invest at any valuation level. Several cited Meta's conduct with respect to its Instagram platform directly. Others wondered whether Phhhoto could sustain its growth in the future in light of Meta's conduct. Nevertheless, many were intrigued with the investment opportunity that Phhhoto provided, and they asked Phhhoto to remain in contact and update its performance, as these potential investors continued to evaluate the situation.

125.   Once the algorithmic change in the order of posts in Instagram users' newsfeeds took effect around April 2016, the rate of Phhhoto's new user registrations plummeted, as did Phhhoto's user engagement metrics. The updated Phhhoto metrics showed that Phhhoto was rapidly failing as a company, despite its large number of registered users. Phhhoto's updated

metrics would not support a case for Series A funding by top venture capitalists. Therefore, Phhhoto ceased its efforts to raise a Series A round of investment. To keep the company afloat, Phhhoto's founders instead tried to secure investors for another convertible note, in the form of an extension of Phhhoto's successful seed round. But as the effects of the Instagram algorithm continued, and as Phhhoto's metrics continued to decline, even this became impossible. Phhhoto's efforts to close the seed extension collapsed during the summer of 2016.

126.    Had Meta not interfered with Phhhoto's growth as a social network, Phhhoto could easily be worth hundreds of millions of dollars, even billions today. For comparison, in 2021, Poparazzi, a far less popular photo-sharing app with 10,000 registered users and 100,000 photo uploads, raised $20 million in a Series A round, and garnered a $135 million valuation. VSCO, a photo sharing app launched in 2011, reported 20 million monthly active users in April 2015 and currently sees between 5 and 10 million daily active users. It raised $90 million in two seed rounds, and it has a current valuation of $550 million.

127.    Without any hope of investment cash flow, Phhhoto's remaining option was to prematurely roll out ads. However, due to its lack of funding, Phhhoto also lacked the necessary resources to put together a proper advertising sales team, to do proper advertising integration, to obtain high-quality ad clients and to otherwise launch a successful advertising strategy at that stage.

128.    On June 20, 2017, as a direct effect of Meta's fraudulent and anticompetitive conduct, Phhhoto became unable to sustain its application infrastructure and was forced to shut down the Phhhoto app. At the time of the shutdown, Phhhoto's founders knew neither the extent of their injuries, nor whether they had even in fact sustained antitrust injury. By this time, Phhhoto's 10 million registered users had created 400 million phhhotos. The Phhhoto team

pivoted back into its parent company, Hold Still Inc., d/b/a Hypno, an experiential marketing business offering photo booths, a content platform, and other interactive camera experiences for retail and live events. Even years after Phhhoto's shutdown, its users continue to express their affection for the app, such as a recent "miss Phhhoto" post on Twitter that received tens of thousands of retweets almost four years after the app shut down.[16]

### E.   Phhhoto learns that Meta's conduct was part of an anti-competitive scheme to crush competitors.

129.    When Meta acquired Instagram in 2012, it unified its control over what were quickly becoming the two principal platforms in the market for personal social networking services, enabling Meta to maintain and enhance monopoly power in this market. By no later than early 2013, Meta had sufficient monopoly power to use its combined control of infrastructure for personal social networking services to diminish and preclude market entry by nascent competitors, including Phhhoto.

130.    Meta used its monopoly power to deny and withdraw various aspects of the critical infrastructure it controlled from nascent competitors. Meta started to cut off the interoperability features that it initially used to grow its own platforms through collaboration with third-party applications. As it did with Phhhoto, Meta revoked access to critical APIs from potential rivals that relied on the APIs for market entry.

131.    In May 2013, Meta cut off a company called Path from access to its APIs, and the company's user base quickly declined. Path went out of business. Similarly, in December 2013, Meta cut off API access to Circle, another nascent competitor in the market for personal social networking services. And in 2014, Meta cut off access to Instagram's API for the app Tiiny,

---

[16] *See,* @miss phhhoto, Twitter (Mar 20, 2022, 12:18 AM), https://twitter.com/search?q=miss%20phhhoto&src=typed_query&f=live.

which, having lost access to its main platform for engaging new users, shut down 11 months

after it launched.

132.    As described above, Meta cut off Phhhoto's access to Instagram APIs on or about

March 31, 2015. When that proved insufficient to preclude Phhhoto's market entry, Meta

embarked on a series of increasingly anticompetitive actions. In roughly April of 2015, Meta

surreptitiously denied Phhhoto integration into Facebook's platform, something that Facebook

had itself earlier initiated. And, when that and other anticompetitive actions proved insufficient

to preclude Phhhoto's market entry, Meta surreptitiously manipulated the algorithm used by the

Instagram platform, with the effect of penalizing Instagram users who posted phhhotos on the

that platform. These anticompetitive actions forced Phhhoto from the market.

133.    A little over a year after the October 25, 2017 discovery of Instagram's algorithm

having actually been suppressing Phhhoto's posts, governmental disclosures shed light on that

action as part of a Meta scheme of anticompetitive conduct. On December 5, 2018, the Digital,

Culture, Media and Sport Committee of the U.K. Parliament, publicly released documents

produced confidentially in *Six4Three, LLC, v. Facebook,* No. 4:16-06716 (N.D. Cal. 2016). This

revelation provided the first link between Meta's earlier actions toward Phhhoto (here, cutting

off API access) as part of an exclusionary scheme with the algorithmic suppression discovered in

late 2017. Phhhoto may not have been Meta's only target, but it was undoubtedly an important

one.

