IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PHHHOTO Inc.<br><br>*Plaintiff,*<br><br>v.<br><br>Meta Platforms, Inc. f/k/a Facebook, Inc.<br>and DOES Nos. 1-7,<br><br>*Defendants.* | Case No. 1:21-cv-06159-KAM-RLM |

**PLAINTIFF PHHHOTO INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT META PLATFORM INC.'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................... 1

II.   LEGAL STANDARD ............................................................................................... 3

III.  ARGUMENT ............................................................................................................ 4

    A. Meta undertook a course of conduct to exclude competition and unlawfully maintain its
       Monopoly in the PSNS market. ............................................................................... 4

        1. Phhhoto's claims must be analyzed together as a course of conduct, not
        individually as "refusals to deal."............................................................................ 5

           a.  Phhhoto sufficiently pleads a course of exclusionary conduct ........................ 7

             i. API withdrawal ................................................................................................ 7

             ii. Captioning ..................................................................................................... 7

             iii. Boomerang. .................................................................................................. 10

             iv. Misrepresentatons to consumers. ................................................................ 11

             v.  Algorithm and change in user feed ordering. ..............................................12

             vi. Predatory hiring. ......................................................................................... 13

           b.  Meta's reliance on *New York v. Facebook* is misplaced................................ 13

        2. Meta possessed monopoly power in the relevant PSNS market......................... 14

    B. Phhhoto's antitrust claims are timely. ................................................................... 16

        1. Meta fraudulently concealed the suppression of Phhhoto-related content and its
        anticompetitive course of conduct.......................................................................... 18

           a. Phhhoto did not know of its antitrust cause of action.................................... 19

           b. Phhhoto exercised more than reasonable diligence....................................... 20

        2. Each suppression constituted a continuing violation. ........................................ 23

    C. Phhhoto's fraud and unlawful competition claims satisfy New York law. ..................... 23

        1. Phhhoto pleads the elements of fraud with the requisite particularity................. 25

        2. Meta violated New York's "broad and flexible" doctrine of unfair competition. 26

        3. Phhhoto's state law claims are timely................................................................. 27

IV.  CONCLUSION ....................................................................................................... 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014)..................................................................6, 9, 19

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MDL-1775, 2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010)....................................23

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)..................................................................4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)..................................................................8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d. Cir. 1979)..................................................................7, 10, 23

*Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*,
610 Fed. Appx. 69 (2d Cir. 2015)..................................................................26

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) ..................................................................6

*Continental Ore Co.. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)..................................................................3, 6

*Creative Copier Servs. v. Xerox Corp.*,
No. 01-CV-155, 2005 WL 2175138 (D. Conn. Sept. 2, 2005)..............................................24

*Donahue v. Pendleton Woolen Mills, Inc.*,
633 F. Supp. 1423 (S.D.N.Y. 1986) ..................................................................24

*Express Gold Cash, Inc. v. Beyond 79, LLC*,
No. 1:18-CV-00837 EAW, 2019 WL 4394567 (W.D.N.Y. Sept. 13, 2019) ..........................28

*Faiveley Transp. USA, Inc. v. Wabtec Corp.*,
758 F. Supp. 2d 211 (S.D.N.Y. 2010)..................................................................26

*Free Freehand Corp. v. Adobe Sys., Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..................................................................24

*FTC v. Facebook, Inc.*,
    No. 20-3590 (JEB), 2022 WL 103308 (D.D.C. Jan. 11, 2022) ............................................14

*In re Gabapentin Patent Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ...................................................................................6

*GO Comput., Inc. v. Microsoft Corp.*,
    437 F. Supp. 2d 497 (D. Md. 2006) ................................................................................20

*GO Comput., Inc. v. Microsoft Corp.*,
    508 F.3d 170 (4th Cir. 2007) ..........................................................................................19

*Greenlight Cap., Inc. v. GreenLight (Switzerland) S.A.*,
    No. 04 CIV 3136 (HB), 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005) ......................................28

*Hinds Cnty. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)..............................................................................16

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
    623 F.2d 1255 (8th Cir. 1980) ........................................................................................12

*Kaufman v. Cohen*, 760 N.Y.S.2d 157 (Div. 1st Dept. 2003) .......................................................24

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)................................................................................................17, 23

*Klein v. Facebook, Inc.*,
    No. 20-CV-08570-LHK, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) .................................17

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012)..............................................................................................4

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003)........................................................................................6, 12

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)........................................................................................................12

*Merced Irrigation Dist. v. Barclays Bank PLC*,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016) ..............................................................................21

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)............................................................................................25

*Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.*,
    14 F. Supp. 2d 331 (S.D.N.Y. 1998)................................................................................26

*Midwest Mem'l Grp., LLC v. Int'l Fund Servs. (Ireland) Ltd.*,
    No. 10 Civ. 8660 (PAC), 2011 WL 4916407 (S.D.N.Y. Oct. 17, 2011)................................27

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ..........................................................................3, 6

*Natsource LLC v. GFI Grp.*,
    332 F. Supp. 2d 626 (S.D.N.Y. 2004)......................................................................13

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021), *appeal docketed*, No. 21-7078 (D.C. Cir.
    July 29, 2021).............................................................................................1, 13, 14

*New York v. Hendrickson Bros*.,
    840 F.2d 1065 (2d Cir. 1988)........................................................................17, 18, 20

*In re Nine West Shoes Antitrust Litig.*
    80 F. Supp. 2d 181 (S.D.N.Y. 2000).........................................................................22

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .........................................................................8, 12

*Poster Exchange, Inc. v. National Screen Serv.*
    517 F.2d 117 (5th Cir. 1975) ..................................................................................24

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
    No. 20-cv-00363-BLF, 2021 WL 1615349 (N.D. Cal. Apr. 26, 2021), *aff'd in
    part, appeal dismissed in part sub nom. Reveal Chat HoldCo LLC v. Meta
    Platforms, Inc.,* 2022 WL 595696 (9th Cir. Feb. 28, 2022) ...........................10, 17

*Sears Petroleum & Transp. Corp. v. Ice Ban Am., Inc.*,
    No. 99-cv-704, 2004 WL 834849 (N.D.N.Y. Apr. 15, 2004)..................................25

*SEC v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011)........................................................................19

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................................25

*Todd v. Exxon Corp*.,
    275 F.3d 191 (2d Cir. 2001) ....................................................................................14

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998).........................................................................................4

*Kane ex rel. U.S. v. Healthfirst, Inc.*,
    120 F. Supp. 3d 370 (S.D.N.Y. 2015)........................................................................4

*United States v. Dentsply Int'l Inc.*,
    399 F.3d 181 (3d Cir. 2005)........................................................................................5

*United States v. Empire Gas Corp.*,
537 F.2d 296 (8th Cir. 1976) .........................................................................6

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)........................................................................................4

*United States v. Microsoft Corp.*,
253 F.2d 34 (D.C. Cir. 2001) ................................................................ *passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................................6, 11, 19

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........................................................8, 9, 10, 14

