UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------

PHHHOTO Inc.

        *Plaintiff*,

    v.

META PLATFORMS, INC.
f/k/a FACEBOOK, INC.
and DOES NOS. 1-7,

        *Defendants*.

----------------------------

**MEMORANDUM AND ORDER**

21-cv-06159(KAM)(LB)

**Kiyo A. MATSUMOTO, United States District Judge:**

        Plaintiff PHHHOTO Inc. ("Phhhoto" or "Plaintiff") commenced this action on November 4, 2021, against Defendants Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta") and Does Nos. 1-7 (collectively, "Defendants") pursuant to Section 2 of the Sherman Antitrust Act. ("Section 2"), 15 U.S.C. § 1 *et seq.* (*See* ECF Nos. 1, Complaint; 22, Amended Complaint ("AC").) Plaintiff also alleges Defendants engaged in common law fraud and unfair competition under New York law. (*Id.*)

        Before the Court is Defendants' motion to dismiss the Amended Complaint, filed on March 21, 2022 (ECF No. 22, AC), pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Plaintiff's claims are time-barred and that Plaintiff has failed to state claims upon which relief can be granted. (*See*

*generally* ECF No. 27, Motion to Dismiss ("Mot. to Dismiss").) Plaintiff opposes the Motion to Dismiss. (ECF No. 28, Pl. Opp'n Mem.) For the reasons set forth below, Defendants' motion to dismiss is **GRANTED.**

## BACKGROUND

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the well-pleaded factual allegations in the complaint are presumed to be true, and all reasonable inferences must be drawn in the plaintiff's favor. *See Sabir v. Williams*, 37 F.4th 810, 814 (2d Cir. 2022). The Court must dismiss the complaint if the plaintiff has not stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of

which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation omitted); *see also Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014). The Court may also consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *See Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002).

"To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). Additionally, even if not attached or incorporated by reference, a document upon which the complaint "solely relies and which is *integral to the complaint* may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that "this principle has its greatest applicability in cases alleging fraud" because when a complaint alleges certain representations were made in documents, "the court may properly look at the document to see whether that representation was made" (citation and quotation omitted)). Documents are "integral" where the plaintiff had to rely on their content "to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232

F. Supp. 2d at 276; *see Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (finding documents integral where the plaintiff "relied heavily upon [them] in framing the [c]omplaint"). "[A] district court may [also] rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998). In taking judicial notice of such public records, the Court does so only to establish "the fact of such litigation," not for the truth of the matters asserted in that proceeding. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quotation omitted)).

Based on the foregoing, this Court accepts as true the following allegations.

## I. Factual Background

### A. Meta's Founding of Facebook and Acquisition of Instagram

Founded in 2004 by Mark Zuckerberg, Meta is a publicly traded company incorporated in Delaware, with its principal place of business in Menlo Park, California. (ECF No. 22, AC ¶ 17.) Meta is a social media company that operates two social media platforms, Facebook and Instagram. (*Id.* ¶¶ 17-18.) "Meta's Facebook and Instagram platforms . . . are currently the most widely used platforms for personal social networking services in the United States" and "[n]o other platforms rival Meta in the

market for personal social networking services [(PSNS)]." (*Id.* ¶¶ 139, 156.)

In 2021, Facebook, Meta's "core" social media platform, had approximately 3 billion worldwide users and more than 200 million monthly United States-based users. (*Id.* ¶¶ 18, 151.) Facebook, available on web browsers and cellphones, is the most downloaded personal networking app on the Apple App Store in the United States. (*Id.* ¶¶ 27, 155.) Over 80% of internet users in the United States use Facebook regularly. (*Id.* ¶ 151.)

Meta bought Instagram in 2012. (*Id.* ¶ 30.) In 2020, Instagram boasted more than 138 million monthly U.S.-based users. (*Id.* ¶ 152.) Over 54% of internet users in the United States use Instagram each month, and users collectively spend a total of 1.5 billion minutes per day on Instagram. (*Id.*)

Fundamental to the success of these personal social networking platforms is Meta's so-called "social graph," which "facilitates connections between users' friends, family, and other personal connections." (*Id.* ¶¶ 137–38.) In addition, a sharing function allows users to share content with other users who are connected and permits users to "broadcast" to other users, including people they know and new connections. (*Id.*) Users may also find and connect with other users through the social graph by tracking user information and facilitating connections among interested users. (*Id.* ¶ 139.)

**B. Phhhoto's Use of Meta's Platform**

Plaintiff Phhhoto is a Delaware corporation with its principal place of business in Brooklyn, New York. (ECF No. 22, AC ¶ 16.) Founded by Omar Elsayed, Champ Bennett, and Russell Armand, with "nearly $ 2 million of their own money," Phhhoto was launched into the market on July 7, 2014, as a means to create and share new video content. (*Id.* ¶¶ 16, 39.) Phhhoto was founded as an innovative social networking application that enabled users to rapidly photograph a burst of photos and "[link] them together into a looping video, animating a still picture." (*Id.* ¶ 1.) Users could create these "short video[s]" or moving photos (which Phhhoto named "phhhoto" posts) on the Phhhoto application and share them either on Phhhoto's "new social network" or users' existing social media accounts on other platforms, such as Instagram and Facebook. (*Id.* ¶¶ 2-3.) At its peak, between late 2015 and 2016, Phhhoto had a total of 3.7 million monthly users and 1.3 million daily active users. (*Id.* ¶ 16.) Phhhoto had a 40% ratio of daily active users ("DAU") to monthly active users ("MAU"), a metric considered by advertisers. (*Id.* ¶ 43.)[1] Phhhoto was first launched on the iPhone in 2014 and became available on the Android phone in 2015. (*Id.* ¶¶ 3, 76.) By 2016, Phhhoto had 10 million

---

[1] According to the Amended Complaint, "DAUs, MAUs, and time spent using a platform are appropriate metrics for gauging Meta's market share, as Meta's executives, investors, and industry observers all rely on DAUs, MAUs, and time spent on a platform as common units of measure." (ECF No. 22, AC ¶ 157.)

registered users.  (*Id.* ¶ 44.)  On June 20, 2017, the company "shut down operations as a social networking application," allegedly due to Defendant's anticompetitive and fraudulent conduct.  (*Id.* ¶¶ 13, 104, 128.)

Phhhoto describes itself as a "nascent competitor" in the market for personal social networking services.  (*Id.* ¶¶ 56, 129, 130, 134, 136, 139, 181, 190, 218.)  "New entrants in the market for personal social networking services must convince users that enough of their friends and family members will also engage with the social networking platform to make use of the platform worthwhile."  (*Id.* ¶ 164.)  "From the standpoint of a potential market entrant, enticing users to join a new platform is the first critical hurdle because users are reluctant to incur such high switching costs—which increase over time as users invest more in their social network."  (*Id.* ¶ 166.)

Phhhoto was able to access aspects of Meta's social graph, the "digital representation of a person's relationship with other people" and what "personal social networking services are built on."  (*Id.* ¶¶ 49, 65, 137.)  Meta had been focused on ensuring that its platforms "meet users' various personal networking needs" so that users do not need to "exit the Meta ecosystem."  (*Id.* ¶¶ 167–69.)  Meta built that "ecosystem" through its Application Programming Interfaces ("APIs"), which are "digital tools that allow different applications to share data and functionality with

one another," including third-party applications such as Phhhoto. (*Id.* ¶¶ 32, 169.)   Meta thus integrated millions of third-party applications and websites with its Facebook and Instagram platforms, by sharing its user data through APIs and by permitting the applications to operate on  Facebook and Instagram.   (*Id.*) Meta welcomed the interoperability of third-party applications on its platforms because the interoperability would "spawn creative development by third parties" and "increase engagement with both [Facebook and Instagram]."  (*Id.* ¶ 36.)

Meta asserts that, to Phhhoto's benefit, Meta's APIs were free[2] for third-party application developers to use, and provided new companies like Phhhoto, a cache of data and users already engaged with personal social networking services on Meta's Facebook and Instagram platforms.  (Id. ¶¶ 32-33, 36-38.)  Phhhoto founders created the Phhhoto social media platform relying on Meta's "critical APIs . . . for market entry" and considered the Facebook and Instagram platforms as "critical infrastructure" on which Phhhoto could engage with and recruit new users and attract investors for its own application.  (ECF No. 22, AC ¶¶ 37, 49, 130.)  Meta's APIs benefited Phhhoto and, in turn, also generated more engagement for Meta, because as "more users engaged with

---

[2] Meta states that the access to APIs were free for third-party developers. (ECF No. 27-1 Mot. to Dismiss at 3.)

Phhhoto and posted Phhhotos to Instagram, more users engaged with Instagram—and vice versa." (*Id.* ¶ 52.)

For instance, Phhhoto relied on the "Find Friends API," on Instagram. (*Id.* ¶¶65, 68) The Find Friends API allowed third-party applications like Phhhoto to access an Instagram user's friends list on the third-party application. (*Id.* ¶ 65.) Thus, Phhhoto users could access a list of their Instagram friends who also had Phhhoto accounts, making it easier to add the identified friends on the Phhhoto platform, "recreate their social graph from Instagram," and thereby ease one barrier to entry that Phhhoto believed users faced in engaging with new social media platforms. (*Id.* ) On March 31, 2015, Meta suddenly withdrew Phhhoto's access to Instagram's Find Friends API. (*Id.*)

Another of Meta's interoperability tools on which Phhhoto relied was "iPhone Hooks," adopted by Instagram in 2011. (*Id.* ¶ 69.) iPhone Hooks allowed Phhhoto users to create moving photos or "phhhotos" on the Phhhoto social media platform and share them directly to the Instagram newsfeed with their Instagram friends. (*Id.* ¶¶ 34-35.) Despite being developed as a competing and separate social media platform, Phhhoto alleged that it and many other third-party applications developed their applications to integrate with Meta's platforms, and expected that the Facebook and Instagram platforms would be "critical infrastructure" for

these third-party applications to "grow, attract and engage users, and attract investments." (*Id.* ¶ 37.)

