IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHHHOTO INC.,<br><br>    Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. and DOES NOS. 1-7,<br><br>    Defendants. | Case No. 1:21-cv-06159-KAM-LB |

**META PLATFORMS, INC.'S REPLY IN SUPPORT OF ITS RENEWED
MOTION TO DISMISS PHHHOTO INC.'S AMENDED COMPLAINT**

AARON M. PANNER (*pro hac vice*)
ALEX P. TREIGER (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
atreiger@kellogghansen.com

*Counsel for Meta Platforms, Inc.*

June 2, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................3

I.   Phhhoto Fails To Allege Exclusionary Conduct............................................................3

     A.   *New York v. Meta* Is Indistinguishable and Should Control ................................3

     B.   Phhhoto's Amended Complaint Fails To Allege an Exclusionary Refusal To Deal ...........7

          1.   Withdrawal of Instagram Find Friends API.....................................8

          2.   Restrictions on pre-populated hashtags ...........................................9

          3.   Adoption of algorithmic feed..........................................................10

          4.   Phhhoto fails to allege Meta controlled a monopoly input............12

     C.   Phhhoto Fails To Allege That Meta's Development of Boomerang Was Anticompetitive...........................................................................................13

CONCLUSION......................................................................................................................15

## TABLE OF AUTHORITIES

Page

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ...................................8

*Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ........................................................................................................................12

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201 (C.D. Cal. 2011) ...................................................................................................................14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) .........................2, 8, 9, 12

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ...................................2, 13

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024) ..............................................................................................................................3

*Elevator Antitrust Litig.*, *In re*, 502 F.3d 47 (2d Cir. 2007) ..............................................................10

*IBM. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603 (S.D.N.Y. 2009) ..................................................9

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, *In re*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...............................................................................................................14

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ............................................................11

*National Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243 (2d Cir. 2018) .......................................................................................................................15

*Natsource LLC v. GFI Grp., Inc.*, 332 F. Supp. 2d 626 (S.D.N.Y. 2004) ......................................11

*New York v. Meta Platforms, Inc.*:

    66 F.4th 288 (D.C. Cir. 2023) ........................................................................2, 4, 5, 10, 11

    549 F. Supp. 3d 6 (D.D.C. 2021) ..............................................................................4, 8, 11

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ......................................................8

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) ...............................................................................................................9

*Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592 (2d Cir. 2024) .....................................6, 7, 15

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .................................................... 10

*US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019) ........................................................................ 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ........................................................................................................... 4, 8, 10

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) .................................................. 12

**OTHER AUTHORITIES**

Br. for Appellants, *New York v. Facebook, Inc.*, No. 21-7078 (D.C. Cir. Jan. 14, 2022) ............... 5

Joint Resp. to Order, Joint Appendix (State's Complaint), *New York v. Meta Platforms, Inc.*, No. 21-7078 (D.C. Cir. Aug. 21, 2023) .............................................................. 3, 4, 6

# INTRODUCTION

Phhhoto does not dispute that, to the extent it alleges merely that Meta declined to assist Phhhoto's efforts to grow, it fails to allege a claim under Section 2. But that is all it has alleged. In Phhhoto's words (Am. Compl. ¶ 49), it wanted Instagram's help in acquiring new users because "other channels did not generate sufficient user exposure and engagement" to enable Phhhoto to thrive. But taking that claim at face value, that was Phhhoto's problem, not Meta's.

As alleged in the complaint, Phhhoto sought to build a social network based on a particular "mechanic" – taking semi-animated photographs to share with friends on Phhhoto's platform. Phhhoto's apparent hope was to become a full-fledged rival to Facebook and Instagram. (If Phhhoto simply wanted to continue as a one-trick adjunct to Instagram, it was not a potential market rival at all, and the case fails for that reason.) Meta could not and did not prevent Phhhoto from pursuing that goal: Phhhoto sold its app through other channels (the App Store); its users (whether or not they also used Instagram) were free to post and share phhhotos to Phhhoto's platform (and elsewhere); Phhhoto was free to arrange for the distribution of phhhotos through e-mail, text, and on other social platforms like Twitter; and it was free to promote its app elsewhere however it chose. All that Meta is alleged to have done is to make self-interested business decisions that supposedly rendered the Instagram platform a less effective promotional channel for Phhhoto. To allow such a claim to proceed would be to recognize the very duty of affirmative assistance under Section 2 of the Sherman Act that Supreme Court and Second Circuit precedent has rejected. Meta's alleged release of rival app Boomerang is no more availing: Phhhoto concedes that Phhhoto continued to grow after Boomerang's release, that Boomerang did not cause its decline, and that Boomerang continued to serve users long after Phhhoto disappeared. A product release that is not accompanied by

coercive conduct – which Phhhoto does not allege – is never the basis for liability under Section 2. *See generally Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).

