IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHHHOTO Inc.<br><br>*Plaintiff,*<br><br>v.<br><br>Meta Platforms, Inc. f/k/a Facebook, Inc. and DOES Nos. 1-7,<br><br>*Defendants.* | Case No. 1:21-cv-06159-KAM-LB |

**PLAINTIFF PHHHOTO INC.'S RESPONSE IN OPPOSITION
TO DEFENDANT META PLATFORM INC.'S RENEWED MOTION
TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  ARGUMENT ........................................................................................................................ 2

    A. Meta's Reliance on the District of Columbia (States') Case Opinions Is Misplaced and Misleading. ............................................................................................................ 2

    B. Phhhoto Alleges Anticompetitive and Unlawful Conduct by Meta. ................................... 4

    C. Meta's "Essential Facilities" Argument Is a Red Herring. ................................................12

    D. Phhhoto's Pleading of Meta's Anticompetitive Scheme Satisfies Second Circuit "Course of Conduct" Precedent. .......................................................................................14

    E. The Amended Complaint Correctly Alleges Causation. ....................................................14

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ..................................................................................................5, 10

*City of Groton v. Conn. Light & Power Co.*,
   662 F.2d 921 (2d Cir. 1981) .............................................................................................. 14

*Covad Comm'ns Co. v. Bell Atlantic Corp.*,
   398 F.3d 666 (D.C. Cir. 2005) .......................................................................................... 7

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.*,
   486 F. App'x 186 (2d Cir. 2012) ................................................................................13, 14

*Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*,
   935 F.2d 1469 (7th Cir. 1991) .......................................................................................... 10

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................................. 13

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) ..............................................................................................8, 9, 10

*New York v. Facebook, Inc.*,
   549 F. Supp. 3d 6 (D.D.C. 2021) .................................................................................. 3, 9

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023) ...............................................................................2, 3, 4, 5

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) .............................................................................6, 7, 12

*Otter Tail Power Co. v. United States*,
   410 U.S. 366 (1973) ......................................................................................................... 13

*Phhhoto Inc. v. Meta Platforms, Inc.*,
   123 F.4th 592 (2d Cir. 2024) .....................................................................................*passim*

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ..........................................................................................9, 14

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .......................................................................................10, 13

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004) ........................................................................................5, 10, 11, 13

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ......................................................................................7, 10, 14

Plaintiff Phhhoto Inc. ("Phhhoto") responds below to arguments made by Defendant Meta Platforms, Inc. ("Meta") in Meta's Supplemental Memorandum ("Meta Supp. Mem.") concerning its renewed motion to dismiss Phhhoto's Amended Complaint ("Am. Compl.").[1]

## I. INTRODUCTION

Meta claims that "Phhhoto's allegations all involve Meta's supposed failure to *assist* Phhhoto," but that Meta bears no duty under the antitrust laws to do so. Meta Supp. Mem. at 6 (emphasis in original). Meta's argument in support of its position is replete with errors of fact, misstatements of court decisions, and incorrect citations to Phhhoto's pleading.

To begin with, much of Meta's conduct as alleged by Phhhoto is anticompetitive for reasons having nothing to do with Meta failing "to assist" or even to deal with Phhhoto at all. The few claims that do involve Meta's withdrawal of interoperability features are demonstrably anticompetitive under "duty to deal" case law. Phhhoto's other allegations of illegality, involving aspects of Meta's conduct other than any "duty to deal," are supported by different bodies of case law authority, as explained below.

In any case, the gravamen of Phhhoto's complaint is Meta's anticompetitive scheme to target and damage Phhhoto (and competition more generally) – not any supposed failure by Meta to "assist" Phhhoto. The Second Circuit in its opinion in this case had no difficulty in repeatedly identifying and categorizing Phhhoto's claim as an alleged "exclusionary," "anticompetitive," or

---

[1] Meta does not contest, in either its pre-motion letter or its Supplemental Memorandum, Phhhoto's pleading of the relevant market and market power. The Court should not entertain any dilatory attempt by Meta to raise such arguments in a separate motion before summary judgment (*e.g.*, for judgment on the pleadings), including on the basis of the recently concluded FTC trial against Meta. As Meta acknowledged in its own motion for judgment in that case, that case concerns the current market, not that of the time relevant here. *See Fed. Trade Comm'n v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C.), ECF No. 592, at 9 (arguing relevant evidence is of "competition *today*" (emphasis in original)).

