United States District Court
Eastern District of New York

-----------------------------------X

PHHHOTO INC.,

          *Plaintiff*,                **Order**

   - against -             No. 21-cv-6159 (KAM)(SDE)

META PLATFORMS, INC. f/k/a FACEBOOK,
INC., and DOES Nos. #1-7,

          *Defendant*.

-----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

Plaintiff Phhhoto, Inc. brings this antitrust action under Section 2 of the Sherman Act[1] against Defendant Meta Platforms, Inc., alleging that Meta possessed monopoly power, over the course of three years, in the personal social networking services (PSNS) market and used that power in a scheme employing anti-competitive means to exclude Phhhoto from the PSNS market. Phhhoto alleges that Meta then used that monopoly power to maintain its monopoly against the threat of nascent competitors, such as Phhhoto. Meta's alleged anticompetitive conduct ultimately caused Phhhoto to lose new users and user engagement, leading to a loss of necessary investment funding and cessation of operations in 2017.

---

[1] On March 7, 2025, the Court so-ordered Plaintiffs' dismissal of all state law claims in the amended complaint, leaving only an unlawful monopolization claim in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (ECF Nos. 45, 47.)

Upon considering Phhhoto's amended complaint and Meta's fully briefed motion to dismiss and renewed motion to dismiss, the Court respectfully denies Meta's motion to dismiss.  Phhhoto's Sherman Act claim shall proceed to discovery but only on three of its six alleged antitrust injuries: (1) Meta's termination of Phhhoto's access to Instagram's Find Friends API, (2) Meta's release of Boomerang, an alleged "clone" of Phhhoto's application, and (3) Meta's alleged algorithmic suppression of Phhhoto on Facebook's and Instagram's newsfeeds.

**BACKGROUND**

## I.   Factual Background[2]

### A. Facebook Embraces Interoperability

Meta began as Facebook in 2004, operating as a desktop application. (ECF No. 22 ("Am. Compl.") ¶ 27.)  In 2007, Meta's[3] CEO, Mark Zuckerberg, decided to change Facebook from operating as an application to operating as a platform for third-party developers. (*Id*. ¶ 28.)  To do so, it launched "Facebook Platform" to enable application programming interfaces ("APIs"), which allow applications ("apps") created by third parties and app developers to be interoperable with Facebook.[4]  (*Id*. ¶ 32.)  After it began

---

[2] The Court assumes, for purposes of considering Meta's 12(b)(6) motion, that the well-pleaded allegations in the amended complaint are true.  *See Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023).

[3] The Court notes that Facebook officially changed its name to Meta on October 28, 2021.  (Am. Compl ¶ 17.) The Court will refer to the defendant as Meta when describing events before October 28, 2021 for the sake of clarity.

[4] Over ten million applications and websites were interoperable with Facebook by May 2013. (Am. Compl. ¶ 32.)

offering services and products to third-party developers, Meta also began acquiring other apps. On April 9, 2012, Meta purchased the photo-sharing app, Instagram, for $1 billion. (*Id.* ¶¶ 29–30.) After its April 9, 2012 purchase of Instagram, Meta ran both Facebook and Instagram as interoperable platforms. (*Id.* ¶ 36.)

Meta had increasingly shifted its focus from text-based content to photo and video-based content. Meta launched "Facebook Camera" in May 2012, allowing users to take photos with their phones and then immediately share those photos on Facebook. (*Id.* ¶ 31.) By enticing app developers toward interoperability, Meta benefitted by its platform growth, by May 2013, to over 10 million apps and websites that were integrated with Meta's Facebook platform through APIs. (*Id.* ¶ 32.) In April 2016, Meta implemented a "video-first" strategy, to encourage its users to create and share more photos and videos. (*Id.* ¶ 31.) In a July 2016 earnings call, Zuckerberg stated that he and his team at Meta "see a world where video is first, with video at the heart of all our apps and services." (*Id.* ¶ 31.) In 2017, Meta enhanced Facebook Camera to support GIFs, text, and live video. (*Id.*) Meta also launched "Facebook Stories," for users to create short stories or video collections. (*Id.*)

Instagram, before being purchased by Meta in 2012, had also made strategic decisions to become more interoperable with third-party applications, as had Meta. (*Id.* ¶ 32.) In 2011, Instagram

3

adopted iPhone Hooks, which allowed users to share photos onto Instagram that were taken on an iPhone through a third-party app. (*Id.* ¶ 34.)  App developers could also design their apps to allow a shared photo to display pre-populated hashtags to advise viewers of the identity of the third-party developer's app that was used to take the photo.  (*Id.* ¶¶ 34–35.)  Meta's decisions produced highly desirable results as, in 2016, a survey reported that Facebook was the most widely used social network in the U.S.  (*Id.* ¶ 38.)  Other third-party app developers took notice.

### B. <u>Enter Phhhoto in 2014</u>

Phhhoto entered the market in 2014 as an app that provided social networking centered around photo sharing.  (Am. Compl. ¶¶ 39, 41.)  Phhhoto launched on July 7, 2014 as an iPhone-only app, and its "popularity exploded."  (*Id.* ¶¶ 42, 76.)  By October 2014, Phhhoto was receiving nearly 20,000 new user registrations per day.[5]  (*Id.* ¶ 42.)  Phhhoto continued growing quickly.  By 2016, Phhhoto registered 10 million users and 1.3 million daily active users.  (*Id.* ¶ 44.)  During this time, Phhhoto added several new features.  (*Id.* ¶ 45.)  The addition of the new features increased user engagement, and the increased user engagement enabled Phhhoto to successfully attract new investors.  (*Id.* ¶ 46.)

---

[5] To demonstrate its popularity, Phhhoto compares itself to the "real-time face-filtering/modifying app" Looksery, which was founded in 2013.  (Am. Compl. ¶ 42.)  Looksery launched in June 2014, and, by September 2014, it was gaining on average fewer than 7,000 new user registrations per day before it was purchased by Snapchat.  (*Id.*)

4

Phhhoto relied on, and attributes, a significant amount of its exposure to eventual new users to its interoperability with Instagram and Facebook, but mostly Instagram.  (*Id*. ¶¶ 47–50.) Instagram users learned of Phhhoto through both word of mouth and observing "phhhotos"[6] posted on Instagram by friends and by celebrities such as Beyoncé and Diplo.  (*Id*. ¶ 48.)  Alternative mediums, such as email and text messaging, did not provide sufficient user exposure and engagement to sustain Phhhoto's growth compared to Instagram.  (*Id*. ¶ 49.)  Likewise, Meta benefitted from its interoperability with third-party apps, such as Phhhoto, because new, and often younger, users increasingly engaged with Facebook and Instagram. (*Id*. ¶¶ 39, 50, 58.)  Phhoto and Meta shared a mutually beneficial relationship and, as more users engaged with Phhhoto and posted "phhhotos" to Instagram, more users engaged with Instagram.  (*Id*. ¶ 52.)  Users and user engagement were key determinants of profit, and Phhhoto's interoperation with Meta was profitable.  (*Id*.)