134.    Just ahead of the UK Parliament's disclosures, Meta's conduct changed. On or

about December 4, 2018, Meta amended its platform policies to remove a prior clause that

restricted competitors from "replicat[ing] core functionality that Facebook already provides." It

was on the basis of this policy that, for example, Meta previously stripped API access from the

social networking service Circle. It seemed, at least, that Meta would stop targeting nascent competitors for duplication, acquisition, or destruction (as it did with Phhhoto). This has allowed greater market entry for companies who may previously been unable to gain a foothold.

## IV.    RELEVANT MARKET

### A.    Product Market

135.    Meta competes in, and has monopoly power in, the product market for personal social networking services ("personal social networking" or "personal social networking services"). Personal social networking services are online services or platforms that allow users to develop and maintain social relationships with other people by sharing experiences in a digital social space.

136.    Personal social networking is an appropriate product market because consumers (those who use personal social networking) are unlikely to substitute their use of Meta's Facebook or Instagram platforms for the products that are outside the market (such as YouTube or Twitter). Phhhoto was a nascent horizontal competitor in the market for personal social networking and, but for Meta's anticompetitive conduct, Phhhoto would have become a substitute product for Instagram or Facebook. Personal social networking services are distinct from, and not interchangeable with, other online services in three significant respects.

137.    First, personal social networking services are built on a social graph that facilitates connections between users' friends, family, and other personal connections. A social graph is a digital representation of a person's relationships with other people. It allows users to connect with real world people—both those known in their personal lives, and those they do not know, such as friends-of-friends, or others who have similar interests, hobbies, or personal characteristics (such as background or religion). The social graph provides the foundation for

users, enabling them to communicate, see updates from their connections, learn about connections' personal interests and activities, and find new connections. It also allows users to find new content and services that they might be interested in.

138. Second, personal social networking services provide unique features that allow users to share information with their connections in the digital social space. One key feature of personal social networking services is the ability to "broadcast" from one user to its connections and others. For example, a user can share a news story; post a photo from a vacation; share new, unique content created by novel applications; or announce the arrival of a new baby. This user-generated content is posted in a content feed where users see the broadcast posts from their connections in a running format. Connections can then engage with the user-generated content posted in a content feed, for example, by "favoriting," commenting, or sharing the content with their own social network. Users can also join together in virtual groups, such as those based personal interests ("Billy Strings Music Fans"), hobbies ("DC Family Biking"), or shared history ("PS 232 Class of 2004"). Users can create events and use the social graph to find attendees.

139. Third, personal social networking services allow users to find and connect with others—individuals they know in person, or others that share interests or characteristics. The social graph facilitates these growing social connections by tracking user information and connecting users who may have an interest in connecting to one another. Meta's Facebook and Instagram platforms, as well as Snapchat, are currently the most widely used platforms for personal social networking services in the United States, and Phhhoto was a nascent competitor in the market for personal social networking services. Other examples of personal social networking services include Google+, Path, MeWe, Orkut, and Friendster.

140. Personal social networking services differ significantly from, and are not

interchangeable with, other types of online platforms, such as those used for business or interest-based connections, for video or audio consumption, or online messaging services. For example, Meta's Facebook and Instagram platforms are distinct from LinkedIn, which is a specialized network designed with the specific purpose of creating and maintaining online professional connections. Users of Facebook and Instagram are not likely to substitute a personal social networking service for a specialized or narrow platform such as LinkedIn. Instead, users are likely to have accounts for both: one for personal social networking services, and one for professional endeavors.

141.    Personal social networking services are also distinct from, and not interchangeable with, platforms like YouTube, Spotify, TikTok, or Netflix, each of which allows users to consume media content, and in some cases, broadcast content, but lacks the personal connection integration that personal social networking services possess. Instead, users of such platforms predominantly consume content, but do not employ them predominantly as a means to communicate or connect with friends and family. Rather, users will consume the content generated on these platforms, and then share them with connections on Facebook and Instagram.

142.    For example, a YouTube user may use the Facebook plugin on a YouTube video to "like" the video and share it to their Facebook network directly through the YouTube site. A user may post to Twitter or Reddit and consume content posted by others who are typically individuals that the user does not know in real life. They may follow a politician on Twitter, join a conversation about ski vacations on Reddit, or gain ideas about home décor on Pinterest—all without interacting with a single friend or family member. These broadcast formats are not interchangeable for personal social networking services because they do not provide a primary forum for identifying, connecting with, and communicating with friends and family.

143.     On the opposite end of the spectrum, messaging services, such as WhatsApp or iMessage, allow users to connect with their existing networks, but do not rely on a social graph or shared space for users to find others with similar interests, connections, or hobbies. Messaging services are not part of the market for personal social networking services. Messaging services also lack the "broadcast" and content feed functions of personal social networking services, where users can publish their own updates to all connections, as well as view a running list of similar updates from all connections. Unlike personal social networking services (where the social graph enables users to find friends and connections—both those known in person and unknown), users of messaging services typically enter their own contacts. Users also rely on messaging services to communicate directly with one person or a small group of people they are likely to know in real life, unlike personal social networking services which connect a larger and broader group of contacts.

144.     Similarly, video sharing platforms like Zoom and Houseparty are outside the market for personal social networking services. The live connection these applications provide allow users to connect with others in a virtual "living room" or "conference room," but the experience is transient and impermanent. These types of networks do not rely on a social graph, and users cannot create and broadcast content through them. Rather, video messaging platforms are more akin to a conference call or telephone, but with a digital component, and cannot serve as a substitute for personal social networking services.