**Rules & Statutes**

15 U.S.C § 2 .................................................................................... *passim*

15 U.S.C § 15b..........................................................................................17

15 U.S.C. § 16(i) .......................................................................................24

N.Y. C.P.L.R. § 213(8).............................................................................27

**Other Authorities**

Herbert Hovenkamp, "Schumpeterian Competition and Antitrust" Faculty
Scholarship at Penn Law (2008) .................................................................3

Richard Gilbert and A. Douglas Melamed, *Innovation Under Section 2 of the
Sherman Act,* 84 ANTITRUST L.J. 1, 15 (2021) .........................................1

Robert Bork,
The Antitrust Paradox: A Policy At War With Itself (1978) ..................13

## I.       INTRODUCTION

This action challenges defendant Meta's use of an anticompetitive course of conduct in order to unlawfully maintain its monopoly in the relevant market for personal social networking services ("PSNS"). Meta's scheme excluded Phhhoto, an innovative nascent competitor, from the PSNS market—in which Meta controlled both of the dominant players (Facebook and Instagram)—to the detriment of competition and consumers. (Am. Compl. ¶¶ 181-84)

Facebook, founded by Mark Zuckerberg in 2004 (*Id*. ¶ 17), and Instagram once were separately-owned competitors in the PSNS market. (*Id.*  ¶ 129) Each of them independently decided to become a "platform" to increase its usage, and each adopted services, tools, and products aimed at enticing third-party developers to create applications that would interoperate with the respective platforms. (*Id.* ¶¶ 28-29, 32-35)

In 2012, defendant Meta (then called Facebook) acquired Instagram, its most formidable competitor. (*Id.* ¶ 30) Meta's CEO, Mark Zuckerberg, thus combined the two most powerful platforms in the PSNS market, making the result "critical infrastructure" for the industry.[1] (*Id.* ¶¶ 36-37) Through the Instagram acquisition, Zuckerberg also was able to maintain monopoly control of the market as users migrated to cell phones. (*See id.* ¶¶ 29-31)

Starting in 2013, Zuckerberg used the "critical infrastructure" that he controlled against nascent competitors in order to maintain his monopoly. (*Id.* ¶ 131) *See also New York v.*

---

[1]Meta's monopoly also enabled it to control prices, which it did by degrading its services, diminishing privacy protections, and in antitrust terms, increasing the "quality-adjusted price" paid by users for access to those two key platforms. (*Id.* ¶ 159) *See* Richard Gilbert and A. Douglas Melamed, *Innovation Under Section 2 of the Sherman Act,* 84 ANTITRUST L.J. 1, 15 (2021) ("A monopolist's conduct might increase prices either directly or indirectly by reducing product quality and thus increasing the quality-adjusted price.").

*Facebook, Inc.*, 549 F. Supp. 3d 6, 19-20 (D.D.C. 2021), *appeal docketed*, No. 21-7078 (D.C. Cir. July 29, 2021). Rather than openly rescinding Facebook's and Instagram's welcoming policies and practices, Zuckerberg engaged in a surreptitious campaign to destabilize and reduce the quality of numerous nascent competitors' offerings and the efficiency of their operations, including through manipulating the critical infrastructure that he controlled to damage competition and mislead consumers. (Am. Compl. ¶ 131)

Among the targets of Zuckerberg's exclusionary efforts was Phhhoto—a nascent competitor that could undermine some of Meta's market power. Phhhoto had launched in 2014 as a remarkable, novel product: a mobile app that created a five-frame, looping video (a "phhhoto") and provided a platform for social networking by enabling users to share their phhhotos to their social media accounts. (*Id.* ¶ 2) And Phhhoto appealed directly to Generation Z, at a time when younger users were losing interest in Meta's Instagram platform. (*Id.* ¶ 39) The Phhhoto app soared in popularity, quickly attracting over 10 million registered users—including celebrities like Beyoncé and Diplo—with a new-user growth rate that exceeded even Instagram. (*Id.* ¶¶ 7, 42-44) The press took note, calling the app "one of the many natural successors to our ingrained Instagram behavior." (*Id.* ¶ 2)

Courts and scholars alike are particularly wary of the danger that entrenched monopolists can crush nascent competitors which seek to introduce new technology. "[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts. *United States v. Microsoft Corp.*, 253 F.2d 34, 79 (D.C. Cir. 2001). As the co-author of the leading antitrust treatise has warned, "where a dominant firm is using an

exclusionary practice to protect its established investment from an incipient technology, harm to innovation seems the most likely outcome."[2]

Meta strains to turn this action into a mere refusal to deal case—by compartmentalizing Meta's coordinated conduct into discrete acts—and then tries to apply refusal-to-deal law to each action separately. But Phhhoto is not complaining about a refusal to deal. Phhhoto is complaining about Meta's unified course of conduct that was deployed to maintain Meta's monopoly by excluding Phhhoto from the market. Specifically, Meta used its control of critical infrastructure to *degrade the quality* of Phhhoto's content and the *performance* of its app, as well as to *mislead and harm consumers*. The competitive injury of which Phhhoto complains does *not* stem from Meta's refusing to deal with Phhhoto: it stems from *affirmative actions* that Meta undertook to harm Phhhoto, its nascent competitor.

Finally, it would be error to dissect Meta's conduct into discrete, hermetically sealed packets for legal analysis. Rather, the conduct must be evaluated as a whole. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152-53 (9th Cir. 2019).[3]

## II.    LEGAL STANDARD

A complaint must be sustained if it alleges "enough facts to state a claim [for] relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), taking all

---

[2]    Herbert Hovenkamp, "Schumpeterian Competition and Antitrust" (2008) *Faculty Scholarship at Penn Law* at 9, https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=2790&context=faculty_scholarship.

[3] Unless otherwise indicated, internal citations in quotations are omitted.

factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). A plaintiff's allegation, even if less likely to be true than the defendant's explanation, must be accepted so long as it is plausible. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 168, 190 (2d Cir. 2012).

Some (but not all) of the claims in this case, and Meta's actions to conceal them involve fraud. Where a particular cause of action "sounds in fraud," the complaint "must satisfy the heightened pleading requirements of Rule 9(b) by stating the circumstances constituting fraud with particularity." *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 382 (S.D.N.Y. 2015) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). However, whether a complaint satisfies Rule 9(b) is ultimately "a fact-specific inquiry." *Id.* at 383.

## III.     ARGUMENT

### A.     Meta undertook a course of conduct to exclude competition and unlawfully maintain its monopoly in the PSNS market.

To plead a cognizable Section 2 claim for monopolization, a plaintiff must allege that the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power. *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); *Tops Mkts., Inc. v. Quality Mkts., Inc*., 142 F.3d 90, 98 (2d Cir. 1998); *Microsoft Corp*., 253 F.3d at 59. For the first element, discussed *infra*, a plaintiff can allege monopoly power in a relevant market through *either* direct or indirect evidence. *Tops Markets, Inc.*, 142 F.3d at 98. Here, Phhhoto demonstrates that Meta possessed monopoly power in the PSNS market through *both*: directly by Meta's ability to exclude competition, as well as indirectly by evidence of Meta's market share and high barriers to entry. *Id*.