When users "could share photos instantly from the third-party app[lication] directly to Instagram's 'publish' screen for posting" on the Instagram platform, Meta developed a form of "attribution" to the third-party applications. (*Id.* ¶¶ 34, 69-70.) Initially, Meta allowed a third-party application like Phhhoto to "pre-populate the photo caption [of an Instagram post] to include a hashtag identifying the developer of the content"— that is, the third-party application. (*Id.* ¶ 34.) "Market observers noted that Instagram's adoption of iPhone Hooks positioned Instagram as a hub for other apps and as a key platform in the market for personal social networking services." (*Id.* ¶ 35)

Since its inception Phhhoto measured user engagement by the number of users creating and posting "phhhotos" on the Phhhoto platform, *and* the number of users posting "phhhotos" created on Phhhoto and shared on the Meta Instagram platform. (*Id.* ¶¶ 44, 48-49.)

## C. Phhhoto's Exclusion from Meta's Platform

### 1. Meta Proposes That Phhhoto Integrate with Facebook Newsfeed in February 2015 and the Integration Fails to Occur by June 2015

In 2014, Meta's Facebook platform had not implemented native support for the graphic interchange format ("GIF"), but

internet users circulated GIFs on their web platforms "like Twitter, Tumblr, and Reddit, which had implemented support for the looping image format in prior years." (*Id.* ¶ 53.) Phhhotos, however, had created the ability for users to share content in GIF or MP4 formats. (*Id.* ¶ 49.) In early February 2015, Meta's Strategic Partnerships Manager for Facebook, Brian Hurren, contacted Bennett, one of Phhhoto's founders, to discuss a potential project of integrating Phhhoto's moving photo technology into the Facebook platform. (*Id.* ¶¶ 49, 53–54.) Meta suggested a "platform integration opportunity" for Phhhoto to create a stand-alone application that could only be used on Meta's platform. (*Id.* ¶ 55.) Phhhoto declined Meta's proposal on February 5, 2015. (*Id.*)

In late February 2015, Hurren contacted Bennett again, suggesting an integration plan that would allow Phhhoto's posts to be "shared" to the Facebook newsfeed, a function described by Hurren as "GIF support in newsfeed" that only existed on Instagram's newsfeed at the time. (*Id.* ¶ 57.) Phhhoto considered Hurren's offer significant because "[e]xpanding to Facebook's newsfeed potentially was beneficial for Meta as well as Phhhoto." (*Id.* ¶ 57-58.) Phhhoto began to develop technology with an eye towards integration with the Facebook newsfeed platform. (*Id.* ¶ 58.) For Phhhoto, this integration would translate to more user engagement of Phhhoto's application, because the users would not

11

only be able to create and post "phhhotos" on the Phhhoto platform and Meta's Instagram platform, but also on Meta's Facebook platform. (*Id.*) For Facebook, this integration with Phhhoto would provide a functionality that it did not have yet on its own platform.

Phhhoto took the lead on the technical integration, but "Meta proceeded to string Phhhoto along for months." (*Id.* ¶ 59.) Phhhoto implemented further technical specifications that Hurren requested. (*Id.*) On April 8, 2015, two days after the proposed launch date, Hurren messaged Bennett: "[A]pologies . . . we're delayed at least 2 weeks – we're hung up on some legal conversations and will update as soon as we have a firm schedule." (*Id.* ¶ 60.) Phhhoto continued to work with Facebook on the integration and confirmed implementation of Facebook's metadata changes in May 2015. (*Id.*)

On June 1, 2015, Bennett reached out to Hurren to confirm that Phhhoto had properly implemented Facebook's specifications and asked Hurren to verify. (*Id.* ¶ 61.) Responding that day, Hurren said that he would check on the specifications with the Facebook team, and on June 8, 2015, Hurren reported that he was working with others to assess why phhhotos were not properly sharing onto the Facebook Newsfeed platform. (*Id.*) Ultimately Phhhoto's integration with Facebook did not occur and Meta stopped responding to Phhhoto's inquiries regarding integration after June

8, 2015.  (*Id.*)  Phhhoto does not allege that there was a formal written contract or agreement with Meta regarding the integration proposal.  Nor does Phhhoto allege that Meta officials communicated with Phhhoto to formally cancel the integration project.

Phhhoto alleges that, on information and belief, Meta undermined its own proposal to integrate Phhhoto, abandoned the project, and purposely misled Phhhoto about integration with the Facebook newsfeed.  (*Id.* at ¶ 63.)  Instead by "quashing" the newsfeed integration, Meta used the collaboration to learn significant information about "Phhhoto's usage and growth— including the names of key software developers, whom Meta would later try to hire itself," and "withheld from Phhhoto access to critical infrastructure that Meta controlled".  (*Id.* ¶¶ 62-63.) Around this time, Meta was simultaneously working with other third-party applications on similar photo functions, provided support and information, and successfully integrated another company, GIPHY, which created moving photos, onto the Facebook platform. (*Id.* ¶ 64.)  Aside from "Phhhoto's usage and growth" and names of employees, Phhhoto does not allege that Meta learned Phhhoto's trade secrets regarding its moving photos technology.

### 2. Meta Reduces Phhhoto's Interoperability Starting on March 31, 2015 and Ceases the Pre-Population of Hashtags by Third-Party Applications on August 9, 2015

On March 31, 2015, "while Hurren and Bennett were discussing Facebook's proposed newsfeed integration," Meta

suddenly withdrew Phhhoto's access to Instagram's Find Friends API, which Phhhoto had used since its 2014 launch. (*Id.* ¶ 65.) Phhhoto users were still able to create and save "phhhotos," then publish them onto the Instagram platform (with the iPhone Hooks tool), but Phhhoto users could no longer recreate their social graph from Instagram. (*Id.; see also id.* ¶ 69.)  The termination of Phhhoto's access to Find Friends API "would negatively impact how potential investors perceived Phhhoto." (*Id.* ¶ 65.)  Meta's revocation of Phhhoto's access to Facebook's Find Friends API, however, was "insufficient" to derail Phhhoto's growth in the market, and Phhhoto "grew large and fast," and steadily increased its user engagement to 10 million registered users and 1.3 million daily active users by 2016, and secured additional investments into 2016. (*Id.* ¶¶ 44, 120, 132.)[3]

On April 1, 2015, Phhhoto's Bennet emailed Hurren at Meta saying, "Looks like a change to our permissions was made recently," and asked why that happened.  Hurren responded the next day, and Phhhoto alleges in their telephone conversation, Hurren explained that, "Meta was apparently upset that Phhhoto was growing in users through its relationship with Instagram." (*Id.* ¶ 67.)

On or about August 9, 2015, Meta withdrew the ability of all third-party applications to pre-populate captions on Instagram

---

[3] In years prior, Meta withdrew access to its APIs from other third-party applications, including Path, Circle, and Tiiny.  (ECF No. 22, AC ¶ 131.) Path and Tiiny both went out of business.  (*Id.*)

posts with hashtags of the originating third-party applications, such as Phhhoto, and of the user's identity on the originating application if the user chose to use the hashtag. (*Id.* ¶ 71.) Meta reported publicly that its decision to withdraw the pre-population of hashtags was based on feedback from Instagram users that the pre-populated hashtags felt "spammy," which Phhhoto alleges was pre-textual. (*Id.* ¶¶ 71–73.) Consequently, Phhhoto, and other third-party applications, no longer had the pre-populated hashtags to help "assist[] the Instagram user to find, download, and use the originating app." (*Id.* ¶ 72.)

Meta suggested that third-party platforms could program automatically populated watermarks directly on posts created on the third-party applications, to identify their platforms when posts were shared to the Instagram platform. (*Id.* ¶ 73.) Phhhoto alleges that unlike a hashtag, the watermark suggested by Meta would disfigure or cover content and Phhhoto did not implement Meta's suggestion to use a watermark. (*Id.* ¶¶ 73–74.) After Meta's withdrawal of pre-populated hashtags, unless Instagram users included in their post caption that they created their moving photo on the Phhhoto application and shared it on the Instagram platform, other Instagram users would not know that the Phhhoto application was the source of the moving photos, and could not search by clicking on the Phhhoto hashtag. (*Id.* ¶ 75.)

### 3. Meta's Release of Boomerang, an Alleged "Clone" of Phhhoto on October 22, 2015

In September and October 2015, Phhhoto expanded its application to Android users. (*Id.* ¶ 76.) Phhhoto scheduled its Android launch date for October 22, 2015, for which Phhhoto distributed press releases to journalists and media outlets. (*Id.*) On the morning of October 22, 2015, however, Meta announced it would be launching its own "Boomerang Video App" ("Boomerang") for its Instagram platform. (*Id.* ¶ 77.) Phhhoto alleges that Boomerang's moving photo product was "a slavish clone" of Phhhoto's moving photo product, and was intended to injure Phhhoto, but provides no specific facts to support its allegations. (*Id.* ¶¶ 77-79.) Phhhoto's Android launch did not receive the press it anticipated, which Phhhoto attributes to the timing of Meta's Boomerang launch announcement. (*Id.* ¶ 78.)

Starting in October 2015, moving photos posted on Instagram from Meta's own Boomerang application were originally accompanied by a pre-populated caption that stated, "Made with Boomerang," and a link to download the Boomerang application. The Boomerang caption and link could not be edited or removed by the user creating the post. (*Id.* ¶¶ 81-82.) Instagram users who saw a moving photo on their newsfeed made on the Boomerang application could directly click on a download link on the Instagram platform. (*Id.* ¶ 82.) Phhhoto alleges that Meta's treatment of its own

Boomerang application is contrary to Meta's earlier rationale for removing pre-populated hashtags of other third-party application names, because they were perceived as "spammy". (*Id.*)

Shortly after the launch of Boomerang, Meta changed the pre-populated link in individual posts, to a permanent download button directly within the Instagram's camera feature—thereby reducing the likelihood that Instagram users would "exit the Meta ecosystem." (*Id.* ¶¶ 83, 169.) By March 2022, Meta fully integrated the Boomerang moving photo function into Instagram as a feature, removing the standalone Boomerang application from application stores. (*Id.* ¶¶ 83-84.)

### 4. Meta Launches a New Instagram Newsfeed Algorithm on March 15, 2016

On March 15, 2016, Instagram publicly announced it would be implementing an undisclosed algorithm that would change the order that a user's posts would appear on the Instagram newsfeed. (*Id.* ¶ 85-86.) Prior to the algorithm launched in March 2016, posts appeared on the Instagram newsfeed in reverse-chronological order so that the most recent posts from a user's social graph appeared at the top of a user's feed. (*Id.* ¶ 85.) Meta's press release on March 15, 2016, stated the new algorithm altered the Instagram newsfeed order "based on the likelihood [users would] be interested in the content, [the user's] relationship with the person posting and the timeliness of the post." (*Id.* ¶ 86.)