Phhhoto's contrary argument rests on mischaracterizing the Second Circuit decision – which simply reversed this Court's dismissal on timeliness grounds without addressing the merits – and the decision of the D.C. Circuit in *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023) ("*New York II*"), which expressly rejected the same allegations that Phhhoto pursues here. In ruling on Meta's original motion to dismiss, this Court did not address whether Phhhoto had stated a claim under the antitrust laws, and the Second Circuit did not either: it hardly mentions the D.C. Circuit's decision in *New York v. Meta*, let alone distinguishes a case that – as even Phhhoto concedes – addressed the same allegations that are at issue here. Phhhoto's own attempt to distinguish *New York v. Meta*, based on the assertion that the D.C. Circuit ruled solely on laches, ignores the express holding of that case, which addressed the merits of the states' antitrust claims in affirming the district court's merits-based dismissal.

Phhhoto relies on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), but the D.C. Circuit rejected the states' similar reliance because Meta's alleged failure to support rival apps' efforts to promote themselves on Meta's apps bears no similarity to a monopolist's termination of a profitable joint lift-ticket arrangement and refusal to sell lift tickets at full retail prices to drive its sole rival out of business. Phhhoto's argument (at 14) that its claim depends on Meta's affirmative "anticompetitive acts" is just rhetoric: Meta did nothing to prevent Phhhoto from competing independently. Because Phhhoto has amended its complaint once and declined the chance to amend to address the D.C. Circuit's adverse precedent, the Court should dismiss with prejudice.

2

# ARGUMENT

## I. Phhhoto Fails To Allege Exclusionary Conduct

It is now common ground that "if virtually all of the acts on which Phhhoto's claim relies were lawful and not exclusionary, the case should not proceed."  Pl. Br.[1]  That is true here.

### A. *New York v. Meta* Is Indistinguishable and Should Control

**1.**     *New York v. Meta* should control the result here.  Phhhoto never argues that the D.C. Circuit's affirmance of the district court's dismissal of the states' antitrust complaint misread or misapplied Supreme Court precedent (which, of course, binds this Court as it bound the D.C. Circuit), nor does it urge this Court to depart from the D.C. Circuit's holding.  Instead, it seeks (at 15) to distinguish that case on the ground that it did not "have anything to do with Meta's conduct directed at Phhhoto."

That is a strange assertion.  As Meta explained in its brief (at 7-8), the states' complaint highlighted Meta's conduct involving Phhhoto, describing *all* of the key allegations that re-appear in Phhhoto's later-filed complaint.  The states alleged that Meta "cut[] Phhhoto off from . . . Instagram's Find Friends API," Joint Resp. to Order, Attach. ¶ 226, *New York v. Meta Platforms, Inc.*, No. 21-7078 (D.C. Cir. Aug. 21, 2023) ("*New York* Compl."); Phhhoto alleges that Meta "withdrew Phhhoto's access to . . . Instagram['s] Find Friends API," Am. Compl. ¶ 65.  This is the first category of conduct that Phhhoto claims (at 7-9) is unlawful.  The states alleged that Meta "suppress[ed] all images that were posted with the hashtag #phhhoto," *New York* Compl. ¶ 227; Phhhoto alleges that Meta "withdrew the ability to pre-populate #phhhoto . . . from its Instagram platform," Am. Compl. ¶ 71.  This is the second category of conduct that

---

[1] Phhhoto properly places no reliance on *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), agreeing that "*Duke Energy* is simply not our case.*"*

3

Phhhoto claims (at 9-10) supports liability. The states alleged Instagram's "algorithmic feed" "buried Phhhoto-generated content on Instagram," *New York* Compl. ¶ 227; Phhhoto alleges that Instagram's feed algorithm "suppressed the visibility of Phhhoto's content," Am. Compl. ¶ 85. This is the third category of conduct that Phhhoto relies on (at 12-13). The states alleged that Meta "released a similar feature" to compete with Phhhoto, *New York* Compl. ¶ 226; Phhhoto alleges that Meta released Boomerang supposedly "to injure Phhhoto," Am. Compl. ¶ 79. This is the final category of conduct that Phhhoto still asserts (at 11-12) is anticompetitive. The holding that these allegations fail to state a claim cannot be distinguished on the basis that there is any substantive difference between the states' complaint and Phhhoto's because there is none.