1

"illegal" "scheme." *See, e.g., Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 598, 601, 603, 608 (2d Cir. 2024). Nor did this Court. *See* Mar. 10, 2022 Pre-Mot. Conf. Tr. at 12:22-13:1.

II.   **ARGUMENT**

   A.   **Meta's Reliance on the District of Columbia (States') Case Opinions Is Misplaced and Misleading.**

Meta begins its argument by asserting ***in boldface italics type*** that the D.C. Circuit has "affirm[ed] dismissal of the very conduct allegations that Phhhoto repeats here." Meta Supp. Mem. at 6. Meta is referring to the opinion in *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (hereinafter sometimes, the "States' Case"), but its attempt to rely on that decision is nothing more than an effort to confuse this Court. The courts (trial and appellate) in the States' Case, an injunctive action brought by a consortium of state attorneys general in the District of Columbia, did not address, much less dismiss, any of Phhhoto's allegations here.

First, in evaluating what the D.C. decisions covered, it is important to note that Facebook and Instagram were operated by Meta as separate platforms. Am. Compl. ¶¶ 18, 30. Each had its own "Find Friends" API that worked only on that platform. *See id*. ¶¶ 32, 34. The policies and practices of the Facebook platform did not apply to Instagram. In the case before this Court, Phhhoto's interoperability claims go only to the Instagram platform and its APIs. *See id*. ¶¶ 65–75. Phhhoto also had access to the Find Friends API on the Facebook platform, but that access was never withdrawn, so Phhhoto has made no claim with regard to the Facebook platform APIs in the case before this Court.

Conversely, the opinions (trial and appellate) in the States' Case relate only to policies of the **Facebook** platform. The States, to be sure, tried to get **Instagram's practices toward Phhhoto** before the D.C. courts. *See* States' Complaint ¶¶ 225-231, *New York v. Facebook, Inc.*, 1:20-cv-03589 (D.D.C. Dec. 22, 2020), ECF No. 70. Some of those allegations are similar to

2

claims Phhhoto is bringing here. But the courts (trial and appellate) in the D.C. case ignored all of Phhhoto's claims regrading Instagram. The opinions did not mention, much less analyze, any Instagram policy or practice. It is impossible to argue that the D.C. Circuit dismissed Phhhoto's claims pertaining to Instagram, when the word "Instagram" is not mentioned even once in either the trial court's or appellate court's discussion of Meta's policies.

Evidencing their confusion, the opinions erroneously treated Phhhoto's Instagram API claims as if they were made against the Facebook Platform API policy. *See, e.g.*, *New York v. Meta Platforms, Inc.*, 66 F.4th at 305-06. In the end, no harm was done because, as we explained in our Opposition ("Opp.") to this motion, the D.C. courts only ruled that the API **policy** of the Facebook platform was legal under the Sherman Act and that Phhhoto (even incorrectly assuming that its API claims pertained to that platform) likely still would have a cause of action for withdrawal of the APIs because of its prior course of dealing with Meta. *See* Opp. at 14–15.[2]

In its Supplemental Memorandum, Meta seeks to exploit the confusion of the D.C. courts by misquoting the opinions to make it seem like the courts addressed Instagram policies and practices, when in reality the courts' holdings were expressly limited to the stated policy of the Facebook platform. For example, Meta asserts that the "district court dismissed the states' claims relating to Meta's operation of its services" (Meta Supp. Mem. at 8), but the cited section of the opinion ruled only on **Facebook's** "general no-dealing-with-competitors *policy*." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27-28 (D.D.C. 2021) (emphasis in original).[3]

---

[2] In fact, the D.C. Circuit opinion went even further, holding that the Facebook platform's API policies did not even apply to Phhhoto and similar free-standing apps, but rather were limited to "canvas apps" that ran "within" the Facebook platform – something Phhhoto did not do. *See New York v. Meta Platforms, Inc.*, 66 F.4th at 292, 304. None of the other three cases cited by Meta, *see* Meta Supp. Mem. at 9, involve Instagram APIs, and two of the cited cases do not even involve refusal-to-deal claims.