### C. **Alleged Anticompetitive Conduct**

#### 1. Refusal to Integrate Phhhoto with Facebook's Newsfeed and Withdrawal of Instagram's Find Friends API

On February 1, 2015, Brian Hurren, Facebook's Strategic Partnerships Manager, acting with authority from Ime Achibong,

---

[6] Phhhoto, the company, describes a phhhoto, the digital product, as "a series of integrated photos" taken through a "single point-and-shoot burst."  (Am. Compl. ¶ 16.)

5

Zuckerberg's "right-hand man," contacted Champ Bennett, one of Phhhoto's co-founders, and explained that he wanted to discuss a "potentially interesting platform integration opportunity[,]" involving Phhhoto. (Am. Compl. ¶ 54.) Meta proposed a project to develop a "standalone application" where Phhhoto's moving images camera would be fully operational with Facebook's Messenger app. (*Id*. ¶ 55.) Phhhoto, however, declined the offer as the proposed app would only operate on Facebook Messenger, and Phhhoto would not receive any enhancements for its app. (*Id*.)

Mr. Hurren, however, persisted and again reached out to Phhhoto by email on February 26, 2015. (*Id*. ¶ 57.) After Phhhoto signed a non-disclosure agreement, Mr. Hurren explained that Facebook's next proposal was to integrate Phhhoto into Facebook's newsfeed. (*Id*.) If successful, such an integration would expand Phhhoto's interoperability from only Instagram to Instagram and Facebook. (*Id*.) Phhhoto viewed this offer as mutually beneficial and "offered to take the lead on the technical integration," which would benefit both Facebook and Phhhoto by expanding user engagement and improving Facebook's offerings to provide more value to their users. (*Id*. ¶ 58.) Proceeding with the plan, Phhhoto and Meta discussed rolling out the initial integrated newsfeed to "a small subset of users" on March 20, 2015. (*Id*. ¶ 59.) The integrated newsfeed would expand to all Facebook users

6

on April 6, 2015.  (*Id.*)  On April 8, 2015, however, Mr. Hurren emailed Mr. Bennett that they were delayed by at least two weeks due to continued internal discussions with Meta's legal team.  (*Id.* ¶ 60.)

On March 31, 2015, Meta withdrew Phhhoto's access to Instagram's Find Friends API, preventing Phhhoto users from accessing Instagram's friends list feature.  (*Id.* ¶ 65.)  Before March 31, 2015, Phhhoto was not informed by Meta of any policy violations that would have warranted terminating Phhhoto's access to Instagram's Find Friends API.  (*Id.* ¶ 66.)  Mr. Bennett emailed Mr. Hurren on April 1, 2015 and inquired about the change of permissions.  (*Id.* ¶ 67.)  On April 2, 2015, Mr. Hurren and Mr. Bennett spoke on a call, and Mr. Hurren explained that Meta did not like how Phhhoto was growing in users through its relationship with Instagram, but Phhhoto was not convinced that Facebook had provided a "legitimate business justification" for the change of permissions.  (*Id.* ¶ 68.)

Phhhoto, nevertheless, continued working on the technical integration, by confirming metadata changes and meeting specification requests and requirements.  (*Id.* ¶ 60.)  When Phhhoto completed its work but realized that it was not integrated with Facebook's newsfeed, Mr. Bennett contacted Mr. Hurren on June 1, 2015, June 4, 2015, and June 8, 2015, seeking confirmation from

7

Meta on whether the technical integration was completed correctly, if Phhhoto needed to correct its specifications, or if Facebook was still completing work on its end.  (*Id.* ¶ 61.)  Mr. Bennett did not receive a response.  (*Id.* ¶¶ 61, 63-64.)  The collaboration process, however, provided Meta with an opportunity to learn information about Phhhoto, such as its usage growth, and its key employees, (*Id.* ¶ 62) and, during that time, Meta worked with other third-parties, such as GIPHY, on similar integration projects. (*Id.* ¶ 64.)

### 2. Eliminating Pre-populated Hashtags in Instagram

On August 9, 2015, Meta removed the ability in iPhone hooks for third-party apps to pre-populate Instagram posts with a user's and originating app's hashtags in the caption, along the margins. (Am. Compl. ¶ 71.)  Meta publicly reported that it terminated the hashtag feature because it had received feedback that the pre-populated captions "often [felt] spammy."  (*Id.*)  Phhhoto was, therefore, prevented from using a feature of iPhone Hooks that enhanced awareness about Phhhoto to Instagram users who viewed "phhhotos" posted by individuals that they followed.  (*Id.* ¶¶ 70-71, 75.)

### 3. Announcement and Launch of the Boomerang Feature

During the fall of 2015, Phhhoto began preparing to announce and implement the expansion of its app for use from only iPhones to iPhones and Android phones.  (Am. Compl. ¶ 76.)  Phhhoto planned

8

to announce its launch of Phhhoto for Android devices on October 22, 2015, but, in the morning of October 22, Meta, with John Barnett, an active Phhhoto user, announced Meta's launch of its "Boomerang Video App," which operated indistinguishably like Phhhoto.[7]   (*Id.* ¶¶ 76-77.)  Phhhoto's announcement, therefore, received much less press than expected, and any press that Phhhoto did receive included news about Meta's launch of Boomerang.  (*Id.* ¶ 78.)

### 4. Algorithmic Suppression

In March 2016, Instagram changed the order of its posts from reverse chronological order to an order determined by an algorithm that purportedly ordered posts according to what would be most interesting to the individual Instagram user.  (Am. Compl. ¶ 85-87.)   Phhhoto believed that the new algorithmic ordering would cause posts using the Phhhoto app to be "bumped up" and bring Phhhoto greater visibility and user engagement.  (*Id.* ¶ 89.) Instead, Phhhoto experienced a steep decline in new user registrations in April 2016.  (*Id.* ¶ 91.)  From April 1, 2016 to May 1, 2016, Phhhoto's ranking in the Apple Store of the most downloaded apps fell from 11th place to 41st place.  (*Id.*)   The

---

[7] Facebook also enabled Instagram posts made through the Boomerang app to include a "Made with Boomerang" caption which included a link for viewers to use to download the Boomerang app, a feature similar to the iPhone Hooks.  (Am. Compl. ¶¶ 81-82.)

9

Boomerang app, on the other hand, rose in the Apple App Store rankings. (*Id.* ¶ 108.)