145.     In the same way, services like Twitter and Reddit are used predominantly to share information rather than user created video. Users of Facebook and Instagram are unlikely to substitute with Twitter or Reddit. Rather, they may have accounts for multiple platforms, and use the platforms differently to share or consume different content. In contrast, users with both

Instagram and Facebook accounts may share similar or identical content on both platforms.

146.    Meta recognizes the distinction between personal social networking services and broadcast video formats like YouTube and TikTok. In a January 2019 email Meta noted "people are hiring TikTok for very different jobs to Instagram and they are not directly competing in the core areas of focus for our business," and further that "TikTok is not hired for sharing with friends and family." Nor was YouTube seen as a competitive threat, because "YT and Facebook serve nearly disjoint use cases with respect to video consumption," according to a February 2015 email from a Meta executive.

147.    Meta has also recognized the distinct importance of users' ability to share creative content with close connections. Zuckerberg described Facebook as being "about real connections to actual friends, so the stories coming in are of interest to the people receiving them, since they are significant to the person creating them."

### B.    Geographic market

148.    The relevant geographic market is the United States. While Meta has users worldwide, users themselves are still geographically limited. Network effects are stronger between people who are closer together, such as those living in the United States. Most users in the market for personal social networking services concentrate their connections predominantly to those in the same country. Meta itself tracks performance of its products and those of its rivals by country, rather than on a global or regional basis. Accordingly, the relevant geographic market is the United States.

## V.    MARKET POWER

149.    Monopoly power is the power to control prices or exclude competition. Market power can be inferred from a firm's large percentage share of the relevant market, or it can be

proven directly through evidence of control over prices or exclusion of competition. Meta has, at all relevant times, possessed monopoly power in the personal social networking services market through its Facebook and Instagram platforms.

150.    Meta's monopoly power is shown in this case indirectly, by its overwhelmingly dominant share of the relevant market, as well as directly, including by evidence of its exclusion of competition. The personal social networking services market also has strong direct network effects, significant barriers to entry, and obstacles to switching ("high switching costs") that enable Meta to enhance and maintain its monopoly power.

### A.    Meta's market share demonstrates its monopoly power.

151.    Since at least 2011, Meta has possessed a monopolistic share of the relevant market. Specifically, it has more than 200 million monthly users in the United States and approximately 3 *billion* users worldwide. [17] Over 80% of internet users in the United States use Facebook regularly, [18] and the share of the population using the platform is projected to keep growing.[19] Even if one includes visits to all social media, not only personal social networking services, 71.8% of visits in the United States were to Facebook.[20] On average, users spend in total more than 4 billion minutes per day using Facebook.

152.    Since 2012, Meta has also controlled Instagram, which in 2020 had more than 138

---

[17] Statista Research Dep't, *Facebook usage in the United States*, Statista (June 29, 2021), https://www.statista.com/topics/5323/facebook-usage-in-the-united-states/.

[18] Teodora Dobrilova, *How Many Americans Use Facebook in 2022?*, TechJury (Updated Mar. 15, 2022), https://techjury.net/blog/how-many-americans-use-facebook/#gref (noting that 81% of adults in the U.S. have Facebook accounts).

[19] Statista Research Dep't, *U.S.: Facebook usage penetration 2017-2026*, Statista (Jan. 28, 2022), https://www.statista.com/statistics/183460/share-of-the-us-population-using-facebook/.

[20] Statista Research Dep't, *U.S. market share of leading social media website 2021*, Statista (Jan. 28, 2022), https://www.statista.com/statistics/265773/market-share-of-the-most-popular-social-media-websites-in-the-us/.

million monthly users.[21] On average, over 54% of U.S. internet users use Instagram each month. On average, users spend in total 1.5 billion minutes per day using Instagram.

153.    Since 2012, Meta's share of time spent using apps providing personal social networking services has consistently exceeded 80%, and it has averaged 92%. Likewise, Meta's share of daily active users for personal social networking services has exceeded 70% since 2016, and its share of monthly active users has exceeded 65% since at least 2011.

154.    In terms of user hours, in 2016 users spent an average of 50 minutes daily on Facebook, Instagram, and Messenger—nearly twice the amount of time spent on Snapchat (25-30 minutes), more than three times as much as spent on YouTube (17 minutes), and 50 times the average spent on LinkedIn and Twitter (one minute each).[22]

155.    Meta also is dominant among mobile users of personal networking services. As of September 2019, the three most popular mobile apps for social networking (including messaging services) were all within the Meta family, with Facebook having nearly 170 million monthly users, and Instagram having 121 million monthly users. [23] Facebook is the most-downloaded personal networking app on the Apple App Store in the United States.

---

[21] Statista Research Dep't, *Instagram: Number of users in the United States 2020-2023*, Statista (Jan. 28, 2022), https://www.statista.com/statistics/293771/number-of-us-instagram-users/.

[22] *See* James B. Stewart, *Facebook Has 50 Minutes of Your Time Each Day. It Wants More*, N.Y. Times (May 5, 2016), https://www.nytimes.com/2016/05/06/business/facebook-bends-the-rules-of-audience-engagement-to-its-advantage.html; Biz Carson, *Snapchat users now spend 25 to 30 minutes every day on the app, and it's trying to attract the TV money because of it*, Business Insider (Mar. 26, 2016), https://www.businessinsider.com/how-much-time-people-spend-on-snapchat-2016-3.