4

For the second element here—a monopoly maintenance case—Phhhoto must simply show that Meta has engaged in "anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." *United States v. Dentsply Int'l Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (citing *Microsoft*, 253 F.3d at 79); Areeda & Hovenkamp, Antitrust Law ¶ 651c, at 78 (1996)). In a course of conduct case, that can be demonstrated through a "variety of exclusionary acts." *Microsoft*, 253 F.3d at 58. Phhhoto addresses these exclusionary acts first below.

### 1. Phhhoto's claims must be analyzed together as a course of conduct, not individually as "refusals to deal."

Meta repeatedly asserts that this is simply a refusal to deal case, relying entirely upon that theory for its argument. (Mot. at 2, 17-22) But most of the actions of which Phhhoto complains are not remotely akin to a refusal to deal. Moreover, Phhhoto's case involves an exclusionary course of conduct, which is both conceptually different and far more serious than a simple refusal to deal.

A refusal to deal focuses on a single, discrete, and often public event (a termination of a supply relationship), as to which the affected party can potentially sue for an injunction, antitrust enforcers can pursue legal challenges, and consumers can seek alternatives in the market or possibly even file claims of their own. By contrast, a course of conduct case, exemplified by Meta's conduct here, involves a series of interrelated acts with interrelated effects. Here, Meta intentionally obscured many of those acts through deceit, misrepresentation (both to Phhhoto and to Meta's own users), and outright fraud. Meta cannot escape liability, under well-settled law, by atomizing this course of conduct into discrete events and trying to transmogrify them into individual refusals to deal.

While Phhhoto must allege that elements of Meta's conduct were anticompetitive and, hence, actionable, it "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore,* 370 U.S. at 699; *see also Sunday Ticket Litig.*, 933 F.3d at 1152-53 (reversing dismissal of complaint and requiring a "holistic" view of challenged agreements that defendants contended were separately lawful). Even if certain elements of an antitrust defendant's conduct may be lawful standing alone, "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *accord City of Anaheim v. S. Cal. Edison Co*., 955 F.2d 1373, 1376 (9th Cir. 1992) (improper to focus on "specific individual acts of an accused monopolist while refusing to consider their overall combined effect"); *In re Gabapentin Patent Litig*., 649 F. Supp. 2d 340, 359 (D.N.J. 2009) (sustaining monopolization claims where a series of actions that defendant contended were each lawful "when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws").

The critical issue here is whether Meta's acts were "exclusionary, rather than merely a form of vigorous competition." *Microsoft*, 253 F.3d at 58 (exclusionary acts "reduce social welfare" whereas competitive acts "increase it"). Put differently, Phhhoto has met its burden if Meta's course of conduct—taken as whole—was "prompted not by competitive zeal but by anticompetitive malice." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004).[4]

---

[4] Contrary to Meta's argument that "intent has no independent relevance to the merits of a Section 2 claim," (Mot. at 12) evidence of intent to gain monopoly power may be a factor indicating exclusionary conduct. *See In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (citing *Trinko*, 540 U.S. at 407); *United States v. Empire Gas Corp*., 537 F.2d 296, 301 (8th Cir. 1976).

          **a.**        **Phhhoto sufficiently pleads a course of exclusionary conduct.**

Phhhoto alleges that Meta undertook a course of interrelated exclusionary conduct which included: (1) cutting off Phhhoto's access to critical open application programming interfaces ("APIs"), (2) curtailing support of a portion of the iPhone functionality in order to injure Phhhoto, (3) misusing its platform to launch a clone product (Boomerang) in order to injure Phhhoto, (4) misleading consumers through public misrepresentations, (5) suppressing Meta's own users' feeds containing Phhhoto-related content, and (6) trying unlawfully to recruit Phhhoto's employees. (*See* Am. Compl. ¶ 202) That course of conduct constituted monopoly maintenance, because "a firm with a legitimately achieved monopoly may not wield the resulting power to tighten its hold on the market." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d. Cir. 1979).

**API Withdrawal.** Phhhoto entered the market using the Find Friends API provided by Instagram. (Am. Compl. ¶ 65) And the withdrawal of the API is the closest that any single action in Meta's course of exclusionary conduct gets to a refusal to deal.

At the time, Meta had no product comparable to the Phhhoto app (*id.* ¶ 1), so Brian Hurren of Meta (then Facebook) reached out to Phhhoto to offer integration into the Facebook platform, calling Phhhoto's product "really awesome" (*id.* ¶ 8). Such integration would provide Facebook with new business opportunities through access to all of Phhhoto's users to migrate them onto the Facebook platform. (*Id.* ¶ 66) In the middle of the negotiations, however, Instagram abruptly withdrew the Find Friends API access from Phhhoto. (*Id.* ¶¶ 65-66)

When Phhhoto inquired as to the reasons for the withdrawal, Hurren said that Instagram was apparently upset that Phhhoto was growing in users through its relationship with Instagram.[5] (*Id.* ¶ 67) Of course, Instagram was but one product line at Meta. *Novell*, a case upon which Meta relies heavily in its brief, makes clear that an evaluation of the benefit and profitability of a business relationship must be made company-wide, not at the level of a single product group. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1077 (10th Cir. 2013). Meta continued to negotiate for further integration with Phhhoto for many months (*id.* ¶¶ 58-61), reflecting that Meta viewed a deeper relationship with Phhhoto as beneficial and profitable to Meta as a whole. Cutting off Phhhoto's API access was not done because the relationship was unprofitable to Meta; rather, it was to shield Instagram from competition.

Even viewed improperly in isolation, the API withdrawal should not be evaluated as a refusal to deal.[6] Phhhoto's content kept integrating with the Instagram platform, although the API withdrawal made the app appear unstable to Instagram users, diminishing Phhhoto's standing in the market. (Am. Compl. ¶ 68) For its refusal-to-deal analysis, Meta repeatedly cites *Trinko* and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), arguing at various points that Phhhoto has failed to plead one or another element of those decisions. (Mot. at 2, 17, 18, 19, 20, 23-24) However, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) (argued and won for the plaintiff by Meta's counsel here) exposes deep faults in Meta's analysis and supports Phhhoto's claims even if they were to be improperly deconstructed.

---

[5] Meta claims that the withdrawal was "in keeping with a longstanding, publicly announced policy." (Mot. at 3) Meta's purported rationale is a factual issue, of course, but it also is contrary to the facts: Facebook (the parent) had similar relevant policies to Instagram, yet it continued to pursue collaborations with Phhhoto.
[6] In *Novell*, the court clearly stated that there were no predatory acts other than termination; for that reason, only the refusal-to-deal doctrine was considered. 731 F.3d at 1074.

Analyzing *Trinko* and *Aspen* in great detail, the *Viamedia* court pointed out that *Trinko* is a pleading-stage exception to *Aspen*, not vice-versa, as Meta would have it. *Compare Viamedia,* 951 F.3d at 462-63 *with* Mot. at 20. "[T]he *Aspen Skiing* factors are helpful but not dispositive"—in essence, a starting point for the court's analysis—and a more "nuanced" approach is necessary to assess whether competition was harmed. *Viamedia*, 951 F.3d at 462; *accord In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135  (2d Cir. 2014) (*Trinko* "does not purport to set out a 'test'").