Plaintiff alleges that the change to Instagram's newsfeed algorithm was "widely reported" and not questioned by technology media publications such as *TechCrunch* and mainstream media such as *The New York Times*. (*Id.* ¶ 87.) "Websites and blogs provided advice on who would win and lose under the new algorithm." (*Id.*) Phhhoto alleged that Meta's algorithm change, "if actually implemented as Meta had described . . . should have benefited Phhhoto—a highly popular app with incredibly engaged users, as its metrics demonstrated." (*Id.* ¶ 89.) Phhhoto relied on Meta's statements and expected that under the new algorithm, user posts created on Phhhoto and shared onto the Instagram newsfeed would be "bumped up" in the newsfeed, because those posts were "unique original content shared by close connections" and Phhhoto's visibility and user engagement would be enhanced. (*Id.* ¶¶ 87–89.) Other applications also moved to algorithmic feeds that displayed users' posts "in a more desirable order (to users) than a chronological feed," and Meta's change to its algorithm on its Instagram newsfeed "did not suggest anticompetitive conduct," or "nefarious activity." (*Id.* ¶ 88.)

Between April and May 2016, Phhhoto's new user registrations, activity by users, and ranking as an application "declined precipitously" and its rank among photo and video apps in the Apple App Store dropped from 11th to 41st place. (*Id.* ¶ 91.) Phhhoto had never experienced such a significant decline in ranking

and its engineers and founders, who relied on Meta's statement about its algorithm, worked tirelessly to determine the cause. (*Id.* ¶¶ 91–92.)  By late spring 2016, little over a year had passed since Meta withdrew the Find Friends API from Phhhoto, eight months since Meta terminated the pre-populated hashtags indicating Phhhoto as the source of any "phhhotos" posted on Instagram, and seven months since Meta's launch of its own moving photo application, Boomerang.  During this time, the Phhhoto founders and engineers "searched in vain for explanations for its precipitous downturn in new user growth and user engagement," internally investigating the reason for Phhhoto's declining metrics. (*Id.* ¶ 104.)

On June 20, 2017, as a result of its declining user engagement and inability to raise funds from venture capitalists or advertising, Phhhoto "shut down" operations as a social networking company. (*Id.* ¶¶ 104, 125–28.)  After Phhhoto ceased its operations as a social media platform, its founders "pivoted back into [Phhhoto's] parent company," Hypno, "an experiential marketing business offering photo booths, a content platform, and other interactive camera experiences for retail and live events." (*Id.* ¶ 128.)

Since closing Phhhoto's operations in June 2017, Phhhoto's Instagram account changed its Instagram handle—its unique identifier for each user. (*Id.* ¶ 106.)  Phhhoto's handle

changed from its former Instagram handle @phhoto to a new handle @hypno.cam. (*Id.*) On October 25, 2017, Phhhoto allegedly realized for the first time that Meta's newsfeed algorithm "surreptitiously suppressed the visibility of Phhhoto's content," a fact that Phhhoto alleges had been concealed by Meta's pretextual explanation of its algorithm. (*Id.* ¶¶ 85, 107.) On October 25, Bennett, one of Phhhoto's founders, sought to connect Phhhoto's remaining Instagram followers to Hypno, and posted promotional materials of Hypno's endeavors from two different accounts at the same time: the @hypno.cam account (the previously named, @phhoto account with Phhhoto's Instagram followers) and @hypnocam (the new Hypno account). (*Id.* ¶¶ 105-06.)

After simultaneously posting to the two accounts, Bennett noted that posts from the former Phhhoto Instagram, (re)named @hypno.cam, "appeared to **vanish** from Bennett's own Instagram feed, which he should have received after sending it to himself, among others." (*Id.* ¶ 105.) Bennett also found it odd that the new @hypnocam post had 36 more views than the @hypno.cam post, the former Phhhoto account, despite the fact that the former Phhhoto account, @hypno.cam, had "500 times" the followers as @hpynocam. (*Id.* ¶ 106.)

Phhhoto does not allege other reasons for the lower user engagement on the former Phhhoto account, renamed @hypno.cam. For instance, Phhhoto does not allege whether it posted an announcement

on Phhhoto's Instagram account notifying its users that its former @phhhoto account name had been changed to @hypno.cam, a name its users were not familiar with, so that users who originally followed the former @phhhoto account would not be confused by an account renamed @hypno.cam on their newsfeeds.  Phhhoto also does not address how frequently the Phhhoto Instagram account had been interacting with users in the 4 months after Phhhoto ceased its operations in June 2017.

Phhhoto nonetheless alleges that Bennett's October 25, 2017 posting incident to be the only time Phhhoto had any "reason to begin investigating the sudden user decline and engagement issues Phhhoto had experienced beginning in 2016" and that Phhhoto's decline was "not a function of the app or the code, but rather as a result of Meta's concealed and purposeful **suppression** of Phhhoto's content."  (*Id.* ¶ 107 (emphasis in original).) Phhhoto further alleges:

> On information and belief, based upon Bennett's October 25, 2017 experience, Phhhoto's prior experience after the 2016 algorithm change, and later Meta statements and media reports concerning the Instagram algorithm, Meta in fact weighted and penalized a user's post (and user accounts it deemed offending) by lowering placement in other users' feeds if the post contained content from or created by Phhhoto.

(*Id.* ¶ 107.)

On October 25, 2017, the day Bennett noticed that the
former Phhhoto Instagram account, renamed @hypno.cam, was not
getting the level of Instagram engagement he expected, he emailed
Josh Constine, a journalist for *TechCrunch*. (*Id.* ¶¶ 109-10.)
Bennett inquired whether Constine "heard anything about Instagram
using their algorithmic feed to suppress competitive apps in
photo/video space? [W]e noticed a strange trend as phhhoto
downloads were skyrocketing our IG followers stopped growing and
our view counts suddenly tanked." (*Id.* ¶ 110.) That is, Bennett
inquired of the *TechCrunch* journalist about the followers and view
counts including on Phhhoto's *own* Instagram account, but does not
allege that he inquired of *TechCrunch* or Meta whether users
creating and posting "phhhotos" from Phhhoto to the Instagram
platform might have had their engagement suppressed. On April 18,
2018, after half a year had passed without a response from Constine
to Bennett's October 25, 2017 inquiry, Bennett emailed Constine
again, asking "curious if you ever dug into the algo feed?" (*Id.*)
It is not alleged whether Constine responded.

In June 2018, Meta held a press conference to explain
the basics of the Instagram algorithm "for the first time". (*Id.*
¶ 112.) Meta revealed three main factors that influenced how
users' posts would be displayed on Instagram's newsfeed: "(1)
interest—an algorithmic determination of what content users would
be interested in based on past behavior; (2) recency—how recently

a post was shared, prioritizing newer posts; and (3) relationship—providing a higher ranking to those posts with people who interact frequently." (*Id.*) Phhhoto alleges that in June 2018, Meta "still *disclaimed*" that Meta "hid posts in its newsfeed, engaged in shadowbanning (secretly banning or lowering the rank of a user's post), or favored a format (photo or video), except to the extent an individual was more likely to engage with a particular format." (*Id.*) The *TechCrunch* coverage of Meta's news conference, cited in Phhoto's Amended Complaint at footnote 10, reported that Meta received "backlash about its confusing ordering" after its launch. (Josh Constine, *How Instagram's Algorithm Works*, TechCrunch (June 1, 2018), https://techcrunch.com/2018/06/01/how-instagram-feed-works/.)[4]

On December 5, 2018, "after hearing about the revelations [from Meta's June 2018 Instagram press conference]," (ECF No. 22, AC ¶ 113), and a little over a year after Bennett's October 25, 2017 discovery that Meta's Instagram algorithm was suppressing "content from or created by Phhhoto" (*id.* ¶ 107), Bennett emailed "a contact at Meta" to inquire about the "metrics he had observed in October 2017." (*Id.* ¶ 113.) Phhhoto does not allege whether this communication was with a Meta employee who

---

[4] The *TechCrunch* article also stated that: "Yet on the horizon looms a problem similar to what Facebook's algorithm experienced around 2015: competition reduces reach.  As more users and businesses join Instagram and post more often, but feed browsing time stays stable per user, the average post will get drowned out and receive fewer views." (*Id.*)

worked on Instagram's newsfeed algorithm. The Meta employee acknowledged to Bennett that it was "strange" for a video posted by an account with 32,000 followers to only have about 250 views and suggested that the account may have been "flagged" and "downranked." (*Id.*) Phhhoto alleges that the @hpyno.cam account's post by Bennett on October 25, 2017, did not fit into any category for being flagged, for a policy violation, such as offensive conduct, or fraudulent activity. (*Id.*)

On December 5, 2018, the Digital, Culture, Media and Sport Committee of the Parliament of the United Kingdom publicly released documents produced in discovery in *Six4Three, LLC, v. Facebook*, No. 416-cv-6716 (N.D. Cal. 2016). (*Id.* ¶ 133.) Phhhoto alleges that the U.K. Parliament's disclosures "provided the first link" between Meta's earlier actions toward Phhhoto, specifically, that Meta's revocation of Phhhoto's API access (in March 2015) was part of an exclusionary scheme using algorithmic suppression to affect third-party applications Meta viewed as competition. (*Id.*) Plaintiff alleges that the U.K. government disclosures demonstrate Meta's anticompetitive conduct with respect to APIs and further alleges that Meta's exclusionary scheme of targeted third-party applications including Phhhoto. (*Id.*) This Court takes judicial notice of the Northern District of California documents cited by Phhhoto in footnote 1 of Phhhoto's Amended Complaint and notes that there is no mention in the disclosed discovery documents of

Meta's algorithm for the Instagram newsfeed.  Six4Three, LLC, *Written Statement for the Record, Online Platforms and Market Power, Part II: Innovation and Entrepreneurship*, Hearing Before the House Judiciary Subcommittee on Antitrust, Commercial and Administrative Law (July 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD003.pdf.