Phhhoto's argument (at 15) that the D.C. Circuit's ruling was based on the untimeliness of the states' complaint, rather than the merits, is incorrect and thus provides no basis to disregard its holding. To be sure, the district court held that certain allegations regarding individual apps (including Phhhoto) were irremediable through injunctive relief (even on the *arguendo* assumption that they implicated any exception to *Trinko*'s[2] no-duty-to-deal rule). *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 30-31 (D.D.C. 2021) ("*New York I*"). And the Court of Appeals affirmed this aspect of the district court's order, noting that even if Phhhoto (and a few other apps) were banned, that would be "a drop in the bucket" and a remedy directed to those apps "would serve no antitrust purpose." *New York II*, 66 F.4th at 306.

But Meta is not relying on *that* aspect of the court of appeals' decision; Meta relies instead on the D.C. Circuit's *merits* holding rejecting the states' argument that their allegations were not governed by *Trinko*'s no-duty-to-deal rule. In challenging the district court's order, the states relied on Phhhoto-related allegations to argue that their complaint had "allege[d]

---

[2] *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

4

anticompetitive platform-related conduct" that was actionable despite the general rule limiting duties to deal under Section 2.  Br. for Appellants at 59, *New York v. Facebook, Inc.*, No. 21-7078 (D.C. Cir. Jan. 14, 2022); *see id.* ("[T]he [States'] complaint alleges that Facebook exploited its platform control to degrade the functionality and distribution of rivals' content, including by covertly suppressing content linked to Phhhoto when that app was deemed to pose a competitive threat.").  In support of that argument, the states cited specifically ¶ 205 of their complaint as well as the paragraphs of its complaint related to Phhhoto.  And here is what the D.C. Circuit had to say about that:

> The States also allege that [Meta] used its control over Platform to "degrade the functionality and distribution of potential rivals' content." Complaint ¶ 205.  This is another way of saying that [Meta] refused to deal with its rivals on the rivals' preferred terms.  In *Trinko* the defendant telephone company sometimes "failed to fill" its rivals' orders "at all," but other times only failed to fill its rivals' orders "in a timely manner" or filled its rivals' orders "after filling those for its own local phone service."  540 U.S. at 404-405.  Yet the Supreme Court treated all of the company's actions, and inactions, as refusals to deal.  *See id.* at 406-411.  And in a later case the Court added that as "a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co.*, 555 U.S. at 448.

*New York II*, 66 F.4th at 306.

Similarly, the United States, in its amicus brief in support of the states, pressed the argument that the states' allegations were "'fundamentally different from challenges to unilateral refusals to deal.'"  *Id.* (quoting United States Amicus Br. at 15).  The D.C. Circuit rejected that argument as well:

> We disagree. The States alleged that when Facebook banned a rival under the core functionality policy, the rival "suddenly lost access" to Facebook Platform, "devastating" the rival and leaving it with "broken or buggy features."  Complaint ¶ 202.  The policy thus accomplished what the United States admits unilateral refusals do as well: "withhold valuable access from rivals" "leaving them weakened and less competitive."  United States Amicus Br. at 15.

5

*Id.*; *compare New York* Compl. ¶ 202 ("An app that suddenly lost access to Facebook's APIs was hurt not only because its users would no longer be able to bring their friend list to the new app, but also because a sudden loss of functionality, which creates broken or buggy features, suggests to users that an app is unstable."); *with* Am. Compl. ¶ 68 ("Cutting off API access not only caused Phhhoto to lose access to the Instagram friend list, but also caused buggy features suggesting that the Phhhoto app was unstable.").

      In sum, Phhhoto does not and cannot claim that there is any difference between the factual allegations that the D.C. Circuit rejected in *New York v. Meta* and the allegations of its own complaint; it has not argued that the D.C. Circuit's decision is wrong; it has not urged this Court to depart from that court's reasoning.  Having failed to provide this Court with any basis to distinguish the D.C. Circuit's merits holding, Phhhoto's complaint should be dismissed.