[3] Similarly, in the very next paragraph of its brief, Meta asserts that the D.C. Circuit recognized

3

### B. Phhhoto Alleges Anticompetitive and Unlawful Conduct by Meta.

"**Duty to Deal**" **Conduct**. Phhhoto's allegations regarding withdrawal of the Instagram Find Friends API and captioning capability implicate the "duty to deal" case law. Meta begins its argument on the "duty to deal" issue by making a number of factual claims that it falsely attributes to paragraph 65 of Phhhoto's Amended Complaint. For example, Meta asserts that it launched a Find Friends API for Instagram in 2014, citing paragraph 65 (*see* Meta Supp. Mem. at 2), but Phhhoto's pleading does not say that -- nor does it say most of what the second paragraph on page 2 of Meta's Supplemental Memorandum attributes to paragraph 65.

Meta next cites paragraph 65 for the assertion that Meta withdrew Phhhoto's access to the Instagram Find Friends API "in keeping with a longstanding, publicly announced policy." Meta Supp. Mem. at 2. Paragraph 65 says nothing of the sort: the Phhhoto complaint never even mentions any Instagram API "policy." Rather, according to the Complaint, Phhhoto's access to the API was terminated for an anticompetitive reason: to keep Phhhoto from increasing its user base through its relationship with Instagram. *See* Am. Compl. ¶ 67.

Meta's failure to cite a violation of Instagram policy as the reason for terminating API access was no oversight. Simply put, Phhhoto was not in violation of any Instagram policy, nor, for that matter, any Facebook policy. Phhhoto offered something that neither Instagram nor Facebook had – a looping video image format that captured five frames in a single point-and-shoot

---

that claims it rejected were "based upon [Meta's]" conduct (Meta Supp. Mem. at 8 (brackets supplied by Meta in "cleaned up" quotation)), but the opinion refers to "Facebook" not "Meta." *New York v. Meta Platforms, Inc.*, 66 F.4th at 305. And in that same paragraph of its brief, Meta claims that the D.C. Circuit dismissed claims regarding "Facebook and Instagram" (Meta Supp. Mem. at 8), but the cited section of the opinion does not say "Instagram" at all, only "Facebook." *New York v. Meta Platforms, Inc.*, 66 F.4th at 306. Comparing the wording of the other sentences in the same paragraph with the cited sections of the opinions shows that they are similarly misleading.

burst, effectively animating a still picture. *See* Am. Compl. ¶ 1. Phhhoto therefore complied with the prohibition (at issue in the States' Case in D.C.) on the use of APIs to "replicate core functionality," *New York v. Meta Platforms, Inc.*, 66 F.4th at 294, because, in fact, Meta products lacked the "core functionality" that Phhhoto offered.

Meta next claims that Phhhoto fails to allege "a voluntary and profitable course of dealing the termination of which could support a refusal-to-deal claim." Meta Supp. Mem at 11. According to the Supreme Court, a refusal-to-deal claim is established by showing that the monopolist "elected to forgo . . . *short-run benefits* [not limited to profits] because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985) (emphasis added). This language was cited approvingly in the *Trinko* decision. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 409 (2004). Phhhoto alleges precisely this scenario.

*First*, Phhhoto adequately alleges a voluntary and profitable course of dealing. This course of dealing involved Phhhoto's use of the Instagram Find Friends API and captioning capabilities, not the aborted integration of Phhhoto into the Facebook newsfeed pointed out by Meta (*see* Meta Supp. Mem. at 11). The newsfeed integration was a business deal on which Meta reneged after Phhhoto had expended significant resources. *See* Am. Compl. ¶ 61. With respect to the course of dealing on which the API claim *is* based, Phhhoto did not simply start using Instagram APIs in 2014. Rather, pursuant to instructions published on the Instagram site, Phhhoto filed an application with Instagram to register for API access, which application was authenticated and authorized by Instagram, following which Instagram issued Phhhoto a client ID that Phhhoto could use to access API endpoints.[4] And, as we understand the timeline, Instagram's authorization

---

[4] The Instagram API registration instructions and procedures as of December 5, 2014 can be found at https://web.archive.org/web/20141205034843/http://instagram.com/developer/. The D.C.

occurred after the Phhhoto site and product were thoroughly vetted by Meta's CEO, Mark Zuckerberg. Am. Compl. ¶ 4. Had he found any violation of Instagram policy or the absence of benefits to Meta, the authorization could simply have been denied.