Despite months of research, Phhhoto could not identify a reason for its sudden drop in popularity. (*Id.* ¶¶ 92–94.) Indeed, Instagram's algorithm was cloaked in a "black box," preventing third-party app developers and journalists from learning how the algorithm actually determined the ordering of content on Instagram. (*Id.* ¶ 94.) Phhhhoto's founders would not learn of a convincing reason for Phhhoto's decline in popularity until the fall of 2017. (*Id.* ¶¶ 104, 107–10.)

### 5. Attempted Poaching of Phhhoto Employees

On September 19, 2016, Rushabh Doshi, an Engineering Director at Facebook, emailed Jacob Sologub, a Senior Software Engineer at Phhhoto, stating that Facebook was "looking for great engineers" and asked if Mr. Sologub was interested in joining Facebook to work on an in-app camera. (Am. Compl. ¶ 99.) On September 27, 2016, John Abate, a Technical Recruiter at Facebook, emailed Jason LaFerrera, a System Architect at Phhhoto, and asked Mr. LaFerrera if he would be interested in joining Facebook. (*Id.* ¶ 101.) Neither Mr. Sologub nor Mr. LaFerrera, however, joined Facebook. (*Id.* ¶ 102.)

### D. **Phhhoto Learns of Anticompetitive Conduct**

In 2016 and 2017, after Meta eliminated prepopulated hashtags and implemented the algorithm, Phhhoto continued to lose user

10

engagement, user growth, and investment funds. (Am. Compl. ¶¶ 104, 125.) Phhhoto also failed at switching its funding structure from investment to advertising. (*Id.* ¶ 127.) Phhhoto ultimately closed its operations in June 2017, and its founders returned to their prior company, Hypno. (*Id.* ¶¶ 104, 128.) To bring the remaining followers of Phhhoto's Instagram page over to Hypno's Instagram page, Mr. Bennett posted promotional materials for Hypno to both Phhhoto's Instagram page and Hypno's Instagram page. (*Id.* ¶ 105.) The post from Phhhoto's Instagram page, however, inexplicably appeared for an instant, and then vanished from Mr. Bennett's personal Instagram feed, and Mr. Bennett also learned that the post from the Hypno account received more views than the post from the old Phhhoto account, despite the Phhhoto Instagram account having five hundred times more followers than the Hypno Instagram account. (*Id.* ¶¶ 105-06.) Mr. Bennett then began to investigate whether Phhhoto had actually been harmed by Instagram's algorithm. (*Id.* ¶¶ 107, 109-10.) Meta concealed that Instagram's 2016 algorithm penalized users whose posts contained Phhhoto content by negatively weighting and suppressing their accounts and posts. (*Id.* ¶ 108.)

At a 2018 press conference, Meta explained that three factors determined the algorithmic ordering on Instagram: (1) interest by content users, (2) recency of a shared post, and (3) relationship between people who interact frequently. (*Id.* ¶ 112.) Meta

11

disclaimed that it hid posts in its newsfeed, engaged in shadowbanning (secretly banning or lowering the rank of a user's post), or favored a format (photo or video) except to the extent an individual was more likely to engage with a particular format. (*Id*.)  Mr. Bennett remained skeptical, however, and, on December 5, 2018, Mr. Bennett emailed a contact at Meta about the Hypno promotional post receiving more views from the Hypno Instagram account than from the old Phhhoto Instagram account, despite the Phhhoto Instagram account having many more followers.  (*Id*. ¶ 113.)  The contact at Meta responded that such a result was "strange" and considered the possibility that Meta had "flagged" and "downranked" Phhhoto's Instagram account.  (*Id*.)

## II.  **Procedural History**

Phhhoto commenced this action against Meta on November 4, 2021, alleging four causes of action, including a violation of Section 2 of the Sherman Act for unlawfully maintaining a monopoly in the PSNS market.[8]  (ECF No. 1.)  On March 10, 2022, the Court held a pre-motion conference for Meta's anticipated motion to dismiss.  (Minute Entry dated 3/10/2022.)  Shortly thereafter, Phhhoto amended its complaint and alleged three claims: (1) a violation of Section 2 of the Sherman Act, (2) common-law fraud, and (3) common-law unfair competition.  (Am. Compl. ¶¶ 199-222.)

---

[8] Before Phhhoto commenced this action, the Federal Trade Commission argued that Facebook/Meta maintained a monopoly in the PSNS market of the United States. *See Federal Trade Commission v. Facebook, Inc.*, 560 F.3d 1, 14-15 (D.D.C. 2021).

In its prayer for relief, Phhhoto requested monetary damages, fees and costs, and any further relief that the Court deemed proper. (Am. Compl. at 67-68.)  On June 6, 2022, the parties filed a fully briefed motion to dismiss the amended complaint.  (ECF Nos. 27-29.)  On March 30, 2023, the Court granted Meta's motion to dismiss on statute of limitation grounds.  (ECF No. 34.)

Phhhoto timely appealed, and the Second Circuit reversed in part upon finding that Phhhoto sufficiently alleged that the Sherman Act's statute of limitation should be equitably tolled upon a fraudulent concealment theory rendering Phhhoto's Sherman Act claim timely at the motion to dismiss stage.  (ECF Nos. 36-37, 42); *See Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592 (2d Cir. 2024).  On February 19, 2025, after the Second Circuit denied Meta's motion for rehearing and rehearing en banc, this Court scheduled a pre-motion conference.  (Order dated 02/19/2025.)

At the February 27, 2025 pre-motion conference, Phhhoto informed the Court that it intended to withdraw its state law claims.  The parties also informed the Court that they would engage in settlement discussions but would initiate a new round of motion practice if a settlement was not reached.  (Minute Entry dated 02/27/2025.)  On March 7, 2025, the Court so-ordered the parties' stipulation to dismiss Phhhoto's state law fraud and unfair competition claims with prejudice.  (ECF No. 47.)  Subsequently,

13

the parties failed to reach a settlement and, on June 2, 2025, filed Meta's fully briefed, renewed motion to dismiss Phhhoto's amended complaint, of which only the alleged violation of Section 2 of the Sherman Act remained.   (Order dated 03/19/2025); (ECF Nos. 50-53.)

## LEGAL STANDARD

### I.    FRCP 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When deciding a motion to dismiss, a court must accept the allegations in the complaint as true, but conclusory statements, "threadbare recitals of the elements of a cause of action," and legal conclusions will not suffice. *Id*. (citing *Twombly*, 550 U.S. at 555); *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 162 (2d Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678).

"An antitrust plaintiff must allege sufficient facts to raise a reasonable expectation that discovery will reveal evidence of

14

illegal conduct." *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 41 (D.D.C. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (citation modified). "Courts should exercise caution before dismissing an antitrust complaint in advance of discovery but [should also] bear in mind that proceeding to antitrust discovery can be expensive." *Id.* (quoting *Twombly*, 550 U.S. at 558).