[23] Twitter, in fourth place, trailed far behind with approximately 81 million monthly users, less than half as many users as Facebook's main platform, and only 20% usage of the three leading Meta mobile apps combined. L. Ceci, *Most Popular Social Medica Apps in the U.S. 2019, by Audience* (Jan. 18, 2022), https://www.statista.com/statistics/248074/most-popular-us-social-networking-apps-ranked-by-audience/.

156.     The next largest provider of personal social networking services in the United States is Snapchat, which in 2020 attracted 75 million users per month.[24] However, users spent an average of 600 million minutes per day using the Snapchat service, a fraction of the time spent on Facebook and Instagram.[25] No other platforms rival Meta in the market for personal social networking services. Alternatives have failed to reach the same size or scale, or they have exited the market.

157.     DAUs, MAUs, and time spent using a platform are appropriate metrics for gauging Meta's market share, as Meta's executives, investors, and industry observers all rely on DAUs, MAUs, and time spent on a platform as common units of measure. For example, Snapchat compares its performance to Meta's Instagram platform by comparing MAUs, DAUs, and time spent. Commercial data sources such as ComScore also track these metrics—metrics used by industry participants and observers to assess usage of online services.

**B.     Direct evidence demonstrates Meta's monopoly power.**

158.     Direct evidence of Meta's ability to control prices or exclude competition also proves that Meta had monopoly power. Meta's monopoly power is demonstrated by its ability to exclude competition by preventing new entrants from entering the market and by having prevented small companies from growing large enough to become competitors. Meta has been able to selectively deny potential competitors access to its platforms, and accordingly extinguish them as potential competitors. Meta has also been able to enforce restrictive policies that deny

---

[24] *See* Press Release, Snap Inc. Announces First Quarter 2020 Financial Results (Apr. 21, 2020), https://s25.q4cdn.com/442043304/files/pressrelease/q1-2020-earnings-press-release.pdf.

[25] *See* Deyan G., *How Much Time Do People Spend on Social Media in 2021?*, TechJury, https://techjury.net/blog/time-spent-on-social-media/#gref (noting that the average Facebook user spends 2 hours and 24 minutes on the app per day compared to Snapchat users who spend an average of 30 minutes on the app per day); Carson, *supra* note 27 (noting Snapchat users spend on average 30+ minutes per day on the app).

potential competitors access to Meta's massive user base. Meta's ability to exclude Phhhoto from the market for personal social networking services is direct evidence of Meta's monopoly power.

159.     Further indicating its monopoly power, Meta also has "the power to control prices" because it has been able to increase the quality-adjusted price users pay for access to it platforms. While users do not pay a fee to use Meta's Facebook and Instagram platforms, users pay for these services with their data and their attention to advertisements, which Meta monetizes in advertising revenue. Indeed, Meta recognizes in its Terms of Service:

> *Instead of paying* to use Facebook and the other products and services we offer, by using the Facebook Products covered by these Terms, *you agree* that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.[26]

(emphasis added). Meta recognizes its own value by calculating average revenue per user, which in 2019 was $41.00 per user in the United States and Canada. The *price* users pay for Meta's services is reflected in the quality of the platforms, the amount of data they must provide, and the amount of advertisements they see. In degrading quality to a level users would not otherwise experience in a competitive market, Meta charges supracompetitive prices.

160.     Yet Meta has been able to degrade its services, and demand users provide more data, with fewer privacy protections—without harming its market position. Users therefore pay a higher price to use Meta than they would in a competitive market.

161.     When Meta's conduct has caused significant user dissatisfaction, user engagement is not significantly affected. User dissatisfaction has been rampant in the face of regulatory attention and well-publicized scandals, yet Meta has withstood these challenges without losing many users. Meta's misuse and mishandling of user data and decreasing product quality also

---

[26] Facebook, *Terms of Service*, https://www.facebook.com/terms.php (last revision Jan. 4, 2022).

reflect Meta's monopoly power.

### C. Meta's network has developed strong and durable network effects.

#### 1. Meta's network effects constitute significant barriers to entry.

162. The market for personal social networking services faces high barriers to entry, which enhance the durability of Meta's monopoly power.

163. The most important feature of a personal social networking service is the ability to engage a high number of users. When more users are engaged with a platform, users' posts and content can reach a broader audience, and users view more content from their larger network of connections, causing them to want to engage with the platform more frequently. This results in a "network effect," by which the value or utility of the service increases as more users use it. With personal social networking, high user engagement also attracts new users, as they do not want to miss connecting digitally with their network.

164. New entrants in the market for personal social networking services must convince users that enough of their friends and family members will also engage with the social networking platform to make use of the platform worthwhile. Attaining this necessary critical mass of users is a substantial barrier to entry that can insulate a dominant platform from competitive threats, unless and until a competitor with innovative technology disrupts the market.

165. Relatedly, users of new competitors in the market for personal social networking services experience "high switching costs" in terms of the difficulty of migrating away from the dominant platforms, Meta's Facebook and Instagram. Users cannot take their posts and social networking history with them if they move to another platform. These impediments to switching are called "stickiness," a term Meta's own executives developed and describe as: "The idea is that after you have invested hours and hours in your friend graph or interest graph or follower

graph, you are less likely to leave for a new or different service that offers similar functionality."