Accordingly, at the pleading stage, "it is enough to allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Viamedia*, 951 F.3d at 462. It is immediately apparent that Phhhoto's complaint includes key *Aspen* factors: *e.g.*, "unhappy customers" (Am. Compl. ¶ 128) and a monopolist that "discouraged customers from doing business with its smaller rival." (*Id.* ¶¶ 65, 71-72) *See Viamedia*, 951 F.3d at 459.

**Captioning.** Beginning in 2011, Instagram adopted functionality provided by the Apple iPhone that enabled photo and video content made by users with other products like Phhhoto to run seamlessly on the Instagram platform. (Am. Compl. ¶¶ 34-35) Phhhoto entered the market supporting this technology so that Instagram users could post and see content made with Phhhoto in their Instagram feeds. In 2015, Meta abruptly changed the Instagram functionality and its relationship with Phhhoto. Meta did not refuse to deal with Phhhoto, which would have been immediately apparent, but instead disabled one aspect of the iPhone's functionality, no longer permitting Phhhoto to caption content made by its product so that users could identify it. (*Id.* ¶ 71)

Meta's change hurt consumers, as the quality of Phhhoto-related content in the posts and feeds of Instagram users was reduced. (*Id.* ¶ 74) Additionally, Instagram users could no longer

easily identify and download apps used in making content that interested them. (*Id.* ¶ 72) The change harmed Phhhoto as well, of course, as its ability to engage new users was diminished. But harming one's own users in order to disadvantage a competitor is the very essence of predatory and exclusionary conduct. *See Berkey Photo, Inc.* 603 F.2d at 275. Only a monopolist would even attempt to execute such a strategy. Here, too, Meta reduced its new user engagement through Phhhoto (and Meta's advertising revenue) in the short term.[7]

**Boomerang.** Meta released Boomerang, a slavish copy of Phhhoto's app, which Meta subsequently preferenced on its Instagram platform and bundled with Instagram features. (Am. Compl. ¶¶ 77, 83-84) Meta argues that the release of Boomerang "comports with the Sherman Act" because, under *Novell*, the product's release does not evidence necessary profit sacrifice. (Mot. at 22) However, *Novell* stands for the proposition that a monopolist may withdraw from a prior course of dealing in order to pursue "an innovative replacement product of its own." *See Viamedia*, 951 F.3d at 457-58 (quoting *Novell*, 731 F.3d at 1075). Boomerang was neither innovative nor procompetitive.

Moreover, Meta's argument evidences a profound misunderstanding of the "course of conduct" analysis. Phhhoto is not contending that Boomerang's release constituted profit sacrifice. Rather, the release was a *recoupment phase* of Meta's predatory course of conduct. Through the Boomerang copy, Meta sought to recoup the short-term losses of users and

---

[7] Facebook and Instagram are not "free," as Meta contends (Mot. at 3); rather, users pay for the services with their data and attention to advertisements, which Meta monetizes. (Am. Compl. ¶¶ 19, 159) *See generally Reveal Chat Holdco LLC v. Facebook, Inc.*, No. 20-cv-00363-BLF, 2021 WL 1615349, at *1 (N.D. Cal. Apr. 26, 2021), aff'd in part, appeal dismissed in part sub nom. *Reveal Chat HoldCo LLC v. Meta Platforms, Inc*., 2022 WL 595696 (9th Cir. Feb. 28, 2022).

advertising revenue that it suffered from its prior profit-sacrificing behavior such as the API withdrawals from Phhhoto, thus reinforcing the exclusionary effects of that behavior.

Indeed, the release of Boomerang itself may well have been illegal, if its purpose was "prompted not by competitive zeal but by anticompetitive malice." *Trinko*, 540 U.S. at 409. Phhhoto alleges that Meta released Boomerang not to attract additional users to Instagram, but as a means to injure Phhhoto. (Am. Compl. ¶ 79) Further, Phhhoto believes that the unsealing of a complaint by a coalition of 46 states, the District of Columbia, and Guam (the "States") against Meta will show this. A key paragraph of the States' complaint alleges that Meta viewed Phhhoto "as a potential competitive threat," and immediately thereafter indicates that "[w]hen Instagram released a similar feature [Boomerang], the CEO of Instagram stated that [REDACTED] and instructed his staff [REDACTED]." *See* Compl., *New York v. Facebook, Inc*., 1:20-cv-03589, ECF No. 70, ¶ 226 (D.D.C. Dec. 22, 2021). It is logical to infer from the context that the redacted material contains statements by Instagram's CEO concerning Boomerang's release which the States considered to be explicit expressions of anticompetitive malice toward Phhhoto.

**Misrepresentations to consumers.** Meta had publicly announced—in an official press release in March 2016 and in a post on the corporate website—that a new algorithm would order video posts on Instagram newsfeeds based on "the likelihood you'll [the user] be interested in the content [and] your relationship with the person posting." (Am. Compl. ¶ 86) Further, Meta gave interviews to the New York Times and other media repeating the same misleading statements without clarification, and Meta downplayed the algorithm change at its executive level. (*Id.* ¶¶ 86-88) These statements misled consumers because, in fact, the algorithm clandestinely buried posts with Phhhoto-related content far down in a user's feed, where they were unlikely to be viewed, even if such content was of greatest interest to a user. (*Id.* ¶¶ 107-08) At least three

courts of appeals have held that such misleading statements to consumers can provide the basis for a Section 2 claim or constitute anticompetitive conduct standing alone. *See Novell*, 731 F.3d at 1076; *LePage's*, 324 F.3d at 153; *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1264-65 (8th Cir. 1980).

**Algorithm and change in user feed ordering.** Meta's changes to the order in which it displayed users' Instagram feeds also are part of its exclusionary course of conduct toward Phhhoto. Phhhoto alleges that Meta attached penalties to its own users' posts by lowering placement in other users' feeds if the posts contained content created by the Phhhoto product. (*Id.* ¶ 107) And Meta fraudulently concealed the changes through its false public statement concerning the operation of the algorithm. (*Id.* ¶¶ 85-87)

Meta claims that it harmed Phhhoto only through the operation of its own platform. (Mot. at 18) That is no defense. In the leading cases on the issue—the Supreme Court's opinion in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), absent from Meta's brief, and the D.C. Circuit's *Microsoft* decision—the monopolists were liable for Section 2 violations based on conduct that involved only their platforms.

In *Lorain Journal*, defendant Lorain controlled a monopoly platform (a local newspaper) for "mass dissemination of news and advertising," 342 U.S. at 147, but it was challenged by a new technology, in the form of a radio station. Advertisers had to use the monopoly platform because of its market coverage, but they wanted to advertise on radio as well. *Id.* at 148. To combat the new technology, Lorain refused to accept local advertising from those who advertised, or were about to advertise, on radio. Rejecting the argument from the monopolist that it could select its customers and refuse to deal with whomever it pleased, *id.* at 155, the Supreme Court held the conduct to be an antitrust violation, noting in particular that the monopolist had a

12

"plan and desire to injure" its nascent competitor, *id.* at 149, and destroy and eliminate it altogether, *id.* at 150. Even the most strident critic of antitrust enforcement has pronounced the Supreme Court's decision in *Lorain Journal* to be "entirely correct." Robert Bork, The Antitrust Paradox: A Policy At War With Itself 345 (1978).