On September 21, 2021, *The New York Times* reported on Meta's "Project Amplify" which Plaintiff describes a "secret Meta scheme" during which Meta manipulated and re-ordered posts and content in users' newsfeeds to benefit Meta "over third-party content."  (*Id.* ¶ 114.)  Phhhoto alleges that the reporting confirmed that Meta developed the type of content manipulation that Meta previously directed at Phhhoto.  The Court also takes judicial notice that the *New York Times* article reported that Facebook's Project Amplify was specifically focused on "promot[ing] positive news about [Facebook]," "running ads that linked to favorable articles about Facebook," and "strategy for distancing Mr. Zuckerberg from scandals, partly by focusing his Facebook posts and media appearances on new products."  Ryan Mac & Sheera Frenkel, *No More Apologies: Inside Facebook's Push to Defend Its Image*, The New York Times (Sept. 21, 2021), https://www.nytimes.com/2021/09/21/technology/zuckerberg-facebook-project-amplify.html.)  The article further explained

that two people with knowledge of Meta's Project Amplify said, "While the company had previously used the News Feed to promote its own products and social causes, it had not turned to it to openly push positive press about itself." (*Id.*)

## II. Procedural Background

On November 4, 2021, Plaintiff filed the instant action. (ECF No. 1, Compl.)  On March 10, 2022, the Court held a pre-motion conference for Meta's anticipated motion to dismiss, and the Court offered Plaintiff an opportunity to amend the complaint and address any pleading deficiencies, including Meta's statute of limitations defense.  (ECF Nos. 16, Meta Pre-Motion Conf. Letter; 19, Meta Pre-Motion Supp. Auth. Letter; Minute Entry dated Mar. 10, 2022.)  The parties were also directed to discuss with their clients the possibility of engaging in good-faith settlement discussions.  (*Id.*)  On March 21, 2022, Plaintiff filed the operative Amended Complaint.  (ECF No. 22, AC.)  On June 6, 2022, the parties fully briefed Defendants' motion to dismiss.  (ECF Nos. 27-29.)

## LEGAL STANDARD

A defendant may raise a pre-answer statute of limitations defense in a Rule 12(b)(6) motion to dismiss "[w]here the dates in a complaint show that an action is barred by a statute of limitations."  *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).  On a motion to dismiss, the Court must

"accept all factual allegations [in the complaint] as true, and draw all reasonable inferences in plaintiff's favor." *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

Dismissal based on a statute of limitations is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis and citation omitted).  In deciding when a claim accrues and the statute of limitations begins to run, a district court may consider publicly available documents that are offered solely for purpose of showing that the alleged information was publicly available. *See Staehr*, 547 F.3d at 426.

## **DISCUSSION**

Meta moves to dismiss all of Phhhoto's claims as time-barred by the four-year statute of limitations applicable to Phhhoto's Sherman Act and New York common-law fraud claims, and the three-year statute of limitations applicable to Phhoto's New York unfair competition claim.  (ECF No. 27-1, Mot. to Dismiss at 1, 16.)  Meta argues that each of the acts that Phhhoto alleges injured Phhhoto occurred before April 2016 (ECF No. 22, AC ¶¶ 63, 65, 71, 77, 85), but that Phhhoto did not file its initial complaint until on November 4, 2021, over a year after April 2020,

when all of Phhhoto's claims had expired.   (ECF No. 27-1, Mot. to Dismiss at 1.)

Although Meta also contends that the factual allegations in the Amended Complaint fail to state a claim for anticompetitive behavior, fraud, and unfair competition under federal and New York law, Meta's argument that any viable claim is barred by the applicable statute of limitations is a threshold question the Court will analyze first.

For the reasons stated below, this Court finds that the four-year[5] and three-year[6] statutes of limitations bar all of

---

[5] "In applying a statute of limitations, it is basic that one looks to the essence of plaintiff's claim and not to the form in which it is pleaded." *ITT Corp. v. Lee*, 663 F. App'x 80, 85 (2d Cir. 2016) (quoting *State v. Cortelle Corp.*, 341 N.E.2d 223, 224 (1975)) (cleaned up)). "When a fraud claim is incidental to another asserted claim, the claim does not sound in fraud for purposes of taking advantage of the longer limitations period." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 544-45 (2d Cir. 1999)(citing to *Cortelle Corp.,* 341 N.E.2d at 223 (1975)).  The Court finds that Phhhoto's common law fraud claims (1) did not occur separately from and subsequent to the injuries forming the basis of Phhhoto's Sherman Act claims; and (2) the alleged injuries to Phhhoto caused by any alleged fraud by Meta are not distinct from the alleged injuries caused by Meta's alleged anticompetitive conduct. *Corcoran*, 202 F.3d at 545 (2d Cir. 1999)("A fraud action is not incidental *only when*: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." (emphasis added)).  thus, the Court finds that Phhhoto's New York state law fraud claims are "merely an exacerbation of the original injur[ies]" allegedly caused by Meta's anticompetitive conduct and applies the Sherman Act's four-year statute of limitations to Phhhoto's state law fraud claim.  *Id.*
[6] The statute of limitations for unfair competition claims under New York law has "been treated disparately in New York." *Ediciones Quiroga, S.L. v. Fall River Music, Inc.,* 1995 WL 103842, at *7 (S.D.N.Y. Mar. 7, 1995).  "New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible doctrine that depends more upon the facts [alleged] . . . than in most causes of action," and have applied the six-year period for fraud claims or the three-year period for misappropriation of labor and expenditures. *Greenlight Cap., Inc. v. GreenLight (Switzerland) S.A.*, No. 04 CIV. 3136 (HB), 2005 WL

Phhhoto's claims and that no exception applies to toll the limitations periods.  Because Phhhoto's claims are barred by the statute of limitations, the Court need not decide whether Plaintiff has alleged sufficient facts to support its claims on the merits, that Meta's conduct toward Phhhoto was anti-competitive or fraudulent or unfair under federal or New York Law.  Accordingly, the Court GRANTS Defendants' motion to dismiss the action in its entirety.

**I. Sherman Act Claim**

**A. Application of Four-Year Statute of Limitations**

The Court first considers the allegations in the Amended Complaint and whether they provided any basis to toll the four-year statute of limitations applicable to Phhhoto's federal civil antitrust claim under the Sherman Act.  *See* 15 U.S.C. § 15b (four-

---

13682, at *8 (S.D.N.Y. Jan. 3, 2005)(*citing Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)); *see also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another."); *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2d Cir. 2005)("The statute of limitations for an unfair competition claim based on misappropriation of another's labors or expenditures is three years.").  The Court finds that Phhhoto's allegations of Meta's conduct more closely align with a misappropriation of Phhhoto's labor and intellectual property rather than fraud.  The crux of Phhhoto's unfair competition claims in the Amended Complaint is Meta's failed integration of Phhhoto with the Facebook newsfeed and Meta's subsequent "cloning" of Boomerang.  (ECF No. 47, AC ¶¶ 215-220.)  Moreover, as explained in the Court's analysis of Phhhoto's fraudulent concealment claim, Phhhoto fails to allege sufficient, plausible facts establishing that Meta fraudulently concealed or misrepresented material facts.  Accordingly, the Court respectfully rejects Phhhoto's brief, conclusory argument that a six-year, rather than a three-year, statute of limitation applies to Phhhoto's state unfair competition claim.  (ECF Nos. 28, Pl. Opp'n Mem. at 27-28; 47, AC ¶¶ 186-87, 215-22.)

year statute of limitations); *see also Zenith Radio Corp. v.
Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) ("The basic rule
is that damages are recoverable under the federal antitrust acts
only if suit therefor is commenced within four years after the
cause of action accrued . . . plus any additional number of years
during which the statute of limitations was tolled.") (internal
quotation marks omitted). An "[antitrust] cause of action accrues
and the statute begins to run when a defendant commits an act that
injures a plaintiff's business." *Id.*; *see also Berkey Photo, Inc.
v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979).

Here, the gravamen of Phhhoto's complaint is that Meta
violated Section 2 of the Sherman Act through "an anticompetitive
and exclusionary course of conduct," including but not limited to
the following "overt acts," which Phhhoto alleges were continuing
violations of the antitrust laws (*see* ECF No. 22, AC ¶¶ 197-98,
202):

> (1) Meta's initial promotion of interoperability, and
> then, termination of Phhhoto's access to the
> Instagram Find Friends API on March 31, 2015 (*id.*
> ¶¶ 65, 201);
>
> (2) Meta's termination of efforts to integrate
> Phhhoto into the Facebook newsfeed on or about
> June 8, 2015 (*id.* ¶¶ 63, 197);
>
> (3) Meta's removal of pre-populated hashtags by
> third-party platforms, including Phhhoto, on
> posts shared to the Instagram newsfeed on August
> 9, 2015 (*id.* ¶ 71);

(4)   Meta's "clone" of Phhhoto and release of Meta's Boomerang application on October 22, 2015 (*id.* ¶ 77, 197); and

(5)   Meta's implementation of an algorithmic newsfeed for Instagram on March 15, 2016 (*id.* ¶¶ 85-87, 90.)

Each of the above allegedly anticompetitive acts, however, took place more than four years before November 2021, when Phhhoto filed this action.  Although the parties agreed to briefly toll the limitations period for 14 days, from October 25, 2021 (four years after October 25, 2017, the day Phhhoto alleges it discovered the last overt act) until November 4, 2021, Meta's alleged anticompetitive acts nonetheless occurred well outside the four-year statute of limitations.  (ECF No. 22, AC ¶ 186.)[7]  Indeed, Phhhoto does not dispute all five of Meta's overt acts took place before April 2016, with the final act—Meta's publicly announced implementation of an algorithmic newsfeed occurring on March 15, 2016.  Nor does Phhhoto dispute that it failed to file its Section 2 claim within the four-year statute of limitations of that final act.

**B. No Exception to the Sherman Act's Four-Year Limitations Period Applies**

The Court next considers Phhhoto's assertion that the statute of limitations should be tolled because (1) Meta

---

[7] The Amended Complaint and the parties' briefing do not provide the date the parties consented to a 14-day tolling period starting on October 25, 2021.

fraudulently concealed its anticompetitive conduct and (2) Meta engaged in continuing antitrust violations, and that the limitations clock commenced with each of Meta's continuing acts and resulting injury to Phhhoto. (*Id.* ¶¶ 186–98; *see also* ECF No. 28, Pl. Opp'n Mem. at 16–18.)  Based on the allegations before the Court, the Court finds that Phhhoto failed to allege sufficient facts showing that Meta engaged in fraudulent concealment and committed continuing violations to toll the four-year limitations period.  Consequently, for the reasons below, this action is dismissed.