      **2.**      Phhhoto's half-hearted suggestion that the Second Circuit's decision can be read to support a different merits result finds no support in the holding or reasoning of that case.  The Second Circuit noted that this Court "never reached the merits of Phhhoto's antitrust claim," and its holding was expressly limited to Phhhoto's contention that "the district court erred in declining to toll the statute of limitations based on fraudulent concealment."  *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 597 (2d Cir. 2024).  Because the only conduct that was allegedly concealed was the particular implementation of Instagram's algorithm – the last-in-time conduct – the only question before the Court of Appeals was whether this Court properly declined to address the merits, not whether there was any legal merit to any aspect of the claims.  Phhhoto

6

concedes as much. Pl. Br. 1 (noting the Second Circuit "only ruled on the limitations and tolling issue").

Phhhoto's insistence (at 3) that the Second Circuit "set out the factual predicate in order to satisfy itself as to the unlawfulness of multiple individual acts" is wishful thinking. The Second Circuit said nothing about whether any individual act was lawful, and it did not need to do so to determine that Phhhoto had adequately alleged concealment of conduct (whether lawful or not). Furthermore, the Court of Appeals was aware of the D.C. Circuit decision in *New York v. Meta*, as it cited the case in analyzing whether Phhhoto plausibly alleged that it lacked notice of its claim. *See Phhhoto*, 123 F.4th at 611. Yet that is the *only* mention that the court made of that earlier decision. Had the Second Circuit intended to endorse the legal sufficiency of Phhhoto's allegations – given the earlier ruling of a sister circuit – it would have explained the basis for its contrary view.

In sum, the Second Circuit's decision thus provides no basis for disregarding the D.C. Circuit's holding.

**B.  Phhhoto's Amended Complaint Fails To Allege an Exclusionary Refusal To Deal**

The D.C. Circuit's decision – which, as noted, is not challenged by Phhhoto – is correct; Phhhoto's allegations implicate no duty under the antitrust laws. Contrary to Phhhoto's assertion (at 6), all of the conduct alleged in the amended complaint (with the exception of the release of Boomerang) – the withdrawal of APIs, the prohibition on pre-populated hashtags, and the adoption of algorithmic feed – "involve[s] dealing between Meta and Phhhoto." That is, all the conduct implicates the way in which Meta's operation of its own services affected Phhhoto's use of Instagram as a distribution tool – rather than "'some assay by [Meta] into the marketplace'

7

that interfere[d] with the relationship between [Phhhoto] and third parties" – and therefore is a "standard refusal to deal." *New York I*, 549 F. Supp. 3d at 31-32 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.)). Phhhoto's argument (at 6-7) that this Court can bypass *Trinko* and Second Circuit precedent and hold that a refusal-to-deal becomes unlawful if motivated by "malice," contradicts *Trinko* itself, which upheld a refusal to deal motivated by the desire "to limit entry" by new firms. 540 U.S. at 407-09; *see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (rejecting argument that refusal to deal is unlawful because it was motivated by "intent to foreclose competition").

Phhhoto abandons its claim that Meta's refusal to integrate Phhhoto into the Facebook newsfeed was unlawful, but it continues to challenge other aspects of Meta's interactions with Phhhoto. None of these alleged acts gives rise to a viable Section 2 claim.

        **1.**        **Withdrawal of Instagram Find Friends API**

Phhhoto concedes that the Meta's withdrawal of Instagram's Find Friends API is governed by the *Trinko* refusal-to-deal framework. Its argument (at 9) that the conduct is nonetheless actionable based on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is incorrect. Phhhoto cannot stay on the right side of the "outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, without pleading that Meta terminated a "profitable course of dealing" with Phhhoto and that Meta lost "short-term profits" from withdrawing Phhhoto's API access. Meta Mot. 10 (quoting *Novell*, 731 F.3d at 1074). But as Meta has explained, Phhhoto alleged no facts to satisfy either requirement. Meta Mot. 10-11.