After Instagram authorized Phhhoto's use of the APIs, Phhhoto spent time and resources building support for the Find Friends feature, and the Phhhoto site and product were similarly explored and exercised by Kevin Systrom, the head of Meta's Instagram business, as well as numerous other Meta employees. Am. Compl. ¶ 5. Again, no objection was raised to Phhhoto's continued use of the APIs. Quite to the contrary, after all of the vetting and examination, a Meta employee, acting on instructions from top Meta management, contacted Phhhoto and declared its product to be "awesome." *Id*. ¶ 54. He then proposed a series of business arrangements between Meta and Phhhoto. *Id.* ¶¶ 55-57.[5]

Phhhoto's use of the Instagram APIs, captioning capability and other interoperability features provided enormous short-term benefits to Instagram, something the Court of Appeals opinion in this case highlights, but which Meta's Supplemental Memorandum simply ignores. The Second Circuit twice describes the early business relationship between Meta and Phhhoto as "symbiotic." *Phhhoto Inc. v. Meta Platforms, Inc.*, 124 F.4th 592, 598 (2d Cir. 2024). According to the Court of Appeals' opinion, citing to Phhhoto's pleading, the business relationship

---

Circuit's decision in the States' Case has held that courts may appropriately take judicial notice of Meta's policies and practices on webpages that can be retrieved through the Wayback Machine. *New York v. Meta Platforms, Inc.*, 66 F.4th at 303.

[5] While these proposed arrangements (unlike Phhhoto's use of the APIs and captioning capability) might not be evidence of a course of dealing standing alone, they certainly provide evidence that Meta considered its relationship to Phhhoto to be beneficial and profitable to Meta as a whole, which is the appropriate legal standard for evaluating benefit to the monopolist. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1077 (10th Cir. 2013). Phhhoto had to spend additional time and resources removing the Find Friends feature, as well as altering Phhhoto's strategic path to user engagement, when API access was withdrawn at the end of the first quarter of 2015.

6

specifically contemplated that Phhhoto would "gain exposure and develop a user base" from its interoperation with Meta. *Id*. And Phhhoto's ensuing "success" (*id.*) provided Meta with the opportunity "to expand its user engagement" (*id.*) – more specifically, to "attract users from new generations and revitalize its brand" (*id.*).

The Second Circuit's analysis, and the Amended Complaint paragraphs cited, belie Meta's repeated denunciations of Phhhoto as a "free rider" on Meta's services. *See* Meta Supp. Mem. at 9-10, 12. Moreover, Phhhoto's Amended Complaint explains the relationship between Meta's user engagement and its profits, and it specifically pleads that Meta's interoperation with Phhhoto was profitable for Meta. Am. Compl. ¶ 52.

*Second*, Phhhoto adequately pleads that Meta terminated the course of dealing, thereby forsaking short-term benefits to achieve an anticompetitive end, *see* Meta Supp. Mem. at 10–11, despite that fact that the case law imposes no such obligation on Phhhoto. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Meta claims that Phhhoto must plead "irrational profit sacrifice" and conduct that was "irrational but for an anticompetitive effect," Meta Supp. Mem. at 11, but that is not so. At least two circuit courts of appeal have rejected such tests at the pleadings stage. *See Viamedia*, 951 F.3d at 462; *Covad Comm'ns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005). Under the case law, Phhhoto is only required to plead that which its complaint clearly reflects -- that the monopolist's refusal to deal was "part of a larger anticompetitive enterprise" such as "seeking to drive a rival from the market." *Viamedia*, 951 F.3d at 462 (citing *Novell*, 731 F.3d at 1075).