**DISCUSSION**

I.    **Section 2 of the Sherman Act: Monopoly Maintenance**

    **A. Standard**

Section 2 of the Sherman Act makes it unlawful for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states…" 15 U.S.C. § 2.  The purpose of the Sherman Act is to protect the competitive process, not individual competitors. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342-44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Indeed, "[a]ntitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

A plaintiff asserting a Section 2 violation must, therefore, plausibly allege two elements: (1) the defendant's possession of

15

monopoly power in the relevant market and (2) the defendant's willful acquisition or maintenance of that power rather than growth due to a superior product, business acumen, or historic accident. *Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)); *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (citation omitted). In essence, Phhhoto must allege facts that Meta's "anticompetitive conduct restricted competition within a relevant market." *Regeneron Pharm., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024). Phhhoto, as a private plaintiff, must also allege facts that its alleged injuries were caused by Meta's alleged anticompetitive conduct. *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (citing *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

Courts must also "avoid tightly compartmentalizing the various factual components of the plaintiff's claims and wiping the slate clean after scrutiny of each." *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 604 (S.D.N.Y. 2025) (*quoting City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir.

16

1981)) (citation modified); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404 (1962). Instead, courts should ask if there is a qualitatively "synergistic effect" between multiple, independent acts, not if each claim has a "fraction of validity." *Visa, Inc.*, 788 F. Supp. 3d at 604 (quoting *City of Groton*, 662 F.2d at 928-29).

**B. Alleged Monopoly Power in the Personal Social Networking Services (PSNS) Market in the United States**

1. Product Market

"Evaluating market power begins with defining the relevant market." *Geneva Pharm.*, 386 F.3d at 496. "At the motion-to-dismiss stage, a plaintiff's proposed relevant market must bear a rational relation to the methodology courts prescribe to define a market and include a plausible explanation as to why a market should be limited to exclude possible substitutes." *Regeneron Pharm.*, 96 F.4th at 338 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)) (internal quotation marks omitted). A relevant market contains two components: (1) a product market and (2) a geographic market. *Concord Assocs., L.P. v. Ent. Prop. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (citation omitted). "The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *United States v.*

17

*Live Nation Ent., Inc.*, No. 24-CV-3973 (AS), 2026 WL 456804, at *4 (S.D.N.Y. Feb. 18, 2026).

Courts must be mindful that market definition is a "deeply fact-intensive inquiry," so courts should be hesitant to grant a motion to dismiss for failure to plead a relevant product market. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.) (collecting cases). Yet, there is no "absolute rule" against dismissing a complaint that fails to plausibly allege the existence of both a product and geographic market. *Concord Assocs.*, 817 F.3d at 53 (citing *Todd*, 275 F.3d at 200). Meta does not argue that the United States is not the relevant geographic market. (Am. Compl. ¶ 148.) The Court, therefore, only analyzes the product market allegations.

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *P&L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 458 (E.D.N.Y. 2024) (quoting *PepsiCo, Inc. v. Coca-Cla Co.*, 315 F.3d 101, 105 (2d Cir. 2002)) (internal quotation marks omitted); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502 (1962). Courts find two products or services to be reasonably interchangeable where there is "sufficient cross-elasticity of demand," meaning that "consumers would respond to a slight increase in the price of one product by switching to another product." *Regeneron Pharm.*,

96 F.4th at 339 (quoting *Todd*, 275 F.3d at 201–02 and citing *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019)); *Geneva Pharm.*, 386 F.3d at 496 (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)).

Courts within the Second Circuit have evaluated interchangeability under the "hypothetical monopolist" test, where the court "imagin[es] that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market." *Regeneron Pharm.*, 96 F.4th at 339 (quoting *United States v. Am. Express Co.*, 838 F.3d 179, 199 (2d Cir. 2016)). Courts within the Second Circuit have also looked to "practical indicia," also known as *Brown Shoe* factors, such as "industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" in order to "identify whether two products [or services] are economic substitutes and compete within the same antitrust market." *Regeneron Pharm.*, 96 F.4th 339 (quoting *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502). "The foundational idea is that a market is the arena within which significant substitution in consumption or production occurs." *Live Nation Ent.*, 2026 WL 456804, at *4

19

(quoting Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530a (5th ed. 2025)) (internal quotation marks omitted).

Here, Phhhoto defines the relevant market as the Personal Social Networking Services ("PSNS") market. (Am. Compl. ¶ 135.) The PSNS market is defined as "online services or platforms that allow users to develop and maintain social relationships with other people by sharing experiences in a digital social space." (*Id.*) Phhhoto then alleges that the PSNS market is an appropriate product market because consumers who use personal social networking are unlikely to substitute their use of Meta's Facebook or Instagram platforms for products (such as YouTube or Twitter) outside the market. Personal Social Networking Services are distinct from, and not interchangeable with, other online services in three significant respects: 1) a social graph, that facilitates connections between users' friends, families, and personal connections, as its foundation; 2) the provision of unique features that allow users to share information with their connections in the digital social space; and 3) allowing users to find and connect with other users they may know or who share interests or characteristics. (*Id.* ¶¶ 136–139.)

First, the social graph allows users to connect with friends, family, and other personal connections. (*Id.* ¶ 137.) The social graph allows users to communicate with, and follow updates from, their first-order connections and to then expand and find new

20

connections who may be friends of friends or people with similar interests as the user and the user's current network.  (*Id.*) Second, Phhhoto alleges that PSN services provide unique features to "broadcast" to connections by sharing posts from other websites or applications, posting pictures, or posting announcements of life updates to one's newsfeed.  (*Id.* ¶ 138.) A user's connections can then interact with the user's posts by "favoriting," commenting on, or sharing posts.  (*Id.*)  Third, Phhhoto alleges that PSN services allow users to expand their social networks beyond friends and family by tracking user information and suggesting additional connections for the user to make based on shared interests and activities.  (*Id.* ¶ 139.)

With these unique features, Phhhoto alleges that the PSNS market does not include platforms such as LinkedIn, which provides a specialized social network for professional connections, rather than a general social network.  (*Id.* ¶ 140.)  Further, Phhhoto alleges that the PSNS market does not include platforms such as YouTube, Spotify, TikTok, or Netflix where users focus on media consumption but not on sharing updates, photos, and short videos with friends and family.  (*Id.* ¶ 141.)  If users do share content with friends or family from these platforms, they usually do so through a function that allows them to share content from the media consumption-based platforms to a PSNS platform, such as Facebook or Instagram.  (*Id.*)  In addition, Phhhoto alleges that Meta itself

21

distinguishes its PSNS from broadcast and video platforms, like YouTube and TikTok, by stating that "people are hiring TikTok for very different jobs to Instagram and they are not competing in the core areas of focus of our business." (*Id.* ¶ 146.)