166.    From the standpoint of a potential market entrant, enticing users to join a new platform is the first critical hurdle because users are reluctant to incur such high switching costs—which increase over time as users invest more in their social network. And to be successful, potential competitors must attract a critical mass of third parties to connect with the platform and enhance user experiences, as well as advertisers to monetize their endeavor. Thus, Zuckerberg recognized that the greatest threat to Meta was not from an identical social networking platform—as demonstrated by the failure of Google+—but instead from a differentiated product that would be able to gain necessary scale quickly by offering users an innovative or distinctive way of connecting with friends and family.

167.    High barriers to entry also exist in the personal networking services market because Meta has made it difficult for users to "multi-home" outside the Meta family—that is, to use multiple different platforms to meet users' various personal networking needs. While users can create a post on Instagram and simultaneously share that post to both their Instagram and Facebook feeds, users cannot, by the same click of a "share" button, also share that image directly to Snapchat or Twitter.

168.    Likewise, while Meta users can chat with friends in both their Instagram and Facebook networks from a single integrated platform, they cannot use Meta's messaging platform to reach contacts or services outside the Meta family, like iMessage, Telegram, or GroupMe. And Meta has already begun an effort to integrate Meta's WhatsApp messaging service as well, unifying the platforms of three of the most popular mobile social networking and messenger apps.

169.    Taken together, Meta's suite of products make it unlikely that users will exit the

Meta ecosystem. Even if members of Meta's network delete their Facebook profile, users may still remain active on Messenger, WhatsApp, or Instagram, allowing Meta to continue to harvest data and target ads to those users. A new entrant with less scale than Meta would lose all value of a user who ceased engagement with its platform.

### 2.  Market entrants lack the data necessary to attract advertisers.

170.  Strong network effects exist between Meta and advertisers. As Meta's network has grown, advertisers have become able to reach larger audiences with increasing precision due to the massive quantity of data that Meta has accumulated on users, their friends, and their interests. Meta can accumulate more data which translates to more highly targeted advertising, which increases the value of the ad-targeting services Meta sells to firms and the profit Meta earns from its advertising business. When Phhhoto had no choice but to try to launch an advertising strategy without the necessary resources, its attempt failed, including because it could not acquire top-tier advertisers that Meta had. Meta's power permits it to monetize its ads at a higher rate than a new entrant or advertising vehicle with less scale could.

### 3.  Meta also benefits from cross-side network effects.

171.  A key element of Meta's success has been its ability to engage third-party app developers in creating programs that work directly in, or harmoniously with, Facebook and Instagram. Relatedly, websites, apps, and other forms of online media eagerly connect with Facebook/Instagram through plugins such as the ubiquitous "like" button that a user can click on almost any website. The ability of these third parties to integrate with Meta creates strong network effects that would be difficult for a new market entrant to mirror.

172.  This third-party engagement likewise garners significant cross-side network effects—the value of a network that benefits from an increase in users on the other side of that network—that cannot be readily replicated by a new entrant. For example, through plugins and

its open graph, third parties drive traffic to Meta through their own apps or websites. This too creates a cycle which allows Facebook and Instagram users to view third-party content through Meta's platforms, which drives traffic back to the third-party programs. Meta derives value from these cross-side network effects; it increases the amount of valuable user data—such as what information a user likes, with whom they are connected, and where they are located—which can then be sold to advertisers.

173.    Because of its unparalleled network and access to data, Meta has unprecedented access to information about its users that are key to both (a) engaging users by presenting them with desirable content, and (b) allowing advertisers to specifically target their ads to prospective customers. A new market entrant would not be able to offer advertisers the type of data Meta can provide, which is essential to monetizing personal social networking services.

## VI.    INJURY AND COMPETITIVE HARM

### A.    Injury to Phhhoto

174.    Meta targeted Phhhoto, as described above, with a scheme of anticompetitive, fraudulent, and unfair business practices which, because of Meta's unlawfully maintained monopoly, directly and proximately caused Phhhoto injuries to its business and property.

175.    In withdrawing Phhhoto's access to critical infrastructure, Meta severely diminished Phhhoto's distribution channel, preventing Phhhoto from gaining the scale it needed to grow, attract and engage users, and attract investment. Meta both denied Phhhoto's access to the Instagram platform and prevented it from gaining a foothold on Facebook by quashing the newsfeed integration. Absent Meta's anticompetitive conduct, Phhhoto would have had the ability to become a substantial platform for personal social networking services in the United States.

176.    Through the launch of the Boomerang clone, Meta sought to and did deter investors from investing in Phhhoto. Meta's suppression algorithm devastated Phhhoto's growth and user engagement metrics by preventing users from seeing Phhhoto content on Instagram, ultimately rendering Phhhoto uninvestable.

177.    Meta made knowing and fraudulent misrepresentations upon which Phhhoto relied, including those regarding: (a) Meta's intention to integrate Phhhoto into the Facebook newsfeed; (b) Meta's explanation that it withdrew the third-party ability to pre-populate hashtags through the iPhone Hooks because the hashtags were "spammy"; and (c) the operation of the algorithmic newsfeed that suppressed Phhhoto posts. Together, this conduct prevented Phhhoto from taking the steps necessary to preserve its user engagement and viability as an app.

178.    Meta's anticompetitive, fraudulent, and unfair course of conduct deprived Phhhoto of access to hundreds of millions of dollars of capital to the detriment of its economic viability. Investors would not fund Phhhoto any further because they were concerned that Meta's actions, including Meta's launch of the Boomerang clone and withdrawal of API access, prevented Phhhoto from attracting users as a viable app, and Phhhoto's investability was further diminished by the impact of Meta's suppression algorithm on Phhhoto's user growth and engagement.