In *Microsoft*, a monopolist was challenged with new technology from a nascent rival. When contractual restrictions on third parties were not sufficient to reverse the rival's growth, Microsoft made internal changes to its own code that deterred customers from using the rival's product. 253 F.3d at 63-67. The D.C. Circuit held that these particular actions by Microsoft, which only changed the operation of its own platform, constituted exclusionary conduct in violation of Section 2. *Id.* at 67.

Finally, here, as in *Lorain Journal*, the monopolist injured the competitor by involving third parties. In *Lorain Journal*, it was advertisers. To injure Phhhoto, Meta involved users' feeds. In doing so, Meta made a sufficient "assay into the marketplace" to satisfy even the most unusually restrictive standards it relies upon. (*See* Mot. at 18)

**Predatory hiring.** Meta also unlawfully sought to recruit Phhhoto's key software engineers in order to undermine Phhhoto's business and acquire proprietary information (Am. Compl. ¶¶ 98-103) Contrary to Meta's claim that its actions were "competition" and "cannot support its Section 2 claim" (Mot. at 7 n.3), predatory hiring not only is part of Meta's course of exclusionary conduct but can also constitute a cognizable Section 2 claim. *See Natsource LLC v. GFI Grp.*, 332 F. Supp. 2d 626, 632 (S.D.N.Y. 2004).

        b.      **Meta's reliance on *New York v. Facebook* is misplaced.**

Meta cites extensively to a recent decision dismissing the States' complaint against Meta. *See New York*, 549 F. Supp. 3d at 21-24. Meta claims that the States' complaint "alleg[es] nearly

identical conduct" as Phhhoto does here. (Mot. at 12) However, the judge in the States' case did not rule on *any* of Meta's conduct against Phhhoto, other than the withdrawal of APIs. *New York*, 549 F. Supp. 3d at 21-24. He held that the States' entire case, including as to Meta's API "policy," was barred by laches. *Id.* at 21. In so doing, he thus mooted the question of whether Meta's API policy violated the antitrust laws, and his views on the issue are, at best, *obiter dicta*.[8] Notably, though, the judge was willing to consider that Meta's withdrawals of APIs to particular competitors could be unlawful as refusals to deal. *Id.* at 27.

### 2.    Meta possessed monopoly power in the relevant PSNS market.

"[M]arket definition is a deeply fact-intensive inquiry" that is generally inappropriate for resolution on a motion to dismiss. *See Todd v. Exxon Corp*., 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.). Here, Phhhoto pleads in factual detail why, at all relevant times, Meta possessed monopoly power in the relevant PSNS market. (Am. Compl. ¶ 135) Phhhoto explains the substitutability and interchangeability of products within the market (*id.* ¶ 136) and sets out the key characteristics of products in it. (*Id.* ¶¶ 137-39) Phhhoto further identifies products that are included in the PSNS market (*id.* ¶¶ 139, 156) and explains why specific products in other markets would not be included. (*Id.* ¶¶ 140-46)

Phhhoto's proffered relevant market is the same one upheld by the judge in the FTC's case earlier this year, *see FTC v. Facebook, Inc.,* No. 20-3590 (JEB), 2022 WL 103308 at *8 (D.D.C. Jan. 11, 2022), as well as the one pleaded in the States' complaint (at ¶ 28). Meta nonetheless refers to this plainly plausible market as "gerrymandered" (Mot. at 25) and rehashes

---

[8] Some of the views expressed in the *New York* opinion fall well outside the mainstream, such as requiring a plaintiff to plead short term-losses in a refusal to deal case. *See New York*, 549 F. Supp. 3d at 27. The *Viamedia* court specifically declined to impose that requirement. *Viamedia*, 951 F.3d. at 463.

many of the same arguments that the D.C. judge rejected (Mot. at 25-27). Meta also seeks to confuse the issue by referring to published lists of dozens of "photo and video apps" that are outside of the relevant market. (Mot. at 25) While the rankings of such apps on these lists during the relevant period are helpful in gauging the effect of Meta's exclusionary behavior on Phhhoto (*see, e.g.,* Am. Compl. ¶ 91), they are not limited to social networking and include all kinds of video apps. Consumers who use social networking are unlikely to substitute for their use of products in the PSNS market, which was the source of Phhhoto's user traffic.

Meta then claims that Phhhoto failed to plead that "Meta had power over an input that Phhhoto and other potential PSNS rivals needed to compete." (Mot. at 24) That is risible. The Amended Complaint specifically and repeatedly explains that by combining common ownership of both Facebook's and Instagram's platforms, Meta gained control of infrastructure critical to the success of Phhhoto and other companies. (Am. Compl. ¶¶ 37, 129) The pleading also makes clear how Meta's misuse of this infrastructure injured Phhhoto (*id.* ¶¶ 130, 175), as well as other companies (*id.* ¶ 131).

Meta next claims that Phhhoto's allegation that it "would have become a substitute product for Instagram or Facebook" somehow undermines Phhhoto's allegation of high barriers to entry for the PSNS market. (Mot. at 25) However, Phhhoto's entire argument is directed to the notion that, due to the high barriers of entry created by the consolidation of Instagram and Facebook, Phhhoto's market entry could not succeed without continued access for users of Phhhoto's content to Meta's infrastructure—which Meta unlawfully manipulated as part of its scheme to cause Phhhoto's failure. (Am. Compl. ¶¶ 36-37, 47, 129-30, 175) The Amended Complaint even alleges that the market's barriers to entry were so high that not even Meta could

15

introduce a new product without using its control of its own infrastructure to do so. (*Id*. ¶¶ 80, 83)

Phhhoto's case focuses on the period from Phhhoto's market entry in 2014 through 2017. During this three-year span, Meta's monopoly power is all but incontestable. For example, TikTok, which Meta claims *currently* competes in the relevant market (Mot. at 26), did not exist in its current form at that time and was not even launched outside of China until 2017. As noted, Phhhoto pleads Meta's monopoly power with indirect evidence that is largely identical to the allegations found to be sufficient in the FTC's action (Am. Compl. ¶¶ 151-57), as well as with direct evidence of Meta's ability to exclude competition (*id.* ¶¶ 158-61). Phhhoto's addition of direct evidence renders its case particularly strong because it is probative of monopoly power even in a dynamic technology market. *See Microsoft*, 253 F.3d at 57.

**B.      Phhhoto's antitrust claims are timely.**

Statute of limitations issues are generally "not properly decided on a motion to dismiss" because they are inherently factual. *Hinds Cnty. v. Wachovia Bank N.A.,* 700 F. Supp. 2d 378, 399-400 (S.D.N.Y. 2010). In a course of conduct monopolization case, it is appropriate to consider the aggregated conduct as a whole and look to the last anticompetitive act when assessing the timeliness of the claim on a motion to dismiss—particularly where, as here, the course of conduct includes anticompetitive acts causing antitrust injury to a competitor as well as consumers. *See Free Freehand Corp. v. Adobe Sys., Inc.*, 852 F. Supp. 2d 1171, 1184, 1187 (N.D. Cal. 2012) (statute of limitations tolled by continuing violations doctrine in Section 2 case alleging bundling and other practices which, taken together, were anticompetitive).