### 1. Fraudulent Concealment

"The statute of limitations for an antitrust violation is tolled if plaintiff can show fraudulent concealment." *In re Nine West Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)).  To benefit from tolling based on fraudulent concealment, Phhhoto must plead particular facts showing the following three elements "(1) [Meta] wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented [Phhhoto's] discovery of the nature of the claim within the limitations period; and (3) [Phhhoto] exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (quotation omitted); *see  Nat'l Grp. for*

*Commc'ns & Computs., Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265, 265 n.15 (S.D.N.Y. 2006) (citing *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)).  Tolling ends once "disclosed facts in the public domain [are] adequate to raise [a company's] suspicions as to their claim of injury."  *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224–25 (E.D.N.Y. 2003).

A claim for fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure. *See Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009).  "The burden rests squarely on the party pleading fraudulent concealment[.]"  *In re Nine West*, 80 F. Supp. 2d at 192.  Failure to satisfy the Rule 9(b) standard is grounds to reject a fraudulent concealment argument.  *See, e.g., Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006).

As the Supreme Court has observed, moreover, "[s]tatutes of limitations are vital to the welfare of society and are favored in the law."  *Wood v. Carpenter*, 101 U.S. 135, 139 (1879).  "[T]he length of a limitation period for instituting suit in federal court 'inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'"  *Carey v. Int'l Bhd. of Elec. Workers Loc. 363 Pension Plan*, 201

F.3d 44, 47 (2d Cir. 1999) (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463–64 (1975)).  In assessing the limitations period and its exceptions, the Court is bound by the principle that statutes of limitations "are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam).

Phhhoto argues that the fraudulent concealment doctrine applies to three of the five "overt acts" alleged in its Amended Complaint.  In particular, Phhhoto asserts that: "Meta purposely and fraudulently concealed its anticompetitive and unlawful conduct through misrepresentations and material omissions made to Phhhoto concerning:

> (1)  Meta's ongoing intention to integrate Phhhoto into the Facebook newsfeed;
>
> (2)  [Meta's] reason for withdrawal of the ability to pre-populate captions through iPhone Hooks; and
>
> (3)  [Meta's] operation of and reason for implementation of the algorithmic newsfeed."

(ECF No. 22, AC ¶ 188 (brackets modified).)

Phhhoto contends that "Phhhoto could not and did not begin to discover Meta's fraudulent and anticompetitive conduct until October 25, 2017," and that "Meta's statements deliberately and fraudulently concealed the algorithmic suppression." (*Id.* ¶¶ 111, 186.)  Phhhoto neither argues nor pleads facts to support

34

fraudulent concealment of Meta's termination of Phhhoto's access to Instagram's Find Friends API on March 31, 2015, and Meta's "cloning" of Phhhoto and release of Meta's Boomerang application on October 22, 2015. Accordingly, Phhhoto's Sherman Act claims predicated on those two events are untimely and are dismissed.

For the remaining acts (1-3) above, this Court finds that Phhhoto's factual allegations are insufficient to satisfy the three elements for fraudulent concealment, and that adherence to the limitations period in this matter "is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980). As explained below, Phhhoto's allegations that Meta fraudulently concealed the reasons for Meta's proposal to integrate Phhhoto into Facebook's newsfeed, and Meta's removal of pre-populated hashtags by third parties on the Instagram newsfeed, do not satisfy the first fraudulent concealment element of concealing material facts of Meta's wrong-doing.

First, as detailed further below, Phhhoto alleges that Meta proposed a "potential integration" of Phhhoto with the Facebook newsfeed (ECF No. 22, AC ¶ 57) on February 26, 2015, but alerted Phhhoto of delays due to legal issues, and Meta stopped responding after telling Phhhoto on June 8, 2015, that Meta was trying "to get an ETA on the fix." (*Id.* ¶¶ 60-61.) The allegations in the Amended Complaint do not allege that Meta

35

concealed any material facts or wrongdoing regarding the
potential integration.  Second, Meta's removal of pre-populated
hashtags from Instagram's posts because of feedback that pre-
filled captions were perceived as "spammy," was known to Phhhoto
on August 9, 2015, and there are no facts alleging that Meta's
statements were false or concealed wrongdoing.  (*Id.* ¶ 71.)

As further explained below, because Phhhoto has not
satisfied the first fraudulent concealment element, the Court
will not address the remaining elements as to Phhhoto's
allegations regarding potential integration and the removal of
pre-populated hashtags.  The Court, however, addresses below all
three fraudulent concealment elements as to the alleged third
overt act: Meta's implementation of, and reasons, for the
algorithm.

### a. Concealment of Antitrust Violation

The first prong of fraudulent concealment requires
Phhhoto to show either that Meta "took affirmative steps to
prevent the plaintiff's discovery of [its] claim or injury or
that the wrong itself was of such a nature as to be self-
concealing." *Hendrickson Bros.*, 840 F.2d at 1083; *see also*
*Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 424
(E.D.N.Y. 2015)  .  This Court finds that Phhhoto has not
alleged sufficient facts to plausibly show that any of the three
acts, discussed, *supra*, were concealed.

### i. Meta's Integration of Phhhoto With Facebook between Late February to Early June 2015

First, the Court does not find Meta's proposed integration of Phhhoto into Facebook's newsfeed and its abandonment of the proposal to have been concealed.  Phhhoto alleges that "Meta purposely and fraudulently concealed its anticompetitive and unlawful conduct through misrepresentations and material omissions made to Phhhoto" with respect to "Meta's ongoing intention to integrate Phhhoto into the Facebook newsfeed."  (ECF No. 22, AC ¶ 188-89.)

As an initial matter, the Amended Complaint does not allege a formal agreement, but instead alleges that the "proposed" integration was a "potential" opportunity, and the failure of the integration project between Phhhoto and Facebook was clear by around June 2015, when Meta ceased responding to Phhhoto's inquiries about the project after June 8, 2015.  (*Id.* ¶ 54, 189.)  Thus, on June 8, 2015,  the alleged harm from Meta's "overt act" of proposing and then failing to communicate further with Phhhoto about the potential integration made clear that Meta was not moving forward.  (*Id.*)  Moreover, in the months leading up to June 8, 2015, Meta's Hurren did not conceal that there was resistance, and that Meta was "hung up on" some legal issues concerning the proposed integration.  Specifically, Hurren's April 8, 2015 message to Bennett stated: "[A]pologies .

. . we're delayed at least 2 weeks – we're hung up on some legal conversations and will update as soon as we have a firm schedule." (*Id.* ¶ 60.)  On June 1, 2015, Bennett reached out to Hurren to confirm whether Phhhoto had properly implemented according to Facebook's specifications.  (*Id.* ¶ 61.)  Responding that day, Hurren said that he would check on the specifications with the Facebook team, and on June 8, 2015, Hurren reported that he was working with others to assess why Phhhoto's posts were not properly sharing onto the Facebook platform.  (*Id.*)  No particular facts are alleged establishing specific concealment by Meta of material facts regarding integration, up to and including June 8, 2015, when Meta stopped responding.  Thus, Phhhoto had four years to bring suit, but failed to do so.

Critically, the Court finds that Phhhoto has not alleged with particularity facts supporting Meta's fraudulent concealment of material facts regarding the proposed integration, as required by Rule 9(b).  Phhhoto alleges generally that Hurren's "statements were false, misleading, and omitted the material fact that the integration was shut down because Meta identified Phhhoto as a competitive threat that it sought to first clone and then extinguish." (*Id.* ¶ 189.)  Phhhoto's conclusory description of Meta's alleged statements and omissions, however, does not plausibly show how Meta's statements were false and misleading, how Meta's abandonment of the proposed integration project was

concealed, or what affirmative steps Meta took to conceal that the project was not proceeding. *See Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y. 2012) ("Rule 9(b) also requires a plaintiff to plead with particularity facts giving rise to a strong inference that each defendant acted with the requisite state of mind, or scienter.").

     For instance, as noted above, Phhhoto describes the integration as a "proposed" or "potential" project but does not allege whether there was a formal contract or agreement between Meta and Phhhoto for the integration project in which Meta sought to misdirect Phhhoto. Nor does Phhhoto allege whether Meta made material misstatements, nor does Phhhoto describe any such misstatements. Rather than formally canceling the integration project, Meta stopped responding to Phhhoto after advising Phhhoto during April through June of legal issues and an attempted "ETA on the fix." (ECF No. 22, AC ¶ 61). Phhhoto does not allege facts regarding what information Meta fraudulently received as a result of the failed integration, or facts to support its allegation that Meta's Boomerang was a "clone" of Phhhhoto. Phhhoto alleges only that, on information and belief, Meta utilized the proposed collaboration to learn general information about "Phhhoto's usage and growth." (*Id.* ¶¶ 62-63.) Insofar as Phhhoto alleges that Meta learned "the names of key software developers, whom Meta would later try to hire

itself," this occurred after Meta launched its own moving photo app.  Moreover, Phhhoto does not allege particularized facts plausibly showing that Meta obtained specific proprietary information from Phhhoto during the proposed integration project, or facts regarding the specific features of Phhhoto's moving photo product that Meta allegedly cloned or copied for Meta's own use.  (*Id.* ¶¶ 98-103 alleging that in order to acquire Phhoto's proprietary information, Meta targeted Phhhoto's senior software engineers in September 2016, more than a year after the proposed integration failed in June 2015 (*id.* ¶ 61), and nearly a year after the October 2015 launch of Meta's own Boomerang application (*id.* ¶ 76).)

Furthermore, Phhhoto's own allegations suggest that Meta disclosed information to Phhhoto about Meta's competitive intentions.  Not only did Meta's Hurren report to Phhhoto in April and May 2015 about the resistance to, and legal issues regarding the integration of Phhhoto into the Facebook newsfeed, but on April 1 and 2, 2015, the companies discussed the reasons Meta had cut Phhhoto's access to Instagram's Find Friends API.  (*Id.* ¶ 67.)  In an April 2, 2015 conversation, two months before the proposed integration of Phhhoto with Facebook ceased on June 8, 2015, Meta had already disclosed to Phhhoto that Meta was "apparently upset that Phhhoto was growing in users through its

relationship with Instagram," and "that Meta identified Phhhoto as a competitive threat."  (*Id.* ¶¶ 67, 189.)