Although Phhhoto's entire case is premised on the notion that Instagram *rightly* perceived Phhhoto to be a competitive threat, it nevertheless argues (at 9) that by appropriating Instagram's social graph, Phhhoto "benefited Meta by attracting new, young users." That argument cannot

8

be squared with the complaint's allegations. If Phhhoto was a hub for the young and hip, it hardly needed to leech off Instagram. The suggestion that *Phhhoto* was attracting users to *Instagram* is not merely implausible, it is contrary to the entire premise of the complaint, which is that the desirable users were *on Instagram* and Phhhoto was trying to poach them. In any event, taking this implausible theory at face value, it falls far short of a claim that Meta was profiting from the provision of "find-friends" access to Phhhoto. API access was free, and Meta lost nothing by withdrawing it.

Phhhoto likewise cannot plausibly allege (and does not allege) that withdrawal of this API – which did not limit Phhhoto's ability to post content to Instagram but merely reduced its ability to bootstrap Instagram's existing social graph – had any impact on Instagram's user engagement, let alone an effect sufficient to outweigh the harm that Phhhoto was admittedly trying to inflict. *See IBM v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 614 (S.D.N.Y. 2009) (dismissing Section 2 where there were no allegations defendant has "foregone short term profits" by refusing to deal with rival); *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) (same); *see also* Am. Compl. ¶ 67 (alleging that Meta was "upset that Phhhoto was growing in users through its relationship with Instagram"). Meta lost nothing by allegedly limiting Phhhoto's access to this API.

### 2. Restrictions on pre-populated hashtags

Phhhoto does not assert that Meta's restrictions on third-party apps' ability to pre-populate content with hashtags is the sort of conduct that could implicate *Aspen Skiing*. Restrictions on hashtags is not even a refusal to deal; it is a restriction on the sort of customer-stealing promotions Phhhoto could post on Instagram (for free). Phhhoto does not (and cannot) claim that restricting hashtags affected any user's engagement with Instagram or involved any

9

sort of "profit sacrifice" by Meta.  Phhhoto contends (at 9) that Meta's hashtag restrictions "reduced the quality of user content" because if Phhhoto wanted to brand its content posted on Instagram, Phhhoto had to use watermarks, which Phhhoto claims "would disfigure or cover up content."  Am. Compl. ¶ 73.  But offering Phhhoto a promotional opportunity (even if Phhhoto thought it inferior) is hardly predatory.

The alleged restriction on hashtags is nothing like Microsoft's technical measures that discouraged use of rival browsers on computers running Microsoft's operating system.  *United States v. Microsoft Corp.*, 253 F.3d 34, 64-67 (D.C. Cir. 2001).  Those measures interfered with consumers' use of rival browsers on their computers running Windows with "no justification." *See id.* at 67.  (The one such measure that had a technical justification was held lawful.)  *See id.* By contrast, Meta's rules affect the appearance of content *on its own apps*.  Meta had no obligation under the antitrust laws to allow rivals to include promotional hashtags on Meta's services, and its alleged refusal to do so placed no restriction on rivals' dealings with third parties.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (per curiam) (defendant had "obvious commercial interests . . . in assuring its own control over the [product] it markets"); *see also Trinko*, 540 U.S. at 407-08 (requiring businesses to share facilities would turn courts into "central planners").

### 3. Adoption of algorithmic feed

Phhhoto's contentions (at 12) regarding Meta's algorithmic feed likewise involve a complaint about the terms of dealing in a circumstance where Meta had no duty to deal at all.  As noted above, the D.C. Circuit expressly rejected the argument that "degrad[ing] the functionality and distribution of potential rivals' content" implicated any antitrust duty.  *New York II*, 66 F.4th at 306.  According to Phhhoto, algorithmic feed gave Meta "the ability to choose which posts

10

users would see most prominently and which posts would be buried," Am. Compl. ¶ 90; it did not (and could not) interfere with users downloading and using Phhhoto's own app or Phhhoto's arrangements with any third parties. Meta's alleged downranking of Phhhoto content on Instagram therefore is just "another way of saying that Facebook refused to deal with its rivals on the rivals' preferred terms." *New York II*, 66 F.4th at 306.[3]