In any case, the Amended Complaint pleads numerous examples of Meta's willingness to forsake the short-term benefits of interoperating with Phhhoto, as identified by the Second Circuit, in order to drive Phhhoto from the market. For example, the reason Meta gave Phhhoto for

7

withdrawing API access was to prevent Phhhoto from growing in users, *see* Am. Compl. ¶ 67 – not some procompetitive justification and despite the fact that the short-term "symbiotic" relationship described by the Court of Appeals specifically contemplated Phhhoto gaining users through its relationship with Instagram. *Phhhoto*, 123 F.4th at 598. Similarly, as the Second Circuit noted, Instagram reversed its long-standing practice of hashtag caption identifiers that were "a promotional tool for third-party apps," *id.*, just to damage competitors -- despite the fact that the reversal reduced the quality of user content posted on Instagram's own site. This kind of conduct, as Phhhoto's Opposition explains, violates Section 2. *See* Opp. at 10. And an internal Instagram document, discussed below, evidenced a willingness to use Boomerang to target Phhhoto, even at the expense of sacrificing new users.

**Algorithmic Manipulation**. Meta has cited no case law that would justify its algorithmic manipulation. Instead, it contends that its conduct could not have caused Phhhoto's alleged injury, a meritless argument treated separately below. Phhhoto, on the other hand, relies on the Supreme Court's decision in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), as the basis for alleging that Meta's algorithmic manipulation violated Section 2. *See* Opp. at 12-13.

In *Lorain Journal*, the monopolist argued that it was under no antitrust duty to publish advertisements from third parties, and it could deal with whomever it pleased, 342 U.S. at 155, much as Meta now argues that it was under no antitrust duty to distribute on Instagram Phhhoto content made by third-party Instagram users. Meta Supp. Mem. at 1. And in *Lorain Journal*, the Supreme Court rejected those arguments and ruled against the monopolist.

*Lorain Journal* stands for the proposition that a monopolist controlling a monopoly platform cannot restrict or condition what users or customers can do on that platform based on the users' dealings with a competitor's product, if the effect of that restriction is to diminish the value

8

of the competitor's product and thereby inhibit the competitor's ability to compete for those customers or users on the merits. *See New York v. Facebook, Inc.*, 549 F. Supp. at 32. It is the use of the monopoly to inhibit competitors' ability to compete for third-party users/customers, rather than a direct prohibition on the competitor, that is key to the case.[6]

So, in a *Lorain Journal*-type case, the monopolist's conduct is directed at third-party users, not its own competitors. In those situations, the monopolist is not being required to lend its facilities to a competitor. Its conduct is illegal, rather, because the conduct serves to preserve the monopoly "by keeping user engagement with competing social-networking services 'below the critical level necessary for any rival to pose a real threat to [its] market share'" – precisely Phhhoto's allegations here.[7] *See* Am. Compl. ¶¶ 96, 129, 175, 176.

Phhhoto's facts mirror those of *Lorain Journal*, not those of the States' Case. It is not penalization of posts made by Phhhoto that constitute the gravamen of Phhhoto's case. Rather, Phhhoto complains that Instagram secretly penalized third-party user posts containing content made by Phhhoto's technology. This, according to the Amended Complaint, decreased Phhhoto's visibility to users and thereby diminished Phhhoto's ability to engage with new users – or, in the words used by Judge Boasberg in the States' Case, to compete on the merits for those users.

---

[6] In the decisions in the States' Case, the courts (both trial and appellate) distinguished *Lorain Journal* from the States' allegations before those courts because Facebook's API policy only prohibited Facebook's competitors from using the Facebook platform. Facebook's policy was not directed to third-party users of its platform, and did not diminish a competitor's ability to compete for those customers.

[7] *New York v. Facebook, Inc.*, 549 F. Supp. at 32-33 (citing *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)). At one point in his decision in the States' Case, Judge Boasberg suggests that if the newspaper had merely prohibited ads that mentioned the radio station, that might not have sufficiently limited the opportunity for competitors to enter or remain in the market, so as to support Section 2 liability. *New York v. Facebook, Inc.*, 549 F. Supp. at 34. Nevertheless, Judge Boasberg relied on established case law and framed the test, as set forth in the text above, in terms that Phhhoto's Amended Complaint clearly meets.