Meta provides two main counterarguments as to why Phhhoto failed to allege the appropriate and relevant market. (ECF No. 27-1 ("Meta Mem. of Law") at 31–35[9].) First, in line with Meta's argument that Phhhoto has failed to plausibly plead a refusal to deal claim, Meta argues that Phhhoto failed to plead that Meta controlled an input that Phhhoto needed in order to compete in the alleged PSNS market. (*Id.* at 31.) Indeed, Meta argues that Phhhoto alleges that it "had ample alternative ways to reach users," such as through email and text messaging. (*Id.* at 32.) Therefore, Meta avers, Phhhoto failed to allege "that Meta offered the *only* way for a PSNS to attract users[.]" (*Id.* at 33.)

Second, Meta argues that Phhhoto's market definition is facially invalid because Phhhoto alleges that it was a competitor in the PSNS market but fails to explain why other popular photo and video-based apps are not competitors in the PSNS market. (*Id.* at 33–34.) In addition, Meta argues that Phhhoto failed to allege which product features of an app place it within the PSNS market and why those services are unique and not seen as substitutes for

---

[9] Pincites in this Memorandum and Order refer to the page number generated by CM/ECF.

22

other product services by consumers. (*Id.* at 34–35.) Meta's arguments, however, are unpersuasive.

Phhhoto plausibly alleges that the PSNS market is the relevant antitrust market. As the Court explains below in Section C, addressing the alleged anticompetitive conduct, Meta misreads Phhhoto's complaint as alleging a refusal-to-deal antitrust claim. Instead, Phhhoto plausibly alleges an anticompetitive scheme by an alleged monopolist to lure Phhhoto, a "nascent competitor,"[10] learn critical information about that nascent competitor's innovative service, clone that service, and then use its monopoly power to exclude the nascent competitor from the market, allowing the monopolist to maintain its monopoly. Phhhoto, therefore, does not need to show that it operated within a market in which Meta controlled a necessary input. It must allege, however, that Meta engaged in anticompetitive acts that excluded competition within the PSNS market. Anticompetitive acts that only excluded Phhhoto are insufficient.

Phhhoto also focuses its market definition on the social graph and apps that are primarily used to connect with friends, family, and others. Phhhoto, therefore, provides a reasonable justification for excluding certain apps from its definition of

---

[10] Scholars C. Scott Hemphill and Tim Wu define a nascent competitor as "a firm whose prospective innovation represents a serious threat to an incumbent." C. Scott Hemphill and Tim Wu, *Nascent Competitors*, 168 U. Penn. L. Rev. 1879, 1880 (2020).

the PSNS market.  Phhhoto alleges that market actors within the PSNS market were distinct from more specialized apps like LinkedIn. PSNS market actors included a generalized social graph enabling users to connect with friends, family, and second-order connections.  LinkedIn, on the other hand, focused on business and professional connections.  (Am. Compl. ¶¶ 136–40.)

Phhhoto also excluded apps that centered around entertainment consumption rather than social connection.  (Am. Compl. ¶ 141.) Apps such as YouTube, Spotify, TikTok, and Netflix were used primarily to consume media for one's self, not to connect with others.  (*Id.*)  Furthermore, the media consumed by a user usually was not produced by the user's family members or friends.  (*Id.* ¶¶ 141–42.)  Phhhoto, on the other hand, is alleged to have been used to connect with family and friends and to see looping videos either produced or shared by family and friends.  As mentioned above, Phhhoto also highlights that Meta does not consider apps like YouTube and TikTok to be competitors.  (Am. Compl. ¶ 146.)

Phhhoto distinguished PSNS market actors from apps focused on messaging services.  (Am. Compl. ¶ 143.)  Apps, such as WhatsApp and iMessage, allegedly do not rely on the social graph or shared space for users to connect with friends, family, or others with similar interests, connections, and hobbies.  (*Id.*)  Further, Messaging services apps lack "broadcast" and content feed functions that enable users to "broadcast" their posts, publish

24

their own updates, and enable user's connections to interact with those newsfeed posts, or to allow users to interact with the newsfeed posts of their connections. (*Id.*)

Phhhoto also distinguishes PSNS market actors from video sharing platforms. (Am. Compl. ¶ 144.) Apps like Zoom and Houseparty provide a virtual "conference room" or "living room" and do not rely on a social graph to help users make connections. (*Id.*) Video sharing platforms also lack the capacity to allow users to create and broadcast content on a newsfeed. (*Id.*) Phhhoto alleges that video sharing platforms are, therefore, more akin to a conference call or phone call with a digital component. (*Id.*)

Lastly, Phhhoto distinguishes PSNS market actors from apps used primarily to share information. (Am. Compl. ¶ 142, 145.) Apps like Twitter and Reddit are primarily used to share information, but users do not broadcast videos to friends or family. (*Id.* ¶ 145.)

To show that users do not view applications within the PSNS market as substitutes for applications outside of the alleged market, Phhhoto alleges that users will download other apps, such as LinkedIn or Twitter, and use those apps at the same time as they use apps like Phhhoto and Instagram because users view the apps as useful for different purposes. (Am. Compl. ¶¶ 140, 145.)

25

At the motion-to-dismiss stage, these allegations suffice to plausibly plead a PSNS market in the United States.  *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 767–773 (N.D. Cal. 2022) (Koh, J.); *Federal Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 14-17 (D.D.C. 2021).  The Court emphasizes that this market is plausible for the relevant timeline of this action: 2014–2017. The Court will not assess apps, such as TikTok, by their current uses in 2026 to determine if they invalidate Phhhoto's market definition.  *See Federal Trade Comm'n v. Meta Platforms, Inc.*, --- F. Supp. 3d ---, 2025 WL 3458822, at *7 (D.D.C. Dec. 2, 2025) ("Facebook, Instagram, TikTok, and YouTube have thus evolved to have nearly identical main features.") (citation omitted).

### 2. Monopoly Power

"Monopoly power, [also known as market power], is the power to control prices or exclude competition."  *Geneva Pharm.*, 386 F.3d at 500 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994 (1956)).  A plaintiff may prove monopoly power "directly through evidence of control over prices or the exclusion of competition," but direct proof is rare. *Geneva Pharm.*, 386 F.3d at 500; *Federal Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 12 (D.D.C. 2021) (citing *Microsoft*, 253 F.3d at 51).  Most plaintiffs, therefore, prove monopoly power indirectly "from a firm's large percentage share of the relevant market."  *Geneva Pharm.*, 386 F.3d at 500 (citing *Tops Mkts.*, 142

26

F.3d at 98). For indirect monopoly power, courts consider the relationship between market share and "other relevant market characteristics," such as "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Tops Mkts.*, 142 F.3d at 98 (citing *Int'l Distrib. Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987)).