179.    Meta's fraudulent and anticompetitive course of conduct also drastically reduced Phhhoto's ability to obtain advertising revenue. For each user that Meta denied to Phhhoto through its unlawful conduct, Phhhoto experienced a quantifiable loss of advertising revenue.

180.    Meta's fraudulent and anticompetitive course of conduct reduced Phhhoto's value both during its existence and in its ability to sell its assets when it was shut down.

**B.    Harm to Competition**

181. By its unlawful and anticompetitive conduct, Meta has harmed competition and potential competition in the market for personal social networking services in the United States, and it has caused harm to consumers. As a result of Meta's conduct, potential competitors were less likely to innovate or invest in creating competing services that would benefit and engage users. Further, innovative or differentiated nascent competitors, including Phhhoto, were prevented from gaining scale, which in turn enabled Meta to maintain its monopoly power.

### 1. Harm to Consumers

182. Users benefit from competition among personal social networking platforms. This competition can arise on the basis of: (a) innovation, if a rival creates a new way for users to produce, share, or consume content with other users in their network; (b) price, if users can pay less by providing less personal data for access to a new platform or the new platform pays users to join and engage; and (c) quality, if a new entrant better protects users from harmful content or data breaches, requires users to view fewer advertisements, or provides otherwise improved content and services.

183. As Meta gained and maintained monopoly power it degraded the quality of services it provided to users. This included rolling back privacy protections, increasing the number of advertisements users viewed, and prohibiting third parties from continuing to share their services through Meta. Because potential competitors were less likely to innovate or invest in creating competing services that would benefit and engage users, consumers were deprived of choice in the market for personal social networking services. Users have been deprived of the ability to select products for personal social networking services that offer different features or user engagement activities, different levels of advertising, or data and privacy protection features different from Meta.

184.     Meta users are harmed when the data cost of using Meta platforms, like Instagram and Facebook, is higher than such users would choose if meaningful competition on that basis existed. Meta users give away more personal data and privacy than they would in a competitive marketplace, which lowers the quality of the Meta services. Even if Meta over-collects or misuses user data, consumers who wish to continue using a personal social networking service are captives in Meta's platform monopoly. Meta users are likewise harmed when Meta wields its monopoly power to acquire or destroy nascent competition, which might otherwise have transformed the way that digital communities grow and interact.

### 2.     Harm to Advertisers

185.     Advertisers are likewise harmed because Meta's dominant market position allows it to charge supracompetitive prices for its ad-targeting services, which Meta calibrates with unparalleled success because of the enormous amount of data it harvests from its users. Advertisers are also harmed by lower-quality outcomes than they would have in a competitive marketplace. And because Meta's conduct has suppressed output in the market for personal social networking services, advertisers have had fewer opportunities to engage with users.

## VII.   ACCRUAL OF CLAIMS

### A.     Summary of Claim Accrual

186.     All of Phhhoto's claims are timely. Either they were filed within the six-year statute of limitations (fraud, unfair competition); or the statute of limitations was tolled by one or more of the following: fraudulent concealment, the continuing violations doctrine, and/or the speculative damages doctrine. Phhhoto could not and did not begin to discover Meta's fraudulent and anticompetitive conduct until October 25, 2017. Because Meta fraudulently concealed its conduct, Phhhoto's antitrust claims are timely. They were filed on November 4, 2021—within

the four-year statute of limitations under the Clayton Act. (By agreement of the named parties to this action, any applicable statutes of limitations have been tolled for a total of 14 days).

187.   Further, Phhhoto was not on notice of Meta's conduct: (a) promising to integrate Phhhoto into the Facebook newsfeed; (b) removing the ability to pre-populate hashtags through iPhone hooks because #phhhoto looked "spammy"; (c) revoking Phhhoto's access to the Find Friends API; and (d) copying Phhhoto with Boomerang was part of a scheme of coordinated exclusionary conduct that had caused injury to Phhhoto until December 5, 2018 at the earliest, when the U.K Parliament first published a trove of theretofore confidential documents that revealed that Meta had been targeting competitors like Phhhoto for acquisition or destruction.

**B.     Fraudulent Concealment**

188.   Meta purposely and fraudulently concealed its anticompetitive and unlawful conduct through misrepresentations and material omissions made to Phhhoto concerning: Meta's ongoing intention to integrate Phhhoto into the Facebook newsfeed; the reason for withdrawal of the ability to pre-populate captions through iPhone Hooks; and the operation of and reason for implementation of the algorithmic newsfeed.

189.   First, Facebook's Brian Hurren invited Phhhoto to collaborate with Meta to provide "gif support in newsfeed" on February 26, 2015. After working collaboratively on the integration project, which would be mutually beneficial for both companies, Meta knowingly and fraudulently told Phhhoto in June 2015 that it was working to complete the integration—but never did so. In emails dated June 1 and June 8, 2015, Meta's Hurren said he would "check on my end" and that he was "trying to get an ETA on the fix." These statements were false, misleading, and omitted the material fact that the integration was shut down because Meta identified Phhhoto as a competitive threat that it sought to first clone and then extinguish.

190.     Second, on August 9, 2015, Meta stated publicly that it had withdrawn the ability to pre-populate captions, including hashtags such as #phhhoto, through iPhone Hooks because it had "gotten feedback that the pre-filled captions coming through this sharing channel often feel spammy." In reality, Meta invited developers like Phhhoto to integrate and interoperate with both the Facebook and Instagram platforms, as a way for both Meta and the developers to grow their user base and provide better product offerings.  Meta's statement that it removed the ability to pre-populate captions because they were "spammy" was false, as demonstrated by Meta continuing to allow its own applications—such as Boomerang—to include "spammy" commercial messages that users could not remove from their posts. Meta knew that these statements were false and did not disclose that the real reason for disallowing pre-populating hashtags was to target and eliminate nascent competitors.