In its Amended Complaint, Phhhoto extensively pleads specific facts to demonstrate that its claims are timely under two doctrines.  First, Meta fraudulently concealed its exclusionary

course of conduct (*see* Am. Compl. ¶¶ 188-96), which delays the start of the running of the statute of limitations during the concealment. *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Second, Phhhoto pleads that Meta engaged in a continuing antitrust violation through its multiple suppressions of Phhhoto-related conduct. (Am. Compl. ¶¶ 197-98) The limitations clock started running again with each suppression, regardless of whether Phhhoto had knowledge of Meta's suppression and anticompetitive scheme to drive Phhhoto from the market. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

Meta changed the Instagram algorithm to reorder users' posts in March 2016, but it gave false, fraudulent, and misleading descriptions of that change. It was not until October 25, 2017, at the earliest, that Phhhoto learned enough about how Meta's algorithmic change worked to realize that it was actually an unlawful suppression of Phhhoto's content. Phhhoto's action was filed within four years of obtaining that initial information, which was timely under the Sherman Act's four-year statute of limitations.[9] 15 U.S.C § 15b.

Despite the case-specific, factual nature of limitations inquiries, Meta begins its statute of limitations argument with a review of three *other* actions against it brought by different plaintiffs that were found to be time-barred. (Mot. at 8) None are apposite. One of the three is *New York v. Facebook*, the States' case (now on appeal) that seeks injunctive relief, which was found to be barred by the doctrine of laches, not applicable here. *See supra* at 13. The other two, *Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022), and *Reveal*

---

[9] By agreement of the named parties to this action, any applicable statutes of limitations have been tolled for a total of 14 days. (Am. Compl. ¶ 186) Phhhoto filed its initial pleading on November 4, 2021, four days before the four-year statute of limitations plus fourteen-day tolling period expired. (*Id.*)

*Chat*, 2021 WL 1615349, dismissed claims centered on discrete API withdrawals that were known to those plaintiffs, not a surreptitious course of anticompetitive conduct like that which Phhhoto details here.

### 1.    Meta fraudulently concealed the suppression of Phhhoto-related content and its anticompetitive course of conduct.

The purpose of the fraudulent concealment doctrine is to prevent an unlawful act from being concealed until it is protected by a statute of limitations defense. *Hendrickson Bros.*, 840 F.2d at 1083. An antitrust plaintiff like Phhhoto thus may toll the running of the statute of limitations by plausibly pleading: "(1) that [Meta] concealed from [Phhhoto] the existence of [Phhhoto's] cause of action, (2) that [Phhhoto] remained in ignorance of that cause of action until some point within four years of the commencement of [its] action, and (3) that [Phhhoto's] continuing ignorance was not attributable to lack of diligence on [its] part." *Id*. Meta argues that Phhhoto's claim is time-barred because Phhhoto "had notice of its entire claim by April 2016" (Mot. at 10), after the Instagram algorithm was in place and Phhhoto's metrics had dropped. And if that was not the case, Meta contends that Phhhoto "has failed to plead that it diligently investigated whether the switch to algorithmic feed suppressed its content" (*Id.* at 12). Meta's arguments fail at the pleading stage.

Meta claims that Phhhoto was "aware of the alleged harm almost immediately" because its metrics were dropping. (Mot. at 11) This is a parlor trick. In light of Meta's public statements, when Phhhoto's principals saw the drop in metrics the following month, they did not think it was related to Meta's conduct in changing the order of video posts in Instagram *at all*. There was no basis for any reasonable person to make that association at the time, and Meta (then Facebook) was not at all synonymous with "deceit."

Meta also claims that its "intent is irrelevant to the tolling analysis because intent has no independent relevance to the merits of a Section 2 claim." (Mot. at 12) This is a straw man. First, evidence of intent to gain monopoly power is relevant, as it may be a factor indicating exclusionary conduct. *See In re Adderall*, 754 F.3d at 135 (citing *Trinko*, 540 U.S. at 407). More importantly, Phhhoto's argument is not that it suffered for lack of knowledge of Meta's subjective intent; rather, as discussed below, Phhhoto did not know of and could not file a claim because it did not know that the algorithm suppressed Phhhoto-related content or how it worked.

Indeed, Meta took "affirmative steps to prevent or frustrate" discovery of Phhhoto's claim, *SEC v. Wyly*, 788 F. Supp. 2d 92, 104 (S.D.N.Y. 2011), through the March 2016 press release and its public statements. And for years thereafter, Meta continued to disclaim that it hid posts in users' newsfeeds, secretly banned or lowered the rank of a user's post, or favored a particular format. (*Id.* ¶ 112) Only in reporting by the New York Times in September 2021 on Meta's secret "Project Amplify" scheme was it first confirmed that Meta had developed technology to favor content created by Meta over third-party content by manipulating the order of content in users' feeds. (*Id.* ¶ 114)

### a.     Phhhoto did not know of its antitrust cause of action.

Until October 25, 2017, Phhhoto was not aware of Meta's content suppression and did not know of any injury or claim to investigate or pursue. (*Id.* ¶ 92) Meta quotes from *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170 (4th Cir. 2007), pointing out that the plaintiff there knew of "rumors" about Microsoft's statements concerning it. (Mot. at 10-11) However, the reasons for that plaintiff being on inquiry notice were hardly analogous. The district court opinion in the case (on summary judgment) details the plaintiff's *admitted* suspicions about the conduct, based upon specific information, and his view of Microsoft as a "bunch of thieves,"

which negated any argument of reasonable reliance on denials by Microsoft. *GO Computer, Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497, 500-01 (D. Md. 2006).

By contrast, in the period before October 2017, and at the time of Meta's March 2016 press release, Phhhoto and the world had no reason to doubt Meta's word about the algorithm. That only came later, beginning in 2018, after many revelations about reprehensible conduct by Meta. These more recent revelations include Meta's failure to disclose to millions of users that their personal data had been harvested by a political consulting firm (Cambridge Analytica),[10] the release of internal company documents by the U.K. Parliament showing anticompetitive activity (Am. Compl. ¶ 133), and documents leaked by a company insider (Frances Haugen) indicating that Meta has misled investors.

Meta's affirmative misrepresentations concerning the nature of the algorithm concealed not only the suppression of Phhhoto-related content, but also the interrelated nature of Meta's actions as a course of conduct to drive Phhhoto from the market. Only through discovery of the algorithmic suppression could Meta's scheme and its underlying falsehoods actually come into focus.[11]

### b.    Phhhoto exercised more than reasonable diligence.

For fraudulent concealment to apply, the Second Circuit requires that plaintiff's ignorance of a claim "was not the result of lack of diligence." *Hendrickson Bros.*, 840 F.2d at

---

[10] Only since the Cambridge Analytica scandal concerning Facebook broke in March 2018 has "a constant drumbeat of scandals . . . caused its reputation to slowly decline in the United States." *The Steady Decline of the Facebook Brand*, Morning Consult, Oct. 7, 2021, https://morningconsult.com/2021/10/07/decline-facebook-brand-poll-favorability.

[11] Indeed, even when Phhhoto shut down and statements were made to the press, including concerning the impact of competition from Boomerang on the business, no mention was made of manipulation of the algorithm, because Phhhoto did not yet know.