Thus, the Court cannot find or reasonably infer from Phhhoto's factual allegations that Meta concealed halting the integration of Phhhoto into the Facebook platform. (*Id.* ¶ 177.) Accordingly, the Court determines that Phhhoto has failed to plead fraudulent concealment with respect to the proposed integration project.

### ii. Meta's Termination of the Pre-Populated Hashtags in August 2015

Second, the Court finds insufficient Phhhoto's allegations, that "Meta purposely and fraudulently concealed its anticompetitive and unlawful conduct through misrepresentations and material omissions made to Phhhoto concerning" the reason for withdrawing the ability of third-party applications to pre-populate hashtags in captions through iPhone Hooks.  (*Id.* ¶ 188-89.)

Again, Phhhoto alleges that Meta disclosed its actions to Phhhoto on August 9, 2015, when Facebook publicly announced the withdrawal of its policy of allowing third-party applications to pre-populated hashtags on Meta's Instagram platform.  (*Id.* ¶¶ 71, 190.)  Meta's explanation for its change in policy was that it had received feedback that the pre-filled captions "often feel spammy."  (*Id.* ¶¶ 71, 190.)  Furthermore, by October 2015, Meta

had launched the Boomerang application for Instagram, and Meta's own pre-populated caption "Made by Boomerang" gave notice to Phhhoto that Meta's representation about avoiding "spammy" captions, was just one of Meta's reasons for withdrawing the pre-populated hashtags of third-party applications like Phhhoto. (*Id.* ¶ 81.) Meta's public announcements occurred well outside of the four-year limitations period, and Phhhoto's action is thus untimely regardless of any concealment prior to August 9, 2015 and October 2015, when Meta respectively announced the withdrawal of pre-populated hashtags and the launch of Boomerang. (*Id.*)

Moreover, Phhhoto does not allege with particularity, as required by Rule 9(b), facts that explain how not having all of Meta's "reason[s]" for its allegedly anticompetitive actions delayed Phhhoto's knowledge of its alleged injury from Meta's public disclosure with respect to withdrawing the ability of third-party applications on Instagram to pre-populate hashtags in captions. Phhhoto does not allege that Meta made assurances that it would indefinitely allow third-party applications to pre-populate with their own hashtags on its Instagram platform. Phhhoto also does not allege that Meta guaranteed that it would prioritize the commercial success and display hashtags of third-party applications over its own application's new features. Accordingly, the Court finds that Phhhoto's allegations again fail to establish with particularity that Meta's publicly disclosed

withdrawal of the pre-populated hashtags on Instagram satisfies the first element of fraudulent concealment.

### iii. Instagram's Algorithmic Suppression

Third, the Court also finds that Meta did not conceal algorithm changes that could have negatively affected Phhhoto. Phhhoto alleges that Meta's March 2016 launch and public announcement of Instagram's new algorithm, which changed the order of posts that users would see on their Instagram feeds, "surreptitiously suppressed the visibility of Phhhoto's content," which Meta "concealed by pretextual explanation and would not be known to Phhhoto until Bennett, by sheer chance, saw one of his posts disappear from his screen in late 2017." (*Id.* ¶ 85.) The Court is unconvinced that the factual allegations in the Amended Complaint sufficiently plead that Meta concealed material facts regarding its algorithmic suppression of third-party applications, including Phhhoto. Moreover, as discussed, *infra*, Phhhoto also fails allege sufficient plausible facts to support the remaining two fraudulent concealment elements for the algorithmic suppression: specifically, that Meta's alleged concealment prevented Phhhoto from discovering the claim within the limitations period, and that Phhhoto acted with due diligence to discover the claim within the limitations period.

In March 2016, over a year before Phhhoto's alleged discovery of Meta's concealment of material facts regarding its algorithm, Meta publicly announced that its algorithm would change from a newsfeed that prioritized user posts chronologically to one that prioritized user posts by interest and relationship to the user.  (*Id.* ¶¶ 85-86.)  The algorithm launch was published by Meta in a press release and "widely reported in the press."  (*Id.* ¶ 86.)  Phhhoto alleges that during Meta's announcement of its algorithm in March 2016, mainstream press such as *The New York Times* reported that the new algorithm would prioritize "photos and videos [Meta] thinks [users] will most want to see."  (*Id.* ¶ 87.)

Phhhoto alleges that websites and blogs reported that different parties would "win and lose under the new algorithm." (*Id.*)  And Phhhoto's allegations recognize that, "even companies professing their ability to help promote content on Instagram acknowledged that '[they] might not know exactly how the Instagram algorithm works.'"  (*Id.* ¶ 94.)  Phhhoto does not allege how many more or what operational details Meta was obligated to disclose beyond its public statements.

Based on these circumstances, Court finds that Phhhoto fails to plead with particularity the element that Meta fraudulently concealed material facts regarding Meta's wrongdoing, as required by Rule 9(b).  The March 15, 2016 Meta

press release about the algorithm change, that Phhhoto references in its Amended Complaint (*Id.* ¶ 89 n.7), discloses that: "The order of photos and videos in your feed will be based on the likelihood you'll be interested in the content, your relationship with the person posting and the timeliness of the post." (Instagram, *See Posts you Care About First in your Feed* (Mar. 15, 2016), https://about.instagram.com/blog/announcements/see-posts-you-care-about-first-in-your-feed.)   Meta's press release provides two examples, a "favorite musician shar[ing] a video from last night's concert" or "your best friend post[ing] a photo of her new puppy" as content that would be optimized.  (*Id.*)

Phhhoto acknowledges the material fact that its own content might be promoted or demoted by Meta's algorithm, but vaguely asserts that Meta concealed that its algorithm was suppressing Phhhoto's content.  Those allegations are insufficient to establish fraudulent concealment.  Plaintiff does not allege *why* Meta's algorithm, "if actually implemented as Meta had described," would have optimized "Phhhoto users' posts," rather than disfavored those posts.  (*Id.* ¶ 89.)  Though the Amended Complaint states that "unique original content shared by close connections" is the "the exact type of content Phhhoto users shared on Instagram," Phhhoto does not allege

whether or how its own moving photos were otherwise favored or
disfavored by the algorithm.  (*Id.* ¶ 87.)

Phhhoto further alleges that Meta actively misled
Phhhoto and disclaimed at a 2018 press conference, "that it
either hid posts in its newsfeed, engaged in shadowbanning
(secretly banning or lowering the rank of a user's post), or
favored a format (photo or video)."  (*Id.* ¶ 112.)  These
allegations "are not sufficient to invoke fraudulent
concealment," because "communications to the community at large
will not generally support a finding of fraudulent concealment."
*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, No. 19-
CV-6002 (LJL), 2021 WL 827190, at *11 (S.D.N.Y. Mar. 4, 2021),
*aff'd sub nom. Gamma Traders - I LLC v. Merrill Lynch
Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022).  "It is well
established that general statements about reputation, integrity,
and compliance with ethical norms are inactionable 'puffery,'
meaning that they are 'too general to cause a reasonable
investor to rely upon them.'"  *City of Pontiac Policemen's &
Firemen's Ret. Sys. v. UBS AG*, 752 F. 3d 173, 183 (2d Cir. 2014)
(quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP
Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).  "If that
is so, the statements are also too general for a would-be
plaintiff to rely upon them in foregoing an investigation."
*Spoofing*, 2021 WL 827190, at *11.

Plaintiff's complaint also generally alleges in 2016, "Meta disclosed very little about the operation of Instagram's algorithm," and that "Meta's conduct was also self-concealing because it was performed outside the sight and knowledge of Phhhoto, and the success of Meta's anticompetitive scheme depended on Phhhoto and antitrust regulators remaining in the dark." (*Id.* ¶ 193.)  Courts in the Second Circuit have held that, "standing alone, allegations of fraud are generally insufficient to demonstrate that a particular act is self-concealing." *SEC v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007).  Rather, "for a fraud to be self-concealing, the defendant must have engaged in some misleading, deceptive or otherwise contrived action or scheme, *in the course of committing the wrong*, that was designed to mask the cause of action." *Id.* (quotation omitted).  The Amended Complaint is devoid of factual allegations to support a finding that Meta's alleged fraud was self-concealing.

Phhhoto also generally alleges that it could not gain insight into how the Instagram ranking algorithm worked "[w]ithout insight into Meta's internal documents or code." (ECF No. 22, AC ¶ 94.)  Phhhoto, however, cites no case authority in its memorandum of law supporting its implausible allegation that withholding proprietary "internal" documents and codes to an algorithm constitutes fraudulent concealment.

47

Phhhoto acknowledges that websites and blogs "provided advice on who would win and lose under the new algorithm," and the material fact of Meta's implementation of its algorithm was disclosed to Phhhoto and the public, and not concealed.  (*Id.* ¶ 87.)  Phhhoto's argument that it was entitled to disclosure of Instagram's internal documents and code cannot sustain Phhhoto's fraudulent concealment claim.  Instead, competing businesses do not typically have full insight into one another's decisions, operations and algorithms.  Plaintiff has not particularly alleged that the decisions and omissions that Meta made with respect to its algorithmic newsfeed reflect a "contrived action or scheme" "designed to mask the cause of action."  *Jones*, 476 F. Supp. 2d at 382.

As such, the Court finds that with respect to Meta's algorithm, Phhhoto has not established the first element of a fraudulent concealment claim—the concealment itself.  However, because Phhhoto presses Meta's alleged "algorithmic suppression" more than the other alleged anticompetitive acts by Meta, the Court will consider the next two elements of fraudulent concealment regarding this act.