The fact that Meta imposed no restrictions on Phhhoto's dealing with third parties (or third parties' dealings with Phhhoto) renders *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), on which Phhhoto relies (at 12-13), inapposite. In that case, a monopoly newspaper required advertisers, as a condition of placing ads in the paper, to agree *not* to place ads with a radio station that had recently entered the market. *See id.* at 149. That conduct was anticompetitive because the newspaper "interfer[ed] with its rival's ability to compete on the merits" for customers rather than "simply refus[ing] to deal with the competitor radio station." *New York I*, 549 F. Supp. 3d at 32; *see also id.* at 33 (explaining that "it is as if the *Lorain Journal*, rather than refusing to carry advertisements from any business that also advertised with the competing radio station, instead merely required that advertisements appearing in its paper had to avoid mentioning the radio station"). The D.C. Circuit agreed with the district court that the case was inapposite. *New York II*, 66 F.4th at 304 (holding that Meta's policies restricting rivals' access to its services was "nothing like the exclusive dealing from *Lorain Journal*," because Meta "limit[ed] only how [rival] apps on Facebook operate," leaving rivals "entirely free

---

[3] Phhhoto's purported "predatory hiring" argument (at 12 n.7) fails because an unsuccessful attempt to hire Phhhoto engineers cannot have harmed Phhhoto or competition and because trying to hire talented employees is competition itself. *Natsource LLC v. GFI Grp., Inc.*, 332 F. Supp. 2d 626, 632 (S.D.N.Y. 2004) ("the hiring of a competitor's employees alone generally cannot result in an antitrust violation"). Phhhoto's claim (at 12 n.7) that Meta's public statements about the operation of its services can support a Section 2 claim fails, because it has not pleaded how any misrepresentations to consumers *harmed* competition.

11

to develop" their own competing apps). Phhhoto does not allege that Meta took any action to prevent its users from using Phhhoto but only that Meta declined to promote Phhhoto content as prominently as Phhhoto would have preferred.

### 4. Phhhoto fails to allege Meta controlled a monopoly input

All of Phhhoto's refusal-to-deal allegations fail for the additional reason that it fails to allege that Meta controlled any necessary input for Phhhoto to develop and distribute its competing app. Phhhoto argues (at 16) that, to plead a refusal-to-deal claim, it had to plausibly allege only that it lacked "*adequate* substitutes" to Instagram to "share Phhhoto content." But where rivals have alternative ways to make and distribute their products, the defendant's refusal to deal cannot foreclose competition. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 (7th Cir. 2020) ("A firm's market power is important because, without it, a firm will have little to no ability to distort or harm competition, no matter how great its desire to do so."); *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *6 (S.D.N.Y. Mar. 31, 2021) (dismissing *Aspen Skiing* claim where there was "no allegation that Defendants are the only other provider in the Post-Trade Solutions market"). For example, in *Viamedia*, the defendant had a monopoly facility used for distribution of a certain type of cable-television advertising; without access, its only competitor in an adjacent market was driven out of business. 951 F.3d at 444-45, 452. In *Aspen Skiing*, the defendant, the owner of three of four major ski areas, refused to sell its competitor retail-price ski tickets. 472 U.S. at 601. That it was "prohibitively expensive" for the plaintiff in *Aspen Skiing* to recreate the "all-Aspen ticket" confirmed that the plaintiff could not obtain the monopolized input elsewhere. *Id.* at 608.

Phhhoto's allegations refute its assertion (at 16) that Meta controlled an input that Phhhoto needed to compete. Phhhoto did not need Meta to reach users; its content "could be

12

shared through other channels" – including email, text messaging, and Phhhoto's own app – and "acquired the great bulk of its new users through word of mouth." Am. Compl. ¶¶ 48-49. Phhhoto's allegation that these channels "did not generate sufficient user exposure and engagement to allow Phhhoto to grow," *id.* ¶ 49, does not establish that Meta had power over an input that was *necessary* for Phhhoto to reach users. The absence of such factual allegations provides an additional reason to reject Phhhoto's refusal-to-deal allegations.

### C. Phhhoto Fails To Allege That Meta's Development of Boomerang Was Anticompetitive

No case in the history of American antitrust law has imposed liability on a monopolist simply because it released a product that outcompeted a rival. That makes perfect sense: because even an alleged monopolist "is permitted, and indeed encouraged, by § 2 to compete aggressively on the merits, any success that it may achieve through 'the process of invention and innovation' is clearly tolerated by the antitrust laws." *Berkey*, 603 F.2d at 281.