9

**Boomerang.** In its Supplemental Memorandum, Meta continues to focus solely on the "release" of the Boomerang product – which it claims was procompetitive – and continues to ignore all of Meta's anticompetitive conduct attendant to that product release, as well as the evidence of the company's anticompetitive intent. Meta Supp. Mem. at 13. Indeed, Meta argues that evidence of anticompetitive intent should simply be ignored, *id*. at 14, misciting the D.C. Circuit's *Microsoft* decision, which held that anticompetitive intent can be used to "understand" anticompetitive effects. *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).

In any case, three years after publication of the *Microsoft* opinion, the Supreme Court issued the *Trinko* decision, which explained the role of intent evidence. Under *Trinko*, the basis for determining whether conduct is anticompetitive and "violate[s] Section 2," 540 U.S. at 408, turns on the monopolist's "motivation" – whether the conduct was "prompted not by competitive zeal but by anticompetitive malice." *Trinko*, 540 U.S. at 409. The Supreme Court's prior *Aspen Skiing* decision had also looked to what "motivated" the monopolist, 472 U.S. at 610, and its even earlier *Lorain Journal* decision similarly examined the monopolist's "purpose," *see Lorain Journal*, 342 U.S. at 155. The circuit courts have followed *Trinko*'s instruction. *See, e.g., Viamedia*, 951 F.3d at 460 ("Whether valid business reasons motivated a monopolist's conduct is a question of fact.") (quoting *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1482 (7th Cir. 1991)).

In *Trinko*, the Court sought to ascertain the monopolist's motivation through an analysis of the conduct itself, the statutory framework, and other surrounding circumstances. 540 U.S. at 409-410. In this case, even at a pre-discovery stage, direct evidence of Meta's "anticompetitive malice" toward Phhhoto abounds. For example, in the FTC's trial against Meta, publicly released internal Meta correspondence from early 2012 quotes Mark Zuckerberg for his deep concern that

10

Meta was "vulnerable in mobile" to competition from the new "mobile app companies" with "millions of users" and "meaningful" brands that were "building networks" "competitive with" Meta's, because such companies "could be very disruptive" to Meta. *See* PX2822, *Fed. Trade Comm'n v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C.). An internal Instagram document from the company's top executive to its employees revealed even more: a willingness to use Boomerang to target Phhhoto, even at the expense of sacrificing the acquisition of new users – that is, "Instagram's growth" – in the process. *See Phhhoto Inc. v. Meta Platforms, Inc.*, No. 23-763, ECF No. 98 (2d Cir. Aug. 24, 2023) (discussed in our Opposition at 11).

Under *Trinko* and the other cited cases, the release of Boomerang and all of Meta's exclusionary acts attendant to that release are to be evaluated for legality under Section 2 through the lens of the monopolist's "motivation." Indeed, the attendant acts themselves (including the slavish copying of Phhhoto's product, timing Boomerang's release to bury Phhhoto's publicity, and using Meta's monopoly platform to distribute Boomerang) also supply additional evidence of Meta's "anticompetitive malice" toward Phhhoto.

The Second Circuit in this case dutifully followed *Trinko*'s approach, concluding that Phhhoto adequately pleaded Meta's Boomerang conduct as an anticompetitive act. The Court of Appeals first identified Boomerang as part of Meta's anticompetitive scheme. *Phhhoto*, 123 F.4th at 599. Then, after enumerating various anticompetitive aspects of the Boomerang product and its launch, *id.*, and having conducted its own "independent review" of Phhhoto's allegations, *id.* at 597, the Court found that "Meta's creation of Boomerang could have been an exclusionary effort aimed at undermining Phhhoto's business," as Phhhoto alleges, depending on "Meta's intent." *Id.* at 609. The Court went on to chide Meta for "ignor[ing]" the need to consider the monopolist's intent in evaluating Boomerang as an anticompetitive act in Meta's scheme. *Id*. at 610.