Phhhoto alleges facts regarding Meta's direct and indirect monopoly power through control of prices and exclusion of competition, and Meta's large percentage of market share. (Am. Compl. ¶¶ 149-50.) For direct evidence, Phhhoto argues that Meta had the monopoly power to exclude competitors and to control prices in the form of user data. (*Id.* ¶¶ 149, 158-59.) Meta allegedly excluded competition by denying a competitor access to its platform or through policies that prevent a competitor from reaching Meta's user base. (*Id.* ¶ 158.) Phhhoto further alleges that Meta has been able to raise prices by requiring more data from users while providing less privacy protection. (*Id.* ¶ 159.) Meta has retained its dominant market position, (*id.* ¶ 160), even in the face of increasing user dissatisfaction, and did lose a significant percentage of users. (*Id.* ¶ 161.)

Phhhoto also alleges indirect evidence of Meta's monopoly power, inferred from Meta's large percentage of market share.

Since 2011, Meta received more than 200 million monthly active users, 71.8% of visits to social media in the United States were to Facebook, and users spent a combined 4 billion minutes a day on Facebook. (Am. Compl. ¶ 151.) Phhhoto further alleges that Facebook claimed over 80% of users' time spent on social media since 2012, a share of over 70% of daily active users for PSN services since 2016, and a share of over 65% of monthly active users for PSN services since 2011. (Id. ¶ 153.) For barriers to entry, Phhhoto alleges that Meta benefits from the "network effect" of having the most users. (Id. ¶ 163.) When a new competitor enters into the market, users are unlikely to leave Facebook or Instagram for the new competitor because of "high switching costs" where a user will not receive a similar service on a competitor's platform unless they can convince all of their friends and family to switch platforms with the user. (Id. ¶ 165.)

At the motion to dismiss stage, Meta does not argue against Meta's alleged share of the market, but it argues that Phhhoto has not plausibly alleged a market and necessary input for a refusal-to-deal claim. (Meta's Mem. of Law at 31–33.) As the Court has previously stated, however, Meta's refusal-to-deal argument is misplaced. The Court does not find Phhhoto's allegations regarding direct evidence to be plausible. Courts have held that proving monopoly power through direct evidence is theoretically possible but have not described how direct evidence of monopoly power can

28

be plausibly alleged at the motion to dismiss phase.  *See Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (citing 7 PHILLIP E. AREEDA, ANTITRUST LAW ¶ 1511, p. 429 (1986)); *Tops Mkts.*, 142 F.3d at 98.[11] Phhhoto attempts to allege Meta's monopoly power directly by the exclusion of competition and by supracompetitive prices.  Phhhoto, however, provides only conclusory statements that Meta excludes potential competitors and an anecdotal example of Meta's treatment of Phhhoto.  (Am. Compl. ¶ 158.)  This argument fails because the Second Circuit requires empirical evidence to plead direct proof of monopoly power.  *1-800-Contacts, Inc. v. Federal Trade Comm'n*, 1 F.4th 102, 108 n.11 (2d Cir. 2021).  An anecdotal example is insufficient because it only shows harm to a competitor, not to competition.

Phhhoto's allegations of supracompetitive pricing also fail. (Am. Compl. ¶¶ 159–61.)  Assuming that a user's data constitutes the price users pay to use PSNS platforms, Phhhoto's allegations that Meta charges supracompetitive prices to its users are not supported with sufficient factual detail as to what constitutes a

---

[11] One scholar has argued that lower courts have distilled seven different criteria by which a plaintiff may directly show monopoly power: "(1) evidence of restricted output and supracompetitive prices; (2) the presence of entry barriers; (3) the exclusion of competition; (4) control over prices; (5) the defendant's ability to engage in price discrimination; (6) sustained supranormal profits; and (7) abrupt changes in practices following the elimination of competitors."  Daniel A. Crane, *Market Power Without Market Definition*, 90 Notre Dame L. Rev. 31, 45 (2014).  Professor Crane, however, finds each criterion to be "generally vacuous, confusing, or both." *Id.*

supracompetitive price in the PSNS market.  Phhhoto also fails to allege how Meta's data pricing is supracompetitive compared to its then closest competitors, such as Snapchat.  The Court, therefore, turns to Phhhoto's proffered indirect evidence of Meta's monopoly power.

Though some of the statistics cited by Phhhoto go beyond the relevant time period of 2014 to 2017, Phhhoto does allege that Meta possessed at least 70% of the market with monthly active users and at least 65% of the market with daily active users at a point during the relevant time period.  (Am. Compl. ¶ 153.) These percentages, if combined with high barriers to entry, are sufficient to plausibly plead monopoly power to state an antitrust claim.  *See Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201 (JAV), 2026 WL 321084, at *16 (S.D.N.Y. Feb. 6, 2026) ("A market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.") (quoting *Tops Mkts.*, 142 F.3d at 99).  Moreover, the Court is persuaded that networking effects and high switching costs present high barriers to entry into the PSNS market.  *Facebook, Inc.*, 581 F. Supp. 3d at 51 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476-77, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) and *Microsoft*, 253 F.3d at 55-56); *see also Klein*, 580 F. Supp. 3d at 781 ("Because of the powerful network effects and high switching costs present

30

in social networking services, the Social Network Market has uniquely high barriers.")  Thus, with a high market share and high barriers to entry, Phhhoto has plausibly pleaded, through indirect evidence, that Meta has monopoly power in the PSNS market in the United States.

### C. Alleged Anticompetitive Conduct

The possession of monopoly power alone is not unlawful. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004).  Phhhoto must also plausibly allege that Meta engaged in anticompetitive or exclusionary conduct.  *Gerber Prods.*, 715 F. Supp. 3d at 464 (citing *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Takeda Pharm. Co. Ltd.*, 11 F.4th 118, 137 (2d Cir. 2021) and *Trinko*, 540 U.S. at 407, 124 S.Ct. 872).  The Second Circuit has described anticompetitive conduct as "improper conduct that has or is likely to have the effect of controlling prices or excluding competition" and as "conduct without a legitimate business purpose that makes sense only because it eliminates competition."  *Gerber Prods.*, 715 F. Supp. 3d at 464 (quoting *United Food*, 11 F.4th at 137 and then quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014)).