191.     Third, Meta concealed from Phhhoto the role of the algorithm in suppressing Phhhoto's users' posts and, thus, the reason for Phhhoto's declining growth and user engagement. Meta affirmatively stated that the algorithmic newsfeed would promote posts based on a user's likelihood of being interested in the content, while denying that it hid posts, engaged in shadowbanning, or favored photo or video formats. Indeed, Meta stated publicly when introducing the algorithmic newsfeed that "all the posts will still be there, just in a different order." These statements were false, or at a minimum omitted material facts that would be necessary to make these statements truthful. In 2018, Meta again falsely misrepresented the operation of its algorithm, identifying to the press three factors that predominantly determined the ranking of posts: interest, recency, and relationship. Meta omitted and materially misled Phhhoto and the public by not disclosing that the algorithm in fact suppressed content created on Phhhoto, regardless of whether Phhhoto's posts fit or exceeded these alleged requirements.

Meta continued to conceal the operation of Instagram's algorithm, and on September 21, 2021, it was revealed for the first time, in a New York Times article, that Meta had implemented a scheme called "Project Amplify" to favor content created by Meta over third-parties.

192.    Meta knew that the above statements were false because it was engaged in an anticompetitive campaign to target and eliminate Phhhoto from the market for personal social networking services.

193.    Meta's conduct was also self-concealing because it was performed outside the sight and knowledge of Phhhoto, and the success of Meta's anticompetitive scheme depended on Phhhoto and antitrust regulators remaining in the dark. As a result, Phhhoto did not, and could not, have discovered Meta's fraudulent and anticompetitive scheme sooner than it did, despite the exercise of reasonable diligence.

194.    Phhhoto exercised reasonable diligence in attempting to determine the cause of its declining growth and the reasons for Meta's decision to withdraw critical infrastructure access. Phhhoto inquired of Meta about the reasons for the withdrawal of critical infrastructure access, and it received false and misleading responses, such as the pre-population of #Phhhoto being "spammy."

195.    Phhhoto also exercised due diligence in determining the cause of its declining growth in the first half of 2016. Indeed, because the continued existence of the entire company was at stake, Phhhoto undertook every reasonable effort to determine the cause of the steep decline. Because of Meta's fraudulent statements and material omissions regarding its surreptitious and anticompetitive scheme, and in particular Meta's misrepresentations regarding the changes to its secretive algorithm, Phhhoto was not on actual or inquiry notice that Meta was the cause of Phhhoto's injury.

196.     Phhhoto relied, to its detriment, on Meta's fraudulent statements and omissions in responding to its decrease in user engagement metrics—investigating potential geographic or cyclical decline in usage, changes in user preferences, and possible code bugs. Had Phhhoto known that Meta was purposely targeting Phhhoto to eliminate it from the market, Phhhoto could have taken other actions, such as engaging in a media campaign or bringing a lawsuit against Meta for injunctive relief.

### C.     Continuing Violations and Ascertainment of Damages

197.     Meta has committed continuing violations of the antitrust laws, and a continuing tort of fraud, resulting in substantial monetary injury to Phhhoto. Meta engaged in a pattern of anticompetitive and fraudulent conduct, including: first promoting interoperability on its platforms and then revoking that access in order to maintain its monopoly; fraudulently promising to integrate Phhhoto into the Meta newsfeed but copying Phhhoto instead; and eliminating Phhhoto as a competitor by ensuring that user engagement plummeted such that the app became unattractive for necessary investment and could no longer continue as a viable business. Each time Meta's algorithm suppressed a Phhhoto user's post, Phhhoto suffered new and accumulating injuries. Each of Meta's fraudulent statements, including those made during the 2018 press conference on the operation of its algorithm, misled, defrauded, and injured Phhhoto.

198.     Each of Meta's injurious overt acts accumulated new injuries for Phhhoto. However, even had the acts been discoverable and not concealed at the time, the consequences and damages were then speculative and not yet ascertainable. In 2016, when Phhhoto's engagement metrics began to decline, not only was Phhhoto unaware of the reason for the decline, but it did not and could not know what the ultimate outcome would be.

## VIII.   CAUSES OF ACTION

### A.   Count One: Unlawful Monopolization (Monopoly Maintenance) in the Personal Social Networking Services Market – Section 2 of the Sherman Act, 15 U.S.C. § 2

199.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

200.    As detailed above, at all relevant times, Meta has possessed monopoly power in the relevant market for Personal Social Networking Services in the United States.

201.    By promoting interoperability between Meta and Phhhoto, Meta was able to engage users and collect data related to Phhhoto's users, improve the quality of its services, and increase advertising revenue. After benefiting from the presence of Phhhoto's users' unique and compelling content on its Facebook and Instagram platforms and gaining quantitative insight into Phhhoto's market desirability, Meta abused its monopoly power by withdrawing access to its critical infrastructure. This course of dealing created a profitable arrangement for Meta, and there was no legitimate rationale for severing the course of dealing, which rather was intended to and did suppress competition.