1083; *see, e.g.*, *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) (finding sufficient that the plaintiff "allege[d] that 'the nature, existence and extent of unlawful activity could only be discerned and uncovered by access to [defendant's] emails and detailed review by qualified experts of immense amounts of non-public data'"). As summarized below, there was no lack of diligence here. When Phhhoto's new user registrations and other user engagement metrics plummeted in April 2016, Phhhoto's business started to fail. (Am. Compl. ¶ 91) Phhhoto's founders were as motivated as possible to find the source of the problem and correct it, having reinvested nearly all of their proceeds from a prior venture (almost $2 million) into the company. (*Id.* ¶ 39)

Meta claims that Phhhoto should have known and could have "easily" discovered that the anticompetitive algorithm manipulation was the source of its injury merely "by posting content and observing the result" (Mot. at 12), and therefore did not exercise due diligence. As a technology company, Meta cannot seriously make such a spurious argument.

Instead of immediately looking to the change in the Instagram algorithm itself as the cause of their predicament, Phhhoto's founders logically thought that something they had introduced into their own product had produced problems. (*Id.* ¶ 92) Like many apps, Phhhoto was constantly upgrading its product with new features and releases (*id.* ¶ 45), so that was naturally the first place they looked (*id.* ¶ 92). Additionally, Phhhoto had recently released a new version of its product to run on Android phones, so they had to consider whether that was in some way adversely affecting overall user engagement. (*Id.* ¶ 76) Phhhoto's principals also considered various other reasons for the app's drop in popularity, but they ruled them out. (*Id.* ¶ 93)

21

Even if there had been a reason to suspect that Meta was suppressing Phhhoto through manipulation of the algorithm (which there was not, particularly in light of Meta's fraudulent statements concealing it), the Amended Complaint explains in great detail why Phhhoto (or anyone) could not gain insight into how the Instagram ranking algorithm worked without access to Instagram's documents and code. (*Id.* ¶ 94) *See In re Nine West Shoes Antitrust Litig.* 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (plaintiff can plead self-concealing conduct for fraudulent concealment). The first evidence of Meta's conduct only emerged in October 2017, when one of Phhhoto's principals, Champ Bennett, posted the same promotional material on two different business accounts—Phhhoto's and that of his new company, Hypno. (*Id.* ¶ 104)

Bennett's suspicions were aroused *not* simply because the post appeared to vanish from his own feed, as Meta erroneously claims (Mot. at 11), but because he could compare user engagement on the two different business accounts, having real users totaling in the tens of thousands, by showing them the same content in which he knew they were interested. (*See* Am. Compl. ¶ 106) He could not have discerned this merely by "posting content and observing the results," as Meta asserts. (Mot. at 12) To get this information and insight required that Bennett post the same promotional material to two different business accounts at the same time. This was not something that Phhhoto personnel normally did or had any reason to do. Indeed, Bennett only did so *because* Meta had run Phhhoto out of business. Bennett was trying to connect Phhhoto's remaining Instagram followers to Hypno, the new company. (Am. Compl. ¶ 104)

Bennett could not have done this in April 2016, when Instagram had begun to manipulate user feeds, because there was not even a Hypno account in existence at the time. (*Id.*) Nor was there any reason to suspect that Meta was engaged in anticompetitive conduct. As the Amended Complaint makes clear, the fact that the discovery of Meta's surreptitious conduct even occurred

when it did was "by sheer chance." (*Id.* ¶ 85) And as soon as the suppression became remotely plausible, as reflected in contemporaneous chat transcripts (*id.* ¶ 109), Bennett started to investigate. (*Id.* ¶ 110)

Finally, Meta claims that the States sued Meta and "alleg[ed] nearly identical conduct" (Mot. at 12) in December 2020. As described *supra* at 13, the claims in the States' case were dismissed based upon laches rather than the merits.

### 2. Each suppression constituted a continuing violation.

As Bennett's observation demonstrates, Meta continued to suppress Phhhoto-related posts through at least October 25, 2017. This fact also brings Phhhoto's claims within the statute of limitations as a continuing violation of the antitrust laws (Am. Compl. ¶ 197). Under the continuing violations doctrine, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr*, 521 U.S. at 189; *see Berkey Photo,* 603 F.2d at 292 ("each time a plaintiff is injured by an act of the defendant, a cause of action accrues to him to recover the damages caused by that act."); *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MDL-1775, 2010 WL 10947344 at * 14 (E.D.N.Y. Sept. 22, 2010) (each purchase at a supracompetitive price was a new injury for statute of limitations purposes).

Meta posits two unavailing arguments against application of the doctrine. First, Meta contends that each of its suppressions of Phhhoto-related content was merely a "manifestation" of an "earlier decision" concerning the algorithm. (Mot. at 13) However, unlike a discrete refusal to deal or known prices charged pursuant to a preexisting contract, as in the cases cited by Meta (*see* Mot. at 13-14), Meta engaged surreptitiously in various anticompetitive actions in order to perpetuate its monopoly power and cause Phhhoto new injuries. Meta did not merely continue

indefinitely "to receive some benefit as a result of an illegal act performed in the distant past." *See Free Freehand,* 852 F. Supp. 2d at 1187.

Furthermore, even if Phhhoto's case were to be examined as a refusal to deal, as Meta (wrongly) does, the claim accrues at the time of the initial decision only if it was "irrevocable, immutable, permanent and final." *Poster Exchange, Inc. v. National Screen Serv.* 517 F.2d 117, 128 (5th Cir. 1975); *see also Creative Copier Servs. v. Xerox Corp*., No. 01-CV-155, 2005 WL 2175138, at *2 (D. Conn. Sept. 2, 2005) (whether a defendant's conduct is a new independent act or merely a reaffirmation turns on finality of original refusal). Meta never entirely banned Phhhoto's content, Meta continued to modify the Instagram algorithm throughout the relevant period, and to this day, Meta has not acknowledged that it used the algorithm to harm Phhhoto. At minimum, a factual question exists whether Meta's decision to implement the algorithm to suppress Phhhoto-related content was final.

Second, Meta contends that Phhhoto could not have suffered antitrust injury after June 2017, when Phhhoto stopped supporting the app. (Mot. at 14) However, Phhhoto remained in existence, and its assets were not sold. Consequently, Meta's actions after June 2017 continued to cause Phhhoto injury as a potential competitor by causing its engagement metrics to go down.[12]

---

[12] If the Court were to have any doubt concerning whether the continuing violations doctrine applies between June 2017 and October 25, 2017 (a period of less than five months), Phhhoto submits that governmental tolling could be applied for the nearly eleven months between the filing of the FTC's action against Meta on December 9, 2020 and Phhhoto's filing on November 4, 2021. Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i) provides that the running of the statute of limitations for a private action is suspended during the pendency of a suit by the United States and for one year thereafter. *See Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1441 (S.D.N.Y. 1986) ("FTC proceedings under the Sherman and Clayton Acts are given the same tolling effect as those of the Department of Justice.").