### b. Ignorance of Meta's Algorithmic Suppression

The Court finds that Phhhoto has not sufficiently pleaded its ignorance of Meta's algorithm suppression.  The second element Phhhhoto must prove in establishing fraudulent

concealment is that Meta's fraudulent concealment prevented Phhhoto's discovery of the nature of the claim within the limitations period. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012). "The time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme." *Arneil v. Ramsey*, 550 F.2d 774, 780 (2d Cir. 1977); *see also Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970) ("[T]he statutory period . . . [must] not await [plaintiff's] leisurely discovery of the full details of the alleged scheme."); *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 509 (S.D.N.Y. 1989) (explaining that in the context of a fraudulent concealment analysis, "facts that should arouse suspicion . . . are equated with actual knowledge of the claim" (quotation omitted)); *see also* II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 288–89 (3d ed. 2004 & 2007 Supp.) (observing that "the more recent decisions have paid increased attention to what the plaintiff knew or should have known when the initial act constituting the violation occurred").

"[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." *131 Maine St. Assocs. v. Manko*, 179

F. Supp. 2d 339, 348 (S.D.N.Y. 2002); *see LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) ("As we have explained, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been [wronged], a duty of inquiry arises. Such circumstances are often analogized to storm warnings." (*quoting Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)(cleaned up))). That is, the plaintiff must sufficiently allege that it "neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997) (quotation omitted); *see Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985) ("[T]he statute does not begin to run until the plaintiff either acquires actual knowledge of the facts that comprise [the] cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put [plaintiff] on notice.") (quotations and citation omitted); *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) ("[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he had been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.")

Applying the foregoing legal authority to Phhhoto's allegations, the Court finds that even if Phhhoto could establish either that Meta actively concealed that the algorithm could suppress third-party posts, or that it was a self-concealing act, the Amended Complaint also includes alleged acts by Meta that should have aroused the suspicions of a reasonable business in Phhhoto's situation to trigger a duty of inquiry.

At a very minimum, by March 2016, Phhhoto was aware of multiple indications that Meta's algorithm was suppressing Phhhoto.  By March 2016, when Meta's algorithm was publicly announced, a little over a year had passed since Meta withdrew the Find Friends API from Phhhoto, eight months had elapsed since Meta terminated the pre-populated hashtags Phhhoto had been using to identify Phhhoto as the source of any "phhhotos" posted on Instagram, and seven months had passed since Meta's launch of its own moving photo application, Boomerang, which allegedly is a "clone" of Phhhoto.

Although Meta did not publicly divulge every aspect of its algorithm in March 2016, Phhhoto itself alleges that the media widely reported that Meta's algorithm would change the order of a users' feed, and that "websites and blogs provided advice on who would win and lose under the new algorithm."  (*Id.* ¶ 86-87.)  Phhhoto further alleges that under Meta's new algorithm, "if actually implemented as Meta had described,"

Phhhoto should have benefited from the new algorithm's ordering of posts, and Phhhoto expected that its users' posts would be "bumped up" in the newsfeed," but they declined.  (*Id.* ¶ 89.) Phhhoto does not allege that Meta ever represented that users' posts would be bumped up.

        In April 2016, Phhhoto's new user registration and user engagement unexpectedly "declined precipitously."  (*Id.* ¶ 91.)  Phhhoto thought there was a problem with its application and examined its code and analytics, relying on Meta's public statements regarding its algorithm.  (*Id.* ¶ 92.)  Phhhoto even alleges that Bennett and Armand, another Phhhoto founder, "hypothesized various reasons the [Phhhoto] app may have suddenly dropped in popularity, such as competition from Boomerang and cyclical usage, but ruled them out."  (ECF No. 22, AC ¶ 93.)  No plausible facts in the Amended Complaint explain why the Phhhoto founders would rule out these external possibilities and ignore its duty to inquire.  Yet, Phhhoto also alleges that in March 2016, Meta implemented an algorithm that, according to the media, might affect users' engagement, including Phhhoto's.  As alleged, one month after the launch of Meta's algorithm, Phhhoto's engagement had in fact declined "precipitously", and when considered in the context of Phhhoto's allegations that Meta had already engaged in anticompetitive acts targeting Phhhoto multiple times, a reasonable business

52

would have been on notice that Meta may have been targeting its competitors with the algorithm, thus triggering Phhhoto's duty to inquire if a claim existed against Meta.

The Court determines, based on Phhhoto's own allegations, that when "the algorithmic change in the order of posts in Instagram users' newsfeeds took effect" and "the rate of Phhhoto's new user registrations plummeted, as did Phhhoto's user engagement metrics," there were compelling reasons for Phhhoto to inquire as soon as April 2016, whether Meta's new algorithmic was injuring rather than benefitting Phhhoto.  (*Id.* ¶ 125.)  *Simmons v. Reich*, No. 20-4114, 2021 WL 5023354, at *2 (2d Cir. Oct. 29, 2021)("[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred.")(citation omitted); *Newman v. Warnaco Grp.*, 335 F.3d 187, 193 (2d Cir.2003)(finding that a duty to inquire is triggered by information that "relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants."); *Staehr*, 547 F.3d at 406 ( The triggering information "need not detail every aspect of the [subsequently] alleged fraudulent scheme.")[8]

_____

[8] The Court recognizes that the "duty to inquire" standard is heavily used in securities and RICO cases, several of which the Court cites, but the standard remains applicable and relevant here as it guides Courts in analyzing a fraudulent concealment claim by a Plaintiff who seeks to toll the statute of limitations.

Phhhoto's reasonable suspicion regarding Meta's algorithm should have been heightened considering that Phhhoto acknowledges how closely its business model was tethered to Meta's APIs and newsfeed.  In its factual allegations, Phhhoto repeatedly asserted that "that Facebook and Instagram platforms would be primary [platforms]" for Phhhoto users to share "phhhotos."  (*Id.* ¶ 37.)  Phhhoto alleges that its founders created the Phhhoto social media platform relying on Meta's "critical APIs . . . for market entry" and considered the Facebook and Instagram platforms to be "critical infrastructure."  (*Id.* ¶¶ 37, 49, 130.)  Phhhoto had notice from its inception that its user engagement was linked to the Instagram platform.  Based on Phhhoto's alleged business model, the Court cannot reasonably infer from the Amended Complaint that until October 25, 2017 (ECF No. 28, Pl. Opp'n Mem. at 17), Phhhoto had no reason to suspect that the March 26, 2016 implementation of Meta's new algorithm had likely affected its user engagement, which began declining as of April 2016.

As of April 2016, in the face of a precipitous decline in Phhhoto's new registrations and user engagements on Instagram's newsfeed, just one month after Meta implemented its algorithm that it disclosed would re-order users' posts, Phhhoto was aware of the following additional "storm warnings" that triggered Phhhoto's duty to inquire.  (1) Meta had promoted

interoperability with its applications, but then terminated Phhhoto's access to Instagram's Find Friends API in March 2015 (*id.* ¶¶ 65, 201); (2) Meta had abandoned its proposal to integrate Phhhoto into the Facebook newsfeed in June 2015 (*id.* ¶¶ 63, 197); (3) Meta had terminated the pre-population of hashtags by third-party platforms, including Phhhoto's, on Instagram's newsfeed in August 2015 (*id.* ¶ 71); and (4) Meta had "cloned" Phhhoto and had released Meta's own Boomerang application in October 2015 (*id.* ¶ 77, 197).  As of April 2016, these "storm warnings" triggered Phhhoto's duty to inquire whether Phhhoto could bring claims against Meta for anticompetitive behavior and fraud within the limitations period.  Phhhoto's failure to heed and investigate the "storm warnings" within the limitations period warrants dismissal of its claims.

        Phhhoto asserts that "[i]t was not until October 25, 2017, at the earliest, that Phhhoto learned enough about how Meta's algorithmic change worked to realize that it was actually an unlawful suppression of Phhhoto's content."  (ECF No. 28, Pl. Opp'n Mem. at 3).  But Phhhoto also contends that it did not have reason to suspect Meta, because only in June 2018, did Meta hold a press conference that further described Instagram's algorithm as being based on benign factors such as user interest, the recency of posts, and the relationship between

users.  (*Id.* ¶ 112.)  Phhhoto had reasons and a duty to inquire long before June 2018, and in any case, a competitor's statements about its business conduct are generally not enough to defeat a plaintiff's duty to inquire.  *See, e.g.*, *LC Capital*, 318 F.3d at 155; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 6243526, at *115 (S.D.N.Y. Oct. 20, 2015) (finding that "a person of ordinary intelligence would have understood" a large corporation's incentive to deny wrongdoing and "should have regarded such assurances cautiously . . . should not have forgone a reasonable investigation of public data on the basis of such self-serving statements."); *see also Farr v. Shearson Lehman Hutton, Inc.*, 755 F. Supp. 1219, 1228 (S.D.N.Y. 1991) ("[S]tatements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance do not rise to the level . . . necessary to excuse a reasonable investor from the duty of inquiry.")).  The Court thus finds that Phhhoto has failed to sufficiently allege the second element of fraudulent concealment, that Meta's concealment prevented Phhhoto from discovering its claims within the limitations period.

### c. Reasonable Due Diligence Regarding Meta's Instagram Newsfeed Algorithm

Not only did Phhhoto have a duty to inquire into and discover alleged wrongdoing to support its claims as early as

April 2016, when Phhhoto's new user registrations and user engagement suddenly declined, the  tolling of the statute of limitations is also not appropriate because Phhhoto did not act with reasonable diligence in discovering the alleged algorithmic suppression within the limitations period.  Indeed, the Amended Complaint, along with documents incorporated therein by reference, directly undermine Phhhoto's argument that it acted with the "[r]easonable diligence [that] is a prerequisite to the applicability of equitable tolling." *Koch*, 699 F.3d at 157. Again, Phhhoto must plead due diligence with specificity. Courts in this Circuit have found that "[g]eneral assertions" of "due diligence without more specific explanation . . . will not satisfy the pleading requirements."  *In re Air Cargo Shipping Servs. Antitrust  Litig.*, No. 06-MDL-1775, 2010 WL 10947344, at *18 (E.D.N.Y. Sept. 22, 2010); *see also Masters v. Wilhemina Model Agency, Inc.*, No. 02-cv-4911, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003).