As alleged in the complaint, Meta developed and launched Boomerang in October 2015; it implemented a caption and link that "contained significantly greater functionality" than offered by rival apps; and it promoted the app through the main Instagram app. Am. Compl. ¶¶ 77, 82-83. Meta continued to innovate by including "the Boomerang download button [in] the main Instagram camera" and including the feature with Instagram Stories. *Id.* ¶¶ 83-84. Meta continued to offer Boomerang as a stand-alone app until 2022 – five years after Phhhoto's demise. None of this prevented Phhhoto from continuing to compete.

Phhhoto argues (at 10-12) that it can pursue a claim under Section 2 simply by alleging that Meta's purpose in releasing the app was to "injure" Phhhoto. But that argument misstates the law. Whenever a rival releases a product that copies an existing product or feature, it presumably does so in an effort to win business from an existing competitor; that competition –

13

though invariably resented by the discomfited incumbent – benefits consumers.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 286 (S.D.N.Y. 2015) ("A firm's decision to adopt or not to adopt a new product . . . is ordinarily a business decision within the province of the firm, and (at least in the Section 2 context) has been uniformly rejected as a basis for antitrust liability."), *aff'd*, 938 F.3d 43 (2d Cir. 2019); *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1208 (C.D. Cal. 2011) (launch of a new product "increased competition on the merits" and was "good for the market and competition").  That is why, as the sole precedent that Phhhoto cites recognizes, product introduction is *never* the basis for liability standing alone; rather, a plaintiff must allege some *other* "associated conduct," the "effect of which is to coerce consumers rather than persuade them on the merits."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019).[4]

Phhhoto alleges no such "coercion" here.  On the contrary, on Phhhoto's telling, Boomerang was not a hit:  it did not "produce substantial adoption by users," Am. Compl. ¶ 83, and Phhhoto allegedly ruled out the possibility that "competition from Boomerang" was responsible for the decline in usage of Phhhoto, *id.* ¶ 93.  Given that Phhhoto allegedly continued to grow for months after Boomerang's release and that Boomerang allegedly *never* impacted Phhhoto's growth, Phhhoto can hardly claim that Meta somehow "coerced" users to select Boomerang over Phhhoto.

The Second Circuit's observation, in dicta, that a product innovation may be unlawful if the sole reason for its release was to harm a competitor does not support

---

[4] In *Keurig*, the defendant was alleged not only to have redesigned its single-serve brewer machine to be incompatible with its rivals' coffee cups but also to have engaged in "exclusive dealing, tying agreements, and product disparagement" all of which served to "coerce customers to purchase [Keurig's] K-Cups over Competitor Cups."  383 F. Supp. 3d at 230.  There are no allegations here that Meta did anything to coerce users to use Instagram over Phhhoto's app.

14

Phhhoto.  *See Phhhoto*, 123 F.4th at 609.  The Court did not pass on the adequacy of Phhhoto's allegations concerning Boomerang, and the allegations of the complaint establish that the release of Boomerang was not merely an effort to harm a competitor but instead designed to provide a desired feature to consumers, which Meta allegedly continued to offer both as a feature of the Instagram app and as a stand-alone app for years after Phhhoto went out of business.

Accordingly, Phhhoto's allegations concerning the release of Boomerang cannot support its Section 2 claim.

## CONCLUSION

The Court "advised [Phhhoto] that if it did not seek leave to amend now, the Court was unlikely to grant leave to amend should it grant [Meta's] motion to dismiss."  Minute Entry (Feb. 27, 2025).  In response, Phhhoto "confirmed that it did not wish to amend" because it "did not have additional facts to allege."  *Id.*  The Court should accordingly dismiss Phhhoto's amended complaint with prejudice.  *See National Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018).

Dated:  June 2, 2025

                                                                              Respectfully submitted,

                                                                               /s/ Aaron M. Panner
                                                                              AARON M. PANNER (*pro hac vice*)
                                                                              ALEX P. TREIGER (*pro hac vice*)
                                                                              KELLOGG, HANSEN, TODD,
                                                                                FIGEL & FREDERICK, P.L.L.C.
                                                                              1615 M Street, N.W., Suite 400
                                                                              Washington, D.C. 20036
                                                                              (202) 326-7900
                                                                              apanner@kellogghansen.com
                                                                              atreiger@kellogghansen.com

                                                                              *Counsel for Meta Platforms, Inc.*

15