11

Meta continues to ignore the issue of intent, instead relying on the Tenth Circuit's *Novell* decision to claim its Boomerang conduct was not exclusionary. *See* Meta Supp. Mem. at 13-14. But the hypothetical discussed in that case dealt expressly with an "innovative replacement product." *Novell*, 731 F.3d at 1075. Contrary to Meta's assertion, *see* Meta Supp. Mem. at 14, Phhhoto's Complaint nowhere describes Boomerang as "innovative." Rather, the Complaint correctly describes Boomerang as a "slavish clone of Phhhoto." Am. Compl. ¶ 77. And since Boomerang was nothing more than a tawdry knockoff of Phhhoto, it stagnated on release, leaving Meta unable to compete on the merits of its own product. *Id.* ¶ 80. There was enormous demand for Phhhoto's product, but hundreds of millions of users ended up with Boomerang instead because of Meta's anticompetitive preferencing and penalization. Meta resorted first to withdrawing longstanding captioning capability from Phhhoto, *see id.* ¶ 71, and when even that did not curtail user demand for Phhhoto over Boomerang, Meta resorted to leveraging the monopoly power of its platform to bundle the distribution of Boomerang into its monopoly Instagram product. *Id.* ¶ 83.

In short, all of Meta's anticompetitive conduct attendant to release of Boomerang – not just the product itself – renders Meta's Boomerang conduct violative of Section 2, particularly in light of the company's stated motivation.[8]

### C.     Meta's "Essential Facilities" Argument Is a Red Herring.

Meta next asserts that the Amended Complaint fails because it does not claim that Meta "controlled an input" that was "essential to rivals," thereby precluding Phhhoto from competing just by relying on "alternative suppliers." In other words, according to Meta, Phhhoto must plead

---

[8] Meta does not challenge in either its pre-motion letter or its Supplemental Memorandum two other types of anticompetitive conduct supporting Section 2 liability alleged in Phhhoto's complaint: misleading statements to consumers and predatory hiring practices. This conduct has nothing to do with "assisting Phhhoto," and is well-supported as exclusionary in the case law. *See* Opp. at 11–12, 13. Since Meta has not challenged these acts, they are not treated here.

12

that Meta "controlled the sole means" through which Phhhoto could reach potential new customers. *See* Meta Supp. Mem. at 14–15. That is pure nonsense. This is not an "essential facilities" case, which might well require an allegation of a vital input not otherwise available from another source. *See LePage's Inc. v. 3M*, 324 F.3d 141, 153 (3d Cir. 2003) (*en banc*) (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)).

Denial of access to an essential facility is but one way in which a monopolist might violate the "conduct" element of Section 2. Violating the duty to deal is a separately cognizable category of exclusionary behavior. *See Trinko*, 540 U.S. at 407-08, 410–11; *LePage's*, 324 F.3d at 152–153. Indeed, as the Supreme Court has observed, there are myriad types of exclusionary behavior, *see Trinko*, 540 U.S. at 414, including predatory pricing, fraud on the patent office, and more generally unfair tortious conduct, *see LePage's*, 324 F.3d at 153. Phhhoto's Amended Complaint adequately pleads several different types on exclusionary conduct violative of Section 2. *See* Part II.B, *supra*.

The cases relied upon by Meta (Meta Supp. Mem. at 15), *Otter Tail* and *Eatoni* (in the section cited by Meta), are both essential facilities cases. Meta's treatise cite (Meta Supp. Mem. at 15) is similarly directed to essential facilities. None of these sources speak to other forms of exclusionary conduct. This case involves monopoly maintenance based on types of exclusionary conduct other than denial of essential facilities, including but not limited to violating the duty to deal. *See*, *e.g.*, Am. Compl. ¶ 202. In such cases, there is absolutely no requirement that the plaintiff allege that the monopolist controlled the *only* way or *all of the ways* the competitor could distribute its product. *Microsoft*, 253 F.3d at 34, 62-63. Rather, the plaintiff must prove only that the monopolist's conduct barred the competitor from cost-efficient means of distribution. *Id*. at 63.

This is precisely what Phhhoto has alleged. *See*, *e.g.*, Am. Compl. ¶ 49. Options for market

13

access that are neither "practical" nor "adequate" do not relieve the duty to deal. *Viamedia*, 951 F.3d at 473. More generally, "[u]nlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." *Dentsply*, 399 F.3d at 181. Phhhoto's Complaint contains just such allegations. *See* Am. Compl. ¶¶ 96, 117-118, 129-132, 199-208.