As mentioned above, courts should avoid compartmentalizing the factual components of a claim and should assess whether

31

multiple independent acts have a synergistic effect. *Visa*, 788 F. Supp. 3d at 604. How the Court does so, however, depends on the type of antitrust claim. In *Continental Ore*, the Supreme Court evaluated an antitrust conspiracy claim. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") In the conspiracy context, a court should analyze each alleged act collectively to determine if the alleged monopolist committed an anticompetitive or exclusionary act. *Id*. When, as here, a plaintiff alleges monopoly maintenance through multiple anticompetitive acts, the court should first assess each act individually to determine if it had an anticompetitive effect on the relevant antitrust market and then consider only the acts determined to be anticompetitive together. *United States v. Google*, 687 F. Supp. 3d 48, 68 (D.D.C. 2023) ("when determing whether plaintiffs have met their *prima facie* burden, courts can only aggregate conduct that is itself deemed anticompetitive (even if only minimally so)."). If the court determines that an alleged act was not anticompetitive, the analysis for that act ends. *Id*. The Court, therefore, analyzes each of Meta's alleged anticompetitive acts in turn.

### 1. Phhhoto's Failed Integration Into Facebook's Newsfeed

Phhhoto alleges that Brian Hurren, Meta's Strategic Partnerships Manager for Facebook and Zuckerberg's "right-hand man," contacted Phhhoto co-founder Champ Bennett in early February 2015 to discuss integrating Phhhoto into Facebook's newsfeed but, in reality, used the allure of a partnership as a deceptive technique to ultimately learn of Phhhoto's internal operations and key employees to enable Facebook to create its own Phhhoto-like feature or application. (Am. Compl. ¶¶ 54–59, 63.) Meta contends that most of Phhhoto's allegations, including the failure to integrate into the newsfeed, amount to a refusal-to-deal claim and are analogous to the States' allegations that were rejected by the D.C. Circuit in *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023). (ECF No. 50 ("Meta Renewed Mem. of Law") at 11–13.)

Meta states that Phhhoto's allegations of Meta terminating Phhhoto's access to the Find Friends API, eliminating Phhhoto's access to the pre-populated hashtags, and Meta adopting an algorithmic newsfeed over a reverse chronological newsfeed are all encompassed in a refusal-to-deal claim. (*Id.* at 12-15.) The Court therefore, addresses Meta's refusal-to-deal argument as a whole here rather than addressing it piece-by-piece for each allegation. The Court, ultimately, finds Meta's refusal-to-deal argument to be

33

a misinterpretation of Phhhoto's amended complaint because this action presents a distinguishable factual scenario.

Meta argues that this case is analogous to the States' case in *New York v. Meta Platforms, Inc.* 549 F. Supp. 3d 6 (D.D.C. 2021) (*New York I*); 66 F.4th 288 (D.C. Cir. 2023) (*New York II*). In that action, the States argued that Meta's policy change to rescind API access to apps that were considered to be an actual or potential competitive threat constituted an antitrust violation. *New York I*, 549 F. Supp. 3d at 19. Both the D.C. District Court and the D.C. Circuit Court, however, rejected that argument under a refusal-to-deal theory. *Id*. at 27-29; *New York II*, 66 F.4th at 305-06. As a private business, Meta is free to choose its business partners and is not required to allow competitors to access its platform or its user base. (Meta Renewed Mem. of Law at 11.) (citing *Pac Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)); *New York II*, 66 F.4th at 305 (citation omitted). The States, therefore, failed to allege a harm to competition from Meta's policies. Meta argues that Phhhoto brings the same claims here as the States in the District of Columbia and that this Court should, therefore, reach the same result as the D.C. Circuit. (Meta Renewed Mem. of Law at 14-15.)

This case is different from the D.C. litigation. There, the courts analyzing the States' claims clarified that they rejected the States' claims because the States challenged Meta's *policies*

34

but not Meta's *implementation* of those policies. *New York I*, 549 F. Supp. 3d at 14, 28. Here, Phhhoto has alleged facts that address the implementation of Meta's policies against Meta's competitors in the PSNS market. Phhhoto also alleges a different relationship dynamic than a plaintiff in a refusal-to-deal case. In a refusal to deal case, the plaintiff is typically a small competitor that needs access to a monopolist's platform, network, or infrastructure to compete. *See e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). The small competitor approaches the monopolist to gain access to a product or service within the monopolist's control. Not so here.

Phhhoto's amended complaint alleges that Phhhoto operated on its own platform and was interoperable with Instagram. Phhhoto offered an innovative product of looping videos that Facebook did not offer. (Am. Compl. ¶ 41.) Facebook, the alleged monopolist, twice approached Phhhoto, the nascent competitor, about collaborating so Facebook could become interoperable with Phhhoto's app that provided looping videos, which had become increasingly popular, and Phhhoto could expand from Instagram and gain access to Facebook's user base. (*Id.* ¶¶ 54-55, 57-58.) Phhhoto alleges that Facebook, however, presented this offer with ulterior, anticompetitive motives. (*Id.* ¶ 56.) Phhhoto's amended complaint alleges that Meta engaged in an anticompetitive scheme

35

to exclude Phhhoto, a nascent competitor, from the PSNS market to maintain Meta's monopoly.  (*Id.* ¶¶ 56, 59, 61–63.)  Contrary to Meta's arguments, Phhhoto does not allege that as a small, nascent competitor, Phhhoto sought but was denied access to Facebook's platform.  The Court, therefore, does not accept Meta's refusal-to-deal interpretation of Phhhoto's amended complaint.

Nonetheless, the Court finds that Phhhoto's "failed integration" allegations do not plausibly state a harm to competition in the PSNS market.  Phhhoto alleges that Meta invited Phhhoto to be integrated into Facebook's newsfeed but never intended to effectuate the integration.  Meta's offer was only intended to provide Meta access to Phhhoto's internal operations and personnel so that Meta could later clone the Phhhoto technology for Meta's own app and actively recruit knowledgeable Phhhoto employees to work for Meta.  Phhhoto, however, also alleges that Facebook ultimately chose to integrate with Phhhoto's competitor GIPHY.  (Am. Compl. ¶ 64.)  By choosing to partner with GIPHY instead of Phhhoto, Meta made a legitimate business decision that may have harmed Phhhoto, but it did not harm competition in the PSNS market.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'") (quoting *Brown Shoe Co.*, 370 U.S. at 320).

2. Withdrawal of Find Friends API

Phhhoto began as an iPhone app that was interoperable on Instagram.  (Am. Compl. ¶¶ 29, 76.)  Phhhoto's users, therefore, benefitted from Instagram's Find Friends function to easily connect with friends and family.  On March 31, 2015, while discussing Phhhoto's integration with Facebook's newsfeed, Meta terminated Phhhoto's access to Instagram's Find Friends API, ending Phhhoto's users' ability to "recreate their social graph from Instagram."  (*Id.* ¶ 65.)  Users then began to engage with Phhhoto less, fewer new users registered with Phhhoto, and Phhhoto was less able to raise necessary capital because investors saw that Phhhoto's growth was slowing down.