202.    Meta willfully maintained and enhanced its monopoly power through an anticompetitive and exclusionary course of conduct as alleged herein, including but not limited to cutting off Phhhoto's access to critical APIs, revoking Phhhoto's ability to use the iPhone hooks to prepopulate with #Phhhoto, fraudulently promising to integrate Phhhoto into the Meta newsfeed but creating a clone of Phhhoto's product instead, and suppressing Phhhoto's users' posts to the Instagram newsfeed.

203.    As a direct and proximate result of this unlawful conduct, Phhhoto was injured in its business and property by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

204.     As a result of Meta's conduct, Phhhoto has suffered the type of injury that the antitrust laws were intended to prevent.

205.     Meta's conduct has harmed and continues to harm competition in the market for personal social networking services, including by stifling innovation and investment, degrading quality, suppressing output, and depriving consumers of choice in the Personal Social Networking Services market in the United States.

206.     There are no procompetitive justifications for Meta's anticompetitive and exclusionary conduct.

207.     The anticompetitive effects of Meta's conduct outweigh any procompetitive benefits, to the extent that any such benefits even exist. In any event, any benefits of Meta's conduct could have been achieved by less anticompetitive means.

208.     By its acts and practices, Meta has engaged in a course of conduct that constitutes monopolization, here the unlawful maintenance and exercise of monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**B.     Count Two: Fraud**

209.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

210.     Meta made misrepresentations of fact and material omissions to Phhhoto, including but not limited to Meta's intention to integrate Phhhoto into the Facebook newsfeed; the reason for withdrawing the ability to pre-populate hashtags through iPhone Hooks; and the operation of and reason for implementing the algorithmic newsfeed.

211.     In making these misrepresentations of fact and material omissions to Phhhoto, Meta knew that they were false.

212. Meta intended for Phhhoto to rely on the aforesaid misrepresentations of fact and material omissions that pertained to features of Phhhoto that were crucial to the company and the program's user engagement.

213. Phhhoto relied on Meta's aforesaid misrepresentations of fact and material omissions in the manner previously alleged herein.

214. As a direct and proximate result of Meta's misrepresentations of fact and material omissions, Phhhoto incurred damages by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

**C.      Count Three: Unfair Competition**

215. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

216. Meta engaged in a fraudulent, anticompetitive, and exclusionary course of conduct as alleged herein, including but not limited to cutting off Phhhoto's access to critical APIs, revoking Phhhoto's ability to use the iPhone hooks to prepopulate with #Phhhoto, fraudulently promising to integrate Phhhoto into the Facebook newsfeed but creating a clone of Phhhoto's product instead, and suppressing Phhhoto's users' posts to the Instagram newsfeed.

217. Moreover, Meta misapplied its commercial advantage by misrepresenting that it was working to integrate Phhhoto into the Facebook newsfeed, first offering Phhhoto the opportunity to work collaboratively with Facebook, but then stringing Phhhoto along under the guise of continued collaboration after deciding to abandon the project. Meta gained significant information about Phhhoto's usage and growth—including the names of key software developers—and then used information gained through Phhhoto's efforts to integrate into the Facebook newsfeed to take commercial advantage of Phhhoto.

218.    To gain this technical information and insight into Phhhoto's app, Meta misled Phhhoto's founders through repeated fraudulent statements, claiming that it was making progress and working on fixes to make the integration happen, all the while knowing that it had already shifted its plan to destroying the nascent competitor.

219.    By promoting interoperability between Meta and Phhhoto, Meta was able to engage users, collect data related to Phhhoto's users, improve the quality of its services, and increase its advertising revenue. After benefiting from the presence of Phhhoto's unique and compelling content on its platforms and gaining quantitative insight into Phhhoto's market desirability, Meta took commercial advantage of Phhhoto by withdrawing access to the critical infrastructure.

220.    Meta's acts against Phhhoto—using fraudulent statements and the guise of an ongoing collaboration to obtain critical information on the Phhhoto app, using said information to clone the Phhhoto app with Boomerang, withdrawing Phhhoto's API access and then attempting to poach Phhhoto's best engineers for its own in-app camera once it had already started suppressing Phhhoto's posts—shows that Meta exercised bad faith.

221.    As a direct and proximate result of this unlawful conduct, Phhhoto has been injured in its business and property, by losing investment opportunities, having its advertising revenue diminished, and suffering the total loss of the value of the company.

222.    By its acts and practices, Meta has engaged in a course of conduct that constitutes the common law tort of unfair competition.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.    Judgment for Plaintiff against Meta with the respect to the claims set forth herein;

      b.      Monetary damages, including treble and/or punitive damages, in an amount to be proven at trial;

      c.      Expenses of litigation and costs of this action, including reasonable attorneys' fees; and

      d.      Such other and further relief as the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY.

Dated:  March 21, 2022

*/s/ Scott Martin*_____
Scott Martin
Irving Scher
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
smartin@hausfeld.com
ischer@hausfeld.com

Michael D. Hausfeld (*pro hac vice*)
Sarah R. LaFreniere
Ian Engdahl (application for admission *pro hac vice* forthcoming)
Brittany Nieves (*pro hac vice*)
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
Tel.: (202) 540-7200
mhausfeld@hausfeld.com
slafreniere@hausfeld.com
iengdahl@hausfeld.com
bnieves@hausfeld.com

Gary L. Reback (*pro hac vice*)
CARR & FERRELL LLP
120 Constitution Drive
Menlo Park, CA 94025
Tel.: (650) 812-3400
greback@carrferrell.com

**Counsel for Plaintiff PHHHOTO Inc.**