### C.        Phhhoto's fraud and unlawful competition claims satisfy New York law.

#### 1.        Phhhoto pleads the elements of fraud with the requisite particularity.

In New York, fraud is a "representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and induce the other party to act upon it, and which causes injury." *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001). A fraud claim "need only allege the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud had occurred." *Sears Petroleum & Transp. Corp. v. Ice Ban Am., Inc.*, No. 99-cv-704, 2004 WL 834849, at *8 (N.D.N.Y. Apr. 15, 2004) (citing *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982)).

Phhhoto alleges fraud based upon, *inter alia*, Meta's statements concerning the operation of the algorithmic newsfeed. (Am. Compl. ¶¶ 85-86) Those statements involve "a representation of fact, which was untrue," and do not require any independent duty of disclosure because "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Meta thus finds no safe harbor in its argument that the statements were "not inconsistent with treating competitor content differently from other content." (Mot. at 29) Meta's overt, false statements upon which Phhhoto relied are actionable.

And Meta's assertion that Phhhoto fails to plead detrimental reliance simply ignores the relevant allegations. Phhhoto alleges that it "spent months looking for issues, including running analytics to determine if Phhhoto had bugs that were causing the app to crash on users" (Am. Compl. ¶ 92) and describes how, "instead of wasting time and effort looking for issues with the code, Phhhoto could have turned to the media, the courts, investors, or its community with an explanation and a plea for assistance." (*Id.* ¶ 95).

### 2. Meta violated New York's "broad and flexible" doctrine of unfair competition.

Meta would require Phhhoto to plead that Meta "misused any of its property" to state an unfair competition claim. (Mot. at 29) Phhhoto need not do so. "[T]he tort of unfair competition is a 'broad and flexible doctrine' that has been described as 'encompassing any form of commercial immorality'" including, *inter alia,* misappropriation of property. *Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 Fed. Appx. 69, 70 (2d Cir. 2015). An unfair competition claim can be "grounded in either deception or appropriation of the exclusive property of the plaintiff." *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 337 (S.D.N.Y. 1998). Here, Phhhoto states an unfair competition claim by alleging that Meta's deceptive and fraudulent conduct represented a misapplication of its commercial advantage. (*See generally* Am. Compl. ¶¶ 54-63, 71, 85-86.)

Even if misappropriation were necessary, Phhhoto alleges that Meta misappropriated "the skill, expenditures, and labors of a competitor," *Big Vision,* 610 Fed. Appx. at 70, by "stringing Phhhoto along" while Phhhoto tried to integrate into the newsfeed, and by obtaining "significant information about Phhhoto's usage and growth—including the names of key software developers." (Am. Compl. ¶¶ 59, 62, 217) Phhhoto also alleges that Meta gained "technical information and insight into Phhhoto's app" (*id.* ¶ 218), and used that information "to take commercial advantage of Phhhoto" (*id.* ¶ 217). Finally, Phhhoto alleges that under the guise of continued interest in integration, Meta gained valuable information on Phhhoto's usage and growth, as well as on its employees, in order to create Boomerang and to recruit Phhhoto's engineers for the express purpose of injuring Phhhoto. (*Id.* ¶¶ 217-220) Such information was all proprietary to Phhhoto. (*Id.* ¶¶ 217-19); *see Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221 (S.D.N.Y. 2010) (recognizing "a party asserting an unfair competition claim

need only have 'a colorable property or pecuniary interest' in the [] property at issue to state a claim' pursuant to unfair competition").

### 3. Phhhoto's state law claims are timely.

Each of Phhhoto's state law claims is properly subject to the six-year statute of limitations for fraud, *see* N.Y. C.P.L.R. § 213(8).

**Fraud.** Meta relies upon a doctrine unused in New York in the antitrust context to assert that the four-year statute of limitations for antitrust should govern Phhhoto's fraud claim because Meta's fraud is purportedly "incidental" to Phhhoto's antitrust claim. (Mot. at 16-17) However, fraud allegations are not merely "incidental" where a plaintiff has "state[d] a valid cause of action for actual fraud." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (1st Dept. 2003). If a fraud claim can stand on its own—as Phhhoto's can—in that it "has meaning and force independent of the plaintiff's other claims," the doctrine does not apply. *See Midwest Mem'l Grp., LLC v. Int'l Fund Servs. (Ireland) Ltd.*, No. 10 Civ. 8660 (PAC), 2011 WL 4916407, at *5 (S.D.N.Y. Oct. 17, 2011).

To illustrate, if the Court were to dismiss Phhhoto's antitrust claim solely on the basis of the relevant market, Phhhoto's fraud claim could still proceed. Indeed, had Phhhoto filed only a fraud claim, surely Meta would not then have argued that the standalone fraud claim should be subject to the four-year statute of limitations on the ground that Phhhoto should have pleaded that Meta engaged in monopolization as well.

**Unfair Competition.** Meta argues that the statute of limitations for Phhhoto's unfair competition claim is three years because the claim involves the misuse of Phhhoto's skill, expenditures, or labor. (Mot. at 15 (citing *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 307 (S.D.N.Y. 2017))) However, "courts typically analyze the nature of

[an] unfair competition claim to determine which statutory period applies," and fraud-based

unfair competition claims are subject to the six-year statute applicable to fraud claims.

*Greenlight Cap., Inc. v. GreenLight (Switzerland) S.A.*, No. 04 CIV. 3136 (HB), 2005 WL

13682, at *7 (S.D.N.Y. Jan. 3, 2005); *Express Gold Cash, Inc. v. Beyond 79, LLC*, No. 1:18-CV-

00837 EAW, 2019 WL 4394567, at *5 (W.D.N.Y. Sept. 13, 2019) (applying six-year fraud

statute of limitations to unfair competition claim based on false and deceptive advertising claim).

Because the crux of Phhhoto's unfair competition claim is that Meta obtained Phhhoto's data and

technical insights through fraudulent statements, misrepresentations, and misleading behavior

(Am. Compl. ¶¶ 217-20), the six-year statute applies.

## IV.     CONCLUSION

Meta's motion to dismiss should be denied in its entirety.[13]


Dated:  May 23, 2022                         */s/ Scott Martin*_____
                                            Scott Martin
                                            Irving Scher
                                            HAUSFELD LLP
                                            33 Whitehall Street, 14th Floor
                                            New York, NY 10004
                                            Tel.: (646) 357-1100
                                            smartin@hausfeld.com
                                            ischer@hausfeld.com

                                            Michael D. Hausfeld (*pro hac vice*)
                                            Sarah R. LaFreniere
                                            Ian Engdahl (application for admission *pro
                                            hac vice* forthcoming)
                                            Brittany Nieves Nyovanie (*pro hac vice*)
                                            HAUSFELD LLP
                                            888 16th Street NW, Suite 300
                                            Washington, DC 20006
                                            Tel.: (202) 540-7200

---

[13] In the event that the Court finds Phhhoto's pleading deficient as to any claim, Phhhoto respectfully requests leave to amend.

mhausfeld@hausfeld.com
slafreniere@hausfeld.com
iengdahl@hausfeld.com
bnieves@hausfeld.com

Gary L. Reback (*pro hac vice*)
CARR & FERRELL LLP
120 Constitution Drive
Menlo Park, CA 94025
Tel.: (650) 812-3400
greback@carrferrell.com

**Counsel for Plaintiff PHHHOTO Inc.**