        Without adjudicating whether each of Meta's alleged overt acts are anticompetitive conduct, the Court finds insufficient Phhhoto's claim that it exercised due diligence. Phhhoto pleads no specific factual allegations whatsoever of its diligence with respect to investigating its suspicion that Meta's algorithm may have been suppressing third-party applications including Phhhoto.  To the contrary, Phhhoto

alleges that in April 2016, one month after Meta's announced implementation of its algorithm in March 2016, Phhhoto noticed the alleged effects of Instagram's algorithm on Phhhoto's suddenly declining metrics. "Phhhoto's founders logically thought that something they had introduced into their own product had produced problems." (*Id.* ¶ 92.) Phhhoto alleges that although it examined its own codes and metrics (*id.*), it did not investigate whether Meta's algorithm was a factor (*id.* ¶ 92.) Given all of the previously enumerated "storm warnings" of Meta's anticompetitive targeting of Phhhoto, and the sudden decline of Phhhoto's user engagement immediately after Meta's algorithm change, it was incumbent on Phhhoto to at least investigate and determine whether Meta's algorithm was an obvious alternative cause for Phhhoto's declining metrics. *LC Capital Partners*, 318 F.3d at 154. Moreover, based on its own allegations, Phhhoto failed to investigate, much less diligently inquire, whether Meta's algorithm was the cause of its decline. From its inception, Phhhoto relied on Meta's platform systems to attract and retain users as much as it relied on its own platform. Instead of engaging in a diligent investigation, Phhhoto did not reach out to a Meta contact until December 2018, over a year and a half after its alleged October 2017 discovery of "how Meta's algorithmic change worked" (ECF No. 28, Pl. Opp'n Mem. at 3), and long after its metrics had dropped in April

2016, and the company went out of business in June 2017.  (ECF No. 22, AC ¶¶ 104, 113.)

Due diligence is a requisite element of a fraudulent concealment defense to the statute of limitations bar, and Phhhoto fails to include factual allegations regarding its due diligence as to Meta's algorithm.  *See Hendrickson*, 840 F.2d at 1083 (holding that plaintiffs must allege that their "continuing ignorance was not attributable to lack of diligence on [their] part"); *see also Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36-37 (2d Cir. 2002).  Indeed, by failing to include sufficient factual allegations of its due diligence to discover its claims against Meta, Phhhoto has not satisfied the requirement that fraudulent concealment be pleaded with particularity.  *In re Merrill Lynch*, 154 F.3d at 60 ("[T]hey make no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with what response.")

Phhhoto also does not allege any reason for its failure to engage in due diligence to discover whether Meta was acting in an anticompetitive manner, other than Phhhoto's reliance on Meta's public explanations of its algorithm.  As demonstrated by public reporting incorporated into Phhhoto's Amended Complaint, beginning in April 2016, Instagram's new algorithm had already spurred widespread media speculation and

confusion about "who would win and lose under the new algorithm" (ECF No. 22, AC ¶ 87), so much that Instagram held a press conference to clarify the algorithm.  Phhhoto does not allege that during this lengthy period between Phhhoto's awareness of "storm warnings" and the filing of its complaint, Phhhoto *also* sought to investigate the algorithm and its effects directly with Meta.  Accordingly, the Court finds that Phhhoto's allegations offer no specific and plausible justification for its lack of diligence, and Phhhoto's failure to investigate and discover Meta's alleged anticompetitive behavior is fatal to the survival of Phhhoto's claims.

Taken as a whole, Phhhoto's allegations of fraudulent concealment fail because Phhhoto has not alleged with particularity that Meta allegedly engineered and concealed an algorithmic suppression, but alleges no dates for those suppressions.  Moreover, the facts alleged demonstrate that Phhhoto was on notice of potential wrongful conduct by Meta, which required Phhhoto to investigate its claims with due diligence before the statute of limitations expired.  Phhhoto's own timeline of events undermines any argument that Phhhoto acted with reasonable diligence in investigating Meta's alleged wrongdoing, as a matter of law, and Phhhoto is not entitled to toll the statute of limitations based on the fraudulent concealment tolling doctrine.

### 2. Continuing Violations

Phhhoto also pleads that the statute of limitations has continued to accrue because Meta engaged in a continuing antitrust violation through its multiple suppressions of Phhhoto-related conduct.  (ECF No. 22, AC ¶¶ 197-98).  In other words, Phhhoto argues that the limitations clock started anew with each algorithmic suppression.  *See Klehr*, 521 U.S. at 189.  When a plaintiff alleges continuing antitrust violations, "the general limitations rule has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d at 192 (E.D.N.Y. 2003) (quoting *Klehr*, 521 U.S. at 117); *see also Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 251 (S.D.N.Y. 2003).  "As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F.Supp.2d 224, 230 (E.D.N.Y. 2010) (quotation omitted).

Here, compelling circumstances are absent.  The last challenged "act" in Phhhoto's complaint is Instagram's March

2016 implementation of the algorithmic feed (even if Phhhoto claims that it did not discover this act until October 2017). Although that act might have continuing consequences, any supposed continuing effects of the algorithm are a result of inaction by Phhhoto which does not create continuing violations. *In re Ciprofloxacin Hydrochloride*, 261 F. Supp. 2d at 229 (noting that "the focus is on the timing of the causes of action, i.e., the defendant's overt acts, as opposed to the effects of the overt acts"). Moreover, the continuing violations doctrine could not plausibly aid Phhhoto, as Phhhhoto alleges that it "shut down its operations in June 2017" (ECF No. 22, AC ¶ 13), more than four years prior to the filing of the complaint.

Phhhoto contends in its opposition memorandum, but does not allege in the Amended Complaint, that, because it has remained in legal existence as a corporate entity and its assets were not sold, Meta's actions since June 2017 have continued to cause Phhhoto injury as a *potential* competitor.  Phhhoto's argument regarding its status as a dormant entity that discontinued operations in June 2017 is unsupported by plausible factual allegations.  (ECF No. 28, Pl. Opp'n. Mem. at 24.)  Even assuming that Meta's continued operation of its algorithm is a new act for purposes of the continuing violations doctrine, "the commission of a 'separate new overt act' will not permit the

plaintiff to recover for the injury caused by old overt acts
that do not fall within the limitations period." *In re
Ciprofloxacin Hydrochloride*, 261 F. Supp. 2d at 229.  Phhhoto
sues only for Meta's prior anticompetitive acts (ECF No. 22, AC
¶ 202), and alleges no facts that after ceasing operations in
June 2017, Phhhoto sought to reenter the market for a moving
photos application, such that Meta harmed that effort.

        The Court cannot reasonably infer from the factual
allegations that Meta has engaged in continued actions that have
harmed Phhhoto within four years of the filing of this action in
November 2021.  Accordingly, Phhhoto has not pleaded a
continuing violation of the antitrust laws to revive the statute
of limitations.  Phhhoto's federal antitrust claims are untimely
and are dismissed.

## II. State Law Claims of Fraud and Unfair Competition

        Although the three and four-year statutes of
limitations for Phhhoto's state law claims have also expired,
the Court respectfully declines in any event to exercise
supplemental jurisdiction over Phhhoto's state law claims of
fraud and unfair competition.  Pursuant to 28 U.S.C. §
1367(c)(3), district courts may decline to exercise supplemental
jurisdiction over state law claims when, as here, the court has
"dismissed all claims over which it has original jurisdiction."
The Second Circuit has instructed that "federal courts, absent

exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of [before trial]." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986). Even if the state law claims were timely, which they are not, there are no exceptional circumstances warranting retention of federal jurisdiction over the remaining state law claims in this case, particularly as this Court has thus far not engaged with those claims. Having dismissed Phhhoto's Section 2 claim over which the Court has original jurisdiction, the Court respectfully declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Cangemi v. United States*, 13 F.4th 115, 135 (2d Cir. 2021)("Of course, the fact that the district court was not *precluded* from exercising supplemental jurisdiction over Plaintiffs' state-law claims against the [Defendant] does not necessarily mean that it did not abuse its discretion in doing so . . . after all federal claims have been dismissed, the default rule is that federal courts should not decide related state-law claims unless there is good reason for doing so." (quotation and citation omitted)). Accordingly, the state law claims are dismissed with prejudice.[9]

---

[9] The parties also do not invoke the Court's diversity jurisdiction under 28 U.S.C. § 1332 (ECF No. 22, AC ¶ 24), nor can they establish complete diversity, because Meta and Phhhoto are both incorporated in Delaware. (AC ¶¶ 16-17.)

**III. Leave to Replead**

Finally, the Court respectfully denies Phhhoto's request that the Court grant it leave to amend.  (ECF No. 28, Pl. Opp'n Mem. at 28 n. 13.)  The Court recognizes that pursuant to Federal Rule of Civil Procedure 15(a), leave to amend a complaint "shall be freely given when justice so requires." Therefore, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citations omitted).  A court may, however, dismiss a plaintiff's claims without leave to amend when the proposed amendments would be futile.  *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*, 381 U.S. 178, 182 (1962)). An amendment to the complaint is futile if the "proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).  Leave to amend may also be denied where previous amendments have not cured the complaint's deficiencies.  *Ruotolo*, 514 F.3d at 184 (citing *Foman*, 381 U.S. at 182); *see also DeJesus v. Sears, Roebuck & Co.*, Inc., 87 F.3d 65, 72 (2d Cir. 1996) (noting that the Second Circuit has "upheld decisions to dismiss a complaint

without leave to replead when a party has been given ample prior opportunity to allege a claim." (collecting cases)).

Here, after Meta identified the bases for its proposed motion to dismiss, including the statute of limitations, in its pre-motion conference letter (ECF Nos. 16, Meta Pre-Motion Conf. Letter; 19, Meta Pre-Motion Supp. Auth. Letter), the Court allowed Phhhoto an opportunity to amend its complaint. (Minute Entry dated March 10, 2022 Order.)  Phhhoto has failed in its 69-page Amended Complaint of 222 paragraphs to allege sufficient facts that cure the untimeliness of all of its federal claims. Under these circumstances, and because further amendments to the complaint would not cure the deficiencies discussed in this opinion, any amendment would be futile.  Phhhoto's Amended Complaint is, therefore, dismissed with prejudice.  *See, e.g.*, *Ariel (UK) Ltd. V. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (holding that the district court did not abuse its discretion in not *sua sponte* granting leave to amend following dismissal of the complaint where plaintiff "had already amended its complaint once, and any amendment would have been futile.").

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss in its entirety, Defendants' claims are **DISMISSED** with prejudice, and leave to amend a second time is **DENIED**.  The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and to close the case.


**SO ORDERED.**

Dated:    March 30, 2023
          Brooklyn, New York



                                    Hon. Kiyo A. Matsumoto

                                    United States District Judge