### D. Phhhoto's Pleading of Meta's Anticompetitive Scheme Satisfies Second Circuit "Course of Conduct" Precedent.

The leading **published** Second Circuit decision on "course of conduct" is *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981). But Meta does not cite that case in its course of conduct argument. Rather, Meta relies upon an **unpublished** decision of the Second Circuit, *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186 (2d Cir. 2012), without mention of the decision's status and lack of precedential effect. In any case, the *Eatoni* decision does no more than invoke and cite *City of Groton* for the course of conduct standard in the Second Circuit. *See Eatoni*, 486 F. App'x at 191. For the reasons stated in our Opposition, Phhhoto's pleading satisfies this standard. *See* Opp. at 1-3.[9]

### E. The Amended Complaint Correctly Alleges Causation.

Finally, Meta argues that its algorithmic manipulation would have caused Phhhoto's user engagement metrics (the number of user posts, likes, follows, etc.) to decline precipitously and Phhhoto's new user registrations to decline more slowly. Meta Supp. Mem. at 19. And since

---

[9] Moreover, if Meta seeks to imply that *Eatoni* imposes some higher standard as the law of this circuit, different from the Second Circuit's published decisions on point, Phhhoto's Amended Complaint must surely have satisfied the *Eatoni* standard in the minds of the Second Circuit panel for the reasons explained in our initial Opposition. Namely, the Second Circuit treated Meta's anticompetitive acts as part of a scheme, and viewing that scheme as a whole, applied the statute of limitations analysis only to the last major act of the scheme, the algorithmic manipulation. *See* Opp. at 3-4.

14

Phhhoto's Amended Complaint reports just the opposite (new user registrations declining before user engagement metrics), Meta posits that its algorithmic manipulation could not have caused Phhhoto's injury. *Id*.

Meta cites nothing for this wild speculation, and it is flat wrong. The Amended Complaint explains (¶¶ 48-49) that Phhhoto acquired new users principally by individuals seeing and being attracted to content created with Phhhoto's technology in the Instagram feeds of their friends. As Meta's algorithmic manipulation began to kick in, the chances for exposure of potential new Phhhoto users to content created with Phhhoto's technology changed abruptly. As contrasted with the situation prior to deployment of the algorithm, these individuals saw little Phhhoto content, and hence, far fewer new users signed up with Phhhoto than before the algorithm was deployed. Phhhoto continued to acquire some new users (something Meta clearly forgets), but its rate of acquisition declined. These new users made posts, follows, likes, and so forth, as did Phhhoto's existing users, so overall user metrics (number of user posts, likes, etc.) did not decline after deployment of the algorithm as soon as new user registrations did.[10]

The initial decline in new user registrations, followed by a more gradual decline in engagement metrics, as pleaded in the Amended Complaint (¶ 91), is precisely what anyone working in social networking would have expected from Meta's anticompetitive conduct. That conduct caused Phhhoto's injury, as the Amended Complaint clearly alleges (¶¶ 117-118).

---

[10] It is also possible that Meta's other anticompetitive conduct contributed to the more immediate decline in user registrations. For example, as the Amended Complaint explains, Meta's Boomerang product was unable to compete effectively with Phhhoto on the merits, so Meta resorted to, among other anticompetitive acts, leveraging its monopoly platform by bundling a Boomerang download button into its Instagram camera. *See* Am. Compl. ¶ 81. Potential new Phhhoto users, who might eventually have seen some Phhhoto-created content, were instead directed when using the monopoly platform to download Boomerang. Having acquired the Boomerang product, they never even tried Phhhoto.

| | |
|---|---|
| Dated:  June 2, 2025 | */s/ Scott Martin*<br>Scott Martin<br>HAUSFELD LLP<br>33 Whitehall Street, 14th Floor<br>New York, NY 10004<br>Tel.: (646) 357-1100<br>smartin@hausfeld.com<br><br>**Counsel for Plaintiff PHHHOTO Inc.** |

16