For this conduct, Phhhoto alleges more than harm to itself. Phhhoto also alleges that it reached out Mr. Hurren at Facebook to inquire as to why Phhhoto lost access to Instagram's API.  (*Id.* ¶ 67.) On April 2, 2015, Mr. Hurren spoke to Mr. Bennett during a phone call and allegedly informed Mr. Bennett that "Meta was apparently upset that Phhhoto was growing in users through its relationship with Instagram."  (*Id.*)  Meta's alleged conduct would harm both its competitor, Phhhoto, and the competition process within the PSNS market.  Phhhoto has, therefore, plausibly alleged that Meta implemented its termination of Instagram's API for anticompetitive reasons rather than for a "legitimate business purpose."  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133

37

(2d Cir. 2014) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)); *see also Microsoft Corp.*, 253 F.3d at 59 ("Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps [the court] understand the likely effect of the monopolist's conduct.") (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)).  The Court finds that Phhhoto's API withdrawal allegation survives Meta's motion to dismiss.

### 3. Removal of Phhhoto's Pre-Populated Hashtags

Similar to Phhhoto's interoperability with Instagram's API, Phhhoto also initially benefitted from Instagram's policy to allow hashtags to be pre-populated when a "phhhoto" was shared from Phhhoto's app to Instagram.  Phhhoto alleges, however, that Meta ended that policy on August 9, 2015, when it withdrew the ability of Phhhoto and other third-party apps to pre-populate posts with hashtags.  But Phhhoto does not allege more.  (Am. Compl. ¶¶ 71-75.)  Phhhoto's allegations about Meta's removal of pre-populated hashtags is no more than a generalized complaint that fails to show an anti-competitive act.  The complaint alleges that Meta's explanation, that it ended the pre-population of hashtags because it received negative feedback from users "that the pre-filled" hashtags often felt "spammy."  (*Id.* ¶¶ 71-72.)  Without more factual allegations that Meta ended the policy for anticompetitive reasons rather than in response to user complaints, the Court finds

that Phhhoto's blocking of pre-populated hashtags allegation is not plausibly pleaded to constitute an antitrust harm to competition in the PSNS market. The allegations regarding the termination of pre-filled hashtags, therefore, do not survive Meta's motion to dismiss.

### 4. Launch of Boomerang

Phhhoto next alleges that Meta's launch of Boomerang, on October 22, 2015, on the same day that Phhhoto planned to announce its launch for Android devices, in addition to its pre-existing iPhone application, was an anticompetitive act rather than an innovative act. (Am. Compl. ¶¶ 77, 79.) Meta announced the release of Boomerang on October 22, 2015, after it had invited Phhhoto to work on integrating with Facebook's newsfeed. When Facebook users posted a looping video with the Boomerang app, the app pre-populated a "Made with Boomerang" caption along with a link to download the Boomerang app. (Am. Compl. ¶ 81.) Taking as true Phhhoto's allegation that Boomerang was a clone of the Phhhoto app created after Meta learned important confidential information about Phhhoto during their newsfeed integration efforts, (*id.* ¶ 77), Phhhoto plausibly pleads that the launch of Boomerang was for anticompetitive reasons rather than for innovative reasons. Meta's procompetitive justifications for releasing Boomerang are appropriately considered at trial or the motion for summary judgment stage. *Panini Am., Inc. v. Fanatics, Inc.*, 2025 WL

39

753954, at *8 (S.D.N.Y. Mar. 10, 2025) (citing *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019)).

### 5. New Newsfeed Algorithm

Facebook and Instagram initially had operated their newsfeeds on a reverse chronological order, but, in March 2016, Meta switched the basis for newsfeed ordering from a reverse chronological order to an order determined by an algorithm. (Am. Compl. ¶ 85.) Meta announced to the public that the algorithm would order posts on one's newsfeed based on what would most interest the user. (*Id.* ¶ 86.) Phhhoto's allegations, however, plausibly pleaded that Meta's implementation of the algorithm did not reflect Meta's publicly stated policy.

Rather, Phhhoto alleges that Meta used its algorithm to suppress the posts of business rivals rather than to compete with them to produce more innovative products and services. Meta, allegedly used its monopoly power to reduce the visibility of its rivals. (*Id.* ¶¶ 90-97.) Phhhoto experienced sharp declines in new user registrations and user engagement soon after Meta deployed its algorithm, which resulted in plummeting metrics and funding prospects. Phhhoto's allegations state a plausible harm to competition within the PSNS market and survives Meta's motion to dismiss.

40

6. Alleged Recruitment of Phhhoto's Engineers

Though Phhhoto labels its last alleged antitrust injury as the poaching of its workers, Phhhoto's allegations merely state that Meta attempted, but failed, to recruit two of Phhhoto's top employees during September 2016. (Am. Compl. ¶¶ 99-102.) The recruitment and hiring of a rival's workers, without more, is insufficient to state an antitrust claim. *Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 655 F. Supp. 3d 52, 78 (D. Conn. 2023) ("Generally, one firm's hiring of its competitor's employees does not present a compelling case for antitrust intervention.") (quoting *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 n.6 (2d Cir. 1987)) (internal quotation marks omitted). This makes sense. Antitrust law also seeks to protect a competitive labor market for workers so they may be free to change employers. *Id*. To state an antitrust violation for allegedly poaching a rival's employee, the plaintiff must show that the monopolist sought the rival's employee in order to gain access to the rival's confidential information or for the sole reason of preventing a rival from having an employee, not because the monopolist sought to improve its own employee base. *See West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010) (citing *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (Per Curium)). Because Phhhoto only alleges that Meta attempted to

41

recruit two of Phhhoto's employees, both of whom declined to even apply to Facebook or Instagram, (Am. Compl. ¶ 102), Phhhoto's allegation that Meta attempted to poach Phhhoto's employees to thwart competition fails to survive Meta's motion to dismiss.

<u>**CONCLUSION**</u>

In sum, Phhhoto's claim under Section 2 of the Sherman Act monopoly maintenance claim survives Meta's motion to dismiss on the basis of Phhhoto's allegations of (1) Meta's termination of Phhhoto's access to Instagram's Find Friends API, (2) Meta's release of the Boomerang app, and (3) Meta employing its new newsfeed algorithm to suppress Phhhoto on the newsfeeds of Facebook and Instagram users.  These allegations may proceed to discovery, and the parties are respectfully referred to the Magistrate Judge. Meta's motion to dismiss is **DENIED.**

**So ordered.**

Dated:     March 30, 2026
           Brooklyn, New York     _____
                                  **Kiyo A. Matsumoto**
                                  United States District Judge
                                  Eastern District